**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| AVAYA, INC., | : | |
| | : | |
| Plaintiff, | : | Civ. No. 06-2490 (GEB) |
| | : | |
| v. | : | **MEMORANDUM OPINION** |
| | : | |
| TELECOM LABS, INC., TEAMTLI.COM | : | |
| CORP., CONTINUANT, INC., SCOTT | : | |
| GRAHAM, DOUGLAS GRAHAM, and | : | |
| BRUCE SHELBY, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**BROWN, Chief Judge**

    This matter comes before the Court upon the motion of defendants/counterclaimants

Telecom Labs Inc. ("TLI") and Continuant, Inc. ("Continuant," collectively "Counterclaimants")

for leave to file Second Amended Counterclaims against plaintiff/counterclaim defendant Avaya,

Inc. ("Avaya") [Docket No. 83].   This Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 1331, 1332.  The Court has considered the parties' submissions and decided the matter

without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth

below, this Court will grant in part and deny in part Counterclaimants' motion.

I.      **BACKGROUND**[1]

    A.    **Procedural History**

---

[1]The facts of this case are fully set forth in this Court's Memorandum Opinion entered on
August 29, 2008 [Docket No 59].  Familiarity with such facts and terms defined therein is
assumed.

This suit began on June 2, 2006 when Avaya filed a complaint against Counterclaimants and TeamTLI.com Corp. ("Team") alleging, among other things, that TLI, Team and Continuant gained unauthorized access to Avaya systems.  In its original complaint, Avaya asserted ten causes of action.  On July 14, 2008, Avaya filed a Third Amended Complaint, which added three new causes of action.

**1.      The First Amended Counterclaims**

On March 14, 2008, TLI and Continuant filed their Amended Counterclaims and Jury Demand (the "First Amended Counterclaims").   The First Counterclaims consist of ten causes of action: (1) monopolization in violation of Section 2 of the Sherman Act; (2) conspiracy to monopolize in violation of Section 2; (3) attempted monopolization in violation of Section 2; (4) tying the receipt of patches and upgrades for the Definity systems to the purchase of service and maintenance in violation of Section 1 of the Sherman Act; (5) tying the receipt of patches and upgrades for Avaya's PDS systems to the purchase of service and maintenance in violation of Section 1; (6) illegal conspiracy in violation of Section 1; (7) tortious interference with business/contractual relations; (8) tortious interference with a prospective business or economic advantage; (9) injurious falsehood/trade libel or slander; and (10) breach of implied covenant of good faith and fair dealing.

The first six of the First Amended Counterclaims concern alleged violations of the Sherman Act, 15 U.S.C. §§ 1-7.  Five of the counterclaims concern the market for PBX service and maintenance.  One counterclaim concerns the market for PDS service and maintenance.

**a.      PBX-Related Counterclaims**

2

### (1)    Section 2 Monopolization Counterclaim

Counterclaimants alleged that Avaya has monopolized, conspired to monopolize and attempted to monopolize the relevant market consisting of "post-warranty service and maintenance for Avaya Definity systems, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts [in] the United States."  (First Amended Counterclaims ¶¶ 296.)  Counterclaimants alleged that there are "no reasonably interchangeable substitutes for the service and maintenance of . . . Avaya Definity equipment or [the] purchase of maintenance contracts."  (*Id*. at ¶ 296.) Counterclaimants allege that "[d]issatisfied Avaya PBX owners . . . . are 'locked into' their PBX purchases" due to "extremely high switching costs . . . and . . . the PBX's extremely long useful life."  (*Id*. at ¶ 297.)  Moreover, Counterclaimants alleged that "customers were not, at the time they purchased their systems, able to accurately predict the life-cycle cost of their system and compare it to the cost of purchasing a competitor's system."  (*Id*. at ¶ 298.)

Counterclaimants also asserted that Avaya has "at least 60 percent" of the market share in the relevant market and so has market power due to this market share, its control over the logins, parts and upgrades, its proven ability to exclude third party servicers and its ability to charge supra-competitive prices.  (*Id*. at ¶¶ 8, 300.)  Allegedly, Avaya's monopoly power was acquired and maintained through intentional exclusionary conduct,  including "tying and bundling maintenance to crucial patches and upgrades; filing this lawsuit containing meritless and pretextual intellectual property claims; making false and defamatory statements about Counterclaimants to customers and others; threatening customers who use, or are considering using, Counterclaimants' maintenance services; and constantly shifting its policies with regard to

customers and ISPs' ability to access the customers' Avaya systems, the pricing of access to logins needed to self-maintain their products, and the customers' use of independent, 'unauthorized,' maintenance providers." (*Id.* ¶¶ at 300-01, 303-05.)

### (2)    Section 2 Attempted Monopolization Counterclaim

Counterclaimants also alleged that "Avaya specifically intends to eliminate or foreclose competition in the Relevant Markets through the tactics described above." (*Id.* at ¶ 324.)   The Counterclaims stated that "[a]bsent action by this Court . . . there is a dangerous probability that Avaya will succeed in obtaining a monopoly in the Relevant Markets." (*Id.* at ¶ 328.)

### (3)    Section 2 Conspiracy to Monopolize Counterclaim

Counterclaimants further alleged that "Avaya's conduct . . . has been undertaken not only individually but also in concert with, and pursuant to agreements with, its co-conspirator BusinessPartners." (*Id.* at ¶ 316.) Counterclaimants alleged that "Avaya's and its co-conspirators' monopoly power" is evidenced by their collective market share, which is "over 90% of sales in the relevant market." (*Id.*)

### (4)    Tying in Violation of Section 1

Counterclaimants alleged that, in violation of Section 1, "Avaya has orchestrated a horizontal conspiracy involving certain of its BusinessPartners, distributors of certified Avaya parts, and others to allocate the maintenance and service business of Definity owners, to restrict the output of available maintenance and service, and, as a result, to fix and raise the prices of maintenance and service paid by owners." (*Id.* at ¶ 355.)   Counterclaimants asserted that this is a *per se* illegal conspiracy, and is also illegal under the rule of reason. (*Id.* at ¶ 357.)

### b.    PDS Counterclaim: Tying in Violation of Section 1

4

The Counterclaimants also alleged that Avaya was able to use its market power in PDS system patches and upgrades to force PDS owners to "choose Avaya maintenance and service over that of lower cost or better quality ISPs."  (*Id.* at ¶ 349.)  The First Amended Counterclaims specified that "[f]or purposes of this claim the relevant . . . market . . . is the market for post-warranty service and maintenance of PDS systems purchased from Avaya."  (*Id.* at ¶ 342.) Counterclaimants asserted that this market is separate from the "primary U.S. market for the sale of PDS systems" and that "[t]here are no reasonably interchangeable substitutes" for such service and maintenance.  (*Id.*)  Counterclaimants stated that "virtually all, if not all, owners of Avaya PDS systems are 'locked into' their PDS purchases" due to high switching costs and the platform's long useful life.  (*Id.* at ¶ 343.)  Moreover, according to the First Amended Counterclaims, the PDS customers were, for various reasons, unable to predict the "life-cycle cost" for their PDS system.  (*Id.* at ¶ 344.)   The Counterclaims stated that the PDS patches and upgrades "are uniquely desirable and critical for the proper functioning" of the Avaya PDS systems and that "Avaya is the *only* source" for the patches and upgrades.  (*Id.* at ¶ 349 (emphasis in original)  The Counterclaimants contended that the tying is unlawful per se and unlawful under the Rule of Reason.  (*Id.* at ¶ 351.)

### 2.      Avaya's Motion to Dismiss

On April 18, 2008, Avaya filed a motion to dismiss the first six causes of action in the First Counterclaims. [Docket No. 45.] In a Memorandum Opinion and Order entered August 29, 2008 [Docket No. 59] ("Memorandum Opinion"), this Court granted in part and denied in part Avaya's motion.

