Anthony P. La Rocco, Esq.
David S. Kwon, Esq.
**K&L GATES LLP**
One Newark Center, 10th Floor
Newark, New Jersey 07102
Phone: (973) 848-4000
Fax: (973) 848-4001
*Attorneys for Defendants / Counterclaimants*
*Telecom Labs, Inc. and Continuant, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AVAYA INC., | Hon. Garrett E. Brown, U.S.D.J. |
| | Hon. Lois H. Goodman, U.S.M.J. |
| Plaintiff, | |
| | Civil Action No. 3:06-cv-02490 |
| v. | |
| | **SECOND AMENDED COUNTERCLAIMS** |
| TELECOM LABS, INC., TEAMTLI.COM CORP., CONTINUANT, INC., DOUGLAS GRAHAM, SCOTT GRAHAM and BRUCE SHELBY, | **AND JURY DEMAND** |
| Defendants. | |

Defendants / Counterclaimants Telecom Labs Inc. ("TLI") and Continuant, Inc. ("Continuant") (collectively, "Counterclaimants"), through their undersigned counsel, K&L Gates LLP, by way of amended counterclaims against Plaintiff / Counterclaim Defendant Avaya Inc. ("Avaya"), allege as follows:

**INTRODUCTION**

1.      This lawsuit is the most recent tactic in Avaya's determined and continuing attempt to restrict competition in the U.S. market for the service and maintenance of enterprise telephone systems (known as private branch exchanges or PBXs) built by Avaya and its

predecessors, Lucent Technologies, Inc. ("Lucent") and American Telephone and Telegraph Company ("AT&T"). Avaya was spun off in September 2000 from Lucent, itself a spin-off from AT&T, the original telecommunications monopoly. But Avaya has not been content simply to accept the legitimate benefits that come from the fact that, at the time of AT&T's 1984 break-up, virtually all large U.S. businesses had AT&T (now Avaya) "Definity" or its predecessor telecommunications platforms and that many owners have since upgraded those systems to Lucent and now Avaya systems rather than replace them with equipment sold by the different original equipment manufacturers ("OEMs") that subsequently entered the market.

2.      Instead, Avaya has unlawfully leveraged its monopoly power over owners of the Avaya (and Lucent and AT&T) Definity platform telecommunications systems to maintain a monopolistic stranglehold on the separate market for post-warranty service and maintenance of such systems. Avaya is able to maintain its monopoly on the service and maintenance aftermarket, not by offering better service or lower prices, but because equipment owners are locked into their Avaya/Lucent/AT&T Definity platform – their huge investments in their Definity platform, the long life of the equipment, and the monumental cost and risk of switching to a different telecommunications platform make switching to another platform economically untenable.

3.      Counterclaimants TLI and Continuant are growing companies specializing in the maintenance and service of various telecommunications systems manufactured and sold by Avaya, including the Avaya "Definity" platform and the Avaya Proactive Contact System, previously known as the Avaya Predictive Dialing System ("PDS"). Along with other budding competitors (known as independent service providers or "ISPs"), TLI and Continuant have competed with Avaya to provide service and maintenance for Definity and (for Continuant) PDS

platforms. Counterclaimants' customers have a high level of satisfaction with TLI and Continuant, are better served by TLI, Continuant or another ISP than they had been by Avaya, and have saved substantial amounts of money in recurring maintenance charges by using TLI, Continuant or another ISP.

4.       In the late 1990s and early 2000s, Lucent, and then Avaya, deliberately downsized their service and maintenance personnel ranks, thereby creating a need for outside service and maintenance providers. That need began to be filled by competition from Avaya's own dealers (known as "BusinessPartners") and ISPs. Realizing that it could lose its stranglehold on the lucrative market for services and maintenance of Definity platforms, Avaya put in place an anti-competitive and deceptive scheme to maintain its dominance. First, Avaya prevented its BusinessPartners from (a) offering service and maintenance to Avaya's existing maintenance customers and (b) competing with Avaya for new business from a class of larger customers. Then, Avaya and its BusinessPartners conspired and agreed to allocate the remainder of the market to the BusinessPartners by excluding competition from ISPs.

5.       Avaya's actions have given rise to Counterclaimants' claims that Avaya has engaged in monopolization, tying, and conspiracy in violation of Sections 1 and 2 of the Sherman Act. To begin with, there is, and has long been, a U.S. "antitrust" market (or "aftermarket") for post-warranty service and maintenance of PBX systems purchased from Avaya and its predecessors that is separate from the primary U.S. market for the sale of PBX systems. (A new Avaya system comes with a limited duration warranty that includes maintenance. But, since the useful life of an Avaya system far exceeds this initial warranty period, system owners thereafter purchase maintenance repeatedly in varying time increments.) Antitrust markets are defined by looking to reasonably interchangeable substitute products and

cross-elasticities of supply and demand for those products.  Here, there are no reasonably interchangeable substitutes for service and maintenance of Avaya telephony systems.  And participants in those markets, including Avaya and its BusinessPartners, consider the two markets to be separate and treat them as such, selling maintenance and service separately from systems.

6.     Avaya's monopolistic and anti-competitive behavior in the aftermarket is not, and has not been, disciplined by competition in the primary market for PBX systems.  Dissatisfied Avaya PBX owners cannot simply replace their Avaya system with one from a competitor.  Instead, virtually all, if not all, owners of Avaya or its predecessors systems are "locked into" their PBX purchases because of: (a) extremely high switching costs – especially relative to potential monopolistic increases in the costs of service and maintenance – that include not just the multi-million dollar cost of such systems but costly and time-consuming re-training and replacing of technical personnel; and (b) the PBXs' extremely long useful life, which, with upgrades, can exceed twenty years and approach indefinite.  Additionally, the installed base of Avaya PBX systems is large relative to new sales allowing Avaya profitably to set and maintain supra-competitive prices in the aftermarket for service and maintenance.

7.     For one or more of the following five reasons virtually all of Avaya/Lucent/AT&T's customers were not, at the time they purchased their systems, able to accurately predict the life-cycle cost of their system and compare it to the cost of purchasing a competitor's system:

> ■     the customer initially purchased from an Avaya predecessor, *i.e.*, AT&T or Lucent, that had monopoly power in the PBX market such that the customer had no meaningful alternative source from which to acquire a PBX system;

■ Avaya or its predecessor intentionally deceived the customer about its policy(ies) regarding long-term maintenance options/access/pricing at the time of purchase;

■ Avaya or its predecessor unintentionally (or intentionally) failed to make clear to the customer its policy(ies) regarding long-term maintenance options/access/pricing at the time of purchase;

■ Avaya or its predecessor changed its policy(ies) regarding long-term maintenance options/access/pricing (including its policies regarding the use of "unauthorized" independent service providers) after the customer purchased its system – something that happened not once, but numerous times; or

■ lack of information about future Avaya and competitors' service and maintenance pricing made it impossible for the customer to accurately compare the life-cycle cost of purchasing an Avaya PBX to the life-cycle cost of purchasing a competing PBX.

8. Avaya, both individually and by virtue of its anti-competitive agreements with its BusinessPartners, has had, for the entire period covered by this action, market power in the U.S. national market for maintenance and service of Avaya/Lucent/AT&T PBX systems.  This market power is evidenced by Avaya itself at all times possessing, upon information and belief, a market share in excess of at least sixty percent (60%), and, combined with its BusinessPartners, a market share in excess of ninety percent (90%).

9. Avaya's market power is also evidenced by the fact that Avaya and its predecessors have had, and have exercised, the power to exclude competition in the market and to price its service and maintenance at supra-competitive levels.  Avaya has succeeded in eliminating competition from several independent service providers, and – as more fully described below – has used this baseless lawsuit, tying and bundling, false accusations of illegal activity, baseless and pretextual claims to intellectual property protection, ever-shifting access permission policies, cost squeezes and other predatory tactics to eliminate price and quality competition from Counterclaimants and other remaining ISPs.

10.     For example, in 2003 Avaya illegally exercised its monopoly power in the market when it changed its policy regarding whether, and to what extent, it would allow BusinessPartners to compete with Avaya for maintenance/service business.  TLI, which was then an Avaya BusinessPartner and had just signed an agreement with Avaya that allowed it to compete with Avaya, refused to accede to the new policy and insisted on retaining the right to compete with Avaya.   In response, Avaya wrongfully terminated TLI's BusinessPartner relationship and denied TLI access to passwords and log-ins necessary for a service provider to access the Avaya PBX maintenance software.  Thereafter, Avaya heightened aggressively its campaign to eliminate competition from Counterclaimants and other independent service providers.  For example, in July 2005, Avaya unilaterally and without prior notice changed its policy and began to deny support of any kind to Avaya PBX-owners that used independent service providers that Avaya characterized as "unauthorized service providers" (the "July 1, 2005 Policy Change").

11.     Avaya has also illegally used tying and bundling of patches (corrections of software errors or "bugs") in an effort to stamp out competition from ISPs.  Avaya and its predecessors are and have been the only sources for patches of Avaya PBX systems.  These patches are necessary to allow Avaya PBX systems to function optimally.  Avaya, however, has changed its policies and practices regarding the conditions under which it would make these unique and desirable patches available.  In particular, as part of Avaya's July 1, 2005 Policy Change, it advised its PBX-owners that it would no longer furnish "non-systems critical" patches to those who made use of ISPs that Avaya characterized as "unauthorized service providers." Prior to its July 1, 2005 Policy Change, Avaya did not follow any policy or practice of withholding any patches from customers of "unauthorized service providers."  After making this

policy change, Avaya has actively sought to advise customers – customers considering using or that have chosen to use ISPs that Avaya characterizes as "unauthorized" – that such customers will lose, among other things, the ability to access or obtain patches by using such ISPs.  Locked-in customers who determine they need or want access to patches have little choice but to accept such ever-shifting conditions on Avaya's policy and practices with respect to patches.

12.     Avaya has also recently begun to illegally use tying and bundling of upgrades (a new release or version of a software application) in an effort to stamp out competition from ISPs.  Avaya is the only source of upgrades to Avaya PBX equipment and software.  These upgrades allow customers to maximize the life of their Avaya PBX platforms while maintaining state-of-the-art telecommunication capabilities.  Avaya seeks to force customers to consider purchasing software upgrades by making announcements about Avaya's end-of-life and/or end-of-support of older software versions, including announcements that, over time, Avaya would cease support for customers with older versions of its software.  Until recently, Avaya has never refused to sell upgrades to customers of ISPs.  However, Avaya has recently shifted its policies regarding the conditions under which it would make these unique and desirable upgrades available.  In particular, in late 2007, Avaya announced that existing PBX customers wishing to upgrade their systems by purchasing the latest version of its enterprise PBX telephony software, known as CM 5.0, must also agree to purchase mandatory software support – or software maintenance (now inclusive of patches) – from Avaya.  Pursuant to its July 1, 2005 Policy Change, Avaya will also refuse to provide any support – including, upon information and belief, software support or patches – to any customer of an "unauthorized service provider."  Coupled with Avaya's earlier-announced July 1, 2005 Policy Change, locked-in customers wishing to upgrade their Avaya PBX telecommunications software have little choice but to accept such ever-shifting conditions.

13.     Finally, Avaya has orchestrated a nationwide conspiracy among its BusinessPartners strictly limiting the circumstances under which, and how, BusinessPartners can compete with Avaya for sales of maintenance and service for Avaya/Lucent/AT&T PBX systems.   Pursuant to this conspiracy, Avaya and its BusinessPartners have agreed on certain terms and conditions of sale, on the allocation of customers and territories, and on taking steps designed to eliminate competition from ISPs.   Avaya and its BusinessPartners participate and compete in the market for maintenance and service of Avaya/Lucent/AT&T PBX systems. Moreover, Avaya's agreements with its BusinessPartners harm competition in the market by allowing it and its BusinessPartners to charge supra-competitive prices and exclude competition – including competition from lower-cost, higher-quality, more-responsive ISPs – thus violating the rule of reason.

14.     Avaya's illegal, predatory, and exclusionary actions have not only harmed competition in the market, they have harmed Counterclaimants.   Since 2003, when Avaya wrongfully terminated TLI as a BusinessPartner, TLI and, subsequently, Continuant, have lost and continue to lose existing and prospective customers – and hence sales and profits – to Avaya or Avaya BusinessPartners.   Counterclaimants' losses have resulted not from legitimate competition but from Avaya's predatory and anti-competitive practices.   As mentioned above, and described in greater detail below, those practices include:  tying and bundling maintenance to crucial patches and upgrades; filing this lawsuit containing meritless and pretextual intellectual property claims; making false and defamatory statements about Counterclaimants to customers and others; threatening customers who use, or are considering using, Counterclaimants' maintenance services; constantly shifting its policies with regard to customers' and ISPs' ability to access the customers' Avaya systems, pricing of access to logins

needed to self-maintain their products, and the customers' use of independent "unauthorized" maintenance providers; and entering into agreements with its BusinessPartners designed to limit competition and exclude Counterclaimants from competing in the relevant markets.

15.    Avaya has engaged in similar tactics in an effort to monopolize the market for maintenance and service of its separate Predictive Dialing Systems ("PDS"), a product that automatically dials batches of telephone numbers for connection to agents assigned to sales or other campaigns, and are widely used in call centers.  For example, Avaya has sought to tie and bundle maintenance and service of Avaya PDS equipment to patches and upgrades for those systems, has made false and defamatory statements about Continuant to customers and others, has shifted its policies regarding the ability of end-users to use independent, "unauthorized" maintenance providers and the ability of end-users to access their Avaya PDS equipment, and has filed this lawsuit containing meritless and pretextual intellectual property claims.  Avaya's illegal, predatory, and exclusionary actions have not only harmed competition in the PDS maintenance market, they have harmed Continuant, which has sought to compete against Avaya in maintaining PDS equipment (in addition to PBX systems) since Continuant commenced operations in 2005.

## THE PARTIES

16.    Counterclaimant TLI is a Washington company, organized and existing under the laws of the State of Washington, with its principal place of business in Fife, Washington.  From 1996 to 2000, TLI was a Lucent dealer.  TLI was an Avaya dealer from 2000 to 2003, until Avaya wrongfully terminated its agreement with TLI.  Since its termination by Avaya, TLI has, among other things, acted as an ISP for Definity equipment.

17.     Counterclaimant Continuant is a Washington company, organized and existing under the laws of the State of Washington, with its principal place of business in Fife, Washington.  Continuant has never had a reseller or BusinessPartner relationship with Avaya, and has instead always acted as an independent service provider for Definity and PDS equipment.

18.     Plaintiff / Counterclaim Defendant Avaya is a Delaware company, organized and existing under the laws of the State of Delaware, with its principal place of business in Basking Ridge, New Jersey.  Avaya was spun off from Lucent, which also, at all relevant times, maintained its principal place of business in New Jersey.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Counterclaimants TLI and Continuant and Plaintiff / Counterclaim Defendant Avaya are citizens of different States and the amount in controversy exceeds $75,000.  In addition, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

20.     Venue is proper in the District of New Jersey pursuant to 15 U.S.C. § 22 in that Avaya is located, may be found, and transacts business in this District and, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claim occurred in New Jersey, and Avaya maintains a business address in New Jersey and solicits and does business in New Jersey.

## INTERSTATE COMMERCE

21.     The actions complained of herein have and will restrain and adversely affect interstate commerce in that Avaya sells its products and services across state lines and TLI and

Continuant sell their respective service and maintenance of Avaya telecommunications equipment across state lines, and all three companies purchase and sell goods and supplies in interstate commerce.

## GENERAL ALLEGATIONS

I.     **Avaya's Relevant Corporate History**

    A.     **AT&T:  Avaya's Monopolistic Roots**

    22.     For most of its history, AT&T functioned as a legally sanctioned, regulated monopoly.  Given the nature of the technology of telephone systems and service through the first part of the 20th Century, AT&T was able to maintain the government's acceptance of the principle that the telephone system could operate more efficiently as a government-regulated monopoly providing universal service, and was an appropriate and acceptable substitute for the competitive marketplace.

    23.     As a result, AT&T maintained a monopoly in all of the various markets associated with the telecommunications industry, including the manufacturing and leasing, and then selling, of telecommunications systems to businesses.

    24.     By virtue of its manufacturing monopoly, AT&T also maintained a monopoly for the service and maintenance of such systems.  AT&T historically offered extensive service and maintenance options to purchasers of its enterprise telecommunications products, which purchasers had no choice but to utilize AT&T for their service and maintenance needs.

    25.     However, technological changes and developments in the middle of the 20th Century offered additional alternatives to the AT&T long-distance phone system, and lowered the barriers to entry by would-be competitors in the long-distance service and telephone manufacturing markets.

26.     These technological and market changes in telecommunications eventually led to an antitrust suit by the U.S. government against AT&T in 1974.  The lawsuit was settled in 1982, when AT&T agreed to divest itself of the wholly-owned Bell operating companies that provided local exchange service, the parts of AT&T that the government believed were still valid natural monopolies, from those parts where competition was appropriate.  The divestiture took place in January 1984, leaving in its place a new AT&T and regional operating companies.

27.     Although a new AT&T was born as of January 1984, it still was saddled with a corporate culture based on a decades-long existence as a regulated monopoly that had been largely insulated from market pressures for most of its history.

###     B.     AT&T's Gradual Adoption Of A Dealer Sales Channel

28.     As part of AT&T's divestitures of local telephone companies pursuant to its 1982 settlement of the U.S. government's 1974 antitrust / monopolization suit, AT&T developed a new business unit, AT&T Technologies, Inc. ("AT&T Technologies"), which had separate market-focused business units to manufacture and sell consumer products, network systems, technology systems, and information systems.  In 1989, AT&T Technologies branched into several business units, including AT&T Network Systems, AT&T Global Business Communication Systems, AT&T Microelectronics, and AT&T Consumer Products.

29.     AT&T Technologies and its business units primarily followed AT&T's historical direct marketing and servicing business model, whereby the company would sell its telecommunications systems equipment (including operating software) directly to the enterprise owner and attempt to sell it a separate maintenance contract once the original warranty terminated.

30.     At first, AT&T Technologies enjoyed complete command of the enterprise telecommunications equipment manufacturing and sales market, as prospective PBX purchasers lacked any meaningful choice of manufacturers.

31.     AT&T Technologies also maintained complete control over the separate market for service and maintenance of its equipment.

