NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

—————————————————————————— )
AVAYA, INC.,                                          )
                    Plaintiff,         )
                                   )
v.                                                    )          Civil Action No. 06-2490 (GEB)
                                   )
TELECOM LABS, INC., TEAMTLI.COM            )          **MEMORANDUM OPINION**
CORP., CONTINUANT, INC., DOUGLAS           )
GRAHAM, SCOTT GRAHAM AND BRUCE             )          **FILE UNDER TEMPORARY SEAL**
SHELBY,                                               )
                    Defendants.      )
—————————————————————————— )

**BROWN, Judge**

       This matter comes before the Court upon Plaintiff/Counterdefendant Avaya, Inc.'s

("Avaya") Motion for Partial Summary Judgment Dismissing the Tenth and Eleventh Causes of

Action (Tortious Interference) of Defendant/Counterclaimants' Telecom Labs Inc. and

Continuant, Inc. (collectively "TLI/C" or "Counterclaimants") Second Amended Counterclaims.

(Doc. No. 183.)  Counterclaimants oppose the motion.  (Doc. No. 302.)  The Court has

considered the parties' submissions and decided the matter without oral argument pursuant to

Federal Rule of Civil Procedure 78.  For the reasons set forth below, the Court will grant the

motion.

## I.      BACKGROUND

###     A.    Procedural History

       Avaya initiated this action on June 2, 2006 by filing a complaint against Telecom Labs,

Inc. ("TLI"), Continuant, Inc. ("Continuant"), and TeamTLI.com Corp. ("Team"), asserting ten

causes of action alleging, among other things, that TLI, Team, and Continuant gained

unauthorized access to Avaya systems.  (Doc. No. 1.)  Avaya amended its Complaint on August 9, 2006.  (Doc. No. 10.)  On July 14, 2008, Avaya filed a Third Amended Complaint, which added three new causes of action.[1]  Ultimately, on February 8, 2010 Avaya filed its Fourth Amended Complaint.  (Doc. No. 133.)

On August 21, 2006, Counterclaimants and Team filed their Answer to the Amended Complaint which included Counterclaimants' initial Counterclaims.  (Doc No. 11.)  On March 14, 2008, TLI and Continuant filed their Amended Counterclaims and Jury Demand.  (Doc. No. 41.)  The Amended Counterclaims consisted of ten causes of action: (1) monopolization in violation of Section 2 of the Sherman Act; (2) conspiracy to monopolize in violation of Section 2; (3) attempted monopolization in violation of Section 2; (4) tying the receipt of patches and upgrades for the Definity systems to the purchase of service and maintenance in violation of Section 1 of the Sherman Act; (5) tying the receipt of patches and upgrades for Avaya's Predictive Dialing System ("PDS") to the purchase of service and maintenance in violation of Section 1; (6) illegal conspiracy in violation of Section 1; (7) tortious interference with business/contractual relations; (8) tortious interference with a prospective business or economic advantage; (9) injurious falsehood/trade libel or slander; and (10) breach of implied covenant of good faith and fair dealing.

On April 18, 2008, Avaya filed a motion to dismiss the first six causes of action in the Amended Counterclaims, which the Court granted in part and denied in part on August 29, 2008.  (Doc. No. 59.)  Specifically, the Court denied Avaya's motion to dismiss the monopolization, attempted monopolization, and Section 1 conspiracy counterclaims while granting Avaya's

---

[1] The second time Avaya amended its complaint, it added Scott Graham, Douglas Graham, and Bruce Shelby as defendants.

motion to dismiss the conspiracy to monopolize, PBX, and PDS tying counterclaims without prejudice.

On March 1, 2009, Counterclaimants filed a motion for leave to file their Second Amended Counterclaims, seeking to replead all non-dismissed Counterclaims in full, conform the dismissed tying claim to the Court's ruling, assert specific allegations regarding PDS upgrades, and assert new monopolization counterclaims while not seeking to replead the dismissed conspiracy to monopolize counterclaim.  On September 8, 2009, the Court granted Counterclaimants' motion in all respects except for the reassertion of the allegations of *per se* violations with respect to the Section 1 illegal conspiracy proposed counterclaims.  (Doc. No. 101.)

Thereafter, on September 21, 2009, Counterclaimants filed their Second Amended Counterclaims ("Counterclaims").  (Doc. No. 104.)  The Counterclaims consisted of thirteen causes of action: (1) monopolization in the private branch exchange ("PBX") market in violation of Section 2 of the Sherman Act; (2) attempted monopolization in the PBX market in violation of Section 2 of the Sherman Act; (3) tying PBX maintenance and patches in violation of Section 1 of the Sherman Act; (4) tying PBX maintenance and upgrades in violation of Section 1 of the Sherman Act; (5) monopolization in the PDS market in violation of Section 2 of the Sherman Act; (6) attempted monopolization in the PDS market in violation of Section 2 of the Sherman Act; (7) tying PDS maintenance and patches in violation of Section 1 of the Sherman Act; (8) typing PDS maintenance and upgrades in violation of Section 1 of the Sherman Act; (9) illegal conspiracy in violation of Section 1 of the Sherman Act; (10) tortious interference with business/contractual relations; (11) tortious interference with prospective business or economic

advantage; (12) injurious falsehood/trade libel or slander; and (13) breach of the implied

covenant of good faith and fair dealing.

