**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AVAYA INC.,<br><br>Plaintiff,<br><br>v.<br><br>TELECOM LABS, INC., TEAMTLI.COM CORP., CONTINUANT, INC., SCOTT GRAHAM, DOUGLAS GRAHAM, and BRUCE SHELBY,<br><br>Defendants. | Civ. No. 06-2490 (GEB) (LHG)<br><br>**MEMORANDUM OPINION**<br><br>**FILE UNDER TEMPORARY SEAL** |

**BROWN, Senior Judge**

This matter comes before the Court upon the motion of plaintiff Avaya Inc. ("Avaya") for partial summary judgment dismissing the Twelfth and Thirteenth Causes of Action of the Second Amended Counterclaims of defendants/counterclaimants Telecom Labs, Inc. ("TLI") and Continuant, Inc. ("Continuant," collectively "Counterclaimants") (Doc. No. 218). The Court has considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court will grant Avaya's motion.

## I. BACKGROUND

### A. Procedural History

Avaya initiated this action on June 2, 2006 by filing a complaint against Counterclaimants and TeamTLI.com Corp. ("Team"), asserting ten causes of action alleging, among other things, that TLI, Team and Continuant gained unauthorized access to Avaya

systems. (Doc. No. 1). Avaya amended its Complaint on August 9, 2006. (Doc. No. 10). On July 14, 2008, Avaya filed a Third Amended Complaint, which added three new causes of action.[1] Ultimately, on February 8, 2010 Avaya filed its Fourth Amended Complaint. (Doc. No. 133).

On August 21, 2006, Counterclaimants and Team filed their Answer to the Amended Complaint which included Counterclaimants' initial Counterclaims. (Doc No. 11). On March 14, 2008, TLI and Continuant filed their Amended Counterclaims and Jury Demand. (Doc. No. 41). The Amended Counterclaims consisted of ten causes of action: (1) monopolization in violation of Section 2 of the Sherman Act; (2) conspiracy to monopolize in violation of Section 2; (3) attempted monopolization in violation of Section 2; (4) tying the receipt of patches and upgrades for the Definity systems to the purchase of service and maintenance in violation of Section 1 of the Sherman Act; (5) tying the receipt of patches and upgrades for Avaya's Predictive Dialing System ("PDS") to the purchase of service and maintenance in violation of Section 1; (6) illegal conspiracy in violation of Section 1; (7) tortious interference with business/contractual relations; (8) tortious interference with a prospective business or economic advantage; (9) injurious falsehood/trade libel or slander; and (10) breach of implied covenant of good faith and fair dealing.

On April 18, 2008, Avaya filed a motion to dismiss the first six causes of action in the Amended Counterclaims, which the Court granted in part and denied in part on August 29, 2008. (Doc. No. 59). Specifically, the Court denied Avaya's motion to dismiss the monopolization,

[1] The second time Avaya amended its complaint, it added Scott Graham, Douglas Graham, and Bruce Shelby as defendants.

attempted monopolization, and Section 1 conspiracy counterclaims while granting Avaya's motion to dismiss the conspiracy to monopolize, PBX and PDS tying counterclaims without prejudice.

On March 1, 2009, Counterclaimants filed a motion for leave to file their Second Amended Counterclaims, seeking to replead all non-dismissed Counterclaims in full, conform the dismissed tying claim to the Court's ruling, assert specific allegations regarding PDS upgrades, and assert new monopolization counterclaims while not seeking to replead the dismissed conspiracy to monopolize counterclaim. On September 8, 2009, the Court granted Counterclaimants' motion in all respects except for the reassertion of the allegations of *per se* violations with respect to the Section 1 illegal conspiracy proposed counterclaims. (Doc. No. 101).

