**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| AVAYA INC., | : | |
| | : | |
| Plaintiff, | : | Civ. No. 06-2490 (GEB) (LHG) |
| | : | |
| v. | : | **MEMORANDUM OPINION** |
| | : | |
| TELECOM LABS, INC., TEAMTLI.COM | : | **FILE UNDER TEMPORARY SEAL** |
| CORP., CONTINUANT, INC., SCOTT | : | |
| GRAHAM, DOUGLAS GRAHAM, and | : | |
| BRUCE SHELBY, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

**BROWN, Senior Judge**

This matter comes before the Court upon the two motions of plaintiff Avaya Inc.

("Avaya") for partial summary judgment dismissing the first through ninth counts of the Second

Amended Counterclaims of defendants/counterclaimants Telecom Labs Inc. ("TLI") and

Continuant, Inc. ("Continuant," collectively "Counterclaimants") (Doc. Nos. 182, 238).  The

Court has considered the parties' submissions and decided the matter without oral argument

pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, this Court will

deny Avaya's first motion for partial summary judgment and grant in part and deny in part

Avaya's second motion for partial summary judgment.

**I.    BACKGROUND**

   **A.    Procedural History**

Avaya initiated this action on June 2, 2006 by filing a complaint against

Counterclaimants and TeamTLI.com Corp. ("Team"), asserting ten causes of action alleging,

among other things, that TLI, Team and Continuant gained unauthorized access to Avaya systems.  (Doc. No. 1).  Avaya amended its Complaint on August 9, 2006.  (Doc. No. 10).  On July 14, 2008, Avaya filed a Third Amended Complaint, which added three new causes of action.[1]  Ultimately, on February 8, 2010 Avaya filed its Fourth Amended Complaint.  (Doc. No. 133).

On August 21, 2006, Counterclaimants and Team filed their Answer to the Amended Complaint which included Counterclaimants' initial Counterclaims.  (Doc No. 11).  On March 14, 2008, TLI and Continuant filed their Amended Counterclaims and Jury Demand. (Doc. No. 41).  The Amended Counterclaims consisted of ten causes of action: (1) monopolization in violation of Section 2 of the Sherman Act; (2) conspiracy to monopolize in violation of Section 2; (3) attempted monopolization in violation of Section 2; (4) tying the receipt of patches and upgrades for the Definity systems to the purchase of service and maintenance in violation of Section 1 of the Sherman Act; (5) tying the receipt of patches and upgrades for Avaya's Predictive Dialing System ("PDS") to the purchase of service and maintenance in violation of Section 1; (6) illegal conspiracy in violation of Section 1; (7) tortious interference with business/contractual relations; (8) tortious interference with a prospective business or economic advantage; (9) injurious falsehood/trade libel or slander; and (10) breach of implied covenant of good faith and fair dealing.

On April 18, 2008, Avaya filed a motion to dismiss the first six causes of action in the Amended Counterclaims, which the Court granted in part and denied in part on August 29, 2008.

---

[1] The second time Avaya amended its complaint, it added Scott Graham, Douglas Graham, and Bruce Shelby as defendants.

(Doc. No. 59).  Specifically, the Court denied Avaya's motion to dismiss the monopolization, attempted monopolization, and Section 1 conspiracy counterclaims while granting Avaya's motion to dismiss the conspiracy to monopolize, PBX and PDS tying counterclaims without prejudice.

On March 1, 2009, Counterclaimants filed a motion for leave to file their Second Amended Counterclaims, seeking to replead all non-dismissed Counterclaims in full, conform the dismissed tying claim to the Court's ruling, assert specific allegations regarding PDS upgrades, and assert new monopolization counterclaims while not seeking to replead the dismissed conspiracy to monopolize counterclaim.  On September 8, 2009, the Court granted Counterclaimants' motion in all respects except for the reassertion of the allegations of *per se* violations with respect to the Section 1 illegal conspiracy proposed counterclaims.  (Doc. No. 101).

Thereafter, on September 21, 2009, Counterclaimants filed their Second Amended Counterclaims ("Counterclaims").  (Doc. No. 104).  The Counterclaims consist of thirteen causes of action: (1) monopolization in the private branch exchange ("PBX") market in violation of Section 2 of the Sherman Act; (2) attempted monopolization in the PBX market in violation of Section 2 of the Sherman Act; (3) tying PBX maintenance and patches in violation of Section 1 of the Sherman Act; (4) tying PBX maintenance and upgrades in violation of Section 1 of the Sherman Act; (5) monopolization in the PDS market in violation of Section 2 of the Sherman Act; (6) attempted monopolization in the PDS market in violation of Section 2 of the Sherman Act; (7) tying PDS maintenance and patches in violation of Section 1 of the Sherman Act; (8) tying PDS maintenance and upgrades in violation of Section 1 of the Sherman Act; (9) illegal

conspiracy in violation of Section 1 of the Sherman Act; (10) tortious interference with business/contractual relations; (11) tortious interference with prospective business or economic advantage; (12) injurious falsehood/trade libel or slander; and (13) breach of the implied covenant of good faith and fair dealing.

On or about April 20, 2011, Avaya filed its first motion for partial summary judgment dismissing the first through ninth Counterclaims (Doc. No. 182) and on or about July 15, 2011, Avaya filed its second motion for partial summary judgment seeking the same relief (Doc. No. 238).

**B.      PBX Systems and PDS Platforms**

This case involves two telecommunications systems: (1) "Private Branch Exchange" systems, also known as "PBX" systems; and (2) "Predictive Dialing System" platforms, also known as "PDS" platforms.

PBX systems are telephone switching systems containing hardware, firmware and software.  PBX systems are used by mid-to-large sized companies and other enterprises to connect their voice communications to the public voice networks.  (Fourth Amended Complaint ¶ 16.)  Avaya manufactures, sells and services PBX systems.[2]  According to Counterclaimants, the PBX systems manufactured, sold and serviced by Avaya and its predecessors are commonly referred to as the "Definity" platform.   (Counterclaims ¶ 1.)  Other manufacturers currently produce and sell competing PBX systems.  (Id. ¶¶ 1, 37.)

---

[2] In October 1996, American Telephone and Telegraph Company ("AT&T") spun off various telecommunication business units to form Lucent Technologies, Inc. ("Lucent"). (Counterclaims ¶ 41.)  In September 2000, Lucent spun off its "enterprise networking group" to form Avaya.  (Counterclaims ¶ 1, 56.)

PDS platforms are hardware and software systems that "automate dialing and increase dialing efficiency by predicting call outcomes based upon a number of factors." (Id. ¶ 50.) In 1999, Avaya's predecessor, Lucent, acquired a company that manufactured and sold a PDS platform. (Id. ¶ 49.) After the acquisition, Lucent began to manufacture and sell the PDS platform. (Id. ¶ 52.) As a result of its spin off from Lucent, Avaya took over the manufacture and sales of the PDS platform. (Id. ¶ 57.)

### C. Counterclaimants

Counterclaimants specialize "in the maintenance and service of various telecommunications systems manufactured and sold by Avaya" including Avaya's PBX and PDS systems. (Counterclaims ¶ 3.)

TLI was a Lucent dealer from 1996 to 2000, during which time it resold products manufactured by Lucent and other manufacturers and rarely offered maintenance contracts. (Id. ¶¶ 70-73.) When Avaya was spun off from Lucent in 2000, Lucent's dealer contracts were assigned to Avaya. (Id. ¶¶ 74.) Thus, TLI became an Avaya dealer. Subsequently, and due in part to the negative effects that Avaya's downsizing had on Avaya's own service abilities, Avaya began to encourage TLI and other Avaya PBX dealers to perform service and maintenance on the Definity platforms. (Id. ¶¶ 76, 79, 80.) TLI began hiring former Avaya employees and actively competing for Avaya's existing maintenance contracts, thereby "substantially increasing [its] revenue." (Id. ¶¶ 77, 81.)