### a.      PBX First Amended Counterclaims

### (1)     Relevant Market

The Court held that Counterclaimants had sufficiently pled a plausible relevant market. (Mem. Op. at 18-23.)  The Court noted that "[t]he Counterclaims state that the relevant product market for the PBX-related counterclaims is "the post-warranty service and maintenance for Avaya Definity systems, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts." (*Id.* at 18-19 (First Amended Counterclaims at ¶ 296.)) The Court then held that "it is plausible that the purchasers in the PBX primary market relied on the ISPs' allegedly lower cost and higher quality service and maintenance alternative when purchasing the Definity system."  (Mem. Op. at 22).  The Court further held that it is plausible that when Avaya made changes to its policies in March, 2005 regarding MSP usage so as to make it cost prohibitive for the Definity system owners to use an ISP in this manner, Avaya was making a policy change that targeted "locked-in" Definity system owners and in so doing violated antitrust law. (*Id.*)

### (2)     Section 2 Monopolization

The Court denied Avaya's motion with respect to the counterclaims asserting monopolization.  (*Id*. at 23-26.)   Quoting *Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 483 n. 32 (1992), the Court reasoned that while ""[i]t is true that as a general matter a firm can refuse to deal with its competitors . . . such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal.'" (*Id.* at 25 (citation omitted.))  As such, the Court held that Counterclaimants had alleged facts sufficient to survive a motion to dismiss with respect to whether Avaya had a legitimate business justification for excluding ISPs from the market for service and maintenance of Definity systems. (*Id.* at 25-26.)

### (3)     Section 2 Attempted Monopolization

Noting that Avaya's only argument with respect to this counterclaim was that Counterclaimants failed to allege a plausible relevant market and having previously dispensed of this assertion, the Court also denied Avaya's motion with respect to the attempted monopolization counterclaims.  (*Id.* at 26.)

### (4)     Section 2 Conspiracy to Monopolize

With respect to the counterclaims alleging that Avaya had conspired to monopolize with its BusinessPartners, the Court granted Avaya's motion, holding that Counterclaimants had not alleged facts sufficient to support a finding that the BusinessPartners had a specific intent to monopolize. (*Id.* at 26-28.)

### (5)     Section 1 Tying Counterclaim

This Court also granted Avaya's motion to dismiss the counterclaims relating to tying in violation of Section 1 of the Sherman Act, in which Counterclaimants alleged that "Avaya has conditioned the purchase or receipt of patches and upgrades for Avaya Definity systems (the 'tying products') on the purchase of service and maintenance for Avaya Definity systems, (the 'tied products')."  (*Id.* at 28 (quoting First Amended Counterclaims at ¶ 334). ) In so doing, the Court held that: (1) Counterclaimants had not alleged facts to support a plausible relevant market encompassing the two tying products: patches and upgrades; (2) Counterclaimants had defined patches and upgrades differently; (3) and therefore there is no indication that they are reasonably interchangeable.  (*Id.* at 30.)

### (6)     Illegal Conspiracy in Violation of Section 1

The Court also addressed Counterclaimants' Section 1 conspiracy counterclaim, which

alleged that Avaya had "orchestrated a horizontal conspiracy involving certain of its BusinessPartners, distributors or certified Avaya parts, and others to allocate the maintenance and service business of Definity owners, to restrict the output of available maintenance and service and, as a result, to fix and raise the prices of maintenance and service paid by owners." (*Id.* at 37 (citing First Amended Counterclaims at ¶ 355.))  Counterclaimants argued that this was a *per se* illegal conspiracy, but that in the event the Court concludes that it is not *per se* unlawful, it is nevertheless an illegal conspiracy under the rule of reason. (*Id.* at 37 (citing First Amended Counterclaims at  ¶ 357.))

The Court rejected Avaya's argument that the alleged conspiracy should be treated as a *per se* violation, reasoning that the alleged restraint involves not only a dual distributor relationship between the dealers in the PBX system sales market, but also a horizontal arrangement in the service and maintenance aftermarket. (Mem. Op. at 32-33.)   In so holding, the Court noted that it had not found any Third Circuit cases that involve both a dual distributor arrangement in a primary market and a horizontal relationship in a plausible relevant aftermarket. (*Id*. at 33.)  However, the Court stated that, in *Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986), Ninth Circuit held that the alleged conspirators were in a "hybrid" arrangement composed of both a dual distributorship and a horizontal relationship.  (*Id*. at 33-34 (citing *Dimidowich*, 803 F.2d at 1480-81.)) The Court then noted that, in *Dimidowich*, the Court reasoned that it did "'not have enough experience with [hybrid] arrangement[s] to say with any confidence that a concerted refusal to deal in this context almost always will be anticompetitive'" and so concluded that "'[b]ecause of the vertical element of the alleged 'hybrid' agreement, the restriction in the service market may well result in the same type of significant procompetitive

effects in the product market as do restrictions in the context of a dual distributorship'" and therefore a rule of reason analysis would be appropriate.  (Mem. Op. at 34 (citing *Dimidowich*, 803 F.2d at 1481.))

Turning to the instant case, the Court agreed with the reasoning in *Dimidowich*, noting that there was a dual distributor arrangement in the market for PBX systems and a horizontal relationship in the service and maintenance aftermarket. (Mem. Op. at 34.)  The Court further reasoned that, "[l]ike the Ninth Circuit, this Court does not have enough experience with this type of arrangement to say that it will almost always be anticompetitive." (*Id.*)  As such, the Court concluded that a rule of reason analysis was appropriate.

The Court then rejected Avaya's argument that the conspiracy allegations with respect to Avaya and its BusinessPartners are not sufficiently particularized but also held that, to the extent Counterclaimants alleged the conspiracy extends to parties other than Avaya and its BusinessPartners, the counterclaim is dismissed. (*Id.* at 34-35.)

**b.       PDS First Amended Counterclaim**

The Court also granted Avaya's motion with respect the First Amended PDS Counterclaim, which alleged that Avaya engaged in tying of the receipt of patches and upgrades for Avaya's PDS systems to the purchase of service and maintenance in violation of Section 1. (*Id.* at 36-37.)  The Court held that this counterclaim fails for the same reason the tying claim relating to PBX systems failed.  (*Id.* at 37.)  The Court further concluded that this counterclaim also fails because the Counterclaimants only factual allegations regarding "upgrades" relate to PBX platforms, not PDS platforms.  (*Id.*)

**3.       The Instant Motion**

Counterclaimants assert that, pursuant to the parties' agreement during a January 14, 2009 status conference before Magistrate Judge John J. Hughes, counsel for Counterclaimants sent Avaya's counsel a draft of Counterclaimants' Proposed Second Amended Counterclaims ("Proposed Counterclaims", attached as Exh. A to Decl. of David S. Kwon ("Kwon Decl.") [Docket No. 83-3]) by e-mail dated January 21, 2009. (Counterclaimants' Br. at 17 [Docket No. 83-2] (citing Kwon Decl. at ¶ 4).)  Counterclaimants allege that Avaya's counsel responded by e-mail on February 2, 2009, stating that Avaya did not object to Counterclaimants' reassertion of counterclaims asserted in the First Proposed Counterclaims that had not yet been dismissed, but declined to consent "at this time to Defendants' reassertion of counterclaims already dismissed or to Defendants' assertion of new counterclaims in this draft pleading." (Counterclaimants Br. at 17 (citing Kwon Decl. at ¶ 5).)  As such, Counterclaimants filed their Motion for Leave to File Second Amended Counterclaims on March 1, 2009. [Docket No. 83]. The matter was fully briefed as of March 31, 2009.[2]

### B.   The Proposed Counterclaims

Counterclaimants state that they seek leave to amend their counterclaims for two reasons: (1) to "amend and amplify their claims that Avaya engaged in illegal tying both in connection with Avaya [PBX] systems and, separately, Avaya [PDS systems]" in order to "cure the deficiencies cited by this Court in dismissing, without prejudice, Counterclaimants' claims of Illegal Tying in violation of Section 1"; and (2) "to assert new causes of action for monopolization and attempted monopolization in connection with maintenance and service of

---

[2]The Court notes that Counterclaimants' motion for partial summary judgment, filed on February 4, 2009 is also currently pending. [Docket No. 71.] This Court will address that motion in a separately filed memorandum opinion.