32.     With the benefit of this historical control of the manufacturing and sales market, in 1984 AT&T unveiled System 75 as its enterprise PBX platform for large businesses.  System 75 could be seamlessly and economically upgraded to Definity, so when Definity was introduced in 1992, many owners chose to upgrade.  Likewise, Communications Manager was introduced in 2002 (Communications Manager was temporarily known as "MultiVantage").  Owners with Definity platforms could, again, seamlessly and economically migrate to Communication Manager ("CM").  All of these brands make up what the telecom industry widely refers to as the "Definity" platform.

33.     However, the industry's deregulation eventually resulted in numerous competitors entering the manufacturing and sales market.

34.     Contrary to AT&T's direct sales marketing business model, the majority of these new competitors approached the manufacturing and sales market using a dealer channel sales model.

35.     AT&T Technologies, however, carried over and initially clung to its direct sales model.

36.     The dealer sales model became more common in the telecommunications industry, and led naturally to the emergence of a competitive aftermarket for service and

maintenance for equipment manufactured by other companies, as dealers for competitive OEMs began offering their own post-warranty service and maintenance for equipment they sold.

37.     As a result of the increased competition from other manufacturers, many of whom utilized a dealer sales model, AT&T's market share of the sale of new telephone systems began to drop over the course of the decade following deregulation.  Even so, its control of the embedded enterprise market share remained high due to the costs and risks to an owner of switching telecommunications platforms.

38.     In the early 1990s, in reaction to growing competition from other telephone equipment manufacturers, AT&T Technologies incorporated a dealer sales model and began utilizing the services of outside companies to sell directly to purchasers.

39.     AT&T Technologies, however, only allowed most dealers to work with small businesses, and restricted most dealers from working with the Definity platform.  AT&T continued its direct sales marketing model as well, particularly with respect to its existing large enterprise owners.

40.     Even with the increased competition from other manufacturers, AT&T was able to protect its status as a market leader for the manufacture and sale of enterprise telecommunications systems by converting many existing owners of AT&T equipment to the Definity platform and then upgrading an owner's specific system within that platform.  Given the significant useful life of the Definity platform, AT&T could offer an upgrade to an owner's Definity system that was seemingly less expensive to an owner than purchasing an entirely new system from another manufacturer, and less burdensome than having to install an entirely new system, train employees on the use of the new system and replace technical personnel

experienced in the Definity platform for technical personnel having the appropriate level of experience with the new system.

   C.    **AT&T's Spin-Off Of Lucent And The Continuation Of The Direct/Indirect Sales Model**

   41.    In October 1996, AT&T spun-off the business units of AT&T Technologies, which were combined with significant portions of Bell Laboratories to form Lucent Technologies.   At its launch, Lucent was immediately a major player in numerous telecommunications industries and markets, including the sale of enterprise telecommunications systems.

   42.    As with AT&T, Lucent protected its status as a market leader for the manufacture and sale of enterprise telecommunications systems by maintaining its use of the Definity platform and upgrading an owner's specific system within that platform.

   43.    As with AT&T, Lucent marketed its products via both a direct sales marketing model and a dealer sales model.  Lucent utilized dealers for the sale of its equipment, but at the same time controlled the service and maintenance of its products by confining dealers to smaller clients.

   44.    Lucent also continued AT&T's model of directly offering service and maintenance contracts to AT&T and Lucent equipment owners.

   45.    Given the prevalence of AT&T and Lucent products in the manufacturing and sales market, coupled with the direct sales model historically employed by AT&T and then Lucent, Lucent inherited a substantial business for the sale of service and maintenance contracts to an embedded customer base of existing owners of Definity equipment.

   46.    From 1996 through 2000, Lucent kept almost total control of the market for the service and maintenance of Definity equipment, with most large businesses using Definity

systems purchasing and then renewing Lucent service and maintenance contracts.  By Lucent's own estimate, Lucent Service Agreements covered approximately 80% of Definity owners during that time frame and, upon information, an even higher percentage of Definity owners that had full maintenance contracts.

47.     Lucent also acknowledged that Definity customers who chose not to purchase Lucent service agreements employed a variety of support mechanisms, including third party support, time and material support from Lucent or another vendor, self maintenance or a combination of options.  Indeed, Lucent provided time and material support to customers who self-maintained or used independent service providers.  As admitted by Avaya in a verification signed by Linda J. Schumacher, dated October 28, 2003, the "options for T&M maintenance, self-maintenance and ISO's [independent service organization, also referred to as ISPs] are typically discussed, along with the customer's need to purchase the Maintenance Assist offer if it elects self-maintenance or maintenance through an ISO."

48.     During this time, Lucent provided contracted service or time and material support to owners of Definity platforms through its own, in-house staff of experienced and qualified technicians.

**D.     Lucent Acquires Mosaix And Its PDS Platform**

49.     In or about the Spring of 1999, Lucent acquired Mosaix, which manufactured and sold a PDS platform.

50.     Mosaix's PDS platform was originally introduced as a product known as "Voicelink" by a company called Digital Systems International ("DSI").  Voicelink was a suite of hardware and software that offered outbound predictive dialing and was one of the first automated predictive dialing systems.  Voicelink was designed to automate dialing and increase

dialing efficiency by predicting call outcomes based upon a number of factors, including agent availability and call results.

51. In the early 1990s, Voicelink evolved into the Mosaix Call Management System, prompting DSI to change its name to Mosaix.

52. After acquiring Mosaix, Lucent began to manufacture and sell the PDS platform.

**E.** **The Downturn In The Telecommunications Industry In 2000, The Birth Of Avaya And The Development Of The Competitive Service And Maintenance Market For Definity Equipment**

53. In or about 2000, in response to the recession that impacted the telecommunications industry as a whole, Lucent began significantly downsizing its operations, culminating in a massive layoff in early 2000.

54. As a result of Lucent's termination of a significant portion of its workforce, Lucent's direct sales, service and maintenance capabilities were all greatly diminished.

55. Upon information and belief, to compensate for its reduced personnel resources and to avoid any loss of product market share, Lucent increased its indirect sales channel through the launch of its "BusinessPartner" program in February 2000.

56. Lucent also responded to the 2000 downturn by shedding various business units. This included the spin-off of its "enterprise networking group," completed in September 2000, as a new company that was called Avaya.

57. Following its spin-off, Avaya continued the Lucent businesses relating to the manufacture, sale, maintenance and service of enterprise PBX systems and the PDS platform previously acquired from Mosaix.

58. After its spin-off from Lucent, Avaya further reduced its direct sales, service and maintenance capabilities with another round of layoffs in July 2001.

59.     As a result of continued downsizing, Avaya lost many of its employees who had serviced its embedded owner base.

60.     To compensate for the further reduction in its workforce, Avaya informed its dealers that it would shift management of some sales accounts, particularly for smaller to mid-sized businesses, to its dealers.

61.     Avaya also began to encourage its dealers to increase their service capabilities. As Avaya increased its reliance on dealers, Avaya encouraged them to increase the quality and scope of the service and support provided to Definity owners.

62.     Avaya represented to dealers that it would rely on them to provide more direct technical services to the eighty percent (80%) of its customers in the embedded base that represented smaller to mid-size companies.

63.     Avaya hired its dealers as subcontractors both to service its Definity and PDS equipment owner base and to fulfill some of its maintenance obligations to these owners.  In doing so, Avaya hoped and expected its dealers would continue to sell Avaya maintenance contracts that the dealers would help fulfill.

64.     To achieve its reduction in workforce while ensuring that owners were properly serviced, Avaya sought to place its maintenance and service employees who were laid-off or received "early retirement" with its more significant dealers.  Avaya even offered to pay dealers up to fifty percent (50%) of the first-year salary of any former Avaya technical resource employee they hired.

65.     As part of an initiative to further enhance dealer support and service to owners, Avaya also implemented programs awarding higher status under designations such as Gold and Platinum to "BusinessPartners" who satisfied certain guidelines.  Certification was based on four

factors: (a) business engagement, *i.e.*, revenue; (b) competence, *i.e.*, the number and level of Avaya-certified individuals; (c) customer support, including post-warranty maintenance; and (d) customer satisfaction.  BusinessPartners willing to offer owners an Avaya maintenance contract on an exclusive basis, however, automatically met the highest level for all of the operational benchmarks necessary to achieve Platinum status, subject to meeting all other requirements for reaching Platinum status.  To obtain Platinum status, a BusinessPartner was required, among other things, to demonstrate the ability to perform maintenance, including having the systems, software, processes and staffing levels necessary to, in effect, run a 24x7 network operating center.  Avaya did not forbid BusinessPartners from offering competitive maintenance service.

66.    The reduction in Avaya's workforce, however, dramatically and negatively impacted Avaya's own service levels and performance, and created increasing dissatisfaction within Avaya's embedded customer base.

67.    This dissatisfaction, in turn, fueled a market for competitive service and maintenance, as existing and new Definity and PDS platform owners began necessarily to seek alternative maintenance contracts directly from dealers or, alternatively, independent third-party service providers.

## II.    TLI's Relationship With Lucent And Avaya, And Continuant's PDS Maintenance and Service Business

### A.    TLI Becomes A Lucent Dealer

68.    TLI was formed in 1996 as a Seattle-based telecommunications equipment business, with an intent to act as a dealer re-selling and installing telecommunications equipment of various manufacturers to businesses in the United States.

69.     TLI has acted as a dealer for several manufacturers of telecommunications equipment, including Toshiba, Comdial, Alcatel, 3Com, Siemens, Active Voice, Nortel, Cisco, Interactive Intelligence, Vertical Networks and Lucent.

70.     In October 1996, TLI entered into its first dealer contract with Lucent (the "1996 Contract").

71.     Within three years, TLI became one of Lucent's largest dealers in the Seattle area.

72.     On March 6, 1998, Lucent and TLI entered into a replacement dealer contract (the "1998 Contract").   The 1998 Contract was a three-party agreement that included Lucent's distributor, MicroAge Computer Centers, Inc.

73.     Prior to 2000, TLI primarily focused its business as a dealer on re-selling products manufactured by Lucent and other manufacturers.  TLI rarely offered its own alternative service and maintenance or sold its own maintenance contracts to owners because it lacked the technical capacity to do so and Lucent historically was successful in servicing its owner base.

**B.      Following Avaya's Spin-Off, TLI Becomes An Avaya BusinessPartner And Increases Its Maintenance And Service Business**

74.     When Lucent spun-off Avaya in 2000, it assigned its dealer contracts, including the 1998 Contract with TLI, to Avaya.  Following the Avaya spin-off, TLI became an Avaya dealer and immediately began marketing Avaya products, including the Definity platform.

75.     Following Avaya's downsizing, however, TLI also began to build up its technical capacity to perform service and maintenance of the Definity platform.

76.     Relying reasonably upon Lucent and then Avaya's encouragement to dealers to increase their service capabilities, Avaya's representations about the support it would provide dealers, and the incentives Avaya offered dealers to increase their technical capacity, TLI began

hiring former Avaya employees.  Avaya did not inform TLI (or its other representatives) that it would not permit them to offer competing maintenance services.

77.     Duly incentivized by Avaya and by market demand, TLI invested substantial time, effort and capital to develop the necessary software and hardware for a "network operations center" ("NOC").  TLI began to operate its NOC in or about January 2001.

78.     With the NOC in place, TLI was able to solidify and expand its customer base and thereafter achieve Gold BusinessPartner status.  At the time, it was the only dealer so designated in the Pacific Northwest.  TLI had also positioned itself to fulfill the growing demand of Definity platform owners for better maintenance and service at a lower price.

79.     Recognizing the opportunity created by Avaya's diminished capacity and the resulting demand by Definity platform owners for better service, TLI, with Avaya's full knowledge and consent, also began offering its own maintenance contracts to owners.  TLI also began actively competing for Avaya's existing maintenance contracts.  Avaya did not, at the time, object to TLI's competitive offerings.

80.     Upon information and belief, other dealers similarly invested significantly to enhance their service capabilities by creating their own networking operating centers, hiring former Avaya employees, and training technicians to meet the service and maintenance needs of Definity platform owners.

81.     TLI and other dealers began to compete effectively for Avaya's entire maintenance and service owner base, substantially increasing their respective revenue.

82.     Although Avaya may not have anticipated increased competition for service and maintenance business from dealers such as TLI, as well as independent service operators that

started to sprout, there can be no doubt that Avaya's own actions directly led to such competition.

83.     Even with their success, the service and maintenance business of TLI and other dealers still only represented a small portion of the aftermarket for the service and maintenance of Definity equipment, with TLI holding less than one percent (1%) of this market.

**C.     Continuant Enters PDS Maintenance And Service Market**

84.     In 2005, Continuant purchased the assets of Dialer Resources, a division of Avaya's BusinessPartner Viable Resources.  Dialer Resources provided maintenance and service to Avaya PDS owners.

85.     After acquiring the Dialer Resource assets of Viable Resources, Continuant began to offer maintenance and service to Avaya PDS owners.

**D.     Avaya Imposes A New Contract With A New Non-Compete Agreement On TLI And Its Other BusinessPartners**

86.     Sometime after Avaya's spin-off, Avaya's management underwent significant changes.  Among the changes, Avaya appointed a new management team to lead the Avaya Services division, which was responsible for Avaya's service and maintenance business.

87.     The new management team decided to reverse Lucent's/Avaya's prior policy of relying on dealers to service Definity and PDS platform owners, and to take action to stop and reverse the erosion of its revenue for maintenance and service that Avaya had experienced since shifting to an indirect channel model.

88.     To reverse course, Avaya began implementing a series of actions overtly designed to stifle the growing direct competition for the maintenance and service of Definity systems from its dealers, such as TLI, and independent service providers.

89.     To avoid competition from dealers while still being able to rely on them under the dealer program to provide support to Definity owners, Avaya revised the standard dealer contract utilized by Lucent and created a new Avaya One reseller agreement.

90.     Unlike the pre-existing dealer contracts carried over from Lucent, the new Avaya One reseller agreement, designed for Avaya's dealers who Avaya now called "BusinessPartners," contained a strict and express non-compete provision that explicitly prohibited BusinessPartners from offering competitive maintenance contracts to any existing Avaya maintenance customer.

91.     This new restriction prohibiting competition for any existing Avaya maintenance customer was a term that had not applied to TLI or, upon information and belief, any other dealer under any previous Lucent or Avaya contract.

92.     In or about November 2002, Avaya first advised TLI of its intention to replace TLI's existing contract with the new Avaya One Contract, and demanded that TLI sign the new contract.

93.     In response, TLI advised Avaya that it could not abide by the proposed non-compete provision because TLI had invested enormous time, effort, and capital in a business model that required maintenance business from existing Avaya customers, and had substantial un-recouped costs and capital invested in its NOC system.  Given its emphasis on marketing to existing Avaya customers since 2000 following Avaya's dramatic layoffs, TLI had developed a substantial portion of its business from Definity owners that had previously purchased service or maintenance from Avaya.

94.     Avaya, nonetheless, advised that TLI would no longer be able to purchase Avaya products for resale if it did not execute the new Avaya One Contract.  Given the drastic

repercussions of Avaya's demands, in or about November 2002, TLI asked Avaya to provide written clarification of the meaning of the non-compete clause.  Avaya refused to provide such written clarification but continued to allow TLI to buy Avaya equipment under the old Lucent contract.

95.     In January 2003, Avaya's legal department circulated internally a revised draft of the new contract, which it referred to as the Simplified Avaya One reseller agreement, soliciting feedback from Avaya personnel.

96.     In describing the new contract, Avaya's legal department noted that the language was revised to reflect its sales channel practices, and reported that, at the same time, it strengthened provisions that were designed to protect against significant risks to Avaya, including, among other things, provisions aimed at preserving the "Avaya maintenance base."

97.     Reflecting Avaya's concern with preservation of its maintenance base, a proposed Attachment to the Reseller Master Terms and Conditions contained the following provision:

> *3.2  Reseller may not seek to or assist any third-party in replacing, interfering with or substituting any preexisting Avaya Service agreement entered into with an End-User customer.  Any act of interference by a Reseller with an existing Avaya Service Agreement shall be a material breach of this Agreement.  Reseller will not market or resell a third party's services in support of an Avaya Product where Avaya has a preexisting Services agreement during the term of this agreement.*

98.     On its face, this revision would preclude BusinessPartners from marketing their own maintenance contract to an Avaya end-user that already was under an Avaya Services Agreement, even end-users who had purchased their Avaya System from the BusinessPartners. BusinessPartners would only be able to compete for the sale of maintenance contracts with businesses that were purchasing Avaya Definity equipment for the first time or had an existing maintenance contract with another BusinessPartner or ISP.  In other words, BusinessPartners

could compete with Avaya only in the extremely limited circumstance when the BusinessPartners were simultaneously bringing a new business into the universe of Definity equipment owners.  Avaya also prohibited BusinessPartners from working with ISPs to offer maintenance to Avaya system owners with a preexisting Avaya maintenance agreement.

99.     When combined with Avaya's efforts to limit dealer sales activity to smaller and mid-sized businesses, a BusinessPartner's ability to sell its own service and maintenance would effectively be limited to the smaller businesses that generate the least amount of revenue.  Thus, the non-compete provision proposed by Avaya effectively would lock up Avaya's entire maintenance portfolio by eliminating competition from the only businesses that, in Avaya's view, could offer a viable alternative service.

100.    In March 2003, Avaya representatives presented TLI with the Simplified Avaya One Contract, together with an ultimatum that TLI would have to sign it by April 1, 2003 or risk termination.  Avaya advised that, absent a signed contract, TLI would no longer be authorized to sell any Avaya product after that date.

101.    Upon information and belief, Avaya similarly threatened other dealers with termination or non-renewal if they did not sign the new Simplified Avaya One Contract and, as a result of such coercion, most Avaya dealers executed that contract in the form originally provided by Avaya.

102.    TLI, however, attempted to negotiate the scope of the prohibition against competing.  In particular, TLI sought permission to continue to compete for a portion of Avaya's existing maintenance customers.

103.    Ultimately, Avaya and TLI agreed upon a compromise, whereby TLI accepted a limited non-compete provision that precluded it from seeking long-term maintenance contracts

from Avaya's top 874 customers, known as "VCP" customers, as listed in Avaya's VCP Named Account list published at that time on the Avaya BusinessPartner website.

104.    With this revision to the non-compete provision, TLI executed the new contract on March 21, 2003 ("2003 Contract").

105.    Relying on its right, under the 2003 Contract, to compete for the maintenance business of customers other than Avaya's VCP customers, TLI continued in its efforts to sell its own maintenance to owners of Definity systems.