On July 15, 2011, Avaya filed this motion and supporting brief for partial summary

judgment to dismiss the tenth and eleventh causes of actions (tortious interference) of TLI/Cs'

Second Amended Complaint.  (Doc. No. 183.)  TLI/C filed an opposition brief on August 15,

2011 (Doc. No. 302); and Avaya filed a reply brief on September 12, 2011 (Doc. No. 403).

### B.      PBX Systems and PDS Platforms

This case involves two telecommunications systems: (1) "Private Branch Exchange"

systems, also known as "PBX" systems; and (2) "Predictive Dialing System" platforms, also

known as "PDS" platforms.

PBX systems are telephone switching systems containing hardware, firmware, and

software.  PBX systems are used by mid-to-large sized companies and other enterprises to

connect their voice communications to the public voice networks.  (Fourth Amended Complaint

¶ 16.)  Avaya manufactures, sells, and services PBX systems.[1]  According to Counterclaimants,

the PBX systems manufactured, sold, and serviced by Avaya and its predecessors are commonly

referred to as the "Definity" platform.  (Counterclaims ¶ 1.)  Other manufacturers currently

produce and sell competing PBX systems.  (*Id.* ¶¶ 1, 37.)

PDS platforms are hardware and software systems that "automate dialing and increase

dialing efficiency by predicting call outcomes based upon a number of factors."  (*Id.* ¶ 50.)  In

1999, Avaya's predecessor, Lucent, acquired a company that manufactured and sold a PDS

---

[1] In October 1996, American Telephone and Telegraph Company ("AT&T") spun off various
telecommunication business units to form Lucent Technologies, Inc. ("Lucent").  (Counterclaims
¶ 41.)  In September 2000, Lucent spun off its "enterprise networking group" to form Avaya.
(*Id.* ¶¶ 1, 56.)

platform.  (*Id.* ¶ 49.)  After the acquisition, Lucent began to manufacture and sell the PDS

platform.  (*Id.* ¶ 52.)  As a result of its spinoff from Lucent, Avaya took over the manufacture

and sales of the PDS platform.  (*Id.* ¶ 57.)

### C.      Counterclaimants

Counterclaimants specialize "in the maintenance and service of various

telecommunications systems manufactured and sold by Avaya" including Avaya's PBX and PDS

systems.  (Counterclaims ¶ 3.)

TLI was a Lucent dealer from 1996 to 2000, during which time it resold products

manufactured by Lucent and other manufacturers, but it rarely offered maintenance contracts.

(*Id.* ¶¶ 70-73.)  When Avaya was spun off from Lucent in 2000, Lucent's dealer contracts were

assigned to Avaya.  (*Id.* ¶¶ 74.)  Thus, TLI became an Avaya dealer.  Subsequently, and due in

part to the negative effects that Avaya's downsizing had on Avaya's own service abilities, Avaya

began to encourage TLI and other Avaya PBX dealers to perform service and maintenance on

the Definity platforms.  (*Id.* ¶¶ 76, 79, 80.)  To that end, TLI began hiring former Avaya

employees and actively competing for Avaya's existing maintenance contracts, thereby

"substantially increasing [its] revenue."  (*Id.* ¶¶ 77, 81.)

According to the Counterclaims, "[s]ometime after Avaya's spin-off" and "[t]o avoid

competition from dealers . . . Avaya revised the standard dealer contract . . . and created a new

Avaya One reseller agreement."  (*Id.* ¶¶ 86, 89.)  The new "Avaya One" reseller agreements

designated the dealers as "BusinessPartners" and "contained a strict and express non-compete

provision that explicitly prohibited BusinessPartners from offering competitive maintenance

contracts to any existing Avaya maintenance customer."  (*Id.* ¶ 90.)  TLI sought modification of

this provision, and "[u]ltimately, Avaya and TLI agreed upon a compromise, whereby TLI

accepted a limited non-compete provision that precluded it from seeking long-term maintenance contracts from Avaya's top 874 customers, known as 'VCP' customers." (*Id.* ¶¶ 102-03.)  With this modification, TLI signed the new contract with Avaya on March 31, 2003 ("2003 Contract"). (*Id.* ¶ 104.)  However, according to the Counterclaims, in May 2003, "Avaya told TLI that its only options were either to stop offering maintenance contracts to *all* Avaya customers . . . or be terminated" as an Avaya dealer. (*Id.* ¶ 106.)  Then, "four months after [the 2003 Contract] was executed," Avaya allegedly "improperly, immediately reneged on its contractual obligations" and terminated the 2003 Contract without the contractually required sixty days advance written notice. (*Id.* ¶¶ 109-10.)  Since the time the 2003 Contract was terminated, TLI has acted as an independent service provider ("ISP") for Avaya Definity equipment. (*Id.* ¶ 16.)[2]  The Counterclaims allege that Avaya terminated the BusinessPartner status of any former dealer that did not sign the new "Avaya One" contract. (*Id.* ¶ 116.)