Thereafter, on September 21, 2009, Counterclaimants filed their Second Amended Counterclaims ("Counterclaims"). (Doc. No. 104). The Counterclaims consisted of thirteen causes of action: (1) monopolization in the private branch exchange ("PBX") market in violation of Section 2 of the Sherman Act; (2) attempted monopolization in the PBX market in violation of Section 2 of the Sherman Act; (3) tying PBX maintenance and patches in violation of Section 1 of the Sherman Act; (4) tying PBX maintenance and upgrades in violation of Section 1 of the Sherman Act; (5) monopolization in the PDS market in violation of Section 2 of the Sherman Act; (6) attempted monopolization in the PDS market in violation of Section 2 of the Sherman Act; (7) tying PDS maintenance and patches in violation of Section 1 of the Sherman Act; (8) typing PDS maintenance and upgrades in violation of Section 1 of the Sherman Act; (9) illegal conspiracy in violation of Section 1 of the Sherman Act; (10) tortious interference with

business/contractual relations; (11) tortious interference with prospective business or economic advantage; (12) injurious falsehood/trade libel or slander; and (13) breach of the implied covenant of good faith and fair dealing.

On or about July 15, 2011, Avaya filed the instant motion for partial summary judgment dismissing the Twelfth and Thirteenth Causes of Action of the Counterclaims (Doc. No. 218). On or about August 24, 2011, Counterclaimants notified Avaya that they were voluntarily dismissing the Thirteenth Cause of Action of the Counterclaims, leaving the focus of this motion solely on the Twelfth Cause of Action of the Counterclaims.

**B. PBX Systems and PDS Platforms**

This case involves two telecommunications systems: (1) "Private Branch Exchange" systems, also known as "PBX" systems; and (2) "Predictive Dialing System" platforms, also known as "PDS" platforms.

PBX systems are telephone switching systems containing hardware, firmware and software. PBX systems are used by mid-to-large sized companies and other enterprises to connect their voice communications to the public voice networks. (Fourth Amended Complaint ¶ 16.) Avaya manufactures, sells and services PBX systems.[2] According to Counterclaimants, the PBX systems manufactured, sold and serviced by Avaya and its predecessors are commonly referred to as the "Definity" platform. (Counterclaims ¶ 1.) Other manufacturers currently produce and sell competing PBX systems. (Id. ¶¶ 1, 37.)

---

[2] In October 1996, American Telephone and Telegraph Company ("AT&T") spun off various telecommunication business units to form Lucent Technologies, Inc. ("Lucent"). (Counterclaims ¶ 41.) In September 2000, Lucent spun off its "enterprise networking group" to form Avaya. (Counterclaims ¶ 1, 56.)

PDS platforms are hardware and software systems that "automate dialing and increase dialing efficiency by predicting call outcomes based upon a number of factors." (Id. ¶ 50.) In 1999, Avaya's predecessor, Lucent, acquired a company that manufactured and sold a PDS platform. (Id. ¶ 49.) After the acquisition, Lucent began to manufacture and sell the PDS platform. (Id. ¶ 52.) As a result of its spin off from Lucent, Avaya took over the manufacture and sales of the PDS platform. (Id. ¶ 57.)

**C. Counterclaimants**

Counterclaimants specialize "in the maintenance and service of various telecommunications systems manufactured and sold by Avaya" including Avaya's PBX and PDS systems. (Counterclaims ¶ 3.)

TLI was a Lucent dealer from 1996 to 2000, during which time it resold products manufactured by Lucent and other manufacturers and rarely offered maintenance contracts. (Id. ¶¶ 70-73.) When Avaya was spun off from Lucent in 2000, Lucent's dealer contracts were assigned to Avaya. (Id. ¶¶ 74.) Thus, TLI became an Avaya dealer. Subsequently, and due in part to the negative effects that Avaya's downsizing had on Avaya's own service abilities, Avaya began to encourage TLI and other Avaya PBX dealers to perform service and maintenance on the Definity platforms. (Id. ¶¶ 76, 79, 80.) TLI began hiring former Avaya employees and actively competing for Avaya's existing maintenance contracts, thereby "substantially increasing [its] revenue." (Id. ¶¶ 77, 81.)