According to the Counterclaims, "[s]ometime after Avaya's spin-off" and "[t]o avoid competition from dealers . . . Avaya revised the standard dealer contract . . . and created a new Avaya One reseller agreement." (Id. ¶¶ 86, 89.) The new "Avaya One" reseller agreements

5

designated the dealers as "BusinessPartners" and "contained a strict and express non-compete provision that explicitly prohibited BusinessPartners from offering competitive maintenance contracts to any existing Avaya maintenance customer." (Id. ¶ 90.) TLI sought modification of this provision, and "[u]ltimately, Avaya and TLI agreed upon a compromise, whereby TLI accepted a limited non-compete provision that precluded it from seeking long-term maintenance contracts from Avaya's top 874 customers, known as 'VCP' customers." (Id. ¶¶ 102-03.) With this modification, TLI signed the new contract with Avaya on March 31, 2003 ("2003 Contract"). (Id. ¶ 104.) However, according to the Counterclaims, in May 2003, "Avaya told TLI that its only options were either to stop offering maintenance contracts to *all* Avaya customers . . . or be terminated" as an Avaya dealer. (Id. ¶ 106.) Then "four months after [the 2003 Contract] was executed" Avaya allegedly "improperly, immediately reneged on its contractual obligations" and terminated the 2003 Contract without the contractually required sixty days advance written notice. (Id. ¶¶ 109-10.) Since the time the 2003 Contract was terminated, TLI has acted as an independent service provider ("ISP") for Avaya Definity equipment. (Id. ¶ 16.)[3] The Counterclaims allege that Avaya terminated the BusinessPartner status of any former dealer that did not sign the new "Avaya One" contract. (Id. ¶ 116.)

The other Counterclaimant, Continuant, "has never had a . . . relationship with Avaya, and has instead always acted as an independent service provider for Definity and PDS equipment." (Id. ¶ 17.) In 2005, Continuant acquired a company that offered maintenance and service to Avaya PDS owners. Continuant has continued to provide such maintenance and

---

[3] It appears that Avaya refers to ISPs as "unauthorized service providers" or "USPs". (Counterclaims ¶ 295; Avaya's Br. at 1.) The Court uses the terms interchangeably.

service.  (Id. ¶¶ 84-85.)

### D.   System Logins

The Counterclaims allege that Avaya's Definity system uses a "login" procedure to restrict access to the "telephony application software" (herinafter, the "software") embedded in the Definity system.  (Id. ¶ 139.)[4]  Access to the software is necessary to perform service and maintenance on a Definity system.  (Id. ¶ 141.)  The "login" procedure requires a user to enter into the system a "username" and a "password," collectively known as a "login."  (Id. ¶ 139.) System owners and service technicians use different types of logins that are associated with different levels of access to the system.  (Id. ¶ 143.)  Once users are logged in to the system, they may enter certain commands, which assist in the service and maintenance of the system. Individuals with high level access are able to execute commands that individuals with lower level access are not able to execute.

According to the Counterclaims, there are various levels of logins for technician services, the lowest of which is the "CRAFT" login.  (Id.)  In 2001, Avaya introduced an alternative login, called the "DADMIN" login, which was available to Avaya dealers at no charge, upon written request from a Definity system owner.  (Id. ¶¶ 158, 161.)  Prior to 2001, "Avaya resellers, dealers and BusinessPartners were given CRAFT logins."  (Id. ¶ 159.)  The DADMIN login allows the dealers to execute the same basic commands that are capable of being executed with a

---

[4] According to the Counterclaims, Definity systems "contain two types of software - the operating systems software and the telephony application software."  (Counterclaims ¶ 129.) The operating systems software "perform[s] basic systems tasks such as controlling and allocating memory, managing the sharing of resources and files of a system, and providing a platform for other software applications."  (Id. ¶ 130.)  "[T]he telephony application software, which is loaded on to the main server of a Definity system, is designed generally to provide all of the functions and features of the phone system purchased by the customer."  (Id. ¶ 132.)

CRAFT login.  (Id. ¶ 160.)

Counterclaimants assert that there are two levels of logins available to Definity system owners: a "user" login and a "super-user" login.  (Id. ¶ 143.)  In the late 1980's, in response to the desire of large Definity system owners to perform basic maintenance themselves, Avaya created Maintenance Software Permissions ("MSPs").  (Id. ¶¶ 144-45.)  "[O]nce enabled [MSPs] simply allow a customer, using certain, pre-existing customer-level logins, to execute certain commands that allow for performance of maintenance functions."  (Id. ¶ 146.)

A Definity system owner that has a "super-user" login with an MSP can perform the same basic commands that are capable of being executed with a CRAFT or DADMIN login. (Id. ¶ 143.)  Thus, there have been at least three ways to login to a Definity system for maintenance purposes: through a CRAFT login, through a DADMIN login, or through a "super-user" login with MSP.

Originally, owners could activate MSPs by paying a one-time fee which, according to Counterclaimants, "represented the actual cost for a technician to install the MSP."  (Id. ¶¶ 148, 150.)  Importantly, the Counterclaimants allege that "AT&T and Lucent did not prohibit a customer that purchased MSPs to authorize a third party vendor or service provider of the customer's choosing from accessing its Definity system."  (Id. ¶ 149.)

In 1996, Lucent changed its policy with respect to MSPs.  Under the new policy, "MSPs were provided without additional cost to end-users who requested them and maintained a service contract with Lucent."  (Id. ¶ 154.)  However, "[e]nd users who did not have a service contract with Lucent could also obtain MSPs through a Maintenance Assist Offer."  (Id.)  The "Maintenance Assist Offer" requires the end-user to pay a monthly fee for its MSP access.  (Id.)

Counterclaimants allege that from 1996 to March 2005, owners could obtain MSPs in this manner regardless of whether they had service contracts with Lucent.  (Id. ¶¶ 188-92, 211.) Initially, Avaya continued to offer this option to users after it was spun-off from Lucent.  (Id. ¶ 156.)

Counterclaimants also allege that AT&T and Lucent did not disclose to buyers of Definity systems any restrictions on the customers' ability to access or use the commands necessary to perform maintenance, or use of ISPs to do so.  (Id. ¶¶ 163-176.)  Indeed, Counterclaimants reference portions of a Purchase/Service Agreement used by Lucent as early as 1996, which allegedly granted the system owners a broad general license to use the software without restriction in terms of access to specific commands for maintenance.  (Id. ¶¶ 177-80.)

### E.    Allegations Concerning Avaya's Conduct

Counterclaimants assert that in response to increasing competition in the service and maintenance market, "Avaya implemented a series of increasingly aggressive policies to restrict access to the necessary passwords and permissions."  (Id. ¶ 194.)[5]  First, in March 2003, Counterclaimants allege that Avaya made changes to the Purchase/Service Agreement for new owners, so as to make "non-sublicensable" the license given to owners to use the software.  (Id. ¶ 197.)  Counterclaimants allege that Avaya has wrongly sought to apply the new Purchase/Service Agreement retroactively.  (Id. ¶¶ 206-11.)

Moreover, in March 2005, Avaya began charging owners more for MSPs through Maintenance Assist Offers, unless the owners were eligible for a "loyalty discount."  (Id. ¶ 230.)