Avaya PDS [systems]."  (Counterclaimants' Br. at 1.)  As such, Counterclaimants assert that the

Amended Counterclaims otherwise re-plead, in substantially identical form, those causes of

action that this Court declined to dismiss in the Memorandum Opinion, namely: (1) the Section

2 monopolization and attempted monopolization counterclaims with respect to the PBX

systems; (2) the Section 1 illegal conspiracy counterclaim with respect to the PBX systems; and

(3) the various state law counterclaims.  (*Id*. at 8.)  Counterclaimants also assert that they do not

seek to re-plead the Section 2 conspiracy to monopolize counterclaim with respect to the PBX

systems, which the Court dismissed in the Memorandum Opinion.  (*Id.*)

### 1.    The Re-pleaded Counterclaims- *Per Se* Allegations in Section 1 Illegal Conspiracy Counterclaims

Counterclaimants seek to re-plead its counterclaim alleging that Avaya has engaged in

an illegal conspiracy under Section 1 of the Sherman Act with respect to PBX systems by

"orchestrat[ing] a horizontal conspiracy involving certain of its BusinessPartners, distributors of

certified Avaya parts, and others to allocate the maintenance and service business of Definity

owners, to restrict the output of available maintenance and servicing, and, as a result, to fix and

raise the prices of maintenance and service paid by owners." (Proposed Counterclaims at ¶ 419.)

As such, Counterclaimants also reassert that such actions constitute a *per se* illegal conspiracy,

or in the alternative, an unlawful restraint on trade under the rule of reason. (*Id.* at ¶¶ 420-21.)

### 2.    The Revised Counterclaims- Section 1 Tying Counterclaims

Counterclaimants also seek to amend the First Amended Counterclaims in so far as they

allege that Avaya engaged in tying with respect to both the PBX and PDS systems in violation

of Section 1 of the Sherman Act.[3]  For both of these systems, Counterclaimants now assert separate and distinct causes of action for tying of patches to maintenance and the tying of upgrades to maintenance. (*Id*. at ¶¶ 343-67, 393-417.)

> a.    **Proposed Section 1 Tying Counterclaims- PBX Systems**

With respect to patches, Counterclaimants state that "[t]he provision of maintenance and service for Definity . . . equipment (including software) is a separate product from patches for Definity . . . equipment" and that "Avaya has conditioned the purchase or receipt of non-systems critical patches for Definity and other ECG Platform equipment (the 'tying products') on the purchase of service and maintenance for Definity  . . . equipment (the 'tied products') from Avaya and its BusinessPartners."  (*Id*. at ¶¶ 345, 348.)  Counterclaimants further allege that "Avaya has told customers that if they obtain maintenance or service from ISPs classified by Avaya as 'unauthorized,' Avaya will not provide or sell them these patches." (*Id.* at ¶ 348.) Counterclaimants assert that this conditioning represents a change in Avaya's earlier policy of not imposing such restrictions and therefore Avaya systems purchasers could not have taken this tying into account when assessing the life-cycle cost of purchasing an Avaya system. (*Id.* at ¶ 349.) Counterclaimants also assert that Avaya is the only source for patches for the Definity systems. (*Id*. at ¶ 350.)

Counterclaimants also aver that patches vary in importance, with some being system critical, *i.e.* necessary for the proper functioning of the Avaya systems, while others are simply "uniquely desirable for the optimal performance of certain Avaya systems functions."  (*Id*. at ¶

---

[3] The Counterclaimants allegations with respect to tying and PBX systems are found at paragraphs 343 to 367 of the Proposed Counterclaims, while the allegations regarding tying and PDS systems are located at paragraphs 393 to 417 of the Proposed Counterclaims.

351.)  Counterclaimants allege that, "[b]ecause locked-in systems-owners desire to keep their systems functioning properly, and cannot reasonably anticipate whether their future need for patches will be system critical or non-system critical, locked-in systems-owners are compelled to purchase service and maintenance from Avaya or one of its chosen BusinessPartners."  (*Id*.)  As such, Counterclaimants state that Avaya "has market power in these products sufficient to coerce a substantial percentage of owners of Avaya Definity . . . equipment to purchase service and maintenance from Avaya or one of its chosen BusinessPartners", thereby effectively distorting and/or eliminating competition in the relevant markets by forcing customers to choose Avaya maintenance and service over lower cost and/or better quality maintenance and service offered by ISPs. (*Id*.)  Thus, Counterclaimants allege that Avaya's possession of market power in the tying products constitutes a per se violation or, in the alternative, is unlawful under the rule of reason. (*Id*. at ¶ 353.)

Counterclaimants make similar allegations with respect to upgrades and PBX systems. Specifically, Counterclaimants again allege that "[t]he provision of maintenance and service for Definity . . . equipment (including software) is a separate product from upgrades for Definity . . . equipment" and that "Avaya has conditioned the purchase of upgrades for Definity and other ECG Platform equipment (the 'tying products') on the purchase of mandatory software support –or maintenance –for Definity and other ECG Platform equipment (the 'tied products')".  (*Id*. at ¶¶ 358, 360.)  Similarly, Counterclaimants allege that "Avaya has told customers that, in order to purchase an upgrade to Avaya's latest release of PBX telecommunications software, the customer must purchase mandatory software support from Avaya." (*Id.* at ¶ 360.) Counterclaimants allege that, as with patches, this reflects a change in Avaya's earlier policy

and therefore most Avaya systems purchasers could not have taken the change in account when assessing the life-cycle costs of purchasing an Avaya system. (*Id.* at ¶ 361.)  Similarly, Counterclaimants also allege that Avaya is the only source for upgrades for Definity telecommunications systems and that there are no substitutes for these upgrades. (*Id.* at ¶ 362.)

Counterclaimants further assert that "[u]pgrades are uniquely desirable and are critical for locked-in systems owners seeking to maximize the life of their Avaya PBX platforms and equipment at state-of-the-art levels." (*Id.* at ¶ 363.)  Counterclaimants state that Avaya "seeks to force customers to consider purchasing software upgrades by making announcements about Avaya's end-of-life and/or end-of-support of older software versions, including announcements that, over time, Avaya would cease support for customers with older versions of its software." (*Id.*)  Therefore, Counterclaimants contend that Avaya the has market power in these products sufficient to coerce a substantial percentage of owners of Avaya Definity . . . equipment to purchase service and maintenance from Avaya and that this tying has the effect of distorting and/or eliminating competition in the relevant markets by forcing its customers to choose Avaya maintenance and service over lower cost and/or better quality maintenance and service offered by ISPs. (*Id.*)  Thus, Counterclaimants assert that Avaya's possession of market power in these tying products also constitutes a *per se* violation or, in the alternative, is unlawful under the rule of reason.  (*Id.* at ¶ 365).

### b.    Proposed Section 1 Tying Counterclaims- PDS Systems

With respect to PDS Systems, Counterclaimant Continuant's assertions regarding the tying of patches and upgrades are identical to Counterclaimants' allegations regarding PBX

systems. (*Id.* at ¶¶ 343-67, 393-417.)[4]  In addition to these allegations, the Proposed

Counterclaims also include new specific factual allegations regarding upgrades for the PDS

platforms.  Specifically, Counterclaimants now allege that: (1) Avaya also requires end-users or

owners of Avaya PDS equipment seeking to upgrade to the latest version of Avaya's PDS

Software, "Proactive Contact 4.0," to obtain mandatory software support from Avaya; (2) Avaya

refuses to provide support to end-users that utilize "unauthorized service providers"; (3) Avaya

is the only source for "Proactive Contact 4.0"; (4) there are no available substitutes for

"Proactive Contact 4.0"; (5) Avaya PDS end-users wishing to upgrade Avaya PDS software

must purchase Avaya's upgrades because Avaya's competitors' PDS software is not compatible

with Avaya's PDS equipment; and (6) the cost of upgrading Avaya PDS software is

significantly less than the cost of switching to an entirely different PDS system. (*Id.* at ¶¶

302-04.)