106.    However, belying any genuine intent to honor the compromise embodied in the 2003 Contract, Avaya immediately and in bad faith redoubled its efforts to force TLI out of the service and maintenance market.  In or about May 2003, Avaya told TLI that its only options were either to stop offering maintenance contracts to *all* Avaya customers – notwithstanding the expressly negotiated term of the new 2003 Contract – or be terminated.  TLI refused to comply with Avaya's improper threat.

107.    Avaya then attempted to get TLI out of the maintenance and service market by offering to buy TLI's maintenance portfolio at a purchase price that was substantially below market value.  TLI rejected Avaya's woefully inadequate offer, which TLI believed was not made in good faith.

### E.    Avaya Wrongfully Terminates TLI's Contract

108.    Having failed to acquire TLI's maintenance business through fair and amicable means, Avaya promptly resorted to the only remaining option – a wrongful termination of the 2003 Contract with TLI.

109.    Avaya's notice of termination of the 2003 Contract just four months after it was executed and a mere one month after TLI was honored by Avaya's largest distributor as the

"2003 Dealer of the Year – Western Region" plainly demonstrated that Avaya had no intention of abiding by the specifically negotiated non-compete provision.

110.    Disregarding the 2003 Contract's requirement that Avaya provide TLI with sixty (60) days advance written notice prior to termination, Avaya improperly, immediately reneged on its contractual obligations thereunder and treated TLI as though the 2003 Contract was terminated as of the date of the notice letter.

111.    In particular, Avaya began immediately advising TLI's customers that TLI was no longer an Avaya dealer, that TLI would not be able to honor its maintenance and service contracts to its customers, and that Avaya would no longer provide any support for the system if the customers continued to permit TLI to work on their systems.

112.    Avaya also immediately cut off TLI's ability to purchase parts from Avaya's distributors or dealers and access to Avaya's Technical Support Office ("TSO").

## III.    Avaya's Conspiracy With BusinessPartners To Limit Competition

### A.    The Modified Avaya One Contract

113.    Although TLI refused to execute the standard version of the Avaya One Contract and was wrongfully terminated as result, the majority of BusinessPartners, upon information and belief, executed a standard version of the Avaya One Contract.

114.    Subsequent to TLI's termination, Avaya made further changes to the specific terms of the standard Avaya One Contract, including addressing whether BusinessPartners would be permitted to respond to a request for proposal ("RFP") for maintenance issued by a Definity systems owner within ninety (90) days prior to expiration of an existing Avaya maintenance agreement.

115.    Aside from the exception allowing a BusinessPartner to respond to such RFPs, the final version of the Avaya One Contract utilized by Avaya still prohibited all BusinessPartners, generally, from offering competitive maintenance contracts to any existing Avaya maintenance customer.

116.    Upon information and belief, Avaya terminated the BusinessPartner status of any other former Avaya dealer, reseller or BusinessPartner that, like TLI, refused to sign the Avaya One Contract.

**B.      Avaya's Rules of Engagement / Sales Engagement Principles**

117.    In or about March 2003, Avaya also began to seek restrictions on competition between Avaya and its BusinessPartners in addition to the non-compete provision of the revised Avaya One reseller contract which Avaya had introduced in 2002 and 2003 and compelled BusinessPartners to execute under threat of termination.

118.    In particular, Avaya proposed new "Rules of Engagement" (later called "Sales Engagement Principles") by which Avaya and its BusinessPartners agreed not to solicit maintenance business for Avaya products from the existing customers of the other, and not to attempt to replace the other's service contracts regardless of where they are in the term of the contract.

119.    Avaya developed the Sales Engagement Principles in consultation with Avaya's BusinessPartner Council, a group of BusinessPartners that Avaya hand-picked to represent the perspective of BusinessPartners in addressing issues of mutual interest to Avaya and its BusinessPartners.

120.    The Sales Engagement Principles, which were approved by the BusinessPartner Council on or about September 1, 2003, provided, among other things, that:

(a) The Sales Engagement Principles are considered to be Avaya policy and should be adhered to;

(b) Failure to adhere to the Sales Engagement Principles could result in termination of Avaya and/or BusinessPartner's personnel;

(c) The Sales Engagement Principles are intended to direct the market activities of Avaya and BusinessPartners with respect to the sale of telephony systems and post-warranty maintenance and service;

(d) Avaya or the BusinessPartners taking service revenue from the other is against the spirit of partnership;

(e) Avaya and the BusinessPartners may not solicit service business from the other's existing customers and will not attempt to replace the other's service contracts.

121.    Avaya's intent in issuing these Sales Engagement Principles was to further bolster its ability to prohibit BusinessPartners from competing against Avaya for Avaya's existing maintenance customer base.

122.    While the Sales Engagement Principles seemingly applied equally to Avaya as they did to BusinessPartners, Avaya had maintenance contracts with the vast majority of existing Definity systems owners and sought with enactment of the Sales Engagement Principles to protect against any further erosion of its substantial existing maintenance customer base.

123.    In this regard, the Sales Engagement Principles expressly specified that Avaya would have the "direct sales relationship with Strategic and Region-Named accounts."  Under the Sales Engagement Principles, Avaya reserved the right to control the sale of maintenance to these specified, named accounts, which represented Avaya's largest and most valued customers. Under the Sales Engagement Principles, Avaya was not prohibited from actively soliciting the service business on Avaya products from the existing customers of an Avaya BusinessPartner that were listed as a Strategic or Region named accounts.  Similarly, if a BusinessPartner received an RFP from a customer listed as a Strategic or Region named account, the

BusinessPartner was expected to collaborate on the response strategy with Avaya's Direct Account Team.

124.   BusinessPartners who offered their own maintenance and who agreed to sign the Avaya One Contracts and/or abide by the Sales Engagement Principles were able to conspire with Avaya to allocate the remainder of the maintenance market for Definity systems by excluding competition from ISPs in the manner described herein.  Upon information and belief, Avaya's Sales Engagement Principles and the other elements of its anti-competitive conspiracy with its BusinessPartners remain in effect today.

125.   Upon information and belief, since implementing the Avaya One Contract and Sales Engagement Principles, Avaya has terminated the BusinessPartner status of numerous other BusinessPartners that have sought to compete against Avaya for maintenance.

126.   Indeed, since implementing the Avaya One Contract and Sales Engagement Principles, Avaya has significantly reduced the total number of Avaya BusinessPartners, as well as the number of Avaya BusinessPartners "authorized" to resell Avaya enterprise PBX systems. As a result, the number of BusinessPartners whom Avaya contends are permitted access to logins necessary to perform maintenance, and thus who, in Avaya's view, are permitted to perform maintenance on Avaya PBX systems, has significantly dwindled since 2003.

IV.   **Avaya's Deceptive and Abusive Control of System Access for Definity Platform Owners**

127.   In addition to conspiring with BusinessPartners to limit competition for maintenance of Definity platforms and terminating BusinessPartners who refuse to adhere to Avaya's restrictive policies, Avaya has also, over the past several years, engaged in increasingly aggressive tactics designed to abuse its alleged intellectual property rights in purportedly proprietary commands that are necessary to efficiently and effectively perform essential and

basic maintenance functions, including commands that are absolutely necessary for a customer or a vendor of its choosing to remotely maintain a customer's Definity system.

A.    **The Nature of the Software Embedded Within Avaya's Definity Systems**

128.    Avaya's Definity systems are comprised, at the most general level, of hardware, firmware and software.

129.    Avaya's Definity systems contain two types of software – the operating systems software and the telephony application software.

130.    As a general matter, operating systems software is designed (much like Windows operating systems) to perform basic systems tasks such as controlling and allocating memory, managing the sharing of resources and files of a system, and providing a platform for other software applications.

131.    Over the course of time, Avaya and its predecessors have utilized different operating systems software on the Definity line of PBX products.  Avaya's current release of Definity systems utilizes an open-source operating system software known as Linux.

132.    In contrast, the telephony application software, which is loaded on to the main server of a Definity system, is designed generally to provide all of the functions and features of the phone system purchased by a customer.

133.    Avaya, internally, divides the architecture of the telephony application software into three general categories – call processing, administration and maintenance.  According to Avaya's view of the architecture of the telephony application software for Definity systems, call processing generally refers to the aspects of the telephony application software that permits the functioning of the telephone systems, for example, the ability to push buttons on a particular telephone handset to then have that telephone line route a call to the appropriate, intended

recipient, and to connect the call.   Administration generally refers to the portions of the telephony application software that performs functions relating to the configuration and set up of the overall phone system, for example, inputting information about specific individual users and associated phone numbers into the system's database, and the nature or scope of the telephone features available for use by the users of the phone system.   Maintenance generally refers to the portions of the telephony application software that perform diagnostic testing, whether automatically or on command, of the various components of the overall system, to ensure that the components are functioning properly, and also allow a technician to resolve any problems with the functioning of the system, including via remote access.

134.   However, these categories of the telephony application software do not, themselves, constitute separate or distinct software applications, or even clearly defined parts that make up the telephony application software.   To the contrary, they pertain to the nature of the functions, as described by Avaya's engineers, that can be performed using certain aspects of the telephony application software.   Even so, Avaya's engineers disagree as to whether certain commands that perform certain functions fall under administration or maintenance.   In fact, Avaya engineers may characterize and have characterized some commands or the functions they perform as both administration and maintenance.

135.   There are numerous distinct commands that can be performed using the telephony application software, and the functions that can be performed, whether administration or maintenance (or both), multiply exponentially depending on the number of different objects upon which those commands can be directed.   For example, the same command – "test" – can be applied to numerous, distinct objects within the Definity system, such as the station ("telephone handset"), trunk or other component.

136.    Following a customer's purchase of a Definity system, the telephony application software is, as a general matter, loaded seamlessly onto a customer's Definity platform during installation.

137.    Although the telephony application software is capable of performing various functions, including call processing, administration, and maintenance functions, the telephony application software is not loaded separately or in pieces according to these categories of functions.  Similarly, the telephony application software does not physically reside within the memory of the server based on these categories of functions.

138.    Upon information and belief, to the extent that there is any distinct aspect of the software as it is loaded onto or resides in a customer's system, the distinction relates to aspects of the software that are generic to all Definity systems versus the aspects of the software that reflect the specific customer's system, known as "translations" (such as specific features, phone numbers associated with individual lines, and the like).

**B.     The Use of Logins As Access Blocks to the Telephony Application Software on the Definity Systems, and the History of Maintenance Software Permissions and the DADMIN Login**

139.    Avaya's Definity systems utilize blocks to restrict access to the telephony application software embedded within the Definity systems.  These access blocks, generally, are in the form of a login, which requires any user of the system to enter a username and a password associated with the username to gain access to the telephony application software.

140.    Upon information and belief, AT&T first inserted access blocks into its enterprise telecommunications systems while a legal monopoly, and continued to manufacture systems with an access block after its divestiture.  Existing systems did not have the access block removed, and new systems were installed with the access block in place.

141.    Upon information and belief, the original purposes of the access blocks were not to unfairly restrict competition, as Avaya now seeks to do, but for other reasons that were not intended to restrict the ability of a customer, or a vendor of its choosing, from accessing commands necessary to perform maintenance functions.

142.    Upon information and belief, one original purpose of the access blocks, generally, was as a security measure designed to prevent any user without sufficient technical expertise from accessing certain commands or functions that, if improperly utilized, could damage the system.    Another original purpose was to protect the customer from toll fraud, *i.e.*, the unauthorized use of a customer's telephone system by a third party at the expense of the customer.

143.    Avaya and its predecessors have, over time, created and issued various types of logins for its line of Definity systems for use by various types of users, including the customer (including their employees or any other users designated by the customer), Avaya technicians or engineers, and Avaya BusinessPartners.    Avaya's Definity systems currently have two customer level logins – a user and super-user login.    Avaya's Definity systems also have various Avaya technician services level logins, including the CRAFT login, which is the lowest level Avaya services login.    A Definity system owner using a super-user login can, generally, execute the same commands that perform maintenance functions that can be executed with a CRAFT login, with the use of Maintenance Software Permissions ("MSPs").    The DADMIN login is an alternative login to the CRAFT login that Avaya provides, at a customer's request, to BusinessPartners.

1.     **Maintenance Software Permissions**

144.    Upon information and belief, in the late 1980s, certain, large end-users –
universities and federal government agencies – began to develop their own, in-house technical
capability to perform many of the basic maintenance functions that AT&T had been performing
under a maintenance contract.

145.    In response to pressure from these large end-users, AT&T, in the late 1980s,
created MSPs to grant customers the same level permissions to execute commands as the
"CRAFT" login.

146.    MSPs are not separate software for execution of any commands or performance of
maintenance functions.  Rather, MSPs, once enabled, simply allow a customer, using certain,
pre-existing customer-level logins, to execute certain commands that allow for performance of
maintenance functions using portions of the telephony application software that is already
embedded and continually operating on the customer's system.

147.    To enable MSPs, Avaya simply changed a note in the permissions screen for the
customer login from "N" to "Y" for the specified level of permissions for each category of
objects (*i.e.*, stations and trunks, systems and processors, and the like).

148.    In or about June of 1990, AT&T created two, formal MSP offerings, one for
stations and trunks and another for the processor.  The MSPs for stations and trunks could, at the
customer's request, be activated upon payment of a one-time installation fee of $100.00; there
was no right-to-use fee involved.  The MSPs for the processor could be activated upon payment
of the same, one-time fee, plus an additional, one-time right to use fee of, upon information and
belief, $1500.00.

149.    Upon information and belief, AT&T and Lucent did not prohibit a customer that purchased MSPs to authorize a third party vendor or service provider of the customer's choosing from accessing its Definity system.

150.    Upon information and belief, the installation fee represented the actual cost for a technician to install the MSP.

151.    Upon information and belief, prior to the creation of MSPs, AT&T may have also offered a different type of customer-level login, no longer in existence within Avaya's Definity platform, that allowed a customer to execute certain of the commands necessary to perform maintenance functions.

152.    Upon information and belief, prior to the creation of these MSP offers, AT&T employees also had the ability to, and did, grant to specific customers the ability to execute certain commands that, prior to creation of formal MSP offerings, required CRAFT level permissions.

153.    Customers using MSPs continue to utilize existing customer logins to access their systems, with permissions granted within the system to allow the customer login to execute certain commands.

154.    By 1996, Lucent had changed its policy with respect to its MSP offers.  MSPs were provided without additional cost to end-users who requested them and maintained a service contract with Lucent.  End-users who did not have a service contract with Lucent could also obtain MSPs through a Maintenance Assist Offer, pursuant to which the end-user paid a monthly fee.  By December 1999, the monthly fee was $0.60 per port (or down to $0.45 per port with volume discounts) and remained at that price until March 2005.

155.    Although Lucent adopted a new Maintenance Assist offer, Lucent did not actively market this offer, as its primary goal was to sell a Definity system owner a full Lucent maintenance contract.  As such, only a small percentage of Definity owners purchased the Maintenance Assist offer.

156.    Following its spin-off from Lucent, Avaya continued to offer the same Maintenance Assist offer.

157.    As with Lucent, Avaya also chose not to actively market this offer, as its primary goal was to sell a full Avaya maintenance contract to a Definity systems owner.

### 2.    The DADMIN Login

158.    In or about January 2001, Avaya introduced an alternative login, called "DADMIN."  Avaya created this additional login to facilitate Avaya's increasing reliance at that time on its indirect, dealer channel.

159.    Prior to the introduction of the DADMIN login, Avaya resellers, dealers and BusinessPartners were given CRAFT logins to access customer systems for purposes of installing, configuring, servicing or maintaining a customer's system.

160.    The user of a DADMIN login can execute the same basic commands that are capable of being executed with a CRAFT level login and/or a customer login with MSPs enabled (*i.e.*, super-user login).

161.    Consistent with industry practice, Avaya provided the DADMIN login to dealers at no charge, upon written request from a Definity system owner whose system the dealer needed to access.  To make the request, the Definity system owner would complete and sign a BusinessPartner Temporary or Permanent Login Request form.  A Definity system owner could request that Avaya provide its chosen BusinessPartner with either a temporary or permanent

- 37 -

login request, and would typically request a permanent login if it anticipated an ongoing relationship with the BusinessPartner.

162.    Upon receipt of the form, Avaya would activate a DADMIN login within the Definity system owner's system and assign the DADMIN login with a default password (login username = dadmin; default password typically "dadmin1" or some variation) and advise the Definity system owner and its chosen BusinessPartner, after which Avaya would relinquish control of the DADMIN login to the BusinessPartner and its customer.

**C.    The Historical Lack of Disclosure to Customers About Access Blocks**

163.    AT&T and Lucent typically did not disclose to first-time purchasers of Definity systems that their ability to access or use the commands embedded in the Definity platform could in any way be restricted.

164.    Similarly, AT&T and Lucent typically did not disclose to first-time purchasers of Definity systems that, without MSPs, there were severe restrictions and limitations on which commands a customer, using a customer level login, could execute.

165.    Similarly, AT&T and Lucent typically failed to disclose to purchasers of Definity systems any information that would allow the customer to determine which commands existed and could be performed on the system, which commands were needed to perform maintenance functions, including remotely, and which commands could or could not be performed by each type of login, or by a customer using a super-user login with or without MSPs.

166.    In fact, upon information and belief, until a few years ago, Avaya or its predecessors did not even possess or compile any list of commands that could be performed with or without MSPs.

167.     As such, upon information and belief, employees of AT&T and Lucent, including the employees responsible for selling Definity systems, did not – and could not – have any understanding of the number and scope of commands that a customer could or could not execute without MSPs.

168.     AT&T and Lucent also typically did not disclose to first-time purchasers of Definity systems that the customer's ability, or that of the vendor of the customer's choosing, to perform maintenance functions using the software that was embedded and continually operating within the customer's system would, or even could, be restricted.  Upon information and belief, AT&T and Lucent never had any policy in which they refused to provide support or MSPs to a customer that utilized an ISP for maintenance.

169.     Similarly, AT&T and Lucent did not reveal to purchasers of Definity systems that, without MSPs, DADMINs or some other login with CRAFT-level permissions, ISPs could not access all the commands required to perform maintenance functions, including most notably, remote maintenance.

170.     Upon information and belief, given the lack of disclosure to purchasers of Definity systems of any restrictions on their ability to use commands to perform maintenance functions or hire a vendor of their choice to do so, owners of Definity systems lacked any understanding that AT&T, Lucent or any successor would or could restrict access by them, or their chosen vendor, necessary to maintain or service their Definity systems.