The other Counterclaimant, Continuant, "has never had a . . . relationship with Avaya, and has instead always acted as an independent service provider for Definity and PDS equipment." (*Id.* ¶ 17.)  In 2005, Continuant acquired a company that offered maintenance and service to Avaya PDS owners.  Continuant has continued to provide such maintenance and service. (*Id.* ¶¶ 84-85.)

### D.     System Logins and Software Permissions

The Counterclaims allege that Avaya's Definity system uses a "login" procedure to restrict access to the "telephony application software" (herinafter, the "software") embedded in

---

[2] It appears that Avaya refers to ISPs as either "unauthorized service providers" ("USPs") or "unauthorized maintenance providers" ("UMPs"). (Counterclaims ¶ 295; Avaya's Br. at 1.)  The Court uses the terms interchangeably.

the Definity system.  (Counterclaims ¶ 139.)[3]  Access to the software is necessary to perform service and maintenance on a Definity system.  (*Id.* ¶ 141.)  The "login" procedure requires a user to enter into the system a "username" and a "password," collectively known as a "login." (*Id.* ¶ 139.)  System owners and service technicians use different types of logins that are associated with different levels of access to the system.  (*Id.* ¶ 143.)  Once users are logged into the system, they may enter certain commands, which assist in the service and maintenance of the system.  Individuals with high level access are able to execute commands that individuals with lower level access are not able to execute.

According to the Counterclaims, there are various levels of logins for technician services, two of which are the "CRAFT" and "INIT" logins.  (*Id.* ¶¶ 143, 249.)  In 2001, Avaya introduced an alternative login, called the "DADMIN" login, which was available to Avaya dealers at no charge, upon written request from a Definity system owner.  (*Id.* ¶¶ 158, 161.)  Prior to 2001, "Avaya resellers, dealers and BusinessPartners were given CRAFT logins."  (*Id.* ¶ 159.)  The DADMIN login allows the dealers to execute the same basic commands that are capable of being executed with a CRAFT login.  (*Id.* ¶ 160.)

Counterclaimants assert that there are two levels of logins available to Definity system owners: a "user" login and a "super-user" login.  (*Id.*  ¶ 143.)  In the late 1980s, in response to the desire of large Definity system owners to perform basic maintenance themselves, Avaya created Maintenance Software Permissions ("MSPs").  (*Id.* ¶¶ 144-45.)  "[O]nce enabled,

---

[3] According to the Counterclaims, Definity systems "contain two types of software—the operating systems software and the telephony application software."  (Counterclaims ¶ 129.) The operating systems software "perform[s] basic systems tasks such as controlling and allocating memory, managing the sharing of resources and files of a system, and providing a platform for other software applications."  (*Id.* ¶ 130.)  "[T]he telephony application software, which is loaded on to the main server of a Definity system, is designed generally to provide all of the functions and features of the phone system purchased by the customer."  (*Id.* ¶ 132.)

[MSPs] simply allow a customer, using certain, pre-existing customer-level logins, to execute certain commands that allow for performance of maintenance functions."  (*Id.* ¶ 146.)

A Definity system owner that has a "super-user" login with an MSP can perform the same basic commands that are capable of being executed with a CRAFT or DADMIN login. (*Id.* ¶ 143.)  Thus, there have been at least three ways to login to a Definity system for maintenance purposes: through a CRAFT login, through a DADMIN login, or through a "super-user" login with MSP.

Originally, owners could activate MSPs by paying a one-time fee which, according to Counterclaimants, "represented the actual cost for a technician to install the MSP."  (*Id.* ¶¶ 148, 150.)  Importantly, the Counterclaimants allege that "AT&T and Lucent did not prohibit a customer that purchased MSPs to authorize a third party vendor or service provider of the customer's choosing from accessing its Definity system."  (*Id.* ¶ 149.)

In 1996, Lucent changed its policy with respect to MSPs.  Under the new policy, "MSPs were provided without additional cost to end-users who requested them and maintained a service contract with Lucent."  (*Id.* ¶ 154.)  However, "[e]nd users who did not have a service contract with Lucent could also obtain MSPs through a Maintenance Assist Offer."  (*Id.*)  The "Maintenance Assist Offer" requires the end-user to pay a monthly fee for its MSP access.  (*Id.*) Counterclaimants allege that from 1996 to March 2005, owners could obtain MSPs in this manner regardless of whether they had service contracts with Lucent.  (*Id.* ¶¶ 188-92, 211.) Initially, Avaya continued to offer this option to users after it was spun-off from Lucent.  (*Id.* ¶ 156.)

Counterclaimants also allege that AT&T and Lucent did not disclose to buyers of Definity systems any restrictions on the customers' ability to access or use the commands

necessary to perform maintenance, or use of ISPs to do so.  (*Id.* ¶¶ 163-176.)  Indeed, Counterclaimants reference portions of a Purchase/Service Agreement used by Lucent as early as 1996, which allegedly granted the system owners a broad general license to use the software without restriction in terms of access to specific commands for maintenance.  (*Id.* ¶¶ 177-80.)

### E.    Tortious Interference Allegations

 The tenth and eleventh Counterclaims allege tortious interference with business/contractual relations and tortious interference with a prospective business or economic advantage.  The factual bases generally arise from three circumstances, detailed below.