According to the Counterclaims, "[s]ometime after Avaya's spin-off" and "[t]o avoid competition from dealers . . . Avaya revised the standard dealer contract . . . and created a new Avaya One reseller agreement." (Id. ¶¶ 86, 89.) The new "Avaya One" reseller agreements

designated the dealers as "BusinessPartners" and "contained a strict and express non-compete provision that explicitly prohibited BusinessPartners from offering competitive maintenance contracts to any existing Avaya maintenance customer." (Id. ¶ 90.) TLI sought modification of this provision, and "[u]ltimately, Avaya and TLI agreed upon a compromise, whereby TLI accepted a limited non-compete provision that precluded it from seeking long-term maintenance contracts from Avaya's top 874 customers, known as 'VCP' customers." (Id. ¶¶ 102-03.) With this modification, TLI signed the new contract with Avaya on March 31, 2003 ("2003 Contract"). (Id. ¶ 104.) However, according to the Counterclaims, in May 2003, "Avaya told TLI that its only options were either to stop offering maintenance contracts to *all* Avaya customers . . . or be terminated" as an Avaya dealer. (Id. ¶ 106.) Then "four months after [the 2003 Contract] was executed" Avaya allegedly "improperly, immediately reneged on its contractual obligations" and terminated the 2003 Contract without the contractually required sixty days advance written notice. (Id. ¶¶ 109-10.) Since the time the 2003 Contract was terminated, TLI has acted as an independent service provider ("ISP") for Avaya Definity equipment. (Id. ¶ 16.)[3] The Counterclaims allege that Avaya terminated the BusinessPartner status of any former dealer that did not sign the new "Avaya One" contract. (Id. ¶ 116.)

The other Counterclaimant, Continuant, "has never had a . . . relationship with Avaya, and has instead always acted as an independent service provider for Definity and PDS equipment." (Id. ¶ 17.) In 2005, Continuant acquired a company that offered maintenance and service to Avaya PDS owners. Continuant has continued to provide such maintenance and

---

[3] The Court again uses "unauthorized service providers" or "USPs" interchangeably with "ISPs".

service. (Id. ¶¶ 84-85.)

### D. System Logins

The Counterclaims allege that Avaya's Definity system uses a "login" procedure to restrict access to the "telephony application software" (herinafter, the "software") embedded in the Definity system. (Id. ¶ 139.)[4] Access to the software is necessary to perform service and maintenance on a Definity system. (Id. ¶ 141.) The "login" procedure requires a user to enter into the system a "username" and a "password," collectively known as a "login." (Id. ¶ 139.) System owners and service technicians use different types of logins that are associated with different levels of access to the system. (Id. ¶ 143.) Once users are logged in to the system, they may enter certain commands, which assist in the service and maintenance of the system. Individuals with high level access are able to execute commands that individuals with lower level access are not able to execute.

According to the Counterclaims, there are various levels of logins for technician services, the lowest of which is the "CRAFT" login. (Id.) In 2001, Avaya introduced an alternative login, called the "DADMIN" login, which was available to Avaya dealers at no charge, upon written request from a Definity system owner. (Id. ¶¶ 158, 161.) Prior to 2001, "Avaya resellers, dealers and BusinessPartners were given CRAFT logins." (Id. ¶ 159.) The DADMIN login allows the dealers to execute the same basic commands that are capable of being executed with a

[4] According to the Counterclaims, Definity systems "contain two types of software - the operating systems software and the telephony application software." (Counterclaims ¶ 129.) The operating systems software "perform[s] basic systems tasks such as controlling and allocating memory, managing the sharing of resources and files of a system, and providing a platform for other software applications." (Id. ¶ 130.) "[T]he telephony application software, which is loaded on to the main server of a Definity system, is designed generally to provide all of the functions and features of the phone system purchased by the customer." (Id. ¶ 132.)