---

[5]  Counterclaimants allege that no other manufacturer of PBX systems blocks access to an owner's ability to perform maintenance functions using the software on the purchased system. (Id. ¶ 171.)

The "loyalty discount" was given to system owners that "have not and will not contract with any un-authorized 3rd party to provide on-going support."  (Id.)  With the "loyalty discount," the price of the Maintenance Assist Offer to an owner remained the same as before; without it, the price doubled.  (Id.)

In July 2005, Avaya further restricted a Definity system owner's ability to utilize ISPs for service and maintenance by changing its policy so as to not provide MSPs to any owner that did not have a maintenance contract with Avaya or a BusinessPartner.  (Id. ¶¶ 234-37.)

Avaya also allegedly changed its policy regarding whether software "patches" were available to owners.  Patches are "not considered upgrades of the . . . software, but instead are fixes to errors . . . that are discovered in the . . . software that a customer has already purchased."  (Id. ¶ 238.)  According to the Counterclaimants, Avaya is the only source for the patches for its PBX and PDS systems.  (Id. ¶ 241.)  Prior to October 2005, "patches were provided to all end-users free of charge and were available to the public on Avaya's website."  (Id. ¶ 239.)  However, as of October 2005, Avaya began enforcing its new policy regarding patches by placing "patches behind a firewall and institut[ing] a login procedure designed to limit access to the patches to end-users who had a service contract with Avaya or an Avaya BusinessPartner."  (Id.)

Similarly, "[s]ometime after 2005," Avaya made changes to the request form used by Definity system owners to request a DADMIN login.  The changes specified that DADMINs were "for the use of the BusinessPartner 'only'" and that Avaya was permitted to later remove the DADMIN password.  (Id. ¶¶ 214-16.)

Counterclaimants next allege that after July 2005 Avaya began sending letters to Definity

10

system owners that explained that "unauthorized vendors" did not have access to Avaya logins and therefore the "unauthorized vendors" would have a reduced ability to support and maintain Avaya systems.  (Id. ¶¶ 244-47.)  Counterclaimants assert that this is the first time Avaya "began, as a general practice to disclose to Definity owners that the ability to maintain a Definity system" would be reduced without a login.  (Id. ¶ 248.)  Additionally, "in or after 2004, Avaya issued a written communication to its BusinessPartners specifically advising them not to perform any service subcontract work for TLI or on behalf of TLI's customers."  (Id. ¶ 259.)

Counterclaimants also allege that Avaya then began "tracking customers" of ISPs and that Avaya would, sometimes through deceptive tactics,  "dial into these customer's phone systems to disable MSPs and otherwise lock out the Definity owners" (Id. ¶¶ 264-71.) Additionally, Counterclaimants allege that Avaya sent defamatory letters to Counterclaimants' customers. (Id. ¶¶ 272-88.)

Finally, in late 2007, Avaya released an "upgrade" for its Definity system software and "announced a new policy with respect to the conditions under which Avaya will" sell the upgrade to owners of Definity systems.  (Id. ¶¶ 289-91.)  Allegedly, those conditions require an owner to purchase a maintenance agreement from Avaya.  (Id. ¶ 292.)  In light of Avaya's policy that it will not provide support to any customer that has used or uses an ISP, "a Definity owner who uses an ISP for maintenance . . . is effectively prohibited from upgrading" even if the owner were willing to pay for the Avaya maintenance.  (Id. ¶ 295.)  Counterclaimants also alleged that with the upgrade, Avaya made additional policy changes regarding the use of MSPs. Specifically, "Avaya now includes MSPs enabled at no additional charge" for customers that obtain the upgrade.  (Id. ¶ 297.)  However, Avaya also announced that "asset owners/end users

11

are strictly prohibited from authorizing, assisting or otherwise permitting any third party . . . to access MSPs or passwords/logins related to MSPs."  (Id. ¶ 298.)

## F.    Antitrust Counterclaims

All nine of the counterclaims at issue in the instant motions ("antitrust counterclaims") concern alleged violations of the Sherman Act, 15 U.S.C. §§ 1-7.  Five of the antitrust counterclaims concern the market for PBX service and maintenance.  The remaining four antitrust counterclaims concern the market for PDS service and maintenance and are brought solely by Continuant.

### 1.    PBX-related Counterclaims

#### a.    Sherman Act Section 2 Counterclaims

Counterclaimants allege that Avaya has monopolized and attempted to monopolize the relevant market consisting of "post-warranty service and maintenance for Avaya Definity systems, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts [in] the United States."  (Counterclaims ¶ 316.)  Counterclaimants allege that there are "no reasonably interchangeable substitutes for the service and maintenance of . . . Avaya Definity equipment or [the] purchase of maintenance contracts."  (Id.) Counterclaimants allege that "[d]issatisfied Avaya PBX owners . . .  are 'locked into' their PBX purchases" due to "extremely high switching costs . . . and . . . the PBXs' extremely long useful life."  (Id. ¶ 317.) Moreover, Counterclaimants allege that "customers were not, at the time they purchased their systems, able to accurately predict the life-cycle cost of their system and compare it to the cost of purchasing a competitor's system."  (Id. ¶ 318.)

Counterclaimants assert that Avaya has "at least sixty percent" of the market share in the

relevant market.  (Id. ¶ 8.)  Counterclaimants allege that Avaya has monopoly power due to this market share, its control over the logins, parts, patches and upgrades, its proven ability to exclude third party service providers and its ability to charge supra-competitive prices.  (Id. ¶ 320.)  Allegedly, Avaya's monopoly power was acquired and maintained through intentional exclusionary conduct.  (Id. ¶ 321.)   The alleged conduct includes "tying and bundling maintenance to crucial patches and upgrades; filing this lawsuit containing meritless and pretextual intellectual property claims; making false and defamatory statements about Counterclaimants to customers and others; threatening customers who use, or are considering using, Counterclaimants' maintenance services; and constantly shifting its policies with regard to customers' and ISPs' ability to access the customers' Avaya systems, the pricing of access to logins needed to self-maintain their products, and the customers' use of independent, 'unauthorized,' maintenance providers."  (Id. ¶ 323.)

With respect to the attempt to monopolize counterclaim, Counterclaimants allege that "Avaya specifically intends to eliminate or foreclose competition in the Relevant Markets through the tactics described above."  (Id. ¶ 337.)   The Counterclaims state that "[a]bsent action by this Court . . . there is a dangerous probability that Avaya will succeed in obtaining a monopoly in the Relevant PBX Markets."  (Id. ¶ 341.)

**b.      Tying in Violation of Sherman Act Section 1**

The Counterclaims state that "[t]he provision of maintenance and service for Definity equipment . . . is a separate product from patches and upgrades for Definity equipment" and that "Avaya has conditioned the purchase or receipt of patches and upgrades . . . on the purchase of service and maintenance."  (Id. ¶¶ 345, 348.)  "Avaya is the *only* source" for patches and

13

upgrades for Definity telecommunications systems.  (Id. ¶¶ 350, 362.)  According to the Counterclaims "Avaya has told customers that if they obtain maintenance or services from ISPs . . . Avaya will not provide or sell them these patches."  (Id. ¶ 348.)  This "forc[es] customers to choose Avaya maintenance and service over lower cost and/or better quality maintenance and service offered by ISPs."  (Id. ¶ 351.)  Counterclaimants assert that "[b]ecause it possesses market power [in patches and upgrades], Avaya's tying is unlawful per se."  (Id. ¶ 353.) Moreover, the Counterclaims state that the tying is also unlawful under the rule of reason.  (Id.)