### 3.   New Counterclaims- Section 2 Monopolization and Attempted Monopolization With Respect to PDS Systems

Counterclaimant Continuant also asserts two new causes of action relating to Avaya's

PDS products under Section 2 of the Sherman Act: (1) monopolization of the aftermarket for

maintenance and service of the PDS systems; and (2) attempted monopolization of that same

aftermarket.  (*Id.* at ¶¶ 368-392.)

### a.   Section 2 Monopolization

Specifically, Continuant alleges that Avaya has monopolized and attempted to

---

[4]The Court notes that only Counterclaimant Continuant asserts the Fifth through Eighth
Causes of Action asserted in the Proposed Counterclaims. (Proposed Counterclaims ¶¶ 368-417.)

monopolize the relevant market consisting of "post-warranty service and maintenance for Avaya PDS equipment, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts [in] the United States."  (*Id*. at ¶ 369.)  Continuant asserts that there are "no reasonably interchangeable substitutes for the service and maintenance of . . . Avaya PDS equipment or [the] purchase of maintenance contracts."  (*Id*.) Continuant also avers that "[d]issatisfied Avaya PDX owners . . . . are 'locked into' their PDS purchases" due to "extremely high switching costs . . . and . . . the PDS' extremely long useful life."  (*Id.* at ¶ 370.) Moreover, Continuant alleges that "customers were not, at the time they purchased their systems, able to accurately predict the life-cycle cost of their system and compare it to the cost of purchasing a competitor's system."  (*Id.* at ¶ 371.)

Continuant alleges that Avaya has market power due to: (1) its market share in the relevant markets; (2) its control over the logins, parts and upgrades; (3) its proven ability to exclude third party servicers and; (4) its ability to charge supra-competitive prices.  (*Id.* at ¶ 373.)  Allegedly, Avaya's monopoly power was acquired and maintained through intentional exclusionary conduct.  (*Id*. at ¶¶ 373-74.)   The alleged conduct includes "tying and bundling maintenance to crucial patches and upgrades; filing this lawsuit containing meritless and pretextual intellectual property claims; making false and defamatory statements about Counterclaimants to customers and others; threatening customers who use, or are considering using, Counterclaimants' maintenance services; and constantly shifting its policies with regard to customers and ISPs' ability to access the customers' Avaya systems, the pricing of access to logins needed to self-maintain their products, and the customers' use of independent, 'unauthorized,' maintenance providers."  (*Id*. at ¶ 375.)

16

### b. Section 2 Attempted Monopolization

With respect to the attempt to monopolize counterclaim, Continuant alleges that "Avaya specifically intends to eliminate or foreclose competition in the Relevant PDS Markets through the tactics described above." (*Id.* at ¶ 388.)   Continuant states that "[a]bsent action by this Court . . . there is a dangerous probability that Avaya will succeed in obtaining a monopoly in the Relevant PDS Markets." (*Id.* at ¶ 392.)

## II.  DISCUSSION

### A.  Standard of Review

Federal Rule of Civil Procedure 15(a)(2) provides that, under the present circumstnaces, "a party may amend [its] pleading only with the opposing party's written consent or the Court's leave.  The Court should freely give leave when justice so requires."  The Supreme Court has identified several factors to be considered when applying Rule 15(a):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir. 1981), cert. denied, 455 U.S. 1018 (1982); *Newlin v. Invensys Climate Controls*, Civ. No. 05-5746 (RBK), 2006 U.S. Dist. LEXIS 61133, (D.N.J. August 16, 2006); *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004); *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000); *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204-05 (3d Cir. 2006) (stating that "leave to amend must generally be granted unless equitable

considerations render it otherwise unjust.")

Thus, while "Rule 15(a) gives the court extensive discretion to decide whether to grant leave to amend after the time for amendment as of course has passed," CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1486 (2d ed. 1990), Rule 15(a)'s "generous standard is tempered by the necessary power of a district court to manage a case" in light of the factors listed in *Foman*. *See Shivangi v. Dean Witter Reynolds, Inc*., 825 F.2d 885, 891 (5th Cir. 1987).

With respect to futility, "[it is] clear that an amendment would be futile when 'the complaint, as amended, would fail to state a claim upon which relief could be granted.'" *In re NAHC, Inc. Sec. Litig*., 306 F.3d 1314, 1332 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1434 (3d Cir. 1997); *see also Harrison Beverage Co. v. Dribeck Imps., Inc*., 133 F.R.D. 463, 468 (D.N.J. 1990), (reasoning that an amendment is futile if it "is frivolous or advances a claim or defense that is legally insufficient on its face," (citations and quotations omitted).) As such, "[i]n assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Burlington*, 114 F.3d at 1434 (citing *Glassman*, 90 F.3d at 623) (further citation omitted)).

### B.    Sherman Act

#### 1.    Section 1

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. "To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within

the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005).

To determine whether a particular action unreasonably restrains trade, courts have applied one of two different methods of analysis: (1) the *per se* rule; and (2) the rule of reason. Under the *per se* rule, certain categories of restraints are simply presumed to be unreasonable and no elaborate inquiry is necessary. *See, e.g., Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) ("*per se* rules are appropriate only for 'conduct that is manifestly anticompetitive'") (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977)). On the other hand, the rule of reason, which is the "prevailing standard," ordinarily requires the Court to engage in a detailed analysis of the effect that the restraint has on competition in a relevant market. *See Sylvania Inc.*, 433 U.S. at 49 (holding that the rule of reason typically requires a detailed examination "in light of the competitive situation in 'the product market as a whole'"); *United States v. Brown Univ.*, 5 F.3d 658, 672 (3d Cir. 1993) (holding that the rule of reason "ordinarily requires a detailed inquiry into the market impact of a restraint").[5]

---

[5]"[A] third standard that falls somewhere between the rule of reason and per se standards" is the "quick look" rule of reason. *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 n.6 (3d Cir. 1998). This method "applies in cases where per se condemnation is inappropriate but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint." *Gordon*, 423 F.3d at 209-210 (citing *Brown Univ.*, 5 F.3d at 669). Under the "quick look" method, "the competitive harm is presumed and the defendant must set forth some competitive justification for the restraints." *Id.* at 210. "[T]he quick look approach may be applied only when an observer with even a rudimentary understanding of economics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets." *Id.*

### 2.      Section 2

Section 2 of the Sherman Act provides as follows:

> Every person who shall monopolize, or attempt to monopolize, or combine or
> conspire with any other person or persons, to monopolize any part of the trade or
> commerce among the several States, or with foreign nations, shall be deemed
> guilty of a felony, and, on conviction thereof, shall be punished by fine not
> exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or
> by imprisonment not exceeding 10 years, or by both said punishments, in the
> discretion of the court.

15 U.S.C. § 2.  The "right to maintain a private cause of action for damages arising under

Section 2 of the Sherman Act flows from Section 4 of the Clayton Act."  *Schuylkill Energy*

*Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 413 (3d Cir. 1997).  Section

4 of the Clayton Act provides, in relevant part, that "any person who shall be injured in his

business or property by reason of anything forbidden in the antitrust laws may sue therefor in

any district court of the United States in the district in which the defendant resides or is found or

has an agent." 15 U.S.C. § 15(a).

To state a claim for monopolization under Section 2, a party must allege facts sufficient

to show: "(1) the possession of monopoly power in a relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth or development as a

consequence of a superior product, business acumen, or historical accident."  *Eastman Kodak*

*Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992) (citing *United States v. Grinnell*

*Corp.*, 384 U.S. 563, 570-71 (1966)).

To state a claim for attempted monopolization, a party must allege facts sufficient to

show: (1) predatory or anticompetitive conduct; (2) specific intent to monopolize; and (3) a

dangerous probability of achieving monopoly power. *Spectrum Sports v. McQuillan*, 506 U.S.

447, 456 (1993); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir.

1997).  "In order to determine whether there is a dangerous probability of monopolization,

courts have found it necessary to consider the relevant market and the defendant's ability to

lessen or destroy competition in that market."  *Spectrum Sports*, 506 U.S. at 456.