171.     Far from it, upon information and belief, purchasers of Definity systems reasonably believed that, with their purchase of the Definity platform, they were purchasing the ability to access and utilize the commands to perform the maintenance functions, including the most basic of functions, necessary to maintain a system through its expected lengthy life-cycle,

as an owner would with any other of Avaya's non-Definity systems or systems of Avaya's competitive OEMs.  An owner would reasonably believe so because the ability to execute the maintenance functions is an integral and essential part of the overall functionality of a Definity system.  Upon information and belief, no other OEM restricts, through access blocks or otherwise, a system owner's ability to access commands that perform maintenance functions using the software embedded on the owner's system.

172.    Avaya's BusinessPartners have also, through their own actions, led Definity system owners to believe that there are no restrictions on their ability to use logins to access commands necessary to perform maintenance functions.

173.    In particular, many Avaya BusinessPartners have previously provided their customers with either DADMIN or, upon information and belief, an equivalent CRAFT level login.

174.    Upon information and belief, as a result of the conduct of Avaya BusinessPartners, many Avaya Definity owners do not believe that there are any restrictions on a BusinessPartner's right or ability to provide them with a DADMIN or CRAFT level login, and do not have any knowledge of any restrictions on their right to use DADMIN or CRAFT level logins.

175.    Upon information and belief, as a result of the lack of disclosure by Avaya and its predecessors, and the actions of Avaya's own BusinessPartners, many Definity system owners do not even understand the distinction between DADMIN, CRAFT and MSPs, let alone whom Avaya asserts is entitled to use each login or permission.

**D.      The Historically Broad Scope of Purchasers' Software License Grants and Lack of Express Restrictions on Use of MSPs or DADMINs**

176.     AT&T and Lucent not only failed to disclose to customers any restrictions on their ability to access or use the commands necessary to perform maintenance, or use of ISPs to do so, they also employed language in the software license provisions of purchase agreements that granted owners of Definity systems a broad license for the use of the embedded software, without restriction in terms of access to specific commands necessary to perform maintenance functions or ability to use a vendor or contractor of its choosing to do so.

**1.      Lucent's Form Purchase / Service Agreement and Related Agreement Documentation**

177.     For example, in the form of Purchase/Service Agreement used by Lucent at least as early as 1996, Lucent granted to purchasers of Definity systems a "personal, non-transferable and non-exclusive right to use, in object code form, all software and related documentation furnished under this Agreement." This software license grant was limited, generally, to use with the equipment for which the software was obtained, and customers were also prohibited from taking steps to derive a source code equivalent of the software or to develop other software. This license grant, however, failed to restrict in any way the ability of the purchaser to utilize any of the commands necessary to perform maintenance, to utilize the maintenance functions, or to employ ISPs to do so.

178.     To the contrary, the purchase documentation would specify, and thereby limit, the scope of the true, right-to-use licenses or features purchased by the end-user, for example, in connection with the number of individual telephone users / number of ports.

179.     The limitation of the license as "personal, non-transferable" was intended to pertain to the sale or transfer of the equipment by the purchaser to a new end-user, and not

intended to restrict the ability of the purchaser to hire the vendor or service provider of its choice to use or maintain any part of the software that the purchaser was entitled to use under the broad terms of the software license grant.

180.    In fact, the form Purchase/Service Agreement utilized by Lucent expressly recognized that purchasers might use ISPs for maintenance or service of their Definity systems. For example, the licensing provisions required the end-user to use its best-efforts to ensure that the purchaser's "employees and users of all software licensed under [the] Agreement" complied with its terms and conditions.   Additionally, Lucent's form Purchase/Service Agreement expressly advised purchasers that the decision to acquire, among other things, "service from parties other than Lucent" was the purchaser's decision.   Under the form Purchase/Service Agreement used by Lucent, should the purchaser elect to acquire any "third party products," defined to include "services," Lucent disclaimed any responsibility or liability for the performance or quality of such "third party products."

181.    In addition to the form Purchase/Service Agreement, Lucent also utilized a document called the Lucent "Service Offerings and Support Plans." ("SOSP").   The form Purchase/Service Agreement expressly incorporated by reference the SOSP as part of the agreement.  The purpose of the SOSP, generally, was to describe the scope of Lucent's service obligations under warranty, a term plan and a full service agreement and the service options available to a Definity systems owner.

182.    The Lucent SOSP, however, did not modify in any way the scope of the software license grant contained in the master Purchase/Service Agreement.  The Lucent SOSP also failed to disclose any restrictions on the Definity system owner's right to execute commands to perform functions using the embedded software, including maintenance functions.

183.   Following its spin-off from Lucent, Avaya continued to use the same, standard form of Purchase/Service Agreement and SOSP until early 2003.

### 2.   Lucent's Addendum for use of MSPs

184.   Upon information and belief, when AT&T sold MSPs to Definity systems owners for a one-time fee, AT&T did not impose any restriction on an owner's use of the MSPs or otherwise modify the scope of the owner's license to use the embedded software granted in the Purchase/Service Agreement.

185.   Upon information and belief, Definity system owners that purchased MSPs for a one-time fee believed that they had purchased the MSPs for the life of the Definity system, irrespective of the owner's version of the system or if the owner upgraded.

186.   At some point after Lucent developed the Maintenance Assist offer, Lucent began to utilize a form of contract addendum to the Definity system owner's original Purchase/Service Agreement, governing the use of MSPs.  In the form of Addendum, Lucent specified, in relevant part, that Lucent was granting to the Definity owner a "personal, non-transferable and non-exclusive right to use the Lucent Software Permissions" to maintain the specified objects (whether Stations and Trunks or Processor and System), for a one-time installation charge.

187.   Upon information and belief, the reference to "personal" and "non-transferable" had the same meaning and intent it did as used in the master form of Purchase/Service Agreement used by Lucent at that time.

188.   The form of Addendum governing use of MSPs also indicated that the Definity system owner could continue its right to use the Lucent Software Permissions even after termination of a Lucent service agreement, "at the charges and under the terms and conditions in

effect at the time." The Addendum, however, failed to specify what the referenced "charges" were.

189. Upon information and belief, Lucent may have modified the language of some of the Addenda signed by certain customers in or about 1999 to provide that, "upon the termination of your Lucent Service Agreement, you agree to allow Lucent either remote access to your system, or access to your premises if your remote access line has been disconnected, to de-activate the Lucent Software Permissions to Maintain Stations and Trunks."

190. However, upon information and belief, Lucent continued to use the prior language permitting the Definity systems owner the continued use of MSPs after termination of a Lucent service agreement as its standard form, and Avaya continued to use that language in its standard form Addendum and did not change the standard language in the form Addendum utilized by Avaya until as late as June 2003.

191. Upon information and belief, customers that had purchased MSPs for a one-time fee, prior to Lucent's development of its Maintenance Assist offer, believed that they had the continued right to use MSPs irrespective of whether they had any maintenance or service agreement with Lucent.

192. Upon information and belief, customers that had obtained MSPs from Lucent or Avaya after executing the original, standard form of Addendum believed that they were purchasing MSPs for a one-time fee, and had the continued right to use MSPs irrespective of whether they had any maintenance or service agreement with Lucent.

193. Upon information and belief, all Definity system owners that obtained MSPs from Lucent also believed that they had the right to hire any ISP of its choosing to perform any maintenance or service of its system, and to use the owner's MSPs to do so.

E.    **Avaya's Attempts To Retroactively Change And Restrict Licensing Rights**

194.    In response to increasing competition from both BusinessPartners and ISPs for maintenance of Definity systems, Avaya implemented a series of increasingly aggressive policies to restrict access to the necessary passwords and permissions, and sought to justify its restrictions by concocting so-called intellectual property rights to the logins and MSPs and the commands embedded in the Definity system that are required to perform maintenance.

195.    Avaya's assertion of its alleged intellectual property rights to hold hostage the passwords and permissions, and thereby restrict access to commands and ability to provide maintenance, is merely a pretext for what is in fact an attempt to eliminate competition as well as an abuse of any purported intellectual property rights Avaya may have in the passwords or maintenance software.

1.    **Avaya's Changes To The Master Purchase / Service Agreement**

196.    First, Avaya began to change its form of master Purchase/Service Agreement with Definity system owners.    In or about March 2003, Avaya abandoned the form of Purchase/Service Agreement utilized by Lucent and Avaya, and created a more extensive "Master Purchase/Service Agreement (United States)", with various Attachments, as the standard or master form of agreement with purchasers of Definity systems (Avaya subsequently renamed it the "Customer Agreement").

197.    The general terms and conditions of the agreement, including the software licensing provisions, were set forth in Attachment A to the new, Master Purchase/Service Agreement.    Under this new form of agreement, Avaya changed the general license grant to generally grant the purchaser a "non-sublicenseable, non-exclusive, non-transferable license to

use the Software and Documentation provided under the Agreement" for the purchaser's "internal business purposes at the indicated capacity levels and locations in the United States." Avaya failed to define the term "non-sublicenseable."  Avaya also failed to indicate any change in intent of the meaning of the term "non-transferable" contained in the license grant.

198.    In its new form of agreement, Avaya also modified and added to the specified restrictions on the software license grant.  Avaya, however, failed to disclose or identify in the software license provisions any restriction on the purchaser's ability to access the commands necessary to perform maintenance, or to use a vendor or service provider of its choosing to perform maintenance on the purchaser's system.

199.    In changing the master form of Purchase/Service Agreement, Avaya also discontinued the use of the SOSP and, instead, created a new document called the Service Agreement Supplement ("SAS").  In creating the SAS, Avaya separated the substance of the SOSP, placing some of the content directly into the new form of Master Purchase/Service Agreement and others into the SAS.

200.    As with the SOSP, the SAS is intended to provide a description of Avaya's service obligations and the service options available to a purchaser of a Definity system. However, unlike the SOSP, the SAS (or its terms) is not expressly incorporated by reference as part of the Master Purchase/Service Agreement.  Instead, the Maintenance Services Terms – Attachment D to the Master Purchase/Service Agreement – defines the SAS and refers to it as one of the documents describing the maintenance and service support options offered by Avaya.

201.    However, both the Maintenance Services Term attachment and the SAS itself state that, to the extent the SAS and the master agreement conflict, the master agreement governs.

202.    The SAS does not set forth any provisions that can or do restrict the scope of the license grant provided in the Master Purchase/Service Agreement.

203.    Upon information and belief, the SAS was, unlike the SOSP, intended to be considered as marketing collateral, and not part of the contract with the purchaser.

204.    Even so, Avaya sought, in the SAS, to refer to specific logins for the Definity system as Avaya logins (INIT, INADS, DADMIN and CRAFT) that protect and restrict access to Avaya's "proprietary software" or restrict the use of logins to access the purported "proprietary software."  Avaya also sought, for the first time in any documentation intended to be provided to purchasers of Avaya Definity systems, to identify restrictions on a customer's ability to utilize logins that access Avaya's purported, "proprietary software" or, alternatively, MSPs.

205.    Avaya, however, failed to provide a copy of the SAS to all Definity system purchasers as part of the agreement.  In fact, Avaya has previously admitted that its policy was to make SAS documents available to customers upon request.

206.    Despite Avaya's inability to demonstrate that each purchaser obtained a copy of the SAS or that the SAS is a part of each purchaser's agreement, Avaya has sought to retroactively impose on Definity systems owners the purported disclosures set forth in the SAS concerning restrictions on the use of certain logins, MSPs and access to the "proprietary software."

207.    Upon information and belief, Avaya has claimed, in dealings with Definity systems owners, that a current form of SAS governs the software license despite the fact that the owners never received a copy of the SAS at the time of or prior to executing a Master Purchase/Service Agreement.

2.     **Avaya's Changes To The Restrictions On Use Of MSPs**

208.   Avaya has also sought to restrict retroactively an owner of a Definity systems right to use MSPs.  Avaya has attempted to enforce the terms of a later form of Addendum and purported restrictions set forth in the SAS, to deny a Definity system owner's right to continued use of MSPs without an Avaya service agreement or Maintenance Assist, without first attempting to determine whether the Definity owner had the right to continued use of MSPs even without an Avaya service agreement or Maintenance Assist.

209.   In fact, Avaya has deliberately sought to take advantage of Definity systems owners who, as a result of the passage of time, may have misplaced the original agreements with Avaya or its predecessors, to impose retroactively new license terms or restrictions that may be contrary to the original purchase agreement.  Upon information and belief, Avaya has only been willing to honor prior agreements between a Definity systems owner if the owner is able to produce the contract.

210.   Avaya has also sought to unilaterally and retroactively change, to the detriment of the customer, the meaning of "personal" and "non-transferable" in the Addendum, to claim that those terms restrict the ability of a Definity system's owner to hire an ISP to maintain the owner's system with the benefit of MSPs.  Avaya has also attempted to impose unilaterally and retroactively changes of the meaning of these terms upon all customers, in disregard of the actual intent of the Addendum in place at the time that the customer obtained MSPs.

211.   Avaya's unilateral and retroactive change of its predecessors' original intent and meaning of these terms to contend that customers who obtained MSPs never had the ability to permit their use by an ISP of their choosing contradicts Ms. Schumacher's October 28, 2003 Verification (filed by Avaya with this Court in opposition to an application for temporary

restraints filed by TLI), in which she acknowledged at that time that Avaya discussed all of options available to a customer for maintenance, including T&M maintenance, self-maintenance and maintenance by an ISO, along with the "customer's need to purchase the Maintenance Assist offer it elects self-maintenance or maintenance through an ISO."

### 3. Avaya's Changes To The Disclosures In The DADMIN Request Form

212.    As with the master form of Purchase/Service Agreement and the Addendum for use of MSPs, Avaya has also changed the form used by a Definity systems owner to request a DADMIN login.

213.    When Avaya first created the DADMIN login in 2001, the login request form failed to disclose any restrictions on the use of DADMINs by the owner's authorized BusinessPartner, or by the owner itself.

214.    Sometime after 2005, Avaya changed the form for requesting DADMINs on several occasions to include language that restricted the use of DADMINs.

215.    For example, Avaya added a footnote to a version of the DADMIN request form indicating that DADMINs were for the use of the BusinessPartner "only."

216.    Upon information and belief, Avaya also made another change to the DADMIN request form, adding a different footnote that indicated that Avaya had the right to access a customer's switch and remove the DADMIN password if Avaya later revokes the DADMIN privileges of the BusinessPartner for whom the customer requested DADMIN authorization.

## V.    Avaya's Deceptive and Abusive Attempts To Control System Access for PDS Platform Owners

217.    In addition to conspiring with BusinessPartners to limit competition for maintenance of Definity platforms and terminating BusinessPartners who refuse to adhere to Avaya's restrictive policies, Avaya has also over the past several years engaged in increasingly

aggressive tactics designed to abuse its alleged intellectual property rights in purportedly proprietary commands that are necessary to efficiently and effectively perform essential and basic maintenance functions, including commands that are absolutely necessary for a customer or a vendor of its choosing to maintain a customer's PDS equipment.

218.    As with Avaya's Definity systems, Avaya PDS equipment are comprised of hardware, firmware and software and contain two types of software – the operating systems software and the PDS application software.

219.    Over the course of time, Avaya and its predecessors have utilized different operating systems software on its PDS equipment, including open-source operating system software such as HP-Unix.

220.    In contrast, the PDS application software, which is loaded on to the main server of a PDS server, is designed generally to provide all of the functions and features of the PDS purchased by a customer.

221.    In order to perform maintenance of an Avaya PDS, access is required to both the PDS operating system software and the PDS application software.

222.    As with Avaya's PBX systems, Avaya's PDS equipment utilize logins to access the PDS operating system software and the PDS application software.  The login typically required to gain access to the PDS operating system software for purposes of performing maintenance is the standard, ROOT login created by HP-Unix for HP-Unix operation system software.  The login typically required to access the PDS application software for purposes of performing maintenance is the ADMIN login.

223.    Avaya contends that only users with authorized ROOT or ADMIN logins are permitted to access the software on Avaya PDS equipment in order to configure, install and/or "provision" the software on Avaya PDS equipment.

224.    Avaya also contends that the ROOT and ADMIN logins are proprietary Avaya logins that Avaya has only provided to Avaya employees, Avaya's authorized BusinessPartners and a few end-users who are provided ROOT and ADMIN level access under special arrangements with Avaya (whom Avaya refers to as "ESP Customers"), and that such BusinessPartners and ESP Customers are contractually prohibited from providing ROOT or ADMIN logins to, or allowing their use by, end-users or third parties.  Avaya further contends that BusinessPartners are also contractually prohibited from configuring, installing and provisioning the software for PDS systems without authorization from Avaya.

225.    Given Avaya's allegations that it has only provided ROOT and ADMIN logins to Avaya employees, certain Avaya BusinessPartners and a few end-users, and that such logins cannot be used by third parties, Avaya effectively seeks to preclude any ISP from performing maintenance on Avaya PDS equipment, or from configuring, installing or provisioning any Avaya PDS software.

226.    Upon information and belief, although Avaya alleges that it has provided ROOT or ADMIN logins to Avaya's authorized BusinessPartners, Avaya has, over time, permitted only a small number of Avaya BusinessPartners to have ROOT or ADMIN level access in order to perform maintenance services on Avaya PDS systems.  Indeed, upon information and belief, Avaya has, over time, reduced the number of BusinessPartners it permits to have ROOT or ADMIN level access to perform maintenance, and that Avaya presently does not authorize any Avaya BusinessPartner to have ROOT or ADMIN level access to offer, sell, provide or perform

a BusinessPartner's own maintenance on any Avaya PDS equipment.   Under these circumstances, in Avaya's view, an end-user presently has no option but to transaction with or utilize Avaya to maintain Avaya PDS equipment.

227.    However, Avaya has failed to adequately disclose to purchasers of Avaya PDS equipment that there are any restrictions on an end-user's ability to access the PDS operation systems software or the PDS application software to perform maintenance, or to configure, install and/or provision PDS software, or on an end-user's ability to engage the vendor of its choosing to do so.

228.    Avaya also has failed to set forth any restrictions in its purchase agreements with end-users on an end-user's ability to use the Avaya PDS operation systems software or application software to perform maintenance or utilize the ROOT or ADMIN logins to do so, or to engage the vendor of its choosing to do so.

**VI.    Avaya's Increasingly Aggressive Tactics To Restrict Competition from ISPs**

229.    In reaction to continued erosion of its existing maintenance base, Avaya made further changes to its policies in 2005 to restrict the ability of an owner of a Definity system from using ISPs to perform maintenance.