First, Counterclaimants contend that while still a party to the 2003 Contract, Avaya approached TLI's existing customers to solicit them away from TLI.  (Counterclaims ¶ 426.) That conduct, Counterclaimants assert, arose after "Avaya told TLI that its only options were either to stop offering maintenance contracts to *all* Avaya customers . . . or be terminated" as an Avaya dealer.  (*Id.* ¶ 106.)  To this end, Avaya tried to buy out TLI's maintenance portfolio, but after the bid was unsuccessful, Counterclaimants allege that Avaya wrongfully terminated the agreement.  (*Id.* ¶¶ 448-49.)  Counterclaimants insist that Avaya failed to provide sixty days advanced notice of the termination, and during those sixty days began to notify TLI customers that TLI was no longer an authorized dealer.  (*Id.* ¶¶ 111.)  Additionally, Counterclaimants assert that Avaya "immediately cut off TLI's ability to purchase parts from Avaya's distributors or dealers" and prematurely deactivated customers' maintenance capabilities.  (*Id.* ¶¶ 112, 428.)

Second, the Counterclaims allege that Avaya contacted existing, former, and prospective TLI and Continuant customers to advise those customers that Counterclaimants could not fulfill their contractual obligations, were engaging in illegal activity, and/or were engaging in conduct that violates state and federal law.  (*Id.* ¶ 427.)  The letters, which Counterclaimants designate as

"fear, uncertainty, and doubt" or "FUD" letters, came in two waves.  First, form letters were sent to Definity system owners who either were considering terminating their Avaya maintenance contracts or who had recently done so.  (*Id.* ¶ 244.)  The letters, sent to PBX and PDS owners considering using an ISP, advised owners that if they "cancelled or did not renew [their] Avaya services agreement," the owners would lose services "including: (i) access to Avaya's Remote Technical Support; (ii) Per Incident Maintenance Support from Avaya; (iii) MSPs or Maintenance Assist, which by virtue of the July 1, 2005 Policy Change, were no longer available to customers of "unauthorized service providers;" and (iv) Product Correction Notices."  (*Id.* ¶ 245.)  Letters sent to owners who had already started using an ISP were informed that "unauthorized service providers" are severely limited in the ability to provide support.  (*Id.* ¶ 247.)

The next wave of FUD letters, Counterclaimants assert, were "far more threatening" because the letters "expressly warn[ed] that 'any unauthorized use of, access to, MSPs or any Avaya Login including DADMIN, CRAFT or INIT is a violation of federal and state laws and could result in civil and criminal liability and the assessment of penalties,'" and that Avaya will "take legal action against violators to protect Avaya proprietary intellectual property."  (*Id.* ¶ 249.)  Counterclaimants assert similarly-worded letters were sent to PDS customers as well, the implication being that ISPs were operating subject to civil and criminal penalties.  (*Id.* ¶ 280, 284.)

Third, Counterclaimants maintain that Avaya accessed customers' PBX and PDS equipment to lock out customers' and Counterclaimants' ability to execute maintenance commands.  (*Id*. ¶ 428.)  This practice, assert Counterclaimants, began after Avaya started to track the loss of maintenance contracts to ISPs and status of MSPs on PBXs that were now being

maintained by ISPs.  (*Id.* ¶¶ 261-62.)  Thereafter, "Avaya engaged in an effort to dial into these customer's [sic] phone systems to disable MSPs and otherwise lock out the Definity owners from accessing and using the commands on their own systems necessary to perform maintenance." (*Id.* ¶ 264.)  What is more, Counterclaimants allege Avaya did that deceptively, without Definity owners' knowledge or consent.  (*Id.* ¶¶ 266-70.)

## II.    DISCUSSION

### A.    Standard of Review

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("[The] purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'").

In deciding whether triable issues of fact exist, a court must view the underlying facts and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987).  The nonmoving party "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If he does

not so respond, summary judgment, if appropriate, shall be entered against him." *Matsushita*, 475 U.S. at 586.  However, "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."  *Celotex Corp.*, 477 U.S. at 323.

### B.   Elements Tortious Interference[4]

To establish their tenth cause of action—tortious interference with a business/contractual relation—Counterclaimants must prove the following: "(1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference." *Digiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 558 (D.N.J. 2002) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751-52 (1989)).

Turning to the eleventh cause of action—tortious interference with a prospective business or economic advantage—a defendant is prohibited from "inducing a third person not to 'continue' a 'prospective relation.'" *MacDougall v. Weichert*, 144 N.J. 380, 403 (1996) (quoting Restatement (Second) of Torts, § 766B(a) (1979)).  The Counterclaimants must prove four elements to maintain this cause of action: (1) a prospective economic or contractual relationship or reasonable expectation thereof; (2) interference done intentionally and with malice; (3) interference caused the loss of the prospective gain; and (4) resulting damages.  *Id.* at 404; *see also Printing Mart-Morristown*, 116 N.J. at 751.

---

[4] The parties agree that New Jersey law applies to the tortious interference claims.

### C.      Application

Because TLI/C carries the burden of proof on both claims, Avaya correctly concludes that the absence of any element requires summary judgment in its favor.  The parties only appear to disagree on two of the elements common to both tortious interference claims: (1) intentional and malicious interference and (2) interference caused damages.[5]  The Court addresses these in turn.