CRAFT login. (Id. ¶ 160.)

Counterclaimants assert that there are two levels of logins available to Definity system owners: a "user" login and a "super-user" login. (Id. ¶ 143.) In the late 1980's, in response to the desire of large Definity system owners to perform basic maintenance themselves, Avaya created Maintenance Software Permissions ("MSPs"). (Id. ¶¶ 144-45.) "[O]nce enabled [MSPs] simply allow a customer, using certain, pre-existing customer-level logins, to execute certain commands that allow for performance of maintenance functions." (Id. ¶ 146.)

A Definity system owner that has a "super-user" login with an MSP can perform the same basic commands that are capable of being executed with a CRAFT or DADMIN login. (Id. ¶ 143.) Thus, there have been at least three ways to login to a Definity system for maintenance purposes: through a CRAFT login, through a DADMIN login, or through a "super-user" login with MSP.

Originally, owners could activate MSPs by paying a one-time fee which, according to Counterclaimants, "represented the actual cost for a technician to install the MSP." (Id. ¶¶ 148, 150.) Importantly, the Counterclaimants allege that "AT&T and Lucent did not prohibit a customer that purchased MSPs to authorize a third party vendor or service provider of the customer's choosing from accessing its Definity system." (Id. ¶ 149.)

In 1996, Lucent changed its policy with respect to MSPs. Under the new policy, "MSPs were provided without additional cost to end-users who requested them and maintained a service contract with Lucent." (Id. ¶ 154.) However, "[e]nd users who did not have a service contract with Lucent could also obtain MSPs through a Maintenance Assist Offer." (Id.) The "Maintenance Assist Offer" requires the end-user to pay a monthly fee for its MSP access. (Id.)

Counterclaimants allege that from 1996 to March 2005, owners could obtain MSPs in this manner regardless of whether they had service contracts with Lucent. (Id. ¶¶ 188-92, 211.) Initially, Avaya continued to offer this option to users after it was spun-off from Lucent. (Id. ¶ 156.)

Counterclaimants also allege that AT&T and Lucent did not disclose to buyers of Definity systems any restrictions on the customers' ability to access or use the commands necessary to perform maintenance, or use of ISPs to do so. (Id. ¶¶ 163-176.) Indeed, Counterclaimants reference portions of a Purchase/Service Agreement used by Lucent as early as 1996, which allegedly granted the system owners a broad general license to use the software without restriction in terms of access to specific commands for maintenance. (Id. ¶¶ 177-80.)

**E. Allegations Concerning Avaya's Conduct**

Counterclaimants assert that in response to increasing competition in the service and maintenance market, "Avaya implemented a series of increasingly aggressive policies to restrict access to the necessary passwords and permissions." (Id. ¶ 194.)[5] First, in March 2003, Counterclaimants allege that Avaya made changes to the Purchase/Service Agreement for new owners, so as to make "non-sublicensable" the license given to owners to use the software. (Id. ¶ 197.) Counterclaimants allege that Avaya has wrongly sought to apply the new Purchase/Service Agreement retroactively. (Id. ¶¶ 206-11.)

Moreover, in March 2005, Avaya began charging owners more for MSPs through Maintenance Assist Offers, unless the owners were eligible for a "loyalty discount." (Id. ¶ 230.)

---

[5] Counterclaimants allege that no other manufacturer of PBX systems blocks access to an owner's ability to perform maintenance functions using the software on the purchased system. (Id. ¶ 171.)

The "loyalty discount" was given to system owners that "have not and will not contract with any un-authorized 3rd party to provide on-going support." (Id.) With the "loyalty discount," the price of the Maintenance Assist Offer to an owner remained the same as before; without it, the price doubled. (Id.)

In July 2005, Avaya further restricted a Definity system owner's ability to utilize ISPs for service and maintenance by changing its policy so as to not provide MSPs to any owner that did not have a maintenance contract with Avaya or a BusinessPartner. (Id. ¶¶ 234-37.)