### c. Illegal Conspiracy in Violation of Sherman Act Section 1

Counterclaimants allege that, in violation of Section 1, "Avaya has orchestrated a conspiracy involving certain of its BusinessPartners, distributors of certified Avaya parts, and others to allocate the maintenance and service business of Definity owners, to restrict the output of available maintenance and service, and, as a result, to fix and raise the prices of maintenance and service paid by owners."  (Id. ¶ 419.)  Counterclaimants assert that this is an unlawful restraint of trade under the rule of reason.  (Id. ¶ 421.)

### 2. PDS-related Counterclaims

### a. Sherman Act Section 2 Counterclaims

Counterclaimants allege that Avaya has monopolized and attempted to monopolize the relevant market consisting of "post-warranty service and maintenance for Avaya PDS equipment, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts" in the United States.  (Counterclaims ¶ 369.)  Counterclaimants allege that there are "no reasonably interchangeable substitutes for the service and maintenance of . . . Avaya PDS equipment or [the] purchase of maintenance contracts."  (Id.) Counterclaimants

14

allege that "[d]issatisfied Avaya PDS owners . . . are 'locked into' their PDS purchases" due to "extremely high switching costs . . . and . . . the PDS' extremely long useful life." (Id. ¶ 370.) Moreover, Counterclaimants allege that "customers were not, at the time they purchased their systems, able to accurately predict the life-cycle cost of their system and compare it to the cost of purchasing a competitor's system." (Id. ¶ 371.)

Counterclaimants assert that Avaya has "substantial market share" in the relevant market. (Id. ¶ 373.) Counterclaimants allege that Avaya has monopoly power due to this market share, its control over the logins, parts, patches and upgrades, its proven ability to exclude third party service providers and its ability to charge supra-competitive prices. (Id.) Allegedly, Avaya's monopoly power in the PDS market was acquired and maintained through intentional exclusionary conduct. (Id. ¶ 374.) The alleged conduct includes "tying and bundling maintenance to crucial patches and upgrades; filing this lawsuit containing meritless and pretextual intellectual property claims; making false and defamatory statements about Counterclaimants to customers and others; threatening customers who use, or are considering using, Counterclaimants' maintenance services; and constantly shifting its policies with regard to customers' and ISPs' ability to access the customers' Avaya systems, the pricing of access to logins needed to self-maintain their products, and the customers' use of independent, 'unauthorized,' maintenance providers." (Id. ¶ 375.)

With respect to the attempt to monopolize counterclaim, Counterclaimants allege that "Avaya specifically intends to eliminate or foreclose competition in the Relevant PDS Markets through the tactics described above." (Id. ¶ 388.) The Counterclaims state that "[a]bsent action by this Court . . . there is a dangerous probability that Avaya will succeed in obtaining a

15

monopoly in the Relevant PDS Markets."  (Id. ¶ 392.)

### b.      Tying in Violation of Section 1

Counterclaimants also allege that Avaya was able to use its market power in PDS system

patches and upgrades to force PDS owners to "choose Avaya maintenance and service over

lower cost and/or better quality maintenance and service offered by ISPs."  (Id. ¶ 401.)  The

Counterclaims specify that the relevant product markets are the markets for

post-warranty service and maintenance for Avaya PDS equipment, including the submarkets for

the provision of service and maintenance contracts, in the United States."  (Id. ¶ 369.)

Counterclaimants assert that this market is separate from the "market for the sale of PDS

systems" and that there are "no reasonably interchangeable substitutes" for such service and

maintenance.  (Id.) Counterclaimants state that "virtually all, if not all, owners of Avaya PDS or

its predecessors systems are 'locked into' their PDS purchases" due to high switching costs and

the platform's long useful life.  (Id. ¶ 370.)  Moreover, according to the Counterclaims the PDS

customers were, for various reasons, unable to predict the "life-cycle cost" for their PDS system.

(Id. ¶ 371.)   The Counterclaims state that PDS patches and upgrades "are uniquely desirable and

critical for the proper functioning" of the Avaya PDS systems and that "Avaya is the *only*

source" for the patches and upgrades.  (Id. ¶¶ 400-01, 412-13.)  Counterclaimants contend that

the tying is unlawful *per se* and unlawful under the Rule of Reason.  (Id. ¶¶ 403, 415.)

## II.    LEGAL STANDARD

### A.    Summary Judgment

A party seeking summary judgment must "show[] that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

16

56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).  In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); Hancock Indus. v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987).

Antitrust law, however, "limits the range of permissible inferences" that can be drawn "from ambiguous evidence."  Matsushita, 475 U.S. at 588.  "To avoid deterring pro-competitive behavior, 'certain inferences may not be drawn from circumstantial evidence.'"  Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374, 380 (3d Cir. 2005) (citations omitted).  To survive a motion for summary judgment, an antitrust plaintiff must produce "economically plausible evidence supporting the elements of its claim."  Id. (citations omitted).  Thus, "[i]f the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted."  Id. (citing Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 468-69 (1992)).

**B.      Sherman Act**

**1.      Section 1**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust

or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with

foreign nations."  15 U.S.C. § 1.  "To establish a violation of Section 1, a plaintiff must prove:

(1) concerted action by the defendants; (2) that produced anti-competitive effects within the

relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that

it was injured as a proximate result of the concerted action."  Gordon v. Lewistown Hosp., 423

F.3d 184, 207 (3d Cir. 2005).

 To succeed on a Section 1 conspiracy claim, first "the plaintiff must show that the

defendant was a party to a 'contract, combination . . . or conspiracy.' Second**,** the plaintiff must

show that the conspiracy to which the defendant was a party imposed an unreasonable restraint

on trade."  Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 218 (3d Cir.

2008).  To determine whether a particular action unreasonably restrains trade, courts have

applied one of two different methods of analysis: (1) the *per se* rule; and (2) the rule of reason.

Under the *per se* rule, certain categories of restraints are simply presumed to be unreasonable

and no elaborate inquiry is necessary.  See, e.g., Business Elecs. Corp. v. Sharp Elecs. Corp., 485

U.S. 717, 723 (1988) ("*per se* rules are appropriate only for 'conduct that is manifestly

anticompetitive'") (quoting Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 50

(1977).  On the other hand, the rule of reason, which is the "prevailing standard," ordinarily

requires the Court to engage in a detailed analysis of the effect that the restraint has on

competition in a relevant market.  See Sylvania Inc., 433 U.S. at 45, 49 (holding that the rule of

reason typically requires a detailed examination "in light of the competitive situation in 'the

product market as a whole'"); United States v. Brown Univ., 5 F.3d 658, 672 (3d Cir. 1993)

(noting that the rule of reason "ordinarily requires a detailed inquiry into the market impact of a

restraint").

A per se tying claim has three elements: "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected." Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 81 n.2 (3d Cir. 2011) (quoting Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 477 (3d Cir. 1992)). If this is shown, "then the defendant's tying practices are automatically illegal without further proof of anticompetitive effect." Town Sound, 959 F.2d at 477. In such cases, "no inquiry need be made into the actual prevailing market conditions in [the tied market]." Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 511 (3d Cir. 1998). In cases where "appreciable market power [in the tying market] cannot be shown, inquiry into the tied product market cannot be avoided, and the plaintiff therefore has the more difficult burden of showing that the arrangement violated the rule of reason because it unreasonably restrained competition in the tied product market." Id. (citation omitted).