>C.    **Application**
>
>>1.    **The Re-pleaded Counterclaims- *Per Se* Allegations of the Section 1 Illegal Conspiracy Counterclaim**

Counterclaimants seek to re-plead their counterclaim alleging that Avaya has engaged in

an illegal conspiracy under Section 1 of the Sherman Act with respect to PBX systems and that

such actions constitute a *per se* illegal conspiracy. (Proposed Counterclaims at ¶¶ 419-421.)  In

so doing, Counterclaimants concede that, in the Memorandum Opinion, this Court "expressed

its view that it was appropriate to analyze Avaya's motion to dismiss the Illegal Conspiracy

claim under the Rule of Reason standard rather than the *per se* rule, and acknowledged a lack of

experience with or existing case law substantively addressing the type of arrangement under

consideration (a dual distributor arrangement in the market for the PBX system and a horizontal

relationship in the service and maintenance aftermarket), sufficient to conclude that such an

arrangement would almost always be anticompetitive under the *per se* rule."

(Counterclaimants' Br. at 23 (citing Mem. Op. at 32-33).)  However, Counterclaimants assert

that the Court "never indicated in its Memorandum Opinion that any Illegal Conspiracy claim

resting on the *per se* theory was dismissed as a matter of law, let alone dismissed

with prejudice." (Counterclaimants' Br. at 23.)  In so arguing, Counterclaimants note this

Court's reliance on *Dimidowich* and argues that such citation does not dictate a contrary

conclusion because *Dimidowich* was decided at the summary judgment stage, not the pleading

stage.  (*Id.* at 24 (citing *Dimidowich*, 803 F.3d at 1476).)  Further, Counterclaimants note that, in *Dimidowich*, the court held that "one justification for rule of reason analysis of restrictions in the context of a dual distributorship is that they provide corresponding benefits in the interbrand market," and that, in the instant case, there is no reason to infer that the dual distributorship arrangement will automatically confer a procompetitive benefit in the interbrand market for service and maintenance of Avaya systems because, in addition to the dual distributorship arrangement, Counterclaimants have also alleged horizontal restraints involving agreements between Avaya and its BusinessPartners to restrain competition in the service and maintenance aftermarket.  (*Id.* at 24 (citing  *Dimidowich*, 803 F.3d at 1481.))  In light of the foregoing, Counterclaimants argue that the Court should not deny them the opportunity to pursue this alternative theory of *per se* liability under Section 1 before discovery has concluded.  (*Id.* at 25.)

Avaya argues that Counterclaimants should not be permitted to reassert these allegations of *per se* liability because, in the Memorandum Opinion, the Court held that Counterclaimants could not pursue this claim and that, because Counterclaimants had failed to seek reconsideration of the Court's ruling in a timely fashion, the Court's ruling on the issue should not be disturbed.  (Avaya's Opp. at 6-7.)  Avaya further argues that, even if Counterclaimants had moved for reconsideration of the court's ruling in a timely fashion, their request would have been denied because they cannot show that: (1) new evidence is available; (2) supervening new law has been announced; or (3) the Court's decision was clearly erroneous and would create manifest injustice. (*Id.* (citing *In re Ins. Brokerage Antitrust Litig,*, No. MDL 1663, 2007 U.S. Dist. LEXIS 64767, at *53 (D.N.J. Aug. 31, 2007) (internal citations omitted.))

Avaya further argues that Counterclaimants arguments that the Court did not dismiss the *per se* claims are specious.  Avaya argues that Counterclaimants misconstrue the Court's language regarding its experience with dual distributorships, thereby ignoring Supreme Court precedent that "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if the courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." (Avaya's Opp. at 7-8 (quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (intenal citations omitted)).)  Avaya further asserts that Counterclaimants argument that *Dimidowich* is distinguishable because it was decided at the summary judgment stage is not relevant to the inquiry into the appropriateness of the application of the *per se* rule as a matter of law and further notes that similar *per se* claims have been dismissed by other courts under Rule 12(b)(6).  (*Id.* at 8-9 (citing *Bedi v. Hewlett-Packard Co.*, 2008 U.S. Dist LEXIS 102672, at *1-*7 (D. Mass. Nov. 17, 2008); *Spahr v. Treadway*, 2008 U.S. Dist. LEXIS 90079, at *14-*22 (E.D. Tenn. Aug. 20, 2008)).  Finally, Avaya also contends that Counterclaimants assert that Avaya must prove that any arrangement that Counterclaimants challenge is on balance "pro-competitive" in order to avoid *per se* treatment. (*Id.* at 9 (citing *Leegin*, 551 U.S. at 886 ("To justify a *per se* prohibition a restraint must have 'manifestly anticompetitive' effects." (further citations omitted)).)

The Court concludes that Counterclaimants cannot continue to assert its *per se* claims with respect to its counterclaim alleging an illegal conspiracy in violation of Section 1 because this Court held, as a matter of law, that the alleged conspiracy between Avaya and its BusinessPartners should not be treated as a *per se* violation.  (Mem. Op. at 32-33.)  While it is

true that the Memorandum Opinion does not explicitly state that Avaya's motion to dismiss was granted with respect to Counterclaimants' *per se* claims, the Court nevertheless clearly concludes that the "alleged conspiracy should not be treated as a *per se* violation" and instead "a Rule of Reason analysis is appropriate." (*Id.* at 32, 34.)  This assessment is a legal conclusion, which cannot be disturbed under the law of the case doctrine, which instructs courts to adhere to decisions of law, once made, throughout the course of a case in the absence of "extraordinary circumstances." *See, e.g., In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998); *United States v. Kikumura*, 947 F.2d 72, 77 (3d Cir. 1991). Such extraordinary circumstances include instances where: (1) new evidence is available; (2) supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice. *City of Phila*, 158 F.3d at 718 (further citations omitted). Here, Counterclaimants do not allege the presence of any of these "extraordinary circumstances."  As such, the Court holds that Counterclaimants' motion for leave to amend is denied with respect to their *per se* claims asserted in the Proposed Counterclaims alleging illegal conspiracy in violation of Section 1 of the Sherman Act.

### 2.      The Revised Counterclaims- Section 1 Tying Counterclaims

Counterclaimants argue that the Court should permit them to amend the First Amended Counterclaims in so far as they allege that Avaya engaged in tying in violation of Section 1 with respect to both the PBX and PDS systems.  Counterclaimants assert that these proposed amendments address and resolve the issues cited by the Court in its dismissal of the Illegal PBX and PDS Section 1 Tying claims without prejudice in the Memorandum Opinion. (Counterclaimants' Br. at 26 (quoting *Borelli v. City of Reading*, 532 F.2d 950, 951 (3d. Cir. 1976) (reasoning that a district court's order dismissing a pleading, without prejudice, includes

24

an "implicit invitation to amplify the complaint,"even if the order does not mention

amendment.)); Mem. Op. at 30, 37.)

### a. PBX Systems

With respect to PBX systems, Counterclaimants assert that they seek to address the

Court's holding that they had failed to allege facts sufficient to support a plausible relevant

market encompassing the two tying products: patches and upgrades. (Counterclaimants' Br. at

26 (citing Mem. Op. at 30).)  Counterclaimants note the Court held that Counterclaimants had

"defined patches and upgrades differently and there is no indication that they are reasonably

interchangeable."  (Counterclaimants' Br. at 27 (citing Mem. Op. at 30).)

Counterclaimants assert that the Proposed Counterclaims directly address "an issue of

apparent confusion caused by Counterclaimants' prior inclusion of patches and upgrades in the

same cause of action." (Counterclaimants' Br. at 27.)  Counterclaimants state that they did not

intend to allege that patches and upgrades are interchangeable.  (*Id*.)  Instead, Counterclaimants

assert that they believe that they have separate and independent cause of actions: (1) for tying of

patches to maintenance and (2) tying of upgrades to maintenance. (*Id*. at 27-28.)

Counterclaimants purportedly seek to clarify this fact in the Proposed Counterclaims by

asserting separate and distinct tying causes of action for patches and upgrades, respectively. (*Id.*

at 28.)