**A.    The Loyalty Discount on Maintenance Assist**

230.    In or about March 2005, Avaya doubled the monthly fee for Maintenance Assist to $1.20 per port, accompanied by a "Loyalty" discount "available to customers that have not and will not contract with any un-authorized 3rd party to provide on-going support of their Avaya communication system for the duration of the Maintenance ASSIST contract" and signed a writing to that effect.  The monthly fee for Maintenance Assist for customers entitled to the new "Loyalty Pricing" was $0.60 per port (or down to $0.45 per port with volume discounts), the

same pricing that Avaya had charged all customers for Maintenance Assist prior to implementing its "Loyalty" pricing scheme.

231.    Avaya enacted this loyalty pricing scheme after learning and with the knowledge that MSPs acquired under Maintenance Assist Agreements were being used by the owners of Definity systems and their ISPs to perform maintenance and service on the systems.

232.    Avaya increased the price of Maintenance Assist with the purpose and intent to eliminate competition from ISPs in the aftermarket for service and maintenance of Definity systems, including specifically competition from TLI.

233.    Upon information and belief, Avaya doubled the price per port for Maintenance Assist and offered the loyalty discount pricing not on the basis of any internal cost or efficiency concerns but in the belief that the additional $0.60 per port that a system owner had to pay for Maintenance Assist would make it cost prohibitive for the owner to also use an ISP for maintenance.  Avaya's action constituted a classic vertical price squeeze in aid of its overall anti-competitive scheme.

**B.    Avaya's July 1, 2005 Policy Change**

234.    Upon information and belief, after assessing the effect of doubling the cost of MSPs to customers of ISPs and determining that it was continuing to lose maintenance and service revenue to ISPs, Avaya began in June 2005 to consider other means to restrict competition beyond simply trying to make a customer's purchase of Maintenance Assist and contemporaneous use of an ISP cost-prohibitive.

235.    Avaya's desire to further restrict a customer's ability to utilize an ISP for maintenance led to Avaya's adoption of an even more restrictive change in policy in July 2005. Unlike Avaya's prior policies, Avaya announced that, effective July 1, 2005, it would completely

withhold any support to any Definity platform owners who did not have a maintenance contract

with Avaya or an Avaya BusinessPartner.

236.    The July 2005 Policy Change provided, among other things, that:

(a)    Avaya **"**will not provide any Per Incident remote or on-site maintenance support to any customer of or directly to an unauthorized service provider, this includes **...** [p]arts replacement – unless covered under Avaya supported warranty"

(b)    "[T]the following services are not available to these customers:

- "Maintenance Software Permissions (MSPs) – Not available without an AGS contract";

- "Maintenance Assist will no longer be available to customers that are supported by unauthorized service providers";

- Product Correction Notices (PCNs) – Non-system critical PCNs are not available without an Avaya maintenance agreement.

(c )    "All requests for remote and on-site maintenance support will be denied when . . . . [Avaya's records indicate] the customer is supported by an unauthorized service provider."

237.    Through its July 1, 2005 Policy Change, Avaya sought, in relevant part, to

prevent customers from being able to rely upon ISPs to perform maintenance with the benefit of

MSPs obtained by a customer under Avaya's Maintenance Assist program or through reliance on

Avaya's support on a T&M basis.

**C.    Avaya's Policy Change Restricting Access to Patches**

238.    Avaya's July 1, 2005 Policy Change also sought to restrict the ability of a

customer using an ISP for maintenance from obtaining "patches" to any Avaya system, including

its Definity or PDS systems, by stating, for the first time, that Product Correction Notices

("PCNs") of a non-system critical nature would no longer be available without an Avaya

maintenance contract.  In effect, Avaya sought to withhold PCNs from any end-user that utilized

an "unauthorized service provider", or an ISP that was not one of Avaya's chosen, authorized

BusinessPartners.   PCNs are, in effect, patches to existing releases of Avaya's application software, including the telephony application embedded on Avaya's Definity and PDS systems. PCNs, or patches, are not considered upgrades of the telephony application software, but instead are fixes to errors, or software "bugs", that are discovered in the telephony application software that a customer has already purchased.

239.   In or about, October 2005, Avaya took additional steps to enforce its new policy regarding access to patches.  Prior to October 2005, patches were provided to all end-users free of charge and were available to the public on Avaya's website.  In October 2005, however, Avaya changed its policy of allowing free public access to patches.  Specifically, Avaya commenced an effort to place patches behind a firewall and instituted a login procedure designed to limit access to the patches to end-users who had a service contract with Avaya or an Avaya BusinessPartner and to deny access to patches to end-users who were customers of ISPs.

240.   Upon information and belief, owners or end-users of Definity systems and Avaya PDS equipment reasonably believed, based on the prior practices of Avaya and its predecessors, that they are entitled to and will receive patches to correct errors or "bugs" with the systems they have purchased from Avaya, that prevent the proper functioning of the system as sold to them by Avaya or its predecessors, irrespective of whether they use an ISP to perform maintenance.

241.   Avaya is the only source for patches for its enterprise PBX system and PDS products.  There are no available substitutes for Avaya's patches.

242.   Upon information and belief, Avaya has sought to restrict customers using ISPs from obtaining patches as another measure to limit the ability of ISPs to compete for the maintenance business, by restricting the ability of  customers or their ISP maintenance provider from obtaining patches that are a necessary component of maintaining a system for its useful life.

- 55 -

**D.**   **Avaya's Letters to Customers Regarding "Unauthorized Service Providers"**

243.   Seeking to leverage the new, restrictive policies that Avaya implemented in July 2005, and relying on its retroactive changes to the scope of software license grant to Definity system owners, Avaya initiated a defamatory marketing campaign targeted against "unauthorized service providers."

244.   Specifically, following implementation of the July 2005 Policy Change, Avaya prepared two forms of letters to be sent, respectively, to Definity system owners (1) with existing Avaya maintenance contracts that Avaya had learned were considering terminating or not renewing an Avaya maintenance contract in order to switch to an ISP, or (2) that had already terminated an existing Avaya maintenance contract to go to an ISP.

245.   In the version of the letter sent to customers of Avaya that were still under Avaya maintenance but were considering using an ISP, Avaya's letter advised the customer of the services that the customer would lose if it cancelled or did not renew its Avaya services agreement, including:   (i) access to Avaya's Remote Technical Support; (ii)  Per Incident Maintenance Support from Avaya;  (iii) MSPs or Maintenance Assist, which by virtue of the July 1, 2005 Policy Change, were no longer available to customers of "unauthorized service providers;" and (iv) Product Correction Notices.

246.   The letter sent to customers of Avaya still under an Avaya maintenance contract also advised that "unauthorized vendors" did not have access to any "Avaya logins which severely reduces their ability to support and maintain Avaya's communications systems," "especially true for remote support."   The letter, however, fails to identify the specific Avaya logins.

247.    In the form of letter to be sent to customers that had already switched to an ISP, Avaya tells its former customers again that "Unauthorized Service Providers do not have access rights to Avaya logins, which may severely reduce their ability to support and maintain Avaya communication systems," and that the lack of such capability reduced, in particular, "remote support."

248.    Upon information and belief, these letters used by Avaya following the enactment of its July 1, 2005 Policy Change represent the first time that Avaya began, as a general practice, to disclose to Definity owners that the ability to maintain a Definity system, including remotely, will be severely reduced without MSPs or an Avaya login.  Avaya also made this new disclosure to customers in these letters, despite the fact that Avaya and its predecessors had routinely marketed the ability of Definity systems to be maintained remotely as one of the benefits of a Definity system.

249.    Unlike the first version of the letter, sent to existing customers, the second letter was far more threatening, expressly warning that "any unauthorized use of, access to, MSPs or any Avaya Login including DADMIN, CRAFT or INIT is a violation of federal and state laws and could result in civil and criminal liability and the assessment of penalties."  In this second letter, Avaya also threatens to "take legal action against violators to protect Avaya proprietary intellectual property."

250.    Having made this threat, Avaya concludes the letter by expressing Avaya's hope to have the opportunity to "win back" the former customer's business by demonstrating a quality service and support model.

251.    As reflected by Avaya's use of the two forms of letter, Avaya deliberately waits until a customer has actually cancelled or not renewed an Avaya service agreement and has gone

to an ISP before advising a customer of Avaya's belief that "Unauthorized Service Providers" cannot legally access the various "Avaya logins." Avaya uses that threat as a last resort to force its former customers back to Avaya by misleading them into believing that they cannot legally use an "Unauthorized Service Provider" to maintain their systems.

**VII.    Avaya's Interference With Counterclaimants' Vendors and Customers**

252.    Since Avaya's wrongful termination of TLI's BusinessPartner status, Avaya has sought to utilize all of the unfair and misleading tactics herein to interfere with the ability of TLI and Continuant to provide owners of Definity systems competitive maintenance and service of those systems.

**A.    Avaya's Interference With Counterclaimants' Vendor Relationships**

253.    Subsequent to its termination as an Avaya BusinessPartner, customers of TLI and, at a later time, thereafter, Continuant, required ongoing support and service from Avaya BusinessPartners.

254.    To fully service the needs of their customers, TLI and/or Continuant established business relationships with various third parties, including, but not limited to, third parties that were also Avaya BusinessPartners.

255.    Upon learning of Counterclaimants' relationships with Avaya BusinessPartners, Avaya applied pressure on the BusinessPartner to cease doing any business with Counterclaimants in connection with Avaya products. Avaya applied pressure by threatening to terminate the BusinessPartner status.

256.    Upon information and belief, Avaya relied on the non-compete provision of the Avaya One Contracts with these BusinessPartners and/or the Sales Engagement Principles, to

contend that the BusinessPartners violated their agreements and the principles by working with or assisting Counterclaimants' maintenance customers.

257.    Avaya applied such pressure despite the fact that Counterclaimants' only sought assistance from or a relationship with Avaya BusinessPartners for the benefit of their customers after Counterclaimants' had already secured a maintenance agreement with the customer.  Thus, the BusinessPartners that teamed with Counterclaimants' did not violate either the Avaya One Contracts or the Sales Engagement Principles, a position that, upon information and belief, one or more of the BusinessPartners asserted in response to Avaya's pressure.

258.    Even so, each of the BusinessPartners that Avaya pressured, ultimately agreed to and in fact did cease teaming with Counterclaimants' or working on behalf of Counterclaimants' customers.

259.    In fact, upon information and belief, sometime in or after 2004, Avaya issued a written communication to its BusinessPartners specifically advising them not to perform any service subcontract work for TLI or on behalf of TLI's customers.

### B.    Avaya's Efforts to Access The Systems Of Counterclaimants' Customers Without Their Authorization Or Even Providing Them Notice

260.    Avaya has also sought to interfere directly with the ability of TLI's and Continuant's customers to perform maintenance functions by itself accessing those customers' Definity systems through improper and deceptive tactics, and then inserting a new access block that locked out both the owner and Counterclaimants.

261.    Subsequent to TLI's termination as an Avaya BusinessPartner, Avaya began to track the loss of maintenance contracts and revenue to ISPs, whom Avaya began, for the first time, to refer to as "unauthorized service providers", and the use of "unauthorized service providers" by owners of Definity systems.

262.     Avaya also began to track the status of MSPs on the Definity systems of former Avaya maintenance customers who had cancelled or terminated their Avaya services agreement to use an ISP.

263.     The customers tracked by Avaya through these efforts included some of Counterclaimants' customers.

264.     After tracking customers of "unauthorized service providers" and/or customers who had MSPs while an Avaya customer but had cancelled or terminated their Avaya service agreement, Avaya engaged in an effort to dial into these customer's phone systems to disable MSPs and otherwise lock out the Definity owners from accessing and using the commands on their own systems necessary to perform maintenance.  Avaya's efforts included dialing into the Definity systems of Counterclaimants' customers.

265.     Avaya typically attempted to access and lock out Definity owners from their own systems without ever advising or providing any notice to the Definity owner of Avaya's intent to access the owner's system.

266.     Upon information and belief, in instances where Avaya has successfully accessed an owner's Definity system and shut off the owner's access, Avaya has typically done so without advising the owner of Avaya's actions or Avaya's belief that it had the right to access the owner's system to restrict the owner's access to certain aspects of the embedded software.

267.     Upon information and belief, in instances where Avaya had difficulty remotely dialing into or accessing a Definity owner's system, Avaya typically still failed to advise or provide notice to the owner of Avaya's need to access the owner's system in order to restrict the owner's access.

268.     Instead, Avaya has resorted to various, deceptive tactics to gain access.

269.    For example, upon information and belief, Avaya has asked former Avaya customers who have switched to TLI and/or Continuant for access into the owner's system for the express purpose only of shutting off the MSPs, only to then restrict access through all logins, including DADMINs.  Upon information and belief, Avaya apparently has even accessed an owner's system without providing any notice whatsoever to the owner, taking advantage of access gained to the system by a technician installing a part in a remote location.  Rather than simply installing the part, Avaya utilized the opportunity to insert a new access block into the owner's system that completely blocked the owner out of the system.

270.    Upon information and belief, Avaya also utilized a form letter requesting that the owner submit to an "audit" of the system, without disclosing Avaya's belief that the owner or its ISP was improperly using any Avaya login or MSPs, or that Avaya intended to block continued access by the owner or its ISP to any part of the embedded software.

271.    Notably, in instances in which Avaya has determined that an owner is improperly continuing to possess MSPs, Avaya has failed to seek to continue to charge customers for the use of MSPs or to bring any legal action against any such owner that, according to the alleged contract documents, is the alleged violator.  Upon information and belief, Avaya has never continued to charge a former customer for use of MSPs or brought legal action against a former customer for continued use of MSPs.

### C.    Avaya's Defamatory Letters to Counterclaimants' PBX Maintenance Customers

272.    Upon information and belief, Avaya issued the second form of letter that Avaya created after implementing its July 1, 2005 Policy Change, or some variation of this letter, to numerous customers of Counterclaimants.

273.    In the letters sent by Avaya to Counterclaimants' customers, Avaya included the accusation that the "unauthorized use of or access to MSPs or any Avaya login, including DADMIN, CRAFT or INIT *is* a violation of federal and state laws and could result in civil and criminal liability." (emphasis added).

274.    By the foregoing statement, Avaya clearly intended to imply to Counterclaimants' customers that TLI and/or Continuant have engaged in illegal and, even, criminal activity.

275.    However, upon information and belief, the employees of Avaya who personally issued such letters to Counterclaimants' customers have no knowledge or understanding of any specific federal or state law that would be violated by any of Counterclaimants' actions in performing maintenance of their customers' Definity systems.

276.    Upon information and belief, the employees of Avaya who personally issued such letters to Counterclaimants' customers also lacked any knowledge of the specific terms or conditions of the recipient customers' software license grant for use of the embedded software, or the specific terms and conditions under which the customer might have received MSPs.

277.    Upon information and belief, the employees of Avaya who personally issued such letters to Counterclaimants' customers also lacked any knowledge of the circumstances under which Counterclaimants may have obtained access to the customer's embedded software, including whether the customer itself was aware of and had been using the DADMIN password, and had provided the DADMIN password to Counterclaimants.

278.    Upon information and belief, Avaya is advising customers of TLI and Continuant that Avaya has sued them for illegal activity in a further attempt to intimidate and scare customers away from TLI and Continuant and force them to turn to Avaya for their service and maintenance needs.

279.     Upon information and belief, Avaya is also using this lawsuit to improperly accuse Counterclaimants of illegal conduct and attempt, through the burdens and costs of litigation, to force Counterclaimants out of business.

**D.     Avaya's Defamatory Communication to Owners of Avaya PDS Platforms**

280.     Upon information and belief, following issuance of the July 1, 2005 Policy Change, employees responsible for the maintenance of Avaya's PDS platforms also sought to use Avaya's new policy to restrict competition from ISPs for maintenance of PDS platforms.

281.     To this end, in or about October 2005, Avaya issued a written communication to owners of Avaya PDS platforms that was similar in content to the letter that Avaya created and issued to former Definity maintenance customers who had switched to an "unauthorized service provider."

282.     In the communication to PDS owners, Avaya advised that "Only Avaya PDS Support and authorized Avaya BusinessPartners can offer and contract to perform maintenance and support to a PDS system without violating existing agreements."

283.     In the communication, Avaya also advised that "Unauthorized Service Providers do not have access rights to Avaya logins, systems and support platforms, which may severely reduce their ability to support and maintain the Avaya PDS system," and that the lack of this capability, in particular, "reduces remote support."

284.     Similar to the letter sent to former Definity maintenance customers, Avaya advised PDS owners that "Any unauthorized access to the PDS system is a violation of federal and state laws and could result in civil and criminal liability and penalties."

285.     Avaya also advised that "all non-maintenance and support services may only be performed by Avaya CSI, or by an Avaya Business Partner."

286.    Avaya issued the communication to Avaya PDS platform owners with the intent of implying that "unauthorized service providers" could not legally perform maintenance or even non-maintenance and support services, for Avaya PDS systems.

287.    The statements in the communication Avaya issued to PDS owners, including prospective or existing customers of Counterclaimants, were false and misleading.

288.    Upon information and belief, the Avaya employees who personally issued this communication to owners of Avaya PDS platforms had no knowledge or understanding of the accuracy of the aforementioned statements made by Avaya in the communication.

## VIII.  Avaya Ties Its Latest Definity and PDS Platforms Software Upgrades to Avaya Support

289.    In or about late 2007, Avaya released for sale to the public the latest release or version of Avaya's call processing or telephony software for use on Avaya's enterprise PBX systems, known as Communications Manager (CM) 5.0.  Prior to the release of CM 5.0, the last release available was CM 4.0.

290.    At the same time, Avaya announced the introduction of its next generation of Definity hardware platform, or server, for its Definity systems.

291.    With the release of CM 5.0, Avaya announced a new policy with respect to the conditions under which Avaya will agree to sell CM 5.0 as part of new systems purchased from Avaya or as an upgrade for owners of existing Avaya enterprise PBX systems.

292.    In particular, Avaya separated its offers for service and maintenance contract for software versus hardware, and announced that, in order to obtain an upgrade to CM 5.0 or purchase CM 5.0 as part of a new systems sale, Avaya now requires owners to purchase a software maintenance agreement from Avaya, known as either "Software Support" ("SS") or "Software Support plus Upgrades" ("SS+U").

293.    Owners of Definity systems who wish to upgrade to CM 5.0 and have an existing, valid maintenance contract directly with Avaya are permitted to continue under their current contract through expiration, but after expiration, are required to sign up for either SS or SS+U.