### 1.      Intentional and Malicious Interference

For purposes of both claims, "malicious interference" means "that the harm was inflicted intentionally and without justification or excuse."  *Printing Mart-Morristown*, 116 N.J. at 751 (quoting *Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 N.J. 552, 563 (1955)).  Ill will towards the plaintiff is not required.  *Id.*  Rather, courts often state the definition in terms of whether the defendant's "conduct was sanctioned by the 'rules of the game.'"  *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 306 (2001).  The malice element is negated when there is "a just and lawful excuse" for the conduct.  *Middlesex Concrete Products & Excavation Corp. v. Carteret Indus. Assoc.*, 37 N.J. 507, 517 (1962).  In other words, "the interference is privileged by reason of the interests furthered by [the] conduct."  *Id.* (citing Prosser, Torts 735 (2d ed. 1955)).

An inquiry into the privilege or justification asserted requires analysis of the relationship of the parties "within the social and factual context presented."  *Id.*  For example, a party acting "to advance its own interest and financial position" is not necessarily malicious.  *See Cedar*

---

[5] The parties do not appear to dispute the first element of each claim, and the Court will assume for sake of argument, that the element is satisfied.  Additionally, the parties designate their second dispute as one concerning the "damages" element, even though they really appear to dispute causation.  However, because causation and damages require scrutiny of the same facts, the Court will address the two elements together.

*Ridge Trailer Sales, Inc. v. Nat'l Community Bank of New Jersey*, 711 A.2d 338, 345 (N.J.
Super. Ct. App. Div. 1998).  The outcome is therefore, fact intensive.  *See Lamorte Burns & Co.*,
167 N.J. at 306.

As detailed above, the interference claimed by Counterclaimants manifests in three
categories of conduct.  For the reasons below, the Court finds that it lacks a basis to grant
summary judgment in favor of Avaya based on the malice element of the tortious interference
claims.

### a.       Termination of the 2003 Contract

The first aspect of the tortious interference claims arises out of Avaya's actions before
and after it provided notice that it was terminating the 2003 Contract.[6]  To begin,
Counterclaimants assert that Avaya prematurely cut off its ability to purchase Definity parts and
access Avaya's Technical Support Office.  (Counterclaims ¶ 36.)  Next, Counterclaimants state
that before TLI was even provided notice of termination, Avaya took steps that precluded TLI's
ability to perform maintenance causing TLI to be in breach of contract with its customers.  For
example, Dawna Obermeier stated in a 2003 certification that Avaya disabled TLI's alarms and
passwords on TLI customers' Definity systems on several occasions in May, June, and July of
2003.  (TLI/C's Ex. 121 to Helmer Certification ¶ 4(a)-(d) and accompanying exhibits.)  The
disabling of TLI alarms and passwords continued after the notice of termination, but notably
before actual termination of TLI's status as a BusinessPartner.  (*Id.* ¶ 5.)  Finally,
Counterclaimants assert that Avaya contacted TLI customers before the 2003 Contract's
termination to inform those customers that TLI was no longer authorized.  (TLI/C's Ex. 113 to
Helmer Certification ¶ 33, Ex. D.)  For instance, in an email dated August 1, 2003, Airborne

---

[6] By letter dated July 31, 2003, Avaya informed TLI that the 2003 Contract "will be terminated
on September 30, 2003."  (TLI/C's Ex. 118 to Helmer Certification)

Express Inc., a TLI customer, contacted TLI to report that Avaya had informed it that TLI was no longer a BusinessPartner.  (*Id.*)

In response, Avaya addresses these activities by arguing they were authorized by the terms of the 2003 Contract.  Avaya points out that the 2003 Contract provides that, upon notice of termination, TLI "shall not submit any orders for Product or Product Components."  (TLI/Cs Ex. 117 to Helmer Certification at 9.)  Consequently, Avaya asserts that it was not improper for it to immediately cut off TLI's ability to purchase parts.

However, Avaya is less direct in addressing the other allegations of wrongful conduct during the time between notice of termination and the date of termination of the 2003 Contract.  In its brief to the Court on the topic of the implied covenant of good faith and fair dealing cause of action, Avaya argues that informing customers that TLI was no longer an authorized dealer was permitted by the 2003 Contract.  (Doc. No. 227 at 18-19.)  "Upon termination of the Agreement," section 17.5(b) requires TLI to "cease holding itself out, in any manner, as an authorized Reseller of Avaya."  (TLI/C's Ex. 117 to Helmer Certification at 10.)  From this language, Avaya extrapolates that "if TLI had no right to hold itself out as an Avaya dealer upon termination, the Court cannot imply an obligation upon Avaya to keep that fact a secret from Avaya's own customers."  (Doc. No. 227 at 18-19.)  However, the Counterclaims allege Avaya wrongfully informed customers that TLI was no longer a BusinessPartner *before* the termination of the contract.  (Counterclaims ¶ 111.)