Counterclaimants next allege that after July 2005 Avaya began sending letters to Definity system owners that explained that "unauthorized vendors" did not have access to Avaya logins and therefore the "unauthorized vendors" would have a reduced ability to support and maintain Avaya systems. (Id. ¶¶ 244-47.) Counterclaimants assert that this is the first time Avaya "began, as a general practice to disclose to Definity owners that the ability to maintain a Definity system" would be reduced without a login. (Id. ¶ 248.) Additionally, "in or after 2004, Avaya issued a written communication to its BusinessPartners specifically advising them not to perform any service subcontract work for TLI or on behalf of TLI's customers." (Id. ¶ 259.)

**F. Trade Libel Allegations**

Counterclaimants allege that, beginning in 2005, Avaya "initiated a practice" of sending "fear, uncertainty, and doubt" or "FUD" letters to PBX and PDS owners and prospective customers. (Counterclaimants' Statement of Undisputed Material Facts [Doc. No. 329] ("SUMF") ¶ 169.) As a result, Counterclaimants assert that Avaya "has made, published and transmitted statements which were knowingly false, made in reckless disregard for truth or falsity, or intended by Avaya to result in harm to Counterclaimants, about the legality of

Counterclaimants' business conduct in the performance of service and maintenance of Avaya Definity systems and/or PDS systems" and "the ability of Counterclaimants to fulfill their service and maintenance contractual obligations to their respective customers." (Id. ¶ 439.) Moreover, Counterclaimants assert that Avaya's statements "claim[ed] that Counterclaimants' conduct violates federal and state law and may result in civil and criminal penalties." (Id.)

## II. LEGAL STANDARD

### A. Summary Judgment

A party seeking summary judgment must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); Hancock Indus. v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987).

### B. Application

The parties agree as to the elements of a cause of action for trade libel under New Jersey law. (Avaya's Br. at 22; Counterclaimants' Opp. Br. at 9.) Namely, to prevail on this claim,

Counterclaimants must show (1) publication, (2) with malice, (3) of false allegations of their property, product or business, and (4) special damages, i.e. pecuniary harm. Mayflower Transit, LLC v. Prince, 314 F. Supp. 2d 362, 378 (D.N.J. 2004) (citations omitted); see also Patel v. Soriano, 369 N.J. Super. 192, 247-49 (App. Div. 2004). There is no dispute between the parties as to the publication element. Avaya, however, contests the remaining elements of the claim, arguing that the statements are true, Avaya did not act maliciously, and Counterclaimants suffered no special damages.

**1. Statements at Issue**

At the outset, Avaya argues that the allegedly libelous statements are limited to the three specifically identified in the Counterclaims. (Avaya's Br. at 20-21; Avaya's Reply Br. at 6.) In opposition, Counterclaimants analogize to pleading standards for defamation claims and maintain that, pursuant to Federal Rule of Civil Procedure 8, they were required solely to give notice of the allegations made against Avaya.[6] Counterclaimants' cited cases, however, do not all appear to support their stated position.[7] Only in Ciemniecki v. Parker McCay, Civil No. 09-6450, 2010 WL 2326209 (D.N.J. June 7, 2010), and Cristelli v. Filomena II, Inc., 1999 WL 1081290 (D.N.J. Dec. 1, 1999), did a claim proceed without "alleg[ing] the precise words alleged to be

---

[6] Counterclaimants assert that "there appear to be no cases addressing the pleading standard for trade libel claims specifically." (Counterclaimants' Opp. Br. at 6 n.3). However, the District Court for the Northern District of Illinois, in an unreported decision, reasoned that Rule 9(b) heightened pleading standards "fall[] out of the picture" when the claimant "is not charging fraud" and thus a trade libel claim was analyzed under the notice pleading standard. Sys. Am., Inc. v. Providential Bancorp, Ltd., No. 05 C 2161, 2006 WL 463314, at *4 (N.D. Ill. Feb. 24, 2006) (citation omitted).