### 2.   Section 2

Section 2 of the Sherman Act provides as follows:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2. The "right to maintain a private cause of action for damages arising under Section 2 of the Sherman Act flows from Section 4 of the Clayton Act." Schuylkill Energy Resources, Inc. v. Pa. Power & Light Co., 113 F.3d 405, 413 (3d Cir. 1997). Section 4 of the

Clayton Act provides, in relevant part, that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent." 15 U.S.C. § 15(a).

To prove a claim for monopolization, a party must show: "(1) the possession of monopoly power in a relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."   Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 481 (1992) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).

To prove a claim for attempted monopolization, a party must show: (1) predatory or anticompetitive conduct; (2) specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power.  Spectrum Sports v. McQuillan, 506 U.S. 447, 456 (1993); Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997).  "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market."  Spectrum Sports, 506 U.S. at 456.

## C.    Application

### 1.    Avaya's First Motion for Partial Summary Judgment

Avaya's overarching argument in support of its first motion for partial summary judgment dismissing Counterclaimants' antitrust counterclaims is that Counterclaimants have not established the alleged aftermarkets.  Specifically, Avaya alleges that Counterclaimants have not shown that PBX purchasers relied upon the availability of maintenance from ISPs at point of

sale ("POS"). (Avaya's Br. at 5-36). Avaya also asserts a corresponding argument regarding

PDS purchasers. (Id. at 36-37). Counterclaimants, although they do not dispute that they must

demonstrate the existence of these relevant aftermarkets to prove their antitrust counterclaims,

dispute that proof of customer reliance is an element of a Kodak monopolization claim. Instead,

Counterclaimants maintain that customer reliance is merely one factor to consider when

determining the ability to exercise monopoly power. (Counterclaimants' Opp. Br. at 32-33).

Counterclaimants further assert that, in any event, customer reliance and the ability to exercise

monopoly power have no bearing on the attempted monopolization, tying or conspiracy claims.

(Id. at 62-64).

In antitrust law, "relevant market" means the "one relevant to the particular legal issue at

hand." 2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust

Principles and Their Application (3d ed. 2007) ¶ 533. "'The outer boundaries of a product

market are determined by the reasonable interchangeability of use or the cross-elasticity of

demand between the product itself and substitutes for it.'" Queen City Pizza, 124 F.3d at 436

(citing Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962); Tunis Bros. Co. v. Ford

Motor Co., 952 F.2d 715, 722 (3d Cir. 1991)). As the Third Circuit noted, "'[c]ross-elasticity of

demand is a measure of the substitutability of products from the point of view of buyers. More

technically, it measures the responsiveness of the demand for one product to changes in the price

of a different product.'" Queen City Pizza, 124 F.3d at 438 n.6 (quoting E. Thomas Sullivan and

Jeffrey L. Harrison, Understanding Antitrust and its Economic Implications 217 (1994)).

The central case on this issue is Eastman Kodak Co. v. Image Technical Services, Inc.,

504 U.S. 451 (1992). In Kodak, the Supreme Court affirmed the Ninth Circuit's reversal of the

district court's grant of Kodak's motion for summary judgment.  The motion sought dismissal of tying and monopolization claims filed by an independent servicer of Kodak photocopiers.  The asserted relevant market in <u>Kodak</u> was the aftermarket for Kodak photocopier parts and service. The foremarket for photocopiers was competitive.  Historically, Kodak customers were able to obtain repair services from independent service organizations that charged less than Kodak did for similar services.  Kodak changed its policy regarding replacement parts and began selling replacement parts only to customers that also purchased Kodak services or repaired their own photocopiers.  The Supreme Court concluded that "[t]he relevant market for antitrust purposes is determined by the choices available to [the] equipment owners."  504 U.S. at 481-82. Accordingly, in its prior opinion, this Court previously stated that, with respect to pleading the relevant market for the PBX-related counterclaims, "[t]he proper focus is on what alternatives were available to purchasers in the primary PBX market."  (Doc. No. 59 at 23 (8/29/08 Mem. Op.))

As Avaya notes, the Third Circuit has reasoned that "[t]o create a triable question of aftermarket monopoly power, the plaintiff must produce 'hard evidence dissociating the competitive situation in the aftermarket from activities occurring in the primary market.'" <u>Harrison Aire</u>, 423 F.3d at 383 (quoting <u>SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.</u>, 188 F.3d 11, 17 (1st Cir. 1999).  This results because "[m]ost firms that service their manufactured products can be expected to have a very high percentage of the services aftermarket for those products."  <u>SMS</u>, 188 F.3d at 16.  Thus, "a court may conclude that the aftermarket is the relevant market for antitrust analysis only if the evidence supports an inference of monopoly power in the aftermarket that competition in the primary market appears unable to

check."  Id. at 17.  In this inquiry, "[o]ne important consideration is whether a unilateral change

in the aftermarket policy exploits locked-in customers."  Harrison Aire, 423 F.3d at 383

(citations omitted).  This is, however, but one of several relevant factors, including evidence of

(1) "supracompetitive pricing", (2) a "dominant share of the relevant aftermarket", (3)

"significant information costs that prevent[] lifecycle pricing", and (4) "high 'switching costs'

that serve[] to 'lock-in'" aftermarket customers.  Id. at 384.  Indeed, as Counterclaimants

suggest, whether customers relied on the ability to use ISPs at POS is, if relevant, merely one of

several non-dispositive factors.

As to the listed factors, although Counterclaimants did not present sufficient evidence of

supracompetitive pricing (see Doc. No. 254-1 ¶ 28 n.29; Harrison Aire, 423 F.3d at 381 (a

"comparatively high price does not, by itself, support a reasonable inference of monopoly

power")) they did present evidence of the other factors. For instance, Counterclaimants have

presented evidence that Avaya possesses a dominant share of the relevant aftermarket (Doc. No.

254-1 ¶ 27 n.28), significant information costs preventing lifestyle pricing (see, e.g., Doc. No.

254-1 ¶ 67 n.69), and high switching costs that lock-in aftermarket customers (see, e.g., Doc. No.

254-1 ¶ 58 n.62), as well as a unilateral change in aftermarket policy that exploits locked-in

customers (see, e.g., Doc. No. 254-1 ¶¶ 73-74 n.74-75).

In its Consolidated Statement of Undisputed Material Facts (Doc. No. 324-9), Avaya

addressed and responded to Counterclaimants' Response to Plaintiff's Statement of Undisputed

Material Facts but not to their Supplemental Statement of Undisputed Material Facts.  Therefore,

several facts presented by Counterclaimants appear to be not directly challenged.  In its reply

brief, however, Avaya asserts that, despite the Court previously finding it "plausible that the

purchasers in the PBX primary market relied on the ISPs' allegedly lower cost and higher quality service and maintenance alternative when purchasing the Definity System," following years of discovery "there is no record evidence that any Avaya PBX or PDS owner expected at POS to enter into a maintenance contract" with an ISP. (See Avaya's Reply Br. at 12-13).  Yet, the record indicates that some PBX or PDS owners did expect to, or indeed did enter into, maintenance contracts with ISPs.  (See, e.g., Counterclaimants' Supplemental Statement of Undisputed Material Facts (Doc. No. 254-1) ¶¶ 41-42.)

Consequently, on the basis of the materials submitted in support of and in opposition to the first motion for partial summary judgment dismissing the antitrust counterclaims, and viewing the underlying facts and drawing all reasonable inferences in favor of Counterclaimants, the non-moving parties here, the Court finds that there is a genuine issue of material fact with respect to the existence of monopoly power in the aftermarket that competition in the primary market appears unable to check and therefore of the plausible relevant markets.  Although the evidence is sufficient to defeat summary judgment, there is no basis for the affirmative finding of the relevant product markets that Counterclaimants' seek.  (Counterclaimants' Opp. Br. at 58-62.)