Counterclaimants contend that the Proposed Counterclaims also allege that: (1) Avaya

has "tremendous market power" over both patches and upgrades because Avaya is the only

source for patches and upgrades for such Avaya PBX systems; (2) by virtue of its market power

over these products, Avaya has been effective at coercing a significant number of Avaya PBX

owners to purchase service and maintenance from Avaya and/or its BusinessPartners (for

patches) or software support or maintenance from Avaya (for upgrades); (3) the product markets

for each of these products are separate and distinct from the product market for maintenance and

service of Avaya systems; and (4) there is sufficient customer demand that Avaya can sell or

furnish both produces separately from maintenance and service and that there is no

countervailing technological reason that would require the products to be sold together. (*Id*. at

28-29.)

   In contrast, Avaya argues that Counterclaimants should not be permitted to amend their

Section 1 Tying Claims because such amendments fail to state a claim upon which relief could

be granted and therefore are futile. (Avaya's Opp. at 10 (citations omitted).)   With respect to

patches, Avaya argues that "Counterclaimants' principal complaint is that Avaya's July 1, 2005

Service Bulletin provided that 'Product Correction Notices ('PCNs') of a *non-system critical*

*nature* would no longer be available without an Avaya maintenance contract.'" ((*Id.* at 13

(quoting Proposed Counterclaims at ¶ 238 (emphasis added)).)   Thus, Avaya contends that the

purported tying market is a "single-brand aftermarket for non-critical patches for the software

embedded on Avaya PBXs" and that Counterclaimants do not allege that Avaya PBX owners

that deal with unauthorized service providers are denied access to any "necessary" patches.

(Avaya's Opp. at 13.)   According to Avaya, because Counterclaimants do not allege that Avaya

limited access to "necessary" patches, their market definition fails because Counterclaimants

cannot plausibly assert that any PBX owner ever relied on unrestricted availability of non-

critical patches when determining whether to purchase an Avaya PBX system.  (*Id.* at 12-13.)

   Avaya further argues that these Proposed Counterclaims are futile because

Counterclaimants only allege that Avaya PBX owners "reasonably believed," based on Avaya's prior practices, that they are entitled to non-critical patches  regardless of whether they use an ISP to perform maintenance.  (*Id*. at 14.)  Avaya argues that "[w]hether or not any Avaya PBX 'owner' had the 'belief' that Counterclaimants attribute to all 'owners' and whether or not this belief was 'reasonable' are immaterial. (*Id.*)  Instead, Avaya contends, Counterclaimants must assert "plausible allegations that the 'owners' relied on some assessment of the likelihood of the availability of desirable non-critical patches *and* somehow factored this assessment in their life cycle costing, or cost of ownership analysis, *at the time of their Avaya PBX system purchases*." (*Id.* at 14-15 (emphasis in original).)

The Court concludes that Counterclaimants have put forth sufficient allegations to state a claim upon which relief could be granted, and so the proposed counterclaims relating to tying patches and PBX systems are not futile. *Burlington*, 114 F.3d at 1434.  "Tying is defined as selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp*., 959 F.2d 468, 475 (3d Cir. 1992) (*en banc*); *see also Allen-Myland, Inc. v. International Business Machines Corp*., 33 F.3d 194, 200 (3d Cir. 1994).  "The antitrust concern over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not." *Queen City Pizza*, 124 F.3d at 442-43 (quoting *Town Sound,* 959 F.2d at 475).

 "Even if a seller has obtained a monopoly in the tying product legitimately (as by obtaining a patent), courts have seen the expansion of that power to other product markets as illegitimate and competition suppressing." *Town Sound*, 959 F.2d at 475.  As such, tying

requires "appreciable economic power" in the tying product market. *Harrison Aire, Inc. v. Aerostar Int'l*, 423 F.3d 374, 385 (3d Cir. 2005)  (citing *Kodak*, 504 U.S. at 464; *Brokerage Concepts v. U.S. Healthcare, Inc*., 140 F.3d 494, 516-17 (3d Cir. 1998)).

"The first inquiry in any § 1 tying case is whether the defendant has sufficient market power over the tying product, which requires a finding that two separate product markets exist and a determination precisely what the tying and tied products markets are." *Queen City Pizza*, 124 F.3d at 443 (citing *Allen-Myland*, 33 F.3d at 200-201).  Here, Counterclaimants have alleged that the "[t]he provision of maintenance and service for Definity . . . equipment (including software) is a separate product from patches for Definity . . . equipment" and that "Avaya has conditioned the purchase or receipt of non-systems critical patches for Definity and other ECG Platform equipment (the 'tying products') on the purchase of service and maintenance for Definity . . . equipment (the 'tied products') from Avaya and its BusinessPartners." (*Id.* at ¶¶ 345, 348.)   Further, Counterclaimants have also put forth sufficient allegations that patches are a distinct and separate product from the provision of maintenance and service for Avaya PBX systems.  (*Id*. at ¶ 346. "There is sufficient consumer demand for maintenance and service of Avaya's Definity and other ECG Platform equipment so as to render it efficient for Avaya to sell or furnish separately patches for those systems on the one hand and the maintenance and service of that equipment on the other hand, and there is no technological reason why these products cannot be sold or provided separately.") Counterclaimants have also alleged that Avaya has market power over patches in that: (1) patches are only available from Avaya (*i.e.*, that Avaya has a 100% market share); (2) patches are unique (*i.e.*, there are no available substitutes); (3) they are uniquely desirable to ensure proper functioning of Avaya

PBX systems; (4) Avaya has been successful in forcing locked-in customers to accede to the tie-in of patches to service and maintenance; and, (5) that those locked-in customers have, as a result, paid supra-competitive prices for service and maintenance inferior to that available from ISPs. (*Id.* at ¶¶ 11, 241, 350, 351, 352.)

Avaya's arguments to the contrary are unavailing.  As Counterclaimants note, they did not limit the aftermarket to non-critical patches as Avaya contends. (Avaya's Opp. at 12-13.)  Rather, Counterclaimants allege that the aftermarket includes both critical and non-critical patches. (Proposed Counterclaims at ¶¶ 344, 351.)  Further, such a distinction between critical and non-critical patches is immaterial.  Counterclaimants have alleged that locked-systems owners cannot reasonably anticipate whether their future need for patches will be system critical or non-system critical, and so are compelled to purchase service and maintenance from Avaya or one of its chosen BusinessPartners and that this contributes to Avaya's market power over the patches. (*Id*. at ¶ 351.)  Additionally, even if the aftermarket were limited only to non-critical patches, the fact remains that Counterclaimants have sufficiently alleged that Avaya PBX purchasers could not obtain these non-essential patches without also committing to purchases maintenance and service for their PBX systems from Avaya or its BusinessPartners.

The Court also rejects as irrelevant Avaya's argument that these Proposed Counterclaims are futile because Counterclaimants failed to allege "plausible allegations" that Avaya PBX owners relied on and factored into their assessment of lifecycle costing of a PBX system the availability of critical and non-critical patches.  (Avaya's Opp. at 14-15.)  As Counterclaimants note, Avaya has cited to no case law for the proposition that "[w]hether or not any Avaya PBX 'owner' had the 'belief' that Counterclaimants attribute to all 'owners' and whether or not this

belief was 'reasonable' are immaterial."  (Counterclaimants' Rep. at 9; Avaya's Opp. at 14-15.)

The Court concludes that, at this stage, it is sufficient for Counterclaimants to allege that

Avaya's prior practices with respect to the availability of patches would lead owners or end-

users of Definity systems to reasonably believe that they are entitled to and will receive patches

for the systems they have purchased from Avaya, irrespective of whether they use an ISP to

perform maintenance. (*See* Proposed Counterclaims at ¶ 240.)

As such, Counterclaimants' motion for leave to amend is granted with respect to the

Proposed Counterclaims asserting Section 1 Tying violations regarding patches in PBX systems.