294.    Although Avaya does not appear to also mandate obtaining Avaya's separate hardware maintenance to upgrade to or purchase CM 5.0, a customer that previously had a full maintenance contract covering software and hardware, whether from Avaya, a BusinessPartner or an ISP, would require some form of separate hardware maintenance to secure the same level of coverage it had prior to any upgrade to CM 5.0.  Consistent with this logic, Avaya makes clear that customers should also elect some level of hardware maintenance on their Definity systems loaded with CM 5.0 to maintain a solution level coverage.

295.    By virtue of Avaya's July 1, 2005 Policy Change, however, Avaya will not provide any support, including for patches, or MSPs, to any customer that utilizes an ISP, which Avaya characterizes as "unauthorized service providers."  Indeed, upon information and belief, Avaya has refused to provide the services offered under Avaya's mandatory software support to any customer that utilizes an ISP for maintenance, even if the customer is willing to purchase software support in order to purchase CM 5.0.  As a result, a Definity owner who uses an ISP for maintenance, including hardware maintenance, is effectively prohibited from upgrading to CM 5.0, even if the Definity owner is willing to sign up for SS or SS+U.

296.    In rolling out CM 5.0, Avaya also changed its policy with respect to MSPs.

297.    With the purchase of or upgrade to CM 5.0 (which itself requires SS or SS+U), Avaya now includes MSPs enabled at no additional charge, although a customer is required to obtain minimum software support from Avaya.

298.    However, in its announcement of CM 5.0, Avaya has adopted newly stated restrictions on the use of MSPs, stating that "asset owners/end users are strictly prohibited from authorizing, assisting or otherwise permitting any third party (including any third party service provider) to access MSPs or passwords/logins related to MSPs."

299.    Avaya is the only source for CM 5.0; any owner or purchaser of an Avaya enterprise PBX system that desires CM 5.0 must purchase it from Avaya.  There are no available substitutes for CM 5.0.

300.    Owners of Avaya enterprise PBX systems seeking to upgrade their telecommunications software must purchase upgrades from Avaya because Avaya's competitors' telecommunications software are not compatible with Avaya's Definity system.  Moreover, the cost of upgrading Avaya PBX telecommunications software is significantly less than the cost associated with switching to an entirely different telecommunications platform.  Thus, locked-in Definity system owners wishing to upgrade their Avaya PBX telecommunications software have little choice but to accept such ever-shifting conditions.

301.    As a result of Avaya's latest policies regarding CM 5.0, a Definity systems owner that uses an ISP whom Avaya characterizes as an "unauthorized service provider" cannot obtain CM 5.0 from Avaya and has no other source for the upgrade.  Avaya's policies regarding CM 5.0 affect a substantial amount of commerce – many existing owners of Avaya Definity systems have already made the decision or are planning to purchase this upgrade, and many more are in a position to do so.  Counterclaimants have the ability competitively to provide maintenance for CM 5.0.

302.    Similarly, Avaya now requires end-users or owners of Avaya PDS equipment seeking to upgrade to the latest version of Avaya's PDS Software – known as "Proactive

Contact, Version 4.0 – to obtain mandatory software support from Avaya.  However, Avaya also refuses to provide support to end-users that utilize "unauthorized service providers" for maintenance of their PDS systems.

303.    Avaya is the only source for Proactive Contact 4.0 (or any upgrade for Avaya PDS equipment); any owner or purchaser of an Avaya PDS that desires Proactive Contact 4.0 must purchase it from Avaya.  There are no available substitutes for Proactive Contact 4.0.

304.    Owners of Avaya PDS equipment seeking to upgrade their PDS application software must purchase upgrades from Avaya because Avaya's competitors' PDS software are not compatible with Avaya's PDS equipment.  Moreover, the cost of upgrading Avaya PDS software is significantly less than the cost associated with switching to an entirely different PDS platform.  Thus, locked-in Avaya PDS owners wishing to upgrade their Avaya PDS software have little choice but to accept such ever-shifting conditions.

305.    Avaya's policies regarding Proactive Contact 4.0 affect a substantial amount of commerce – many existing owners of Avaya PDS equipment have already made the decision or are planning to purchase this upgrade, and many more are in a position to do so. Counterclaimants have the ability competitively to provide maintenance for Proactive Contact 4.0.

## IX.    Owners Are Effectively Locked In To Their Definity And PDS Platforms

306.    Upon information and belief, a substantial majority of current owners of Avaya Definity systems could not, at the time of purchase, accurately gauge the likely life-cycle cost of purchasing and maintaining an Avaya system.  Some purchased systems at a time when Avaya or its predecessors had a monopoly on the market for PBX sales and thus had no choice but to purchase from Avaya.  Some were actively deceived by Avaya with regard to Avaya's ever-

changing policies about restricting access to its maintenance software.  Some who were aware of the policy at the time of purchase were victimized by the many (and confusing) changes in those policies described above.

307.    Moreover, given the fact that Avaya and its predecessors never disclosed what it planned to charge for maintenance in the future, it would have been impossible for any of its customers to accurately predict the life-cycle costs.  For all releases prior to the announcement about CM 5.0, Avaya marketing literature does not disclose to purchasers that they must purchase post-warranty service and maintenance from Avaya or a BusinessPartner.  Some even begin purchasing post-warranty maintenance contracts from ISPs.  By the time an owner eventually discovers, post-warranty, that Avaya and its BusinessPartners have restricted its ability to access the passwords and parts needed to maintain its equipment, that owner is effectively locked into the use of the Definity platform and cannot realistically and economically replace its entire platform with one sold by another manufacturer simply to avoid Avaya's expensive and restrictive policies.

308.    Once an owner has purchased an Avaya PBX system, that owner is locked into their Avaya telecommunications platform because the replacement cost of an enterprise telecommunications system is so great.  Definity platforms can cost in the millions of dollars to purchase and require a significant amount of time, risk of outage and the hiring of specialized personnel to install fully.  Similarly, once an owner has purchased an Avaya PDS platform, that owner is locked into their Avaya PDS platform because the replacement cost of an enterprise telecommunications system is so great.  Avaya PDS platforms can cost in the millions of dollars to purchase and require a significant amount of time, risk of outage and the hiring of specialized personnel to install fully.

309.    The Definity platform has a useful life of over twenty years.   Indeed, with upgrades, the system's useful life can be extended nearly indefinitely.   A Definity platform owner, thus, cannot reasonably be expected to abandon its Definity platform mid-life cycle simply to avoid Avaya's restrictive policies since paying supra-competitive prices for inferior service is still preferable to totally replacing a system in which the customer has so much invested.  The PDS platform has a useful life of at least ten years.  A PDS platform owner, thus, similarly cannot reasonably be expected to abandon its PDS platform mid-life cycle simply to avoid Avaya's restrictive policies since paying supra-competitive prices for inferior service is still preferable to totally replacing a system in which the customer has so much invested.

310.    In selling Avaya's telephony products, Avaya's sales personnel are trained to tout the lengthy life-span of its products, particularly when considering the ability to extend the life-span through periodic upgrades and/or installation of patches.

311.    Aside from the significant costs to purchase a new enterprise telecommunications system, owners who switch to another manufacturer's system are forced to endure the disruption of installing a new system, which can take years to complete.

312.    The disruption to an owner of a Definity or PDS platform, respectively, is exacerbated by the need to train all employees on how to use the new system, re-train staff technicians on the execution of the system's maintenance functions or replace staff technicians who lack the training on a new system.  Owners who have used the Definity or PDS platform, respectively, for a significant period of time and have upgraded their systems within that platform are particularly affected because of the long history of use of the Definity or PDS systems, respectively.

313.     As a result of the significant costs and burden to replace a Definity or PDS platform, particularly to an owner who has used it for many years, Definity and PDS owners are, respectively, effectively locked into keeping these platforms for their entire useful life.  Once locked in, owners have little alternative but to pay Avaya whatever it chooses to charge for service and maintenance for the duration of the platform's useful life.

314.     Upon information and belief, in implementing its increasingly restrictive policies and practices regarding system access, Avaya has relied on the knowledge that customers are effectively locked into the use of the Definity systems or Avaya PDS platforms, respectively, and their belief that Definity or Avaya PDS platform owners would be reluctant to replace the entire Definity system with the enterprise PBX of another manufacturer or the entire PDS platform with the PDS of another manufacturer, solely out of dissatisfaction with Avaya's restrictive policies.

## FIRST CAUSE OF ACTION

### (Monopolization – PBX –in Violation of Section 2 of the Sherman Act)

315.     Counterclaimants incorporate the allegations contained in paragraphs 1 through 314 of these Second Amended Counterclaims as if set forth at length herein.

316.     For the purposes of this and the subsequent antitrust counts under Sections 1 and 2 of the Sherman Act:  (1) the relevant product markets are the post-warranty service and maintenance for Avaya Definity systems, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts (the "Relevant Post Warranty PBX Product Market"); and (2) the relevant geographic market is the United States (the "Relevant Geographic Market") (collectively, the "Relevant PBX Markets").  Owners of Avaya Definity platforms have no reasonably interchangeable substitutes for the service and maintenance of their

Avaya Definity equipment or purchase of maintenance contracts; the provision of service and maintenance and maintenance contracts for Avaya equipment is not interchangeable with other manufacturers' service, maintenance, parts and upgrades.   And participants in those markets, including Avaya and its BusinessPartners, consider the two markets to be separate and treat them as such, selling maintenance and service separately from systems, including renewal maintenance contracts following the expiration of an owner's first post-warranty maintenance contract.

317.   Avaya's monopolistic and anti-competitive behavior in the Relevant PBX Markets is not, and has not been, disciplined by competition in the market for sales of enterprise telephone systems.   Dissatisfied Avaya PBX owners cannot simply replace their Avaya system with one from a competitor.   Instead, virtually all, if not all, owners of Avaya or its predecessors systems are "locked into" their PBX purchases because of: (a) extremely high switching costs – even relative to potential monopolistic increases in the cost of maintenance – which include not just the multi-million dollar cost of such systems but costly and time-consuming re-training costs and replacing of technical personnel; and (b) the PBXs' extremely long useful life, which, with upgrades, can exceed twenty years and approach indefinite.   Additionally, the installed base of Avaya PBX systems is large relative to new sales, allowing Avaya to profitably set and maintain supra-competitive prices in the service/maintenance aftermarket.   Avaya's PBX service and maintenance prices are significantly higher than Counterclaimants' prices for service and maintenance that many customers regard as superior in quality to that provided by Avaya.

318.   Just as importantly, for one or more of the following five reasons, virtually all of Avaya/Lucent/AT&T's customers were not, at the time they purchased their systems, able to

accurately predict the life-cycle cost of their system and compare it to the cost of purchasing a competitor's system:

- the customer purchased from an Avaya predecessor, *i.e.*, AT&T or Lucent, that had monopoly power in the PBX market such that the customer had no meaningful alternative source from which to acquire a PBX system;

- Avaya or its predecessor intentionally deceived the customer about its policy(ies) regarding long-term maintenance options/access/pricing at the time of purchase;

- Avaya or its predecessor unintentionally (or intentionally) failed to make clear to the customer its policy(ies) regarding long-term maintenance options/access/pricing at the time of purchase;

- Avaya or its predecessor changed its policy(ies) regarding long-term maintenance options/access/pricing (including its policies regarding the use of "unauthorized" independent service providers) after the customer purchased its system – something that happened not once, but numerous times; or

- lack of information about future Avaya and competitors' service and maintenance pricing made it impossible for the customer to accurately compare the life-cycle cost of purchasing an Avaya PBX to the life-cycle cost of purchasing a competing PBX.

319.    Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits, *inter alia*, monopolization of any part of the trade or commerce among states.

320.    Avaya has monopoly power in the Relevant PBX Markets, as reflected by, *inter alia*:  its substantial market share of the Relevant Markets both individually and in concert with its BusinessPartners; its control and market power over its passwords, Avaya certified parts, patches, and upgrades, which are necessary to compete in those Markets; its proven ability to exclude third party service providers from the Relevant PBX Markets; and its ability to charge supra-competitive prices for service and maintenance viewed by many customers to be inferior

and more expensive than that available from independent service providers including Counterclaimants.

321.    Avaya's monopoly position in the Relevant PBX Markets has been acquired and maintained through intentional exclusionary conduct, as opposed to business acumen, or historic accident or by virtue of offering a superior product, greater efficiency, or lower prices.

322.    Pursuant to its anti-competitive scheme, as alleged above, after a period of cooperation with TLI and other third party service providers and after encouraging TLI to provide maintenance to owners of Avaya Definity platforms following Lucent's and Avaya's downsizing in 2000, Avaya has changed that policy and is now exploiting its monopoly power to foreclose TLI, Continuant and other ISPs from competing with Avaya and its hand-picked BusinessPartners in all or a substantial portion of the Relevant PBX Markets.

323.    Avaya is willfully maintaining and extending its monopoly control over the Relevant PBX Markets by the above-described exclusionary and predatory conduct.   As described in greater detail elsewhere, that conduct includes: tying and bundling maintenance to crucial patches and upgrades; filing this lawsuit containing meritless and pretextual intellectual property claims; making false and defamatory statements about Counterclaimants to customers and others; threatening customers who use, or are considering using, Counterclaimants' maintenance services; and constantly shifting its policies with regard to customers' and ISPs' ability to access the customers' Avaya systems, the pricing of access to logins needed to self-maintain their products, and the customers' use of independent, "unauthorized," maintenance providers.

324.    Avaya has further sought to maintain and extend its monopoly control over the Relevant PBX Markets by misusing its purported intellectual property rights in an attempt to justify its exclusionary and predatory conduct.

325.    Avaya's anti-competitive and exclusionary conduct described herein is not motivated by technological or efficiency concerns and has no valid or legitimate business justification.  Rather, its purpose and effect is to injure TLI, Continuant and Avaya's other competitive rivals in the Relevant PBX Markets.

326.    Avaya's anti-competitive and exclusionary conduct includes its use of lock-out passwords.  These passwords are necessary inputs for the maintenance of Avaya Definity equipment.  It is impossible for a third party service provider, whether a dealer, an independent provider such as TLI or Continuant, or an owner to maintain and service Avaya Definity equipment unless it has access to the passwords necessary to gain access to the commands needed to perform basic maintenance functions and the Avaya certified parts necessary to fix the equipment.

327.    Under Avaya's view, Counterclaimants cannot legally duplicate Avaya's passwords and there are no alternative means (reasonable or otherwise) for them to gain access to the Avaya Definity equipment.

328.    However, having encouraged TLI and other dealers to provide maintenance and service to owners of Definity equipment and having encouraged Definity platform owners to utilize dealers, Avaya cannot now fairly deny dealers, former dealers or owners access.  Avaya's change in policy about allowing TLI and other BusinessPartners and former BusinessPartners to compete has harmed competition in the relevant market.

329.    Avaya's imposition on owners of Definity platforms of unreasonable, unnecessary, and onerous terms for obtaining Avaya passwords and/or MSPs, and prohibition against "unauthorized" service providers from obtaining the passwords or MSPs at all, constitutes an effective denial of access to the passwords and makes it effectively impossible for Counterclaimants and other independent service providers to compete with Avaya or its co-conspirators BusinessPartners for the provision of service or maintenance or sale of maintenance contracts in the Relevant PBX Markets.

330.    Avaya's certified parts are also necessary inputs for the service and maintenance of Avaya Definity equipment.  According to Avaya and certain system owners, a third party service provider, whether a dealer, an independent provider such as TLI or Continuant, or an owner, cannot adequately maintain Avaya Definity equipment unless it has the Avaya certified parts necessary to fix the equipment.

331.    Counterclaimants cannot duplicate or directly provide to customers Avaya's certified parts.  Counterclaimants have lost business opportunities for maintenance from customers that require that the provider be able to provide Avaya certified parts under a maintenance contract, and for such customers, there is no alternative means for Counterclaimants to fully service or maintain Definity equipment to the customer's requirements without the Avaya certified parts.

332.    Avaya's acts affect a substantial amount of interstate commerce in the Relevant Markets and constitute monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

333.    As described above, Avaya's anti-competitive acts have caused substantial injury to TLI and Continuant, and have also injured and will injure competition in the Relevant PBX

Markets by, *inter alia*, foreclosing and sabotaging competition from TLI, Continuant and other competing ISPs in the Relevant PBX Markets and depriving owners of Definity platforms of competing lower-cost, high quality alternatives for service and maintenance. As a direct and proximate consequence of Avaya's illegal and anti-competitive conduct, Counterclaimants have been injured and will continue to be injured in their business and property by being foreclosed from all or a substantial portion of the Relevant PBX Markets such that they will sustain irreparable injury to their business, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.

**SECOND CAUSE OF ACTION**

**(Attempted Monopolization – PBX – in Violation of Section 2 of the Sherman Act)**

334.    Counterclaimants incorporate the allegations contained in paragraphs 1 through 333 of these Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First Cause of Action as if set forth at length herein.

335.    Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits, *inter alia*, attempts to monopolize any part of trade or commerce among states.

336.    Avaya's conduct, as alleged above, is anti-competitive and predatory.

337.    Avaya has undertaken its anti-competitive and exclusionary conduct, as alleged above, with the purpose of monopolizing, and with the deliberate and specific intent to monopolize, the Relevant PBX Markets. Avaya specifically intends to eliminate or foreclose competition in the Relevant PBX Markets through the tactics described above, including the bundling and tying of patches and upgrades for Avaya Definity systems, erecting technological barriers using passwords and log-ins to prevent competitors from accessing the maintenance software for Avaya systems, bringing this baseless lawsuit based on pretextual intellectual

property claims, making false and defamatory statements to customers about Counterclaimants, conspiring with and entering agreements with its BusinessPartners designed to exclude competition from Counterclaimants and other ISPs while allowing them to charge supra-competitive prices for inferior service, and the other unlawful conduct alleged in these Counterclaims.

338. Avaya's acts affect a substantial amount of interstate commerce in the Relevant PBX Markets and constitute attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Avaya's conduct described herein is not motivated by technological or efficiency concerns and has no valid or legitimate business justification. Rather, its purpose and effect is to injure TLI, Continuant and Avaya's other competitive rivals in the Relevant PBX Markets.

339. Avaya's anti-competitive acts have caused substantial injury to TLI and Continuant, and have also injured and will injure competition in the Relevant Markets by, *inter alia*, foreclosing and sabotaging competition from TLI, Continuant and other competing ISPs in the Relevant PBX Markets and depriving owners of Definity platforms of competing lower-cost, high quality alternatives for service and maintenance.