Considering the facts above, Counterclaimants have succeeded in demonstrating that there is a genuine issue of material fact as to whether Avaya maliciously interfered with TLI's maintenance contracts with PBX owners by removing alarms, changing passwords, and

informing TLI's customers that TLI was no longer a BusinessPartner before the termination of the 2003 Contract.

### b.    FUD Letters

The next factual basis of the tenth and eleventh causes of action are the FUD letters sent to PBX and PDS customers.  Avaya contends that sending letters was justified because it was only advising its customers of Avaya policies and legal rights.  (Avaya's Br. at 32-33; Doc. No. 185-1.)  To support its argument, Avaya analogizes this case to *Nathanson v. Medical College of Pa.*, 926 F.2d 1368 (3d Cir. 1991).  In *Nathanson*, the plaintiff accused Medical College of Pennsylvania ("MCP") of tortiously interfering with her contract with Georgetown Medical School.  *Nathnson*, 926 F.2d at 1387-88.  By letter, MCP informed Georgetown that the plaintiff had matriculated at MCP, a fact that plaintiff had not disclosed on her application to Georgetown.  *Id.*  Georgetown revoked plaintiff's admission because Nathanson was already a student at MCP.  *Id.*  The court held that summary judgment was properly entered dismissing plaintiff's tortious interference claim because "MCP was simply protecting its own contractual interest" and "[a]n action to protect one's contractual right is also ordinarily justification for interference with another's contract."  *Id.* at 1389 (internal citations omitted).

The facts of this case do not neatly correspond to *Nathanson*.  Here, to be precise, Avaya was sending letters to PBX and PDS owners with whom it did *not* have maintenance contracts or to customers choosing not to renew maintenance contracts.  Nonetheless, Avaya can still argue that it was attempting to protect its propriety rights from what it considered to be use by unauthorized third parties.  However, this Court has determined in its Memorandum Opinion addressing the antitrust counterclaims that there is a genuine issue of material fact as to whether such conduct is anticompetitive.  That issue of fact would have to be resolved first because if

16

Avaya's conduct was anticompetitive, then it interfered "intentionally and without justification" in that the conduct was "dishonest[] or illegal" and "thereby interfere[d] with a competitor's economic advantage." *Lamorte Burns & Co.*, 168 N.J. at 307. In particular, Avaya claims it maintains proprietary rights in MSPs and "has never granted the right to use MSPs to unauthorized third-parties." (Avaya's Br. at 8.) But the record indicates that MSPs were originally sold for a one-time fee and without use limitations, and only later did Avaya institute a policy and pricing change. (*See* TLI/C's Supplemental Statement of Undisputed Material Facts ¶¶ 163-66, 171, 173-180.)

Counterclaimants assert that there are additional false or misleading statements contained in the FUD letters, which might convince a reasonable jury that the letters were malicious. "The most egregious false statement . . . is Avaya's assertion that unauthorized access to a PBX or PDS system by an ISP '*is* a violation of federal and state laws.'" (TLI/C's Opp. Br. at 36; Doc. No. 302.) Counterclaimants contend that Avaya had no legal basis for these threats, but Avaya claims that its legal department reviewed the letters. (*Id.*; s*ee* also Avaya's Response to TLI/C's Supplemental Statement of Undisputed Material Facts ¶ 79.) Viewing these facts in favor of Counterclaimants, there is a genuine issue of fact as to whether Avaya was protecting its own legitimate interests and legal rights or whether it was attempting to drive out ISP competition. In other words, there is a genuine issue of fact as to whether Avaya's actions were justified and therefore not malicious.

### c.     Deactivating MSPs/Logins

The third set of circumstances underlying Counterclaimants' tortious interference claims was the deactivation of MSPs and logins on TLI/C customers' systems. Avaya maintains that it was privileged to turn off MSPs and logins because those capabilities are the property of Avaya.

(Avaya's Br. at 8.)  Counterclaimants, however, assert Avaya engaged in improper anticompetitive conduct not protected by a business justification.  Accordingly, Counterclaimants argue that there can be no finding that Avaya's "conduct was sanctioned by the 'rules of the game.'"  *Lamorte Burns & Co.*, 167 N.J. at 306 (2001).

Specifically, Counterclaimants assert that Avaya never had the unilateral right to access customers' systems to disable MSPs, logins, or other local settings.  (TLI/C's Opp. Br. at 28.) Rather, Avaya had, at the most, a contract right to monitor compliance with software licensing terms.  (*Id.*)  For its part, in its Reply to the Supplemental Statement of Undisputed Material Facts of Counterclaimants, Avaya agrees that it had a right to access PBX systems for "compliance" purposes but it further adds that it would be strange if it also did not have the right to take action upon discovery of noncompliance.  (Doc. No. 403-2 ¶¶ 66-67.)