[7] The Court notes that these cases addressed the sufficiency of the pleadings pursuant to Rule 12, whereas the present analysis is under Rule 56, and Avaya did not challenge the trade libel counterclaim in its Rule 12 motion practice.

defamatory." Ciemniecki, 2010 WL 2326209, at *5.

In Palladino v. VNA of S. New Jersey, Inc., 68 F. Supp. 2d 455 (D.N.J. 1999), the court found the defamation claim to have satisfied the liberal pleading requirements of Rule 8 where, inter alia, the plaintiff "*specifically identifie[d]* the allegedly defamatory statements". Id. at 475 (emphasis added). In Mangan v. Corp. Synergies Group, Inc., Civil No. 10-5829, 2011 WL 3328785, at *4 (D.N.J. Aug. 1, 2011) (emphasis added), the court allowed two of four allegedly defamatory statements to proceed under Rule 8 where the "implicit facts underlying the mixed opinion statements are *specifically alleged*". Moreover, Counterclaimants reference further authority from this District with respect to the requirement of identifying particular defamatory statements in the pleadings. See NXIVM Corp. v. Sutton, 2007 WL 1876496, at *9 n.4 (D.N.J. June 27, 2007). Nevertheless, the Court's analysis of the trade libel counterclaim is necessarily limited to the allegedly actionable statements addressed in Avaya's motion. (Avaya's Br. at 20-21; Counterclaimants' Opp. Br. at 5.)

First, Counterclaimants allege that Avaya issued a letter to numerous customers of Counterclaimants that own Avaya PBX systems stating that "unauthorized use or access to MSPs or any Avaya login, including DADMIN, CRAFT or INIT *is* a violation of federal and state laws and could result in civil and criminal liability." ("PBX Statement") (Avaya's Br. at 20 (quoting Counterclaims ¶¶ 272-73)). Counterclaimants also allege that Avaya issued letters to Avaya PDS systems stating that "Unauthorized Service providers do not have access rights to Avaya logins, systems and support platforms, which may severely reduce their ability to support and maintain the Avaya PDS system. The lack of this capability, in particular, reduces remote support;" and "Any unauthorized access to the PDS system is a violation of federal and state laws and could

result in civil and criminal liability penalties." (collectively, "PDS Statements") (Counterclaimants' Opp. Br. at 5.)

**2. Falsity of Statements**

**a. PBX Statement**

Although Avaya attempts to split the PBX Statement into two parts (Avaya's Br. at 24), it is quite reasonably read as simply one statement. (Id. at 20; see Counterclaimants' Opp. Br. at 20.) The Court agrees with Counterclaimants that the key component of the PBX Statement concerns the alleged illegality of Counterclaimants maintaining their customers' Avaya PBX systems. (See Counterclaimants' Opp. Br. at 16.) Avaya first maintained that the issue of illegality is true, on the basis of "[n]umerous federal and state statutes provid[ing] civil and criminal penalties for unauthorized access to software and the misappropriation of trade secrets." (Avaya's Br. at 30.) On reply, however, Avaya asserts that this is merely an expression of an opinion, not a factual statement, and thereby not actionable. (See Avaya's Reply Br. at 6.) The Court will not consider this argument raised for the first time on reply. See Bayer AG v. Schein Pharm., Inc., 129 F. Supp. 2d 705, 716 (D.N.J. 2001). The issue remains whether the alleged truthfulness of this statement requires that summary judgment be granted in favor of Avaya on this trade libel claim.