Avaya maintains, however, that it has found no decisions in this jurisdiction wherein "an antitrust claimant has established a single-brand aftermarket" and thus appears to contend that such single-brand relevant markets cannot exist merely because one has not yet been demonstrated.  Yet, in Kodak, the Supreme Court disagreed with the contention that a single brand of a product or service can never be a relevant market.  504 U.S. at 481-82.  In fact, the Supreme Court recognized that "[b]ecause service and parts for Kodak equipment are not

24

interchangeable with other manufacturer's service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." Id. at 482.  The same appears to be true here with respect to owners of Avaya PBX and PDS.

In summary, Counterclaimants have submitted sufficient evidence to "create a triable question of aftermarket monopoly power."   Therefore, the Court will deny Avaya's first motion for partial summary judgment dismissing the antitrust counterclaims.[6]

### 2.    Avaya's Second Motion for Partial Summary Judgment

Avaya's second motion for partial summary judgment dismissing the antitrust counterclaims addresses, in turn, the monopolization and attempt to monopolize (First, Second, Fifth and Sixth Causes of Action), tying (Third, Fourth, Seventh and Eighth Causes of Action) and illegal conspiracy (Ninth Cause of Action) counterclaims.

### a.    Monopolization and Attempted Monopolization Counterclaims (First, Second, Third and Fourth Causes of Action)

In arguing for dismissal of the monopolization and attempted monopolization counterclaims, Avaya assumes for purposes of this motion that the alleged single-brand aftermarket, the subject of its first motion, has been established. Thus, Avaya contends,

---

[6] To the extent the Court relies on the Shelby Certification in deciding this motion, the Court is compelled to address Avaya's argument in its reply that it is a "sham affidavit." (Avaya's Reply Br. at 28-31.)  This argument prompted a sur-reply submission on behalf of Counterclaimants.  As Avaya noted, the Third Circuit cautioned that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 251 (3d Cir. 2007).  The Court finds, however, that Counterclaimants, by way of their sur-reply, did indeed "demonstrat[e] a plausible explanation for the conflict".

Counterclaimants must prove that Avaya engaged in anticompetitive conduct.  Indeed, it is well established that "[t]he second element of a monopolization claim under § 2 requires the willful acquisition or maintenance of monopoly power" and "the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor." Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 308 (3d Cir. 2007) (citing Verizon Commcn's Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004)).  Claims for attempted monopolization more explicitly require a showing of anticompetitive conduct.  See Spectrum Sports, 506 U.S. at 456.

"Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." Broadcom, 501 F.3d at 308 (citation omitted).  "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." Id. (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 604-05 (1985)).  "Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive." Id. (citations omitted).

Upon a showing of sufficient evidence of anticompetitive conduct, the burden shifts to the alleged monopolist to produce evidence that it had a valid "business justification" for its anticompetitive conduct.  United States v. Dentsply Int'l, 399 F.3d 181, 196 (3d Cir. 2005), cert. denied, 546 U.S. 1089 (2006).  Such valid business justification is "the only recognized justification for monopolizing." LePage's Inc. v. 3M, 324 F.3d 141, 163 (3d Cir. 2003) (en banc), cert. denied, 542 U.S. 953 (2004).  This justification will be rejected if it is "pretextual."

26

See Kodak, 504 U.S. at 484; Dentsply, 399 F.3d at 197. Similarly, it is not "an acceptable defense" to assert that the alleged monopolist "acted in furtherance of its economic interests." LePage's, 324 F.3d at 163-64 (citations omitted). Even if a defendant presents a legitimate, non-pretextual justification, the plaintiff may prevail by showing that the anticompetitive harm caused by the defendant's conduct outweighs its pro-competitive benefits. See United States v. Microsoft Corp., 253 F.3d 34, 59 (D.C. Cir. 2001). The plaintiff can do this by showing that the challenged conduct has impaired competition and "either does not further competition on the merits or does so in an unnecessarily restrictive way." Broadcom Corp., 501 F.3d at 308 (citing Aspen Skiing, 472 U.S. at 604-05 n.32).

Avaya argues that Counterclaimants' evidence of allegedly anticompetitive conduct is described in two documents: (1) a proposal log listing PBX owners to which Counterclaimants allegedly proposed maintenance, and (2) Counterclaimants' response to Interrogatory 54 in Avaya's Eighth Set of Interrogatories explaining the "X" notations in the proposal log identifying the alleged anticompetitive conduct that was a "factor" or "influenced" each owner's decision to not do business with them. (Avaya's Br. at 7.) The categories of conduct include "Unauthorized", "Lawsuit", "Logins/MSPs"and "FUD Letters". (Id.)

As to the "Unauthorized" category, Avaya maintains that "[i]t was not false, misleading, or inaccurate for Avaya (or anyone else) to communicate to owners that Counterclaimants are not 'authorized' by Avaya" and, even so, both false and "truthful statements about a competitor, even by a firm with market power, are not anticompetitive." (Avaya's Br. at 8-9 (citing W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 109 n.14 (3d Cir. 2010) ("[M]aking false statements about a rival, without more, rarely interferes with competition enough to violate the

27

antitrust laws."); Nat'l Ass'n of Pharma. Mfrs., Inc. v. Ayerst Labs., 850 F.2d 904, 916 (2d Cir. 1988).)  With respect to the "Lawsuit" category, Avaya maintains that Counterclaimants' position is that Avaya violated Section 2 by "filing this lawsuit containing meritless and pretextual intellectual property claims." (Avaya's Br. at 10.)  Although Avaya disputes the characterization of the claims, its primary argument here is that its intellectual property claims are not "objectively baseless" and therefore the lawsuit is not a "sham" under the Noerr-Pennington doctrine.  (Id. at 11.)  However, even if the lawsuit were deemed a sham, Avaya argues that Counterclaimants cannot show any antitrust injury.  (Id. at 14.)

With respect to the "Logins/MSPs" category, Avaya argues that, assuming it has market power in a relevant single-brand aftermarket for maintenance, its "use of lock-out passwords" to prevent Counterclaimants from using its maintenance software does not violate Section 2 because a firm with market power may lawfully refuse to deal with competitors.  (Avaya's Br. at 15.)  Finally, Avaya asserts that the "FUD Letters", causing "fear, uncertainty, and doubt" (see Avaya's Statement of Undisputed Material Facts in Support of its Second Motion for Summary Judgment (Doc. No. 239-4) ¶ 969), informing PBX owners of the policies set forth in Avaya's July 1, 2005 Service bulletin, stating that unauthorized use of MSPs and certain logins was a violation of federal and state laws that could result in civil and criminal liability, and threatening to take legal action against violators to protect Avaya's proprietary intellectual property were not anticompetitive. (Avaya's Br. at 24.)  Avaya asserts that there are no false statements and it is not anticompetitive to inform owners of Avaya's policies. (Id. at 25.)

Counterclaimants appear to argue, however, that the full measure of the alleged anticompetitive conduct by Avaya is encompassed by the policy changes from 2005-10 that

28

"force[d] customers to purchase Avaya's supracompetitively priced maintenance and service and not buy or discontinue using maintenance and service from ISPs like TLI/C."[7] (Counterclaimants' Opp. Br. at 13.)  Additionally, Counterclaimants contend that Avaya "withholds its unique T&M services and Tier IV maintenance from Avaya-system owners that use ISPs" and that Avaya's 2005 policy change "used price discrimination, in the form of loyalty discounts, to discourage locked-in customers from using competing ISPs by raising the cost to do so."  (Id. at 13-14.)