With respect to upgrades of PBX systems, Avaya argues that Counterclaimants "do not

and cannot plausibly allege that, when deciding whether to purchase an Avaya PBX system, any

purchaser ever relied on the fact that it would in the future be able to obtain an upgrade to CM

5.0 software without buying software support from Avaya." (*Id*. at 16.)  As support, Avaya notes

that Counterclaimants allege that, when Avaya released the CM 5.0 PBX system in late 2007, it

announced a new policy in which Avaya separated its offers for service and maintenance

contracts for software versus hardware and required owners to purchase a software maintenance

agreement from Avaya in order to obtain an upgrade to CM 5.0 or purchase CM 5.0 as part of a

new systems sale. (*Id*. at 17 (citing Proposed Counterclaims at ¶ 292).)  Avaya further notes that

Counterclaimants point to the policy change that took place on July 1, 2005 to allege that a

"Definity owner who uses an ISP for maintenance, including hardware is effectively prohibited

from upgrading to CM 5.0, even if the Definity owner is willing to purchase [the software

maintenance agreement]." (Avaya's Opp. at 18. (quoting Proposed Counterclaims at ¶ 295).)

Avaya asserts that, in light of such allegations, it is unreasonable to infer that any customer

30

relied on the fact that Avaya would release the CM 5.0 software upgrade without requiring the purchase of support at the time of purchasing an Avaya PBX because: (1) prior to late 2007, no PBX owner could have known that Avaya would release the CM 5.0 software upgrade; and (2) the policy change announced by Avaya in July 2005 occurred more than two years before Avaya released CM 5.0.. (Avaya's Opp. at 18.)  Thus, Avaya argues that there is no likelihood that an Avaya purchaser factored the costs of the CM 5.0 software upgrade in its lifecycle cost analysis. (*Id.*).

Avaya further asserts that Counterclaimants allege that Avaya also requires the purchase of CM 5.0 software support in order to obtain an upgrade to CM 5.0 or to purchase that software as a part of a new systems sale. (*Id*. at 19 (quoting Proposed Counterclaims at ¶¶ 291-92).) Avaya argues that it follows from this statement that "any requirement that the purchasers of a new CM 5.0 system or the software upgrade also purchase Avaya software was implemented as a business strategy for the interbrand market, in which it competes with the other original equipment manufacturers ("OEMs") in the sale of PBX systems." (Avaya's Opp. at 19.)

Additionally, Avaya contends that Counterclaimants' proposed tying market of only CM 5.0 software upgrades also fails because it does not include PBX systems manufactured by Avaya's competitors and therefore "'clearly does not encompass all interchangeable substitute products." (Avaya's Opp. at 19 (quoting *Queen City Pizza*, 124 F.3d at 436).)  Finally, Avaya contends that these Proposed Counterclaims are futile because "there is no tied product" since Counterclaimants fail to sufficiently allege that software support for the upgrade is a relevant aftermarket separate from the upgrade itself or that Counterclaimants can provide or have ever provided software to support the upgrade. (Avaya's Opp. at 20)  Avaya argues that

Counterclaimants assertion that Avaya will decline to provide software support to a purchaser of the CM 5.0 software upgrade under the July 1, 2005 policy change is "no more than an assertion that Avaya's alleged 'policy change' applies to its CM 5.0 PBX system and accompanying software- the core of Counterclaimants' monopolization claim." (*Id.* at 21.)

The Court concludes that Counterclaimants have put forth sufficient allegations to state a claim upon which relief could be granted, and so the proposed counterclaims relating to tying upgrades and PBX systems is not futile. *Burlington*, 114 F.3d at 1434.  As with its allegations with respect to patches, Counterclaimants have alleged that "[t]he provision of maintenance and service for Definity . . . equipment (including software) is a separate product from upgrades for Definity . . . equipment" and that "Avaya has conditioned the purchase of upgrades for Definity . . . equipment (the 'tying products') on the purchase of mandatory software support –or maintenance –for Definity . . . equipment (the 'tied products')." (Proposed Counterclaims at ¶¶ 358, 360.)  Further, they have sufficiently asserted that Avaya has market power over upgrades in that Counterclaimants allege that: (1) upgrades are only available from Avaya (*i.e.*, that Avaya also has a 100% market share over upgrades); (2) upgrades are unique (*i.e.*, there are no available substitutes); (3) upgrades are critical in allowing systems owners to maximize the useful life of their systems; and (4) Avaya has been successful in coercing locked-in customers to accede to the tie-in of upgrades to service and maintenance. (*Id.* at ¶¶ 12, 300, 362, 363.)

Avaya's contentions that Counterclaimants' allegations do not sufficiently set forth that PBX owners relied on the future availability of software upgrades when deciding whether to purchase an Avaya PBX system is belied by the Proposed Counterclaims.  Specifically, Counterclaimants allege that "[u]ntil recently, Avaya has never refused to sell upgrades to

customers of ISPs," but that now Avaya has "shifted its policies regarding the conditions under which it would make these unique and desirable upgrades available." (Proposed Counterclaims at ¶ 12.)  Further, Avaya's argument that Counterclaimants proposed tying market fails because it does not include PBX systems manufactured by Avaya's competitors and therefore does not encompass all interchangeable substitute products is similarly unavailing because Counterclaimants are asserting that Avaya PBX system owners are locked into using upgrades rather than replacing their systems and that this fact demonstrates that upgrades are a separate market in which Avaya has market power.  (*Id*. at ¶ 12, 300, 362, 363.)  As such, Counterclaimants are alleging that there are no reasonably interchangeable products for upgrades, not for PBX systems.  *See Queen City Pizza*, 124 F.3d at 436 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.") (internal citations omitted.)

Similarly, the Court is not convinced by Avaya's argument that Counterclaimants have not alleged a tied product because they fail to sufficiently allege that software support for the upgrade is a relevant aftermarket separate from the upgrade itself or that Counterclaimants can provide or have ever provided software to support the upgrade. (Avaya's Opp. at 20).  As previously noted, the Court concludes that Counterclaimants have sufficiently alleged that these products encompass separate relevant markets (Proposed Counterclaims at ¶¶ 12, 300, 358, 360, 362, 363.)  As such, the Court grants Counterclaimants motion with respect to the Proposed Counterclaims alleging tying of upgrades and PBX systems.

### b.    PDS Systems

33

Counterclaimants make the same arguments in support of the Proposed Counterclaims with respect to its PDS Systems Section 1 Tying Claims as they relate to patches and upgrades. (Counterclaimants' Br. at 26-30).)  Similarly, Avaya argues that "Continuant's PDS tying claims are almost indistinguishable from the PBX tying claims and fail for the same reasons." (Avaya's Opp. at 25-27.)  Additionally, Avaya also notes that, in its Memorandum Opinion, this Court dismissed this counterclaim for the additional reason that there were "no factual allegations regarding 'upgrades' for PDS platforms."  (*Id*. at 26 (quoting Mem. Op. at 37.)) Avaya then argues that, although Counterclaimants have included new paragraphs in the Proposed Counterclaims to remedy this issue, they do little more than clarify that the tying counterclaim: (1) relates to the PDS system software upgrade; (2) alleges that Avaya bundles this software upgrade with software support; and (3) "asserts that Avaya allegedly 'refuses to provide support to end-users that utilize 'unauthorized service providers' for maintenance of their PDS systems.'" (Avaya's Opp. at 26 (quoting Proposed Counterclaims at ¶¶ 302-05; Counterclaimants' Br. at 14).)  Avaya argues that notwithstanding these "scanty allegations, it is clear that this claim fails for the same reasons" that the parallel Proposed Counterclaim relating to PBX fails: that Counterclaimants do not sufficiently establish single-product, single-brand aftermarkets for both the tying and the tied products.  (Avaya's Opp. at 26.)

The Court concludes that the PDS System Section 1 Tying Proposed Counterclaims for both the tying of patches and upgrades are not futile for the same reasons noted with respect to the similar Proposed Counterclaims asserted as to PBX systems.  The Court further holds that, despite Avaya's assertions to the contrary, Counterclaimants have now sufficiently pleaded factual allegations regarding upgrades for PDS platforms to survive the pleading stage.  (*See*

Proposed Counterclaims at ¶¶ 302-05).  As such, Counterclaimants' motion is also granted with respect to the PDS Section 1 Tying Proposed Counterclaims.