340. As a direct and proximate result of Avaya's anti-competitive conduct, Counterclaimants have been injured and will be injured in their business and property.

341. Absent action by this Court to enjoin and preclude Avaya from continuing its anti-competitive conduct, there is a dangerous probability that Avaya will succeed in obtaining a monopoly in the Relevant PBX Markets, including the power to eliminate and foreclose competition, raise prices, limit output, and reduce quality in that Market. Indeed, Avaya has already succeeded in eliminating several competing ISPs from that Market.

342.    Avaya's anti-competitive conduct and attempts to monopolize the Relevant PBX Markets have injured and will continue to injure Counterclaimants by foreclosing them from all or a substantial portion of the Relevant PBX Markets such that they will sustain irreparable injury to their business, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.

### THIRD CAUSE OF ACTION

### (Tying PBX Maintenance – Patches in Violation of Section 1 of the Sherman Act)

343.    Counterclaimants incorporate the allegations contained in paragraphs 1 through 342 of the Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First and Second Causes of Action as if set forth at length herein.

344.    As set forth herein, Avaya's refusal to sell or provide patches to PBX end-user customers of "unauthorized service providers" constitutes unlawful tying in violation of Section 1 of the Sherman Act.  Avaya's tying has harmed and continues to harm Counterclaimants in their business and property and has harmed and continues to harm competition in the Relevant PBX Markets.

345.    The provision of maintenance and service for Definity and other ECG Platform equipment (including software) is a separate product from patches for Definity and other ECG Platform equipment.   These two products are also separate products from the systems themselves.

346.    There is sufficient consumer demand for maintenance and service of Avaya's Definity and other ECG Platform equipment so as to render it efficient for Avaya to sell or furnish separately patches for those systems on the one hand and the maintenance and service of that equipment on the other hand, and there is no technological reason why these products cannot be sold or provided separately.

347.    Counterclaimants, like other ISPs, have provided and are able to provide service and maintenance for Avaya PBX systems, but are no longer able to offer or provide patches.

348.    Avaya has conditioned the purchase or receipt of non-systems critical patches for Definity and other ECG Platform equipment (the "tying products") on the purchase of service and maintenance for Definity and other ECG Platform equipment (the "tied products") from Avaya and its BusinessPartners.   Indeed, Avaya has told customers that if they obtain maintenance or service from ISPs classified by Avaya as "unauthorized," Avaya will not provide or sell them these patches.

349.    This conditioning represents a change from Avaya's earlier policy or practice of not imposing such restrictions.  As a result, most Avaya systems purchasers could not have taken into account the effect of Avaya's tying on the life-cycle cost of purchasing an Avaya system.

350.    Upon information and belief, Avaya is the only source for patches for Definity and ECG telecommunications systems.  There are no substitutes for these patches.

351.    Patches vary in importance.  Some are system critical, *i.e.*, necessary for the proper functioning of the Avaya systems.   Others are uniquely desirable for the optimal performance of certain Avaya systems functions.  Because locked-in systems-owners desire to keep their systems functioning properly, and cannot reasonably anticipate whether their future need for patches will be system critical or non-system critical, locked-in systems-owners are compelled to purchase service and maintenance from Avaya or one of its chosen BusinessPartners.   Avaya thus has market power in these products sufficient to coerce a substantial percentage of owners of Avaya Definity and other ECG Platform equipment to purchase service and maintenance from Avaya or one of its chosen BusinessPartners.  Avaya's coercive tying has been effective in distorting and/or eliminating competition in the Relevant

Markets by forcing customers to choose Avaya maintenance and service over lower cost and/or better quality maintenance and service offered by ISPs.

352.    As a result of the foregoing restrictions on competition among providers of maintenance and service to owners of Definity and/or ECG Platform equipment, such owners will pay higher prices to obtain maintenance and service for their Definity and/or ECG Platform equipment than they would in a fully competitive market, output will be limited, and quality will be reduced in that market.  There are no technological or efficiency reasons that require Avaya to impose its tying requirements.

353.    Because it possesses market power in the tying products, Avaya's tying is unlawful *per se – i.e.,* without regard to the practice's effect on competition in the Relevant PBX Markets.  Avaya's tying is also unlawful when assessed under the rule of reason.  As set forth herein, Avaya's tying harms competition in the Relevant PBX Markets and the anti-competitive consequences of Avaya's conduct outweigh any pro-competitive effects thereof.

354.    Avaya's tying has harmed and will continue to harm Counterclaimants by foreclosing it from all or a substantial portion of the Relevant PBX Markets such that it will sustain irreparable harm to its business, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.

355.    Avaya's tying schemes affect a substantial volume of interstate commerce in the Relevant PBX Markets and are unlawful under the Sherman Act, 15 U.S.C. § 1.

## FOURTH CAUSE OF ACTION

### (Tying PBX Maintenance – Upgrades – in Violation of Section 1 of the Sherman Act)

356.    Counterclaimants incorporate the allegations contained in paragraphs 1 through 355 of the Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First, Second and Third Causes of Action as if set forth at length herein.

357.    As set forth herein, Avaya's refusal to sell upgrades unless its customers also purchase maintenance constitutes unlawful tying in violation of Section 1 of the Sherman Act. Avaya's tying has harmed and continues to harm Counterclaimants in their business and property and has harmed and continues to harm competition in the Relevant Markets.

358.    The provision of maintenance and service for Definity and other ECG Platform equipment (including software) is a separate product from upgrades for Definity and other ECG Platform equipment.   These two products are also separate products from the systems themselves.

359.    There is sufficient consumer demand for maintenance and service of Avaya's Definity and other ECG Platform equipment so as to render it efficient for Avaya to sell or furnish separately upgrades for those systems on the one hand and maintenance and service of that equipment on the other hand, and there is no technological reason why these products cannot be sold separately.   Counterclaimants, like other ISPs, have provided and are capable of providing service and maintenance for Avaya PBX systems, but are unable to offer or provide upgrades.

360.    Avaya has conditioned the purchase of upgrades for Definity and other ECG Platform equipment (the "tying products") on the purchase of mandatory software support – or maintenance – for Definity and other ECG Platform equipment (the "tied products.")  Indeed,

Avaya has told customers that, in order to purchase an upgrade to Avaya's latest release of PBX telecommunications software, the customer must purchase mandatory software support from Avaya.

361.    This conditioning represents a change from Avaya's earlier policy of not imposing such restrictions.  As a result, most Avaya systems purchasers could not have taken into account the effect of Avaya's tying on the life-cycle cost of purchasing an Avaya system.

362.    Upon information and belief, Avaya is the *only* source for upgrades for Definity and ECG telecommunications systems.  There are no substitutes for these upgrades.

363.    Upgrades are uniquely desirable and are critical for locked-in systems owners seeking to maximize the life of their Avaya PBX platforms and equipment at state-of-the-art levels.  Avaya also seeks to force customers to consider purchasing software upgrades by making announcements about Avaya's end-of-life and/or end-of-support of older software versions, including announcements that, over time, Avaya would cease support for customers with older versions of its software.  Avaya thus has market power in these products sufficient to coerce a substantial percentage of owners of Avaya Definity and other ECG Platform equipment to purchase service and maintenance from Avaya.  Avaya's coercive tying has been effective in distorting and/or eliminating competition in the Relevant Markets by forcing customers to choose Avaya maintenance and service over lower cost and/or better quality maintenance and service offered by ISPs.

364.    As a result of the foregoing restrictions on competition among providers of maintenance and service to owners of Definity and/or ECG Platform equipment, such owners will pay higher prices to obtain maintenance and service for their Definity and/or ECG Platform equipment than they would in a fully competitive market, output will be limited, and quality will

be reduced in that market.  There are no technological or efficiency reasons that require Avaya to impose its tying requirements.

365.    Because it possesses market power in the tying products, Avaya's tying is unlawful *per se, i.e.*, without regard to the practice's effect on competition in the Relevant Markets.  Avaya's tying is also unlawful when assessed under the rule of reason.  As set forth herein, Avaya's tying harms competition in the Relevant Markets and the anti-competitive consequences of Avaya's conduct outweigh any pro-competitive effects thereof.

366.    Avaya's tying has harmed and will continue to harm Counterclaimants by foreclosing it from all or a substantial portion of the Relevant Markets, such that it will sustain irreparable harm to their business, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.

367.    Avaya's tying schemes affect a substantial volume of interstate commerce in the Relevant Markets and are unlawful under the Sherman Act, 15 U.S.C. § 1.

### FIFTH CAUSE OF ACTION
### (Asserted by Continuant Only)

### (Monopolization – PDS – in Violation of Section 2 of the Sherman Act)

368.    Counterclaimants incorporate the allegations contained in paragraphs 1 through 367 of these Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First, Second, Third and Fourth Causes of Action as if set forth at length herein.

369.    For the purposes of this and the subsequent antitrust counts under Sections 1 and 2 of the Sherman Act:  (1) the relevant product markets are the post-warranty service and maintenance for Avaya PDS equipment, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts (the "Relevant Post Warranty PDS

Product Market"); and (2) the relevant geographic market is the United States (the "Relevant Geographic Market") (collectively, the "Relevant PDS Markets").  Owners of Avaya PDS equipment have no reasonably interchangeable substitutes for the service and maintenance of their Avaya PDS equipment or purchase of maintenance contracts; the provision of service and maintenance and maintenance contracts for Avaya equipment is not interchangeable with other manufacturers' service, maintenance, parts and upgrades.  And participants in those markets, including Avaya and, if applicable, its BusinessPartners, consider the two markets to be separate and treat them as such, selling maintenance and service separately from systems, including renewal maintenance contracts following the expiration of an owner's first post-warranty maintenance contract.

370.    Avaya's monopolistic and anti-competitive behavior in the Relevant PDS Markets is not, and has not been, disciplined by competition in the market for sales of enterprise telephone systems.  Dissatisfied Avaya PDS owners cannot simply replace their Avaya system with one from a competitor.  Instead, virtually all, if not all, owners of Avaya or its predecessors systems are "locked into" their PDS purchases because of: (a) extremely high switching costs – even relative to potential monopolistic increases in the cost of maintenance – which include not just the multi-million dollar cost of such systems but costly and time-consuming re-training costs and replacing of technical personnel; and (b) the PDS' extremely long useful life, which, with upgrades, can exceed at least ten (10) years and approach indefinite.  Additionally, the installed base of Avaya PDS equipment is large relative to new sales, allowing Avaya to profitably set and maintain supra-competitive prices in the service/maintenance aftermarket.  Avaya's PDS service and maintenance prices are significantly higher than Counterclaimants' prices for service and maintenance that many customers regard as superior in quality to that provided by Avaya.

371.    Just as importantly, for one or more of the following four reasons, virtually all of Avaya's customers were not, at the time they purchased their systems, able to accurately predict the life-cycle cost of their system and compare it to the cost of purchasing a competitor's system:

- Avaya or its predecessor intentionally deceived the customer about its policy(ies) regarding long-term maintenance options/access/pricing at the time of purchase;

- Avaya or its predecessor unintentionally (or intentionally) failed to make clear to the customer its policy(ies) regarding long-term maintenance options/access/pricing at the time of purchase;

- Avaya or its predecessor changed its policy(ies) regarding long-term maintenance options/access/pricing (including its policies regarding the use of "unauthorized" independent service providers) after the customer purchased its system – something that happened not once, but numerous times; or

- lack of information about future Avaya and competitors' service and maintenance pricing made it impossible for the customer to accurately compare the life-cycle cost of purchasing an Avaya PDS to the life-cycle cost of purchasing a competing PDS.

372.    Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits, *inter alia*, monopolization of any part of the trade or commerce among states.

373.    Avaya has monopoly power in the Relevant PDS Markets, as reflected by, *inter alia*:  its substantial market share of the Relevant PDS Markets; its control and market power over its passwords, Avaya certified parts, patches, and upgrades, which are necessary to compete in those Markets; its proven ability to exclude third party service providers from the Relevant PDS Markets; and its ability to charge supra-competitive prices for service and maintenance viewed by many customers to be inferior and more expensive than that available from ISPs including Counterclaimants.

374. Avaya's monopoly position in the Relevant PDS Markets has been acquired and maintained through intentional exclusionary conduct, as opposed to business acumen, or historic accident or by virtue of offering a superior product, greater efficiency, or lower prices.

375. Avaya is willfully maintaining and extending its monopoly control over the Relevant PDS Markets by the above-described exclusionary and predatory conduct. As described in greater detail elsewhere, that conduct includes: tying and bundling maintenance to crucial patches and upgrades; filing this lawsuit containing meritless and pretextual intellectual property claims; making false and defamatory statements about Counterclaimants to customers and others; threatening customers who use, or are considering using, Counterclaimants' maintenance services; and constantly shifting its policies with regard to customers' and ISPs' ability to access the customers' Avaya systems, the pricing of access to logins needed to self-maintain their products, and the customers' use of independent, "unauthorized," maintenance providers.

376. Avaya has further sought to maintain and extend its monopoly control over the Relevant PDS Markets by misusing its purported intellectual property rights in an attempt to justify its exclusionary and predatory conduct.

377. Avaya's anti-competitive and exclusionary conduct described herein is not motivated by technological or efficiency concerns and has no valid or legitimate business justification. Rather, its purpose and effect is to injure Continuant and Avaya's other competitive rivals in the Relevant PDS Markets.

378. Avaya's anti-competitive and exclusionary conduct includes its attempts to use lock-out passwords. These passwords are necessary inputs for the maintenance of Avaya PDS equipment. It is impossible for a third party service provider, whether a dealer, an independent

provider such as Continuant, or an owner to maintain and service Avaya PDS equipment unless it has access to the passwords necessary to gain access to the commands needed to perform basic maintenance functions and the Avaya certified parts necessary to fix the equipment.

379.   Under Avaya's view, Counterclaimants cannot legally duplicate Avaya's passwords and there are no alternative means (reasonable or otherwise) for them to gain access to the Avaya PDS equipment.

380.   Avaya's imposition on owners of Avaya PDS platforms of unreasonable, unnecessary, and onerous terms for obtaining Avaya passwords, and prohibition against "unauthorized" service providers from obtaining the passwords at all, constitutes an effective denial of access to the passwords and makes it effectively impossible for Counterclaimants and other ISPs to compete with Avaya for the provision of service or maintenance or sale of maintenance contracts in the Relevant PDS Markets.

381.   Avaya's certified parts are also necessary inputs for the service and maintenance of Avaya PDS equipment.  According to Avaya and certain system owners, a third party service provider, whether a dealer, an independent provider such as Continuant, or an owner, cannot adequately maintain Avaya PDS equipment unless it has the Avaya certified parts necessary to fix the equipment.

382.   Counterclaimants cannot duplicate or directly provide customers with Avaya's certified parts.   Counterclaimants have lost business opportunities for maintenance from customers that require that the provider be able to provide Avaya certified parts under a maintenance contract, and for such customers, there is no alternative means for Counterclaimants to fully service or maintain PDS equipment to the customer's requirements without the Avaya certified parts.

383.    Avaya's acts affect a substantial amount of interstate commerce in the Relevant PDS Markets and constitute monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C.

384.    As described above, Avaya's anti-competitive acts have caused substantial injury to Continuant, and have also injured and will injure competition in the Relevant PDS Markets by, *inter alia*, foreclosing and sabotaging competition from Continuant and other competing ISPs in the Relevant PDS Markets and depriving owners of PDS platforms of competing lower-cost, high quality alternatives for service and maintenance.  As a direct and proximate consequence of Avaya's illegal and anti-competitive conduct, Counterclaimants have been injured and will continue to be injured in their business and property by being foreclosed from all or a substantial portion of the Relevant PDS Markets such that they will sustain irreparable injury to their business, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.


### SIXTH CAUSE OF ACTION
### (Asserted by Continuant Only)

### (Attempted Monopolization – PDS – in Violation of Section 2 of the Sherman Act)

385.    Counterclaimants incorporate the allegations contained in paragraphs 1 through 384 of these Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First, Second, Third, Fourth and Fifth Causes of Action as if set forth at length herein.

386.    Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits, *inter alia*, attempts to monopolize any part of trade or commerce among states.

387.    Avaya's conduct, as alleged above, is anti-competitive and predatory.

388.    Avaya has undertaken its anti-competitive and exclusionary conduct, as alleged above, with the purpose of monopolizing, and with the deliberate and specific intent to monopolize, the Relevant PDS Markets.  Avaya specifically intends to eliminate or foreclose competition in the Relevant PDS Markets through the tactics described above, including the bundling and tying of patches and upgrades for Avaya PDS equipment, erecting technological barriers using passwords and log-ins to prevent competitors from accessing the maintenance software for Avaya systems, bringing this baseless lawsuit based on pretextual intellectual property claims, making false and defamatory statements to customers about Counterclaimants, conspiring with and entering agreements with its BusinessPartners designed to exclude competition from Continuant and other ISPs while allowing them to charge supra-competitive prices for inferior service, and the other unlawful conduct alleged in these Counterclaims.

389.    Avaya's acts affect a substantial amount of interstate commerce in the Relevant PDS Markets and constitute attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Avaya's conduct described herein is not motivated by technological or efficiency concerns and has no valid or legitimate business justification.  Rather, its purpose and effect is to injure Continuant and Avaya's other competitive rivals in the Relevant PDS Markets.

390.    Avaya's anti-competitive acts have caused substantial injury to Continuant, and have also injured and will injure competition in the Relevant PDS Markets by, *inter alia*, foreclosing and sabotaging competition from Continuant and other competing ISPs in the Relevant PDS Markets and depriving owners of Avaya PDS platforms of competing lower-cost, high quality alternatives for service and maintenance.

391.    As a direct and proximate result of Avaya's anti-competitive conduct, Counterclaimants have been injured and will be injured in their business and property.

392.    Absent action by this Court to enjoin and preclude Avaya from continuing its anti-competitive conduct, there is a dangerous probability that Avaya will succeed in obtaining a monopoly in the Relevant PDS Markets, including the power to eliminate and foreclose competition, raise prices, limit output, and reduce quality in that Market.   Indeed, upon information and belief, Avaya may have already succeeded in eliminating any competition from any of its BusinessPartners for maintenance of Avaya PDS equipment.   Avaya's anti-competitive conduct and attempts to monopolize the Relevant PDS Markets have injured and will continue to injure Continuant by foreclosing it from all or a substantial portion of the Relevant PDS Markets such that they will sustain irreparable injury to their business, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.