The parties also disagree as to the viability of Avaya's justification for turning off MSPs to protect propriety intellectual property rights.  Counterclaimants argue that, even if MSPs are legitimate intellectual property, Avaya improperly leveraged those rights "to monopolize, or attempt to monopolize, a market."  (TLI/C's Opp. Br. at 28.)  In support, Counterclaimants contend that Avaya has falsely asserted that MSPs are available only with the purchase of an Avaya maintenance agreement.  (*Id.* at 29.)  Indeed, there was a time when PBX owners could activate MSPs for a one-time fee.  However, it is not clear if Counterclaimants' customers were among that group.  Moreover, Counterclaimants contend that there is no independent maintenance software for an Avaya PBX that is separately licensed.  (*Id.* at 29.)  As a result, Counterclaimants assert that it was improper to force customers to license MSPs to access software that had already been purchased.  (*Id.*)

18

Taking all inferences in favor of Counterclaimants, the non-moving party here, they have demonstrated a genuine issue of material fact as to whether Avaya had the right to deactivate MSPs and logins.  Additionally, there is a genuine question of fact as to whether Avaya was contractually capable of locking out PBX customers by deactivating logins and local settings.

### 2.     Interference Caused the Loss of a Contract/Business Relationship or a Prospective Economic Advantage

To succeed on a claim of tortious interference, Counterclaimants must prove that the interference by defendant caused the damages.  *See Printing Mart-Morristown*, 116 N.J. at 752. "While the bare elements of the tort of malicious interference with contractual relations are actual interference with a contract plus proof of the malicious nature of that interference, the element of damages is nonetheless required."  *Norwood Easthill Assoc. v. Norwood Easthill Watch*, 536 A.2d 1317, 1320 (N.J. Super Ct. App. Div. 1988) (internal citations omitted).

Counterclaimants' damages calculation is based on the expert report of Glenn Pomerantz, who analyzed Avaya's "anticompetitive conduct" from 2000 to 2010 to calculate Counterclaimants' lost profits.  (*See* Pomerantz Report; Doc. No. 302-6.)  Counterclaimants assert that because of the deactivation of MSPs/logins and FUD letters, they suffered or will suffer lost profits that "conservatively fall in the range of $112 million to $126.7 million." (TLI/C's Opp. Br. at 53.)

Avaya asserts two reasons why Counterclaimants cannot prove that deactivated MSPs/logins caused damages.  First, Avaya states that because MSPs are the licensed property of the PBX owner, Counterclaimants cannot be harmed if they are deactivated.  (Avaya's Br. at 18.) Rather, such a claim of "wrongful deactivation," if any, would lie with the PBX owner.  (*Id.*); *See STX II, LLC v. Union Telecard Alliance, LLC*, Case No. 09-1549, 2011 WL 1741916, at *3

(D.N.J May 4, 2011) (holding that the plaintiff did not have standing to assert a tortious interference claim because it did not own calling cards that were deactivated by the defendant). While the Court agrees with Counterclaimants that an explicit right to use MSPs would not be dispositive, this still does not answer the question of whether the deactivation of MSPs would cause harm to Counterclaimants' prospective and current contractual relations.

Indeed, Avaya persuasively argues that Counterclaimants did not need MSPs and logins to provide maintenance. (Avaya's Br. at 19.) To illustrate, in answering Interrogatory No. 27, Counterclaimants identified multiple ways they accessed Definity systems. (Avaya's Ex. 39 to Oberstaedt Verification; Doc. No. 205-3.) As an alternative to using MSPs, Counterclaimants simply used other methods of accessing maintenance commands. (*Id.*) For instance, Counterclaimants used commonly known CRAFT, INIT, or DADMIN default passwords or hired a third party to determine active passwords for those usernames. (*Id.*) Thus, whether MSPs were activated had little bearing on whether Defendants could provide maintenance to customers and therefore would not materially affect a customer's decision to enter into a contract with Counterclaimants. While Counterclaimants suggest an "*in terrorem*" effect from Avaya's threat to turn off or withhold MSPs, this is not concrete evidence to prove damages, much less sufficient to create a genuine issue of material fact as to the damages element.

The second cause of damages asserted by Counterclaimants stems from the 2003 Contract termination-related communications and FUD letters that Avaya sent to PBX and PDS customers. In its opposition brief, Counterclaimants list examples of lost contracts resulting from Avaya's actions. However, once the totality of the communications and letters are considered, Counterclaimants have failed to come forth with sufficient evidence that the Avaya letters were the *de facto* cause of the loss of current and prospective maintenance contracts.

Specifically, in scrutinizing the examples of lost profits, the Court identifies from the record multiple reasons why a PBX or PDS customer chose not to enter into a maintenance contract with TLI or Continuant.  Regarding Continuant's bid for a maintenance contract to service the State of Michigan PBX systems, Counterclaimants insist that they would have been awarded the contract but for an Avaya FUD letter.  (TLI/C's Opp. Br. at 51.)  However, as Avaya notes in its Statement of Undisputed Material Facts ¶ 67, there were multiple grounds upon which the State of Michigan decided not to sign a contract with Continuant.  Ms. Pamela Platte, an employee of the State, testified to numerous reasons including the urgent need to have a contract in place, a failure of Continuant to provide certifications for its subcontractors, a hesitancy to be a third party to litigation between Avaya and Continuant, and inconsistency in letters sent by Avaya and Continuant.  (TLI/C's Ex. 99 to Helmer Certification at 109:21–110:1; Avaya's Ex. 65 to Oberstaedt Verification at 230:21–239:24.)  Additionally, Ms. Platte explained that she did not "recall making or prioritizing reasons" for the no-award nor did she recall having the impression that Avaya would sue the State of Michigan if it awarded the contract to Continuant.  (*Id.* at 242:8-17.)  Taking the entirety of the testimony into account, there is insufficient evidence that Avaya's actions alone cause the loss of the State of Michigan PBX maintenance contract.