Avaya cites three federal and four state statutes that provide for the alleged civil and criminal penalties. (Avaya's Br. at 30.) In opposition, Counterclaimants refute the application of each of the statutes, save for the New York Penal Law, which nonetheless generally tracks the others that were addressed. In each state statute, liability hinges in whole or in part on whether access was "authorized", who the "owner" is, or both, and in some of the statutes "authorization",

or relevant words such as "consent", "permission", or "owner" is not defined. See, e.g., Md. Code Ann., Criminal Law § 7-302(c)(1); Texas Penal Code Ann. § 33.02(a); Cal. Penal Code § 502. Avaya counters with caselaw from the respective states that has defined the meaning of the statutes at issue which, although useful, is far from dispositive of whether Counterclaimants' actions would constitute "unauthorized" "access" in violation of state or federal law that would render the statement true. (See Avaya's Reply Br. at 8-10.) Indeed, Avaya itself calls the question of Counterclaimants' liability under state and federal law "at best . . . subject to debate". (Id. at 10.)

Thus, although the argument is not fully abandoned or conceded, Avaya nonetheless appears to direct the Court to focus not on the falsity of the statement but that Counterclaimants cannot prove malice. Consequently, the Court finds there is no basis to grant Avaya's motion for summary judgment on the trade libel counterclaim pursuant to this element.

**b. PDS Statements**

Avaya alleges that Counterclaimants admit to the truthfulness of the first PDS Statement in large part by virtue of two email discussions. (Ex. 48 to Verification of Mark J. Oberstaedt, Esq. In Support of Avaya's Statement of Undisputed Material Facts [Doc No. 235-12]; Ex. 59 to Certification of Charles F. Rysavy, Esq. In Support of Counterclaimants' Opposition to Avaya's Motion for Summary Judgment [Doc. No. 330-4]). Despite Avaya's conclusory contention that "[c]learly, these admissions" demonstrate that USPs could not provide the same level of PDS support as Avaya or its BusinessPartners (Avaya's Br. at 37), the truthfulness is not conclusively demonstrated by these exhibits. At best, the individuals involved expressed some doubt as to whether Counterclaimants could adequately support PDS, but it does not rise to the level

necessary to grant summary judgment on the first PDS Statement.

To the extent that Avaya relies upon its arguments related to civil and criminal penalties pursuant to state and federal law for the PBX Statement with respect to the second PDS Statement, as discussed above the Court finds sufficient issues of material fact as to the truthfulness of this aspect of the PDS Statements and therefore cannot grant summary judgment on this basis.

**3. Malice**

The parties generally agree that to prove malice in the context of trade libel, Counterclaimants must show that Avaya's statements "were false or that they were written with reckless disregard for the truth or falsity." Mayflower Transit, 314 F. Supp. 2d at 378. Counterclaimants are correct that Avaya's assertion that malice must be proven by clear and convincing evidence is based upon caselaw regarding overcoming a qualified privilege to publish defamatory information. See Kass v. Great Coastal Exp., Inc., 152 N.J. 353, 355-56 (1998). The Court, however, need not resolve the issue of the burden of proof as there is clearly a material issue of fact with respect to malice.

The above analysis indicated that the falsity of the statements is subject to a genuine issue of material fact and the same is true as to whether the statements were made with reckless disregard for their truth or falsity. In addition, Counterclaimants present enough evidence to demonstrate a question of fact with respect to Avaya's knowledge of the truth or falsity of the statements relating to unauthorized access to PBX or PDS violating state or federal law. (See, e.g., Exhibits to Counterclaimants' SUMF ¶ 204.)

Avaya further argues, however, that Counterclaimants offer no evidence, or argument, that

the first of the PDS Statements, that "Unauthorized Service providers do not have access rights to Avaya logins, systems and support platforms, which may severely reduce their ability to support and maintain the Avaya PDS system" was published with malice. (Avaya's Reply Br. at 12.) Avaya does note, however, that Counterclaimants have argued that the statement is false, which, in light of the above analysis with respect to falsity, would be sufficient to satisfy Mayflower Transit at this stage. Consequently, there is no basis for granting summary judgment in favor of Avaya on Counterclaimants' trade libel counterclaim with respect to the malice element.