The record indicates a prior acquiescence, if not approval, of ISPs by Avaya, as well as a distinct reliance on their availability by PBX and PDS owners, followed by a policy and pricing change on the part of Avaya evidencing disfavor for ISPs that might be deemed anticompetitive. (See, e.g., Exhibits to Counterclaimants' Statement of Undisputed Material Facts ¶¶ 136-43, 146-47, 254-56, 299-310, 321.)  Although the evidence does not conclusively show that Avaya engaged in anticompetitive conduct, it is sufficient to at least create a genuine issue of material fact on the issue that must be resolved by the finder of fact.  The Court would hereafter ordinarily continue the analysis to address Avaya's stated valid business justification for the alleged anticompetitive conduct, but it would seem, in this case, the analysis must stop here.  If the Court were deciding a motion to grant summary judgment on these counts in favor of Counterclaimants, or if Avaya's motion had addressed any of the remaining elements of a monopolization or attempted monopolization claim, the analysis would indeed continue.  The Court, however, need not go further as those issues are not presently before the Court.

---

[7] To be sure, Counterclaimants also allege use of the so-called "lock-out passwords", "FUD" letters and lawsuit threats.  (See Counterclaimants' Opp. Br. at 14-16.)

Therefore, because Counterclaimants have shown sufficient evidence of anticompetitive conduct on the part of Avaya, the Court will deny Avaya's second motion for partial summary judgment with respect to the monopolization and attempted monopolization counterclaims.

### b.      Tying Counterclaims (Third, Fourth, Sixth and Seventh Causes of Action)

Avaya seeks summary judgment dismissing the four tying counterclaims which allege that Avaya required PBX and PDS customers to buy post-warranty maintenance from Avaya or an Avaya Business Partner and not use ISPs for such maintenance in order to receive PBX and PDS patches and upgrades.  To that end, Avaya presents four bases for this relief: 1) that Counterclaimants cannot establish the aftermarkets for the tying and tied product markets; 2) Avaya's competitive strategy in adopting the software support ("SS") model does not give rise to antitrust liability, 3) Counterclaimants cannot show that Avaya has foreclosed competition because only Avaya provides software support, and 4) Counterclaimants cannot show any antitrust injury.  (See Avaya's Br. at 28.)[8]

Avaya first contends that Counterclaimants cannot establish the alleged tying markets. As set forth above, a *per se* tying claim has three elements: "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a

---

[8] As a preliminary matter, the Court notes Avaya's assertion that the tying claims relate solely to Avaya's  requirement that customers purchase one-year of SS for the new CM 5.0 VoIP system released in January 2008 (Avaya's Br. at 26-27), and Counterclaimants' response that the tying counterclaims are in fact not solely limited to the SS requirement for the CM 5.0 VoIP system.  (Counterclaimants' Opp. Br. at 39.)  The Court agrees with Counterclaimants as a review of the counterclaims at issue offers no indication of such a limitation. Avaya also asserts that the PDS tying counterclaims are limited to the release of Proactive Contact 4.0 for PDS. (Avaya's Br. at 28 n.23.)  The Court does not determine Counterclaimants' tying counterclaims to be so limited.

substantial amount of interstate commerce is affected." Warren Gen. Hosp. v. Amgen Inc., 643

F.3d 77, 81 n.2 (3d Cir. 2011) (quoting Town Sound and Custom Tops, Inc. v. Chrysler Motors

Corp., 959 F.2d 468, 477 (3d Cir. 1992)).  It is well-settled that "[t]he first inquiry in any §1

tying case is whether the defendant has sufficient market power over the tying product, which

requires a finding that two separate product markets exist and a determination precisely what the

tying and tied product markets are." Queen City Pizza, 124 F.3d at 443 (citing Allen-Myland,

Inc. v. IBM, 33 F.3d 194, 200-01 (3d Cir. 1994)).  Therefore, Avaya contends that

"Counterclaimants must produce evidence that Avaya had the ability to exploit 'locked-in'

owners."  (Avaya's Br. at 29.)

        In support, Avaya asserts that "[t]here is no evidence in the record that any owner of a

PBX released prior to CM 5.0 has been unable to obtain a necessary patch from Avaya" or "that

Avaya has refused to sell a CM 5.0 or later upgrade to any PBX owner – *including customers of*

*USPs*." (Id.)  Counterclaimants maintain the opposite position that Avaya "has never stopped

refusing, and threatening to refuse, to provide patches to customers who use ISPs."

(Counterclaimants' Opp. Br. at 39.)  The Court finds conflicting evidence in the record,

sufficient to deny summary judgment on this basis, as to Avaya's statement that "[t]here is no

evidence that any PBX owner has been unable to obtain a necessary patch from Avaya."

(Compare Avaya's Statement of Undisputed Material Facts (Doc. No. 239-4) ¶¶ 1038-39, 1080-

85 with Counterclaimants' Statement of Undisputed Material Facts (Doc. No. 313-1) ¶¶ 510,

513, 516.)

        Avaya also maintains that Counterclaimants cannot establish the relevant aftermarkets

because Avaya upgrades are substitutes for new systems sold by Avaya's competitors and

therefore the aftermarket is disciplined by competition from the primary market. (See, e.g., Avaya's Statement of Undisputed Material Facts (Doc No. 239-4) ¶¶ 1122-46.) Counterclaimants assert, however, that the tying counterclaims address software upgrades and not replacement of entire systems. (Counterclaimants' Opp. Br. at 41; Counterclaimants' Statement of Undisputed Material Facts (Doc. No. 313-1) ¶¶ 530-34; 544-46.) The Court disagrees with Avaya's characterization of the nature of the counterclaims at issue and there is an issue of fact sufficient to warrant denial of summary judgment on this basis.

Avaya next argues that its adoption of a new software support model does not give rise to antitrust liability. (Avaya's Br. at 31.) In so doing, Avaya cites to cases addressing other Sherman Act claims that are not germane to the analysis of the Section 1 tying counterclaims at issue here. Consequently, this argument provides no basis for granting Avaya's motion for summary judgment on the tying counterclaims.

Avaya also argues that summary judgment is warranted because "[a] tying claim fails as a matter of law when there is only one seller of the tied product, as is the case here." (Avaya's Br. at 33) (footnote omitted). See Driskill v. Dallas Cowboys Football Club, Inc., 498 F.2d 321, 323 (5th Cir. 1974); Friedman v. Adams Russell Cable Servs., 624 F. Supp. 1195, 1196 (S.D.N.Y. 1986). To be sure, the record does indicate that Avaya is the only provider of SS. (Id.; Avaya's Statement of Undisputed Material Facts ¶¶ 1018-20.) However, as previously addressed, the tying counterclaims are not limited to the provision of SS for CM 5.0. Indeed, Avaya argued that Counterclaimants allege that patches are the "tying products" and service and maintenance are the "tied products" (See Avaya's Br. at 27), and then Avaya demonstrates that "Avaya is the only provider of SS" (See Avaya's Br. at 33). Consequently, the Court will grant

summary judgment here solely to the extent that Counterclaimants allege tying with respect to SS for CM 5.0 as the tied product and otherwise finds no basis for granting summary judgment on this ground.