### 3.     The New Counterclaims- PDS Section 2 Monopolization and Attempted Monopolization

Counterclaimants also argue that the Court should permit them leave to file new Proposed Counterclaims which allege monopolization and attempted monopolization with respect to PDS systems in violation of Section 2. (Counterclaimants' Br. at 30.)  Citing this Court's Memorandum Opinion, Counterclaimants argue that Avaya has no basis to argue that these claims are futile because the Court previously rejected similar arguments with respect to Avaya's motion to dismiss Counterclaimants' PBX First Amended Counterclaims relating to monopolization and attempted monopolization. (*Id.*)  Counterclaimants assert that "[a]lthough these new claims pertain to a separate aftermarket for a separate primary product – maintenance and service of Avaya PDS systems – Counterclaimants' PDS monopolization claims rely upon the same, sound legal theories and arise out of many of the same allegations of Avaya's anticompetitive conduct that this Court recognized were sufficient to maintain Counterclaimants' PBX monopolization [First Amended Counterclaims]." (*Id.*)

Avaya responds that these Proposed Counterclaims are in fact futile because Continuant cannot and has not made the same factual allegations regarding PDS systems as it did with respect to the PBX systems monopolization claim in the First Amended Counterclaims. Specifically, Avaya notes that the Court based its decision to uphold Counterclaimants' PBX monopolization claim on the following facts: (1) that Avaya's predecessors did not prohibit customers that purchased MSPs to authorize third party vendors or service providers from

accessing their Definity Systems; (2) that ISPs previously had access to the Definity System software for maintenance through the owner's access to MSPs; and (3) Avaya now only provides MSPs to owners who have maintenance contracts with Avaya or its BusinessPartners." (*Id.* at 23 (citing Mem. Op. at 7, 22).)  Avaya argues that the Court based its holding that "[a]t this stage of the litigation, . . . it is plausible that the purchasers in the PBX primary market relied on the ISPs' allegedly lower cost and higher quality service and maintenance alternative when purchasing the Definity system" on these allegations. (Avaya's Opp. at 23 (citing Mem. Op. at 22).)  Conversely, according to Avaya, Continuant makes no corresponding factual allegations with respect to access to PDS systems in the Proposed Counterclaims.  (Avaya's Opp. at 24.)  Instead, Avaya contends, Continuant bases these claims on Avaya's alleged efforts to restrict access to the "ROOT" or "ADMIN" logins, which allegedly are needed to access commands that are necessary for a customer or a customer's chosen vendor to maintain the customers' PDS equipment. (*Id.* (citing Proposed Counterclaims at ¶¶ 217-18).)  Avaya argues that Continuant alleges that: (1) Avaya has only provided its employees, certain BusinessPartners and a few end users with such logins; (2) over time, Avaya has only permitted a small number of BusinessPartners to have ROOT or ADMIN level access; and (3)  it presently does not authorize any BusinessPartners to have ROOT or ADMIN level access "to offer, sell, provide or perform a BusinessPartner's own maintenance on any Avaya PDS equipment." (Avaya's Opp. at 24 (citing Proposed Counterclaims ¶¶ 223-26).)  However, Avaya argues, "Continuant makes no allegation that any unauthorized service provider has ever in any way gained access to ROOT or ADMIN logins for PDS systems at any point in time."  (Avaya's Opp. at 24.)  As such, Avaya asserts that Continuant has failed to make sufficient factual

allegations that would support the conclusion that "it is plausible that the purchasers in the [PDS] primary market relied on the ISPs' allegedly lower cost and higher quality service and maintenance alternative when purchasing the [PDS] system." (*Id*. at 24 (citing Mem. Op. at 22).)  According to Avaya, there can be no aftermarket for post-warranty service and maintenance for PDS systems without such allegations. (Avaya's Opp. at 25.)   As such, Avaya argues that it would be futile to permit Continuant to assert its PDS monopolization and attempted monopolization Proposed Counterclaims.

The Court concludes that Continuant has alleged a plausible relevant aftermarket for their PDS systems monopolization and attempted monopolization Proposed Counterclaims. Avaya's argument that Continuant's Proposed Counterclaims fail because they fail to allege that any unauthorized service provider has ever gained access to ROOT or ADMIN logins at any point in time is specious and incorrect.  (Avaya's Br. at 24-25.)   As Counterclaimants note, Avaya has alleged that Continuant has obtained access to and has used PDS logins without Avaya's authorization and has also conceded that Continuant alleges that it has offered and continues to offer service and maintenance for PDS systems.  (Counterclaimants' Rep. at 15-16 (citing Avaya's Third. Am. Compl. at ¶¶ 74-76, 88, 126 [Docket No. 57]; Avaya's Br. at 24 n. 19).)

Further, Avaya misreads this Court's prior Memorandum Opinion when it asserts that Continuant has failed to expressly allege that unauthorized service providers have accessed ROOT or ADMIN logins to establish a relevant market for PDS maintenance. (Avaya's Opp. at 23-24.)  In its Memorandum Opinion, this Court noted that Avaya's interpretation of *Kodak* that the case only applies to situations where the manufacturer had previously dealt directly with

independent servicers is too narrow. (Mem. Op. at 22.)  The Court further noted that "[t]he reasoning underlying *Kodak* - namely that a manufacturer can violate Section 2 where it undertakes some sort of opportunistic conduct to target a group of customers that are "locked in" due to information costs and switching costs - extends to situations beyond those where the manufacturer has dealt directly with the ISPs." (*Id*.)  Noting that Counterclaimants had alleged that ISPs previously had access to the Definity system software for maintenance purpose by way of the owner's access to MSPs, but that Avaya had changed its policy so that it only provided MSPs to owners that have a maintenance contract with Avaya or a BusinessPartner, the Court concluded that "[a]t this stage of the litigation, . . . it is plausible that the purchasers in the PBX primary market relied on the ISPs' allegedly lower cost and higher quality service and maintenance alternative when purchasing the Definity system . . . and that when Avaya made changes to its policies regarding MSP usage so as to make it cost prohibitive for the Definity system owners to use an ISP in this manner, Avaya was making a policy change that targeted the "locked-in" Definity system owners and thereby violated the antitrust laws."

Similarly, Continuant has alleged that: (1) Avaya  has "failed to adequately disclose to purchasers of Avaya PDS equipment that there are any restrictions on an end-user's ability to access the PDS operations systems software or the PDS application software to perform maintenance, or to configure, install and/or provision PDS software, or on an end-user's ability to engage the vendor of its choosing to do so"; and (2) Avaya has "also failed to set forth any restrictions in its purchase agreements with end-users on an end-user's ability to use the Avaya PDS operation systems software or application software to perform maintenance or to utilize the ROOT or ADMIN logins to do so, or to engage the vendor of its choosing to do so." (Proposed

Counterclaims at  ¶¶ 227, 228.) As such, Continuant has made sufficient allegations to support the inference that PDS systems purchasers reasonably believed that: (1) at the time of purchase of such systems, they were purchasing the ability to access and utilize the commands to perform the maintenance functions on such systems or hire a vendor to do so; and (2)  high switching costs prevent them from replacing their Avaya PDS systems with another manufacturer's system after Avaya subsequently disclosed their restrictive login policies and as such had the effect of "locking-in" Avaya PDS customers to a single brand aftermarket for maintenance of their PDS systems.  For the foregoing reasons, Counterclaimant's motion with respect to the PDS Section 2 monopolization and attempted monopolization counterclaims is granted.

III.    CONCLUSION

For the foregoing reasons, Counterclaimants' motion for leave to file amended counterclaims is granted in part and denied in part.  Specifically, the Court grants Counterclaimants' motion in all respects except for the reassertion of the allegations of *per se* violations with respect to the Section 1 Illegal Conspiracy Proposed Counterclaims.  An appropriate form of order is filed herewith.


Dated: September 8, 2009


                                    __s/ Garrett E. Brown, Jr._____
                                    GARRETT E. BROWN, JR., U.S.D.J.

39