**SEVENTH CAUSE OF ACTION**
**(Asserted by Continuant Only)**

**(Tying PDS Maintenance – Patches – in Violation of Section 1 of the Sherman Act)**

393.    Counterclaimants incorporate the allegations contained in paragraphs 1 through 392 of the Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First, Second, Third, Fourth, Fifth and Sixth Causes of Action as if set forth at length herein.

394.    As set forth herein, Avaya's refusal to sell or provide patches to PDS end-user customers of "unauthorized service providers" constitutes unlawful tying in violation of Section 1 of the Sherman Act.   Avaya's tying has harmed and continues to harm Counterclaimants in their business and property and has harmed and continues to harm competition in the Relevant Markets.

395.    The provision of maintenance and service for PDS equipment (including software) is a separate product from patches for PDS equipment.  These two products are also separate products from the systems themselves.

396.    There is sufficient consumer demand for maintenance and service of Avaya's PDS equipment so as to render it efficient for Avaya to sell or furnish separately patches for those systems on the one hand and the maintenance and service of that equipment on the other hand, and there is no technological reason why these products cannot be sold or provided separately.

397.    Counterclaimants, like other ISPs, have provided and are able to provide service and maintenance for Avaya PDS equipment, but are no longer able to offer or provide patches.

398.    Avaya has conditioned the purchase or receipt of patches for Avaya PDS equipment (the "tying products") on the purchase of service and maintenance for Avaya PDS equipment (the "tied products") from Avaya and its BusinessPartners.  Indeed, Avaya has told customers that if they obtain maintenance or service from ISPs classified by Avaya as "unauthorized," Avaya will not provide or sell them these patches.

399.    This conditioning represents a change from Avaya's earlier policy or practice of not imposing such restrictions.  As a result, most Avaya systems purchasers could not have taken into account the effect of Avaya's tying on the life-cycle cost of purchasing an Avaya system.

400.    Upon information and belief, Avaya is the only source for patches for Avaya PDS equipment.  There are no substitutes for these patches.

401.    Patches vary in importance.  Some are system critical, *i.e.*, necessary for the proper functioning of the Avaya systems.  Others are uniquely desirable for the optimal performance of certain Avaya systems functions.  Because locked-in systems-owners desire to

keep their systems functioning properly, and cannot reasonably anticipate whether their future need for patches will be system critical or non-system critical, locked-in systems-owners are compelled to purchase service and maintenance from Avaya or one of its chosen BusinessPartners.  Avaya thus has market power in these products sufficient to coerce a substantial percentage of owners of Avaya PDS equipment to purchase service and maintenance from Avaya or, if applicable, one of its chosen BusinessPartners.  Avaya's coercive tying has been effective in distorting and/or eliminating competition in the Relevant PDS Markets by forcing customers to choose Avaya maintenance and service over lower cost and/or better quality maintenance and service offered by ISPs.

402.    As a result of the foregoing restrictions on competition among providers of maintenance and service to owners of Avaya PDS, such owners will pay higher prices to obtain maintenance and service for their Avaya PDS equipment than they would in a fully competitive market, output will be limited, and quality will be reduced in that market.  There are no technological or efficiency reasons that require Avaya to impose its tying requirements.

403.    Because it possesses market power in the tying products, Avaya's tying is unlawful *per se – i.e.,* without regard to the practice's effect on competition in the Relevant PDS Markets.  Avaya's tying is also unlawful when assessed under the rule of reason.  As set forth herein, Avaya's tying harms competition in the Relevant PDS Markets and the anti-competitive consequences of Avaya's conduct outweigh any pro-competitive effects thereof.

404.    Avaya's tying has harmed and will continue to harm Counterclaimants by foreclosing it from all or a substantial portion of the Relevant PDS Markets such that it will sustain irreparable harm to its business, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.

405.     Avaya's tying schemes affect a substantial volume of interstate commerce in the Relevant Markets and are unlawful under the Sherman Act, 15 U.S.C. § 1.

## EIGHTH CAUSE OF ACTION
### (Asserted by Continuant Only)

### (Tying PDS Maintenance – Upgrades – in Violation of Section 1 of the Sherman Act)

406.     Counterclaimants incorporate the allegations contained in paragraphs 1 through 405 of the Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action as if set forth at length herein.

407.     As set forth herein, Avaya's refusal to sell upgrades unless its customers also purchase maintenance constitutes unlawful tying in violation of Section 1 of the Sherman Act. Avaya's tying has harmed and continues to harm Counterclaimants in their business and property and has harmed and continues to harm competition in the Relevant PDS Markets.

408.     The provision of maintenance and service for PDS equipment (including software) is a separate product from upgrades for PDS equipment.  These two products are also separate products from the systems themselves.

409.     There is sufficient consumer demand for maintenance and service of Avaya's PDS equipment so as to render it efficient for Avaya to sell or furnish separately upgrades for those systems on the one hand and maintenance and service of that equipment on the other hand, and there is no technological reason why these products cannot be sold separately. Counterclaimants, like other ISPs, have provided and are capable of providing service and maintenance for Avaya PDS systems, but are unable to offer or provide upgrades.

410.    Avaya has conditioned the purchase of upgrades for Avaya PDS equipment (the "tying products") on the purchase of mandatory software support – or maintenance – for Avaya PDS equipment (the "tied products.")   Indeed, Avaya has told customers that, in order to purchase an upgrade to Avaya's latest release of PDS telecommunications software, the customer must purchase mandatory software support from Avaya.

411.    This conditioning represents a change from Avaya's earlier policy of not imposing such restrictions.   As a result, most Avaya systems purchasers could not have taken into account the effect of Avaya's tying on the life-cycle cost of purchasing an Avaya system.

412.    Upon information and belief, Avaya is the *only* source for upgrades for Avaya PDS equipment.   There are no substitutes for these upgrades.

413.    Upgrades are uniquely desirable and are critical for locked-in systems owners seeking to maximize the life of their Avaya PDS equipment at state-of-the-art levels.   Avaya also seeks to force customers to consider purchasing software upgrades by making announcements about Avaya's end-of-life and/or end-of-support of older software versions, including announcements that, over time, Avaya would cease support for customers with older versions of its software.   Avaya thus has market power in these products sufficient to coerce a substantial percentage of owners of Avaya PDS equipment to purchase service and maintenance from Avaya.   Avaya's coercive tying has been effective in distorting and/or eliminating competition in the Relevant PDS Markets by forcing customers to choose Avaya maintenance and service over lower cost and/or better quality maintenance and service offered by ISPs.

414.    As a result of the foregoing restrictions on competition among providers of maintenance and service to owners of Avaya PDS platforms, such owners will pay higher prices to obtain maintenance and service for their Avaya PDS platforms than they would in a fully

competitive market, output will be limited, and quality will be reduced in that market. There are no technological or efficiency reasons that require Avaya to impose its tying requirements.

415.    Because it possesses market power in the tying products, Avaya's tying is unlawful *per se, i.e.*, without regard to the practice's effect on competition in the Relevant PDS Markets. Avaya's tying is also unlawful when assessed under the rule of reason. As set forth herein, Avaya's tying harms competition in the Relevant PDS Markets and the anti-competitive consequences of Avaya's conduct outweigh any pro-competitive effects thereof.

416.    Avaya's tying has harmed and will continue to harm Counterclaimants by foreclosing it from all or a substantial portion of the Relevant PDS Markets, such that it will sustain irreparable harm to their business, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.

417.    Avaya's tying schemes affect a substantial volume of interstate commerce in the Relevant PDS Markets and are unlawful under the Sherman Act, 15 U.S.C. § 1.

## NINTH CAUSE OF ACTION

### (Illegal Conspiracy in Violation of Section 1 of the Sherman Act)

418.    Counterclaimants incorporate the allegations contained in paragraphs 1 through 417 of these Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First, Second, Third, Fourth, Fifth, Sixth, Seventh and Eighth Causes of Action as if set forth at length herein.

419.    As described above, Avaya has orchestrated a conspiracy involving certain of its BusinessPartners, distributors of certified Avaya parts, and others to allocate the maintenance and service business of Definity owners, to restrict the output of available maintenance and service, and, as a result, to fix and raise the prices of maintenance and service paid by owners.

420.    Avaya's conspiracy with its co-conspirators BusinessPartners to allocate maintenance and service business of Definity platform owners is an illegal conspiracy to allocate customers, restrict output and raise prices in violation of Section 1 of the Sherman Act.

421.    Specifically, Avaya's combination and conspiracy with its co-conspirator BusinessPartners is an unlawful restraint of trade under Section 1 of the Sherman Act as assessed under the rule of reason.  As described above, Avaya's scheme has harmed and continues to harm competition in the Relevant PBX Markets and its pro-competitive aspects, if any, are outweighed by its anti-competitive aspects.

422.    Avaya's acts affect a substantial amount of interstate commerce in the Relevant PBX Markets and constitute an illegal conspiracy to allocate customers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

423.    As a direct and proximate result of Avaya's anti-competitive and conspiratorial conduct, Counterclaimants have been and continue to be injured in their business and property, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.  Avaya's anti-competitive and conspiratorial conduct has harmed and will continue to harm Counterclaimants by foreclosing them from all or a substantial portion of the Relevant PBX Markets such that they will sustain irreparable injury to their business, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.

## TENTH CAUSE OF ACTION

### (Tortious Interference with Business/Contractual Relations)

424.    Counterclaimants incorporate the allegations contained in paragraphs 1 through 423 of these Second Amended Counterclaims, and repeat and re-allege each and every paragraph

in the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Causes of Action as if set forth at length herein.

425.   The conduct of Avaya, as set forth at greater length herein, constitutes tortious interference with Counterclaimants' current business and/or contractual relationships with third parties.

426.   As noted, while still party to the 2003 Contract with TLI, Avaya approached existing customers of TLI to solicit them away from TLI.  Avaya was aware of such customers' identities because TLI was contractually obligated to provide that information.

427.   As noted, Avaya has also contacted existing, former and prospective customers of both TLI and Continuant, has advised such customers that Counterclaimants cannot fulfill their respective contractual obligations to their customers, are engaging in illegal activity, and/or are engaging in conduct that violates federal and state law, and may result in civil and criminal penalties.

428.   Avaya has also directly accessed or attempted to access the Definity or PDS equipment of Counterclaimants' customers, utilizing deceptive means, to lock out the ability of the customers and Counterclaimants to execute the maintenance commands necessary to effectively maintain the equipment.

429.   By approaching Counterclaimants' service and maintenance customers in the manner described herein, Avaya has tortiously interfered with the business relations and/or agreements that Counterclaimants have, respectively, with their service/maintenance clients.

430.   As a result of the foregoing conduct, Counterclaimants have suffered damages.

## ELEVENTH CAUSE OF ACTION

### (Tortious Interference with Prospective Business or Economic Advantage)

431.    Counterclaimants incorporate the allegations contained in Paragraphs 1 through 430 of these Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth and Tenth Causes of Action as if set forth at length herein.

432.    The conduct of Avaya, as set forth at greater length herein, constitutes tortious interference with Counterclaimants' prospective business advantage.

433.    Counterclaimants have an expectation of obtaining an economic benefit as a consequence of their ability to provide service and maintenance business to Avaya Definity and/or PDS systems end-users, including but not limited to continued performance and renewal of their existing customers' contracts.

434.    Avaya was aware of Counterclaimants' opportunities to solicit and secure the business of servicing and maintaining Avaya Definity systems and/or PDS systems, and of the benefits that Counterclaimants would derive as a consequence of those service and maintenance contracts.

435.    Avaya's above-described conduct was an intentional and malicious interference with Counterclaimants' expectant economic or business advantage.

436.    Counterclaimants' existing service and maintenance business and Avaya's attempt to purchase TLI's maintenance business demonstrate a reasonable probability that Counterclaimants' prospective business or economic advantage would have occurred but for Avaya's wrongful interference.

437.    As a consequence of Avaya's wrongful action, Counterclaimants have sustained damages.

## TWELFTH CAUSE OF ACTION

### (Injurious Falsehood / Trade Libel or Slander)

438.    Counterclaimants incorporate the allegations contained in paragraphs 1 through 437 of these Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth and Eleventh Causes of Action as if set forth at length herein.

439.    Avaya has made, published and transmitted statements which were knowingly false, made in reckless disregard for truth or falsity, or intended by Avaya to result in harm to Counterclaimants, about the legality of Counterclaimants' business conduct in the performance of service and maintenance of Avaya Definity systems and/or PDS systems – including statements claiming that Counterclaimants' conduct violates federal and state law and may result in civil and criminal penalties – as well as the ability of Counterclaimants to fulfill their service and maintenance contractual obligations to their respective customers, in oral and written communications directed to Counterclaimants' existing and potential customers and others.

440.    The foregoing conduct was undertaken by Avaya with the intent of prejudicing and hindering Counterclaimants in the conduct of their respective business and to deter others from dealing with Counterclaimants.

441.    Avaya did not enjoy any privilege, of any kind, to make its false and misleading statements concerning Counterclaimants' business conduct with the specific intent to harm Counterclaimants.

442.     Counterclaimants have suffered damages as the result of the false, misleading and disparaging statements made by Avaya concerning Counterclaimants' service and maintenance business.

## THIRTEENTH CAUSE OF ACTION
### (Asserted by TLI Only)

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

443.     Counterclaimants incorporate the allegations contained in paragraphs 1 through 442 of these Second Amended Counterclaims, and repeat and re-allege each and every paragraph in the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and Twelfth Causes of Action as if set forth at length herein.

444.     Under the 2003 Contract, Avaya owes TLI a duty of good faith and fair dealing.

445.     As detailed above, far from comporting its behavior in a manner consistent with its implied covenant of good faith and fair dealing, Avaya has demonstrated its clear intent to frustrate TLI's expectations under the 2003 Contract.

446.     As noted, although Avaya attempted to force TLI to agree to completely cease providing service and maintenance of Avaya products to any end-users having an Avaya service contract, Avaya ultimately agreed, under the 2003 Contract, to limit the scope of the non-compete limitation so as to allow TLI to continue providing such services to all but Avaya's largest customers.

447.     Far from accepting TLI's right to market its independent service and maintenance business and enter into service and maintenance contracts with Avaya product customers, as expressly agreed to under the 2003 Contract, Avaya revealed its true intentions of prohibiting TLI from entering such service and maintenance contracts with any Avaya customer.

448.    To avoid TLI's ability under the 2003 Contract to provide independent service and maintenance to Avaya product users, Avaya immediately presented to TLI a Hobson's choice – stop offering the maintenance service to all Avaya customers or allow Avaya to acquire TLI's maintenance business at a dramatically below market price.

449.    When TLI rejected Avaya's bid, Avaya promptly sought to cut off TLI's ability to provide maintenance service through the only remaining option – terminating the 2003 Contract.

450.    However, far from simply seeking to terminate the 2003 Contract, Avaya improperly sought to capitalize on its anticipated termination sixty (60) days following notice, despite the fact that the 2003 Contract was still in force, by, *inter alia,* approaching TLI's customers and advising them that TLI was no longer able to service Avaya products, and then soliciting their business.

451.    Avaya's course of dealing in negotiating the 2003 Contract that expressly allows TLI to compete with Avaya to provide service maintenance business and then engaging in a course of conduct designed to frustrate such competition constitutes a breach of Avaya's implied covenant of good faith and fair dealing under the 2003 Contract.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Counterclaimants respectfully requests that this Court grant the following relief:

A.    Issue an Order permanently enjoining Avaya from:

(1)    withholding and refusing to disclose logins or permissions necessary to perform maintenance to Counterclaimants' customers for any and all Avaya Definity and PDS systems sold, maintained, or serviced by

Counterclaimants or for any and all customers under a maintenance contract with either TLI or Continuant;

(2)     changing login passwords on Avaya Definity or PDS systems sold, maintained, or serviced by TLI and Continuant, and/or on Avaya Definity and PDS systems of customers under a maintenance contract with TLI or Continuant, without the customers' written consent;

(3)     preventing customers of TLI and Continuant from obtaining Avaya certified parts, technical support, upgrades and/or patches; and

(4)     making false and disparaging comments regarding TLI or Continuant to existing and prospective customers of TLI and Continuant;

B.     On all of Counterclaimants' Causes of Action, an order precluding Avaya from engaging in any practice of providing access permissions to owners of Avaya Definity or PDS equipment only upon payment of fees to Avaya;

C.     Pursuant to 15 U.S.C. § 26, Fed. R. Civ. P. 65, and the Court's inherent power, preliminarily and permanently enjoining Avaya from continuing its anti-competitive conduct, including without limitation, the tying and bundling of the sales of upgrades and/or patches with maintenance and service contracts, and logins necessary for maintenance and service, and from otherwise interfering with Counterclaimants' competition with Avaya as independent service providers;

D.     Pursuant to 15 U.S.C. § 15, award damages equal to treble the amount of the injuries sustained by Counterclaimants as a result of Avaya's unlawful conduct, including attorneys' fees, interest and costs;

E.      On all of Counterclaimants' Causes of Action, compensatory and consequential

damages and other economic relief;

F.      On all of Counterclaimants' Causes of Action, punitive damages;

G.      On all of Counterclaimants' Causes of Action, for costs associated with this

lawsuit and all reasonable attorneys' fees;

H.      On all of Counterclaimants' Causes of Action, for such other and further relief as

this Court deems just and proper.


### JURY DEMAND

Defendants demand a trial by jury on all issues so triable.

                              **K&L GATES LLP**
                              *Attorneys for Telecom Labs, Inc and*
                              *Continuant, Inc.*


                              By:  /s/ *Anthony P. La Rocco*
Dated:  September 21, 2009                 Anthony P. La Rocco

**Of Counsel:**

        Douglas F. Broder (admitted *pro hac vice*)
        K&L GATES LLP
        599 Lexington Avenue
        New York, New York 10022
        Tel.: (212) 536-4808
        Fax: (212) 536-3901

## CERTIFICATION UNDER L. Civ. R. 11.2

I, Anthony P. La Rocco, hereby certify that I am a member of the law firm of K&L Gates LLP, attorneys for Defendants Telecom Labs, Inc. and Continuant, Inc., and that certain of the subject matter in controversy in this case is substantially similar to, and the subject of, certain claims in another court proceeding captioned Black Box Corporation v. Avaya Inc., Civil Action No. 3:07-cv-6161 (GEB/JJH).   The parties to that court proceeding are Plaintiff Black Box Corporation and defendant Avaya Inc.

I certify that the foregoing statements by me are true.   I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.


/s/ *Anthony P. La Rocco*_____
Anthony P. La Rocco

Date:  September 21, 2009