Apart from the State of Michigan contract, Counterclaimants assert other examples of customers who chose to cancel maintenance contracts or declined to enter into contracts.  But there are fatal problems with these examples as well.  Counterclaimants fail to take into account other reasons cited by former customers for declining to renew or enter into maintenance contracts.  (*See, e.g.*, Avaya's Ex. 235 to Helmer Certification at 109:4-15.)

Nor, in referring to additional allegations of lost contracts, do Counterclaimants cite to anything that the Court may consider as direct or circumstantial evidence that Avaya's communications were the sole cause of Counterclaimants' damages.  For instance, in their Supplemental Statement of Undisputed Material Facts, Counterclaimants cite a 2010 cease and desist letter that they sent to Avaya as of evidence supporting damages caused by Avaya.  However, citing a cease and desist letter is no more helpful to the Court on summary judgment than Counterclaimants' pleadings, upon which a non-moving party "may not rest" to demonstrate "a genuine issue for trial."  *Matsushita*, 475 U.S. at 586.  In other words, the Court will not consider the cease and desist letter as evidence sufficient to prove that the allegations made in the cease and desist letter are in fact true.

As another example, Counterclaimants cite Adams County, Colorado as a customer that declined to enter into a contract based on an Avaya FUD letter.  (TLI/C's Opp. Br. at 51.)  Yet the only evidence of such provided by Counterclaimants is an email written by a TLI/C employee explaining a conversation he purportedly had with an Adams County representative "who was heated" and who "said the only way he can consider [TLI/C] is if Avaya rescinds their letter saying he won't have access to his system."  (TLI/C's Ex. 234 to Helmer Certification.)  However, the Court cannot consider that evidence because it is hearsay, and Counterclaimants have not relied on any exception to the hearsay rule justifying its admission, nor have they pointed to any other documentation of a lost contract with Adams County, Colorado.

Furthermore, Counterclaimants rely on the findings of their expert Glenn Pomerantz.  Mr. Pomerantz made his damages calculations after analyzing alleged instances of tortious interference.  (*See* Pomerantz Report; Doc. No. 302-6.)  But the instances of deactivation of MSPs/logins and FUD letters relied upon in the report are nothing more than examples lifted

from Counterclaimants' Second Amended Counterclaims.  (*See, e.g.*, *id.* at 8-9.)  The alleged

instances of tortious interference are not supported, for example, by affidavits or any other

evidence that would be admissible at trial.  *See* Fed. R. Civ. P. 56(c)(1) (explaining what may be

cited to in order to support a factual assertion).  Ultimately, Mr. Pomerantz's damages

calculation is based Counterclaimants' pleadings, upon which Counterclaimants cannot rely to

demonstrate a genuine issue of material fact at the summary judgment stage.  *Matsushita*, 475

U.S. at 586 (holding that the non-moving party "may not rest upon the mere allegations or

denials of his pleading.").

Consequently, based on the record before the Court, Counterclaimants are unable to raise

a material issue of fact that Avaya's actions caused their damages, an element essential to both

tortious interference claims.  Therefore, Avaya's partial motion for summary judgment must be

granted, and Counterclaimants' claims of tortious interference with a contract/business

relationship and tortious interference a prospective business or economic advantage will be

dismissed.

### 3.      Noerr-Pennington Immunity and the New Jersey Litigation Privilege

Avaya argues that its letters cannot be the basis for claims of tortious interference under

the Noerr-Pennington doctrine.  Under this doctrine, "[a] party who petitions the government for

redress generally is immune from antitrust liability."  *Cheminor Drugs, Ltd. v. Ethyl Copr.*, 168

F.3d 119, 122 (3d Cir. 1999).  New Jersey state tort claims, including tortious interference, are

also barred by the Noerr-Pennington doctrine.  *Cheminor Drugs*, 168 F.3d at 128-29; *see also*

*Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1084 (5th Cir.

1988).

In the alternative, Avaya contends that its communications with PBX and PDS owners are privileged.  New Jersey's litigation privilege provides "jurors, witnesses, parties and their representatives absolute immunity with respect to 'statements, even those defamatory and malicious, made in the course of proceedings before a court of justice and having some relation thereto . . . .'"  *Hawkins v. Harris*, 141 N.J. 207, 214 (1995) (internal quotations omitted).

However, the Court has determined that Counterclaimants cannot satisfy an essential element common to both tortious interference claims.  Accordingly, the Court need not reach the issues of whether Avaya is entitled to immunity under the Noerr-Pennington doctrine or whether its FUD letters are privileged under New Jersey's litigation privilege.

## III.     CONCLUSION

For the reasons stated above, the Court grants Avaya's partial motion for summary judgment dismissing the tenth and eleventh causes of action of Counterclaimants' Second Amended Counterclaims (tortious interference).  An appropriate order is filed herewith.


Date:  January 25, 2012

                                            /S/ Garrett E. Brown, Jr.
                                            HON. GARRETT E. BROWN, JR., U.S.D.J.