**4. Special Damages**

The parties do not dispute the requirement of this element, namely that claims for trade libel require proof of special damages. Mayflower Transit, 314 F. Supp. 2d at 378. "The necessary showing is specific: plaintiff must establish pecuniary loss that has been realized or liquidated, such as lost sales, or the loss of prospective contracts with customers." Patel, 369 N.J. Super. at 248-49. Thus, to prove special damages requires that the plaintiff "allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication." Mayflower Transit, 314 F. Supp. 2d at 378 (citation omitted).

Following Avaya's contention that Counterclaimants cannot prove special damages as a matter of law, Counterclaimants argued that the report of their expert, Glenn Pomerantz, CPA, demonstrates losses attributable to Avaya's letters and misrepresentations regarding the loss of MSP/login access to Counterclaimants' customers. (Counterclaimants' Opp. Br. at 35.) Avaya, relying upon an earlier submission in support of a separate motion, contends that Pomerantz is not an appropriate "causation" witness, there is no foundation for his opinions, his opinions are based

upon inadmissible hearsay and he is not qualified to "testify about a person's intent, motive, or state of mind." (See Avaya's Reply Br. at 1.)

The Court is reluctant to engage in a full-fledged Daubert analysis solely on the basis of Avaya's arguments on reply, particularly where it need not do so. With respect to the proposed contract between Continuant and the State of Michigan, as Avaya notes in its Local Civil Rule 56.1 Statement, there were "several reasons for the State's decision not to enter into a maintenance contract with Counterclaimants", (Avaya's Statement of Undisputed Material Facts [Doc. No. 225-1] ¶ 72), and Counterclaimants' attempt in their response to pin the reason on Avaya's FUD letter is unavailing in light of the entirety of the testimony. Consequently, there is no issue of material fact here with respect to evidence of special damages resulting from the State of Michigan declining to enter into a maintenance contract with Counterclaimants and, more importantly, no evidence sufficient to meet the standard that any such special damages were the direct result of the allegedly false publication.

Counterclaimants' Statement of Undisputed Material Facts in Opposition to Avaya's motion (Doc. No. 329), contrary to their arguments, similarly presents no evidence that any damages allegedly arising from the loss of other former or potential customers were the direct result of Avaya's allegedly false statements. (See Counterclaimants' SUMF ¶¶ 183-204). As Avaya argues, "[t]he mere fact that a prospective customer received a letter from Avaya is not *de facto* proof that the customer did not enter into a maintenance contract with Counterclaimants because of something untruthful in Avaya's letter." (Avaya's Br. at 37.) Indeed, these paragraphs provide no evidence of special damages, let alone an issue of fact as to special damages. In one instance, although Counterclaimants allege that one potential customer "wrote . . . Continuant

informing him that due to a threatening note sent by Avaya" the company would be renewing with Avaya, the cited exhibit fails to demonstrate a final decision that would have resulted in damages attributable to Avaya's letter. (See Counterclaimants' SUMF ¶183.) Counterclaimants are therefore, on the basis of the record before the Court, unable to prove an essential element of their trade libel counterclaim. Consequently, Avaya's motion for summary judgment must be granted and Counterclaimants' trade libel counterclaim will be dismissed.

**5. Noerr-Pennington Immunity**

Avaya argues that its allegedly libelous statements are immune from prosecution under the Noerr-Pennington doctrine and the New Jersey litigation privilege. In light of the above analysis granting Avaya's motion for summary judgment dismissing Counterclaimants' trade libel counterclaim, the Court need not reach the issue raised in Avaya's brief regarding the alleged immunity of the FUD letters.

## III. CONCLUSION

For the foregoing reasons, Avaya's motion for partial summary judgment dismissing the Twelfth and Thirteenth Causes of Action of Counterclaimants' Counterclaims is granted. An appropriate Order accompanies this Memorandum Opinion.

Dated: January 25, 2012

s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.