Avaya further argues that summary judgment should be granted on the patches tying counterclaims because, by definition, such a claim requires two separate products yet SS and patches are effectively a single product. (Avaya's Br. at 33.)  Counterclaimants do not contest the settled standard for a tying claim but argue that patches and upgrades are indeed separate products from service and maintenance. (See Counterclaimants' Opp. Br. at 38.)  The Court again notes that the counterclaims are not limited to the provision of SS for CM 5.0, but it is unquestionably covered by the counterclaims.  The evidence referenced by Avaya demonstrates that patches are indeed a component of SS, with no evidence identified by Counterclaimants to create a genuine issue of material fact.  (See Counterclaims ¶ 12; Avaya's Statement of Undisputed Material Facts ¶¶ 1022-23.)  Therefore no tying claim can survive with respect to patches and SS.  Avaya argues, however, only that patches and SS are the same product, which appears to leave the PBX maintenance and upgrades tying counterclaim unaddressed, as well as both PDS tying counterclaims.  Consequently, summary judgment will be granted solely with respect to the third counterclaim and only insofar as it alleges tying as to SS and patches.

Finally, Avaya argues that the tying claims fail because here is no evidence that Avaya's policies regarding patches or upgrades injured Counterclaimants or foreclosed competition. (Avaya's Br. at 34-36.)  With respect to patches, Avaya's argument is essentially twofold in that Counterclaimants do not provide patches or SS and that Counterclaimants' customers have continued to be able to obtain patches from Avaya.  As to the former argument, the Court has

33

already granted summary judgment as to the tying counterclaim with respect to PBX maintenance and patches insofar as it relates to tying of SS and patches.  As to the latter argument, the Court has noted herein an issue of fact regarding whether ISP customers have always been able to obtain patches from Avaya.  (See, e.g., Counterclaimants' Statement of Undisputed Material Facts (Doc. No. 313-1) ¶¶ 510, 513, 516.)  Moreover, Counterclaimants present evidence of harm to competition sufficient to create a triable issue.  (Id. ¶¶ 591-92.) Consequently, there is no basis for granting summary on the patches prong of Avaya's argument.

With respect to upgrades, Avaya presents sufficient evidence demonstrating that Counterclaimants do not themselves sell Avaya PBX upgrades directly to their customers.  (See Avaya's Statement of Undisputed Material Facts ¶¶ 1153-54.)  Counterclaimants do not explicitly concede this point, but argue in the alternative that the harm occurred when Avaya "announced its policy and threatened to withhold patches and upgrades" because Avaya system owners could not know "that Avaya would not enforce its clearly stated tying policy." (Counterclaimants' Opp. Br. at 41.)  Avaya's counter that "a threat alone is insufficient to constitute an illegal tying arrangement," Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc., 96 F.3d 10, 17 (1st Cir. 1996), has seemingly not been expressly adopted by the Third Circuit.  However, the Court finds this to be merely a rewording of the analysis of whether a substantial amount of interstate commerce has been affected.  Counterclaimants present little more than assertions on this front that the Court finds insufficient.

Therefore, the Court will grant summary judgment in favor of Avaya with respect to the fourth counterclaim alleging tying of PBX upgrades and maintenance.

c.      **Conspiracy to Restrain Trade Counterclaim (Ninth Cause of Action)**

Avaya seeks summary judgment as to the ninth counterclaim, asserting that there is no evidence that Avaya's "BusinessPartners" ("BP") agreements and policies reduced output or raised prices of maintenance, as alleged in this claim.  (Avaya's Br. at 37.)  Additionally, Avaya argues that Counterclaimants lack standing to bring this claim because they cannot prove an antitrust injury, i.e., they can identify no financial harm they suffered as a result of the alleged conspiracy between Avaya and its BPs to raise PBX maintenance prices.  (Id. at 37-38.)

Counterclaimants must show that Avaya was a party to a "contract, combination . . . or conspiracy."  Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 218 (3d Cir. 2008).  This requires "some form of concerted action" demonstrating a "'unity of purpose or a common design and understanding or a meeting of minds' or 'a conscious commitment to a common scheme'".  In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004) (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)).  "Unilateral activity by a defendant, no matter the motivation, cannot give rise to a Section 1 violation," InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159 (3d Cir. 2003), as "[t]he existence of an agreement is the hallmark of a Section 1 claim."  In re Baby Food Antitrust Litig., 166 F.3d 112, 117 (3d Cir. 1999).

Counterclaimants present evidence of such agreements to fix prices, reduce output, allocate customers, and boycott ISPs. (See, e.g., Counterclaimants' Statement of Undisputed Material Facts ¶¶ 319, 325, 329, 331.)  Additionally, Counterclaimants counter Avaya's standing argument by presenting evidence of financial harm, in the form of lost customers, and therefore revenue and profits, resulting from Avaya's allegedly anticompetitive, conspiratorial conduct.

35

(See, e.g., Counterclaimants' Statement of Undisputed Material Facts ¶¶ 432-36, 440, 443.) This evidence is sufficient to at least create a triable issue and therefore the Court will deny Avaya's motion for summary judgment on this ground.

### d.   Causation

Finally, in support of its second motion for partial summary judgment, Avaya argues that Counterclaimants cannot show that any alleged anticompetitive conduct by Avaya was a "material cause" of Counterclaimants' alleged injuries, i.e., PBX owners' decisions to decline to do business with them.  (Avaya's Br. at 41.)  Avaya relies heavily upon the Eighth Circuit case, Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483 (8th Cir. 1992), where the Eighth Circuit affirmed defendant's motion for summary judgment in part because plaintiff "failed sufficiently to establish the causal connection between its decline and Xerox's alleged antitrust violations".  Id. at 1495.

Counterclaimants point out that, in Rossi v. Standard Roofing, Inc., 156 F.3d 452 (3d Cir. 1998), the Third Circuit reasoned that the burden of proving the fact of damage under Section 4 of the Clayton Act "is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond the minimum point goes only to the amount and not the fact of damages."  Id. at 483 (citing Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 (1969)).[9]  The Rossi court found sufficient evidence of causation to proceed to the jury because, whereas in Amerinet the plaintiff "was only able to show that, at most, the allegedly illegal activity was 'one

---

[9] The Court notes that it appears that the parties have assumed that the standing principles of Section 4 of the Clayton Act are applicable to alleged violations of Section 1 of the Sherman Act. The Court finds no reason for dispute and proceeds with the analysis accordingly.  See Bogus v. Am. Speech and Hearing Ass'n, 582 F.2d 277, 288 n.13 (3d Cir. 1978).

factor among many, and not a controlling or major factor' in specific potential clients' decisions not to purchase from the plaintiff," Rossi's evidence was, on the contrary, "more substantial". Rossi, 156 F.3d at 485.  Indeed, the court found that Rossi had produced evidence from five specific customers that they would have purchased from Rossi had he been permitted to sell to them and that the inability to consummate those sales was a direct result of the alleged antitrust violation.  Id.

     Here, as noted above, Counterclaimants have presented an assortment of testimony in support of its position that they have suffered "some damage" as a result of Avaya's anticompetitive conduct.  The Court finds that, although not conclusive, there is sufficient evidence of causation here, as in Rossi, that should allow it to proceed to the finder of fact. Therefore, Avaya's motion for summary judgment on this basis is denied.

**III.     CONCLUSION**

For the foregoing reasons, Avaya's first motion for partial summary judgment dismissing the first through ninth counts of Counterclaimants' Counterclaims is denied and Avaya's second motion for partial summary judgment dismissing the first through ninth counts of Counterclaimants' Counterclaims is granted in part and denied in part.  An appropriate Order accompanies this Memorandum Opinion.


Dated: January 25, 2012

                                     __    s/ Garrett E. Brown, Jr.          
                                     GARRETT E. BROWN, JR., U.S.D.J.