UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

AVAYA INC.,

  Plaintiff/Counterdefendant,

    v.

TELECOM LABS, INC.,
TEAMTLI.COM, CONTINUANT INC.,
DOUGLAS GRAHAM, SCOTT GRAHAM,
and BRUCE SHELBY,

  Defendants/Counterclaimants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 06-2490
(JEI/KMW)

**OPINION**

**APPEARANCES:**

ARCHER & GREINER, PC
Robert T. Egan, Esq.
Lloyd Freeman, Esq.
Mark Oberstaedt, Esq.
Christine S. Baxter, Esq.
Trevor J. Cooney, Esq.
Erin R. Carroll, Esq.
Julie A. Robinson, Esq.
One Centennial Square
Haddonfield, NJ 08033
    Counsel for Plaintiff/Counterdefendant

*Pro Hac Vice*:
BRYAN CAVE LLP
Lawrence Scarborough, Esq.
Kathleen S. Callahan, Esq.
Jacob A. Kramer, Esq.
Daniel T. O'Connor, Esq.
J. Michael Cooper, Esq.
Daniel I. Prywes, Esq.
Desmonne A. Bennett, Esq.
1155 F Street, N.W.
Washington, DC 20004
    Counsel for Plaintiff/Counterdefendant

K&L GATES LLP
Anthony P. Larocco, Esq.

Charles F. Rysavy, Esq.
Kathy D. Helmer, Esq.
Dana B. Parker, Esq.
Michael E. Waller, Esq.
Robert F. Pawlowski, Esq.
Mark D. Marino, Esq.
Ashley L. Turner, Esq.
Benjamin I. Rubinstein, Esq.
Stacey A. Hyman, Esq.
Scott G. Kobil, Esq.
Matthew S. Sachs, Esq.
One Newark Center
10th Floor
Newark, NJ 07201
  Counsel for Defendants/Counterclaimants

*Pro Hac Vice*:
K&L GATES LLP
Douglas F. Broder, Esq.
Anthony P. Badaracco, Esq.
Daniel A. Pincus, Esq.
599 Lexington Avenue
New York, NY 10022
  Counsel for Defendants/Counterclaimants

**IRENAS**, Senior District Judge:

Plaintiff in this seven-year-old case is Avaya Inc. ("Avaya"), a leading manufacturer of telecommunications equipment. Defendants are Telecom Labs Inc. ("TLI"), TEAMTLI.com ("Team"), Continuant Inc. ("Continuant"), Douglas Graham ("D. Graham"), Scott Graham ("S. Graham"), and Bruce Shelby ("Shelby"),[1] competitors of Avaya in the highly profitable post-warranty maintenance market for Avaya-made PBX telephone systems.[2] A jury trial began on September 17, 2013 and is expected to continue through February 2014. Pending before the Court are Defendants' seven motions for judgment as a matter of law under Fed. R. Civ. P. 50, filed after Avaya finished presenting its affirmative claims.

---

[1] Defendants will collectively be referred to as "TLI/C" or Defendants.

[2] PBX stands for Private Branch Exchange and refers to a high-functioning phone system that incorporates both voice and data transmission. (Tr. at 805) Sometimes referred to as a special purpose computer, a PBX system is composed of a switch, comprised of circuit cards that connect the customer's phones to the public telephone network, and the individual phones. Because of the strong competition for the sale of PBX systems from manufacturers such as Cisco, Siemens, and NEC, the profit margins on the sale of Avaya PBX systems are much lower than the profit margins for maintenance work on such systems.

Although an Avaya PBX can last up to 30 years, and must be maintained with technical support to be continually operational, its sale warranty lasts less than one year. (Tr. 1689) The combination of a long shelf-life, short warranty period, and high profit margin, creates a very lucrative post-warranty maintenance market. (Tr. 4685-86) Avaya has a dominant position in this market, in part because competitors in the sales market do not seek to maintain Avaya PBXs. Between 2005 and 2010, Avaya had approximately 140,000 to 150,000 unique maintenance customers, (Tr. 5735); since October 2003, Defendants have had 470 such customers total. (Tr. 2933)

Avaya filed the instant suit in 2006 against the corporate defendants, all of which are run and operated by D. Graham.[3] Upon being sued, Defendants counterclaimed, resurrecting antitrust violations first filed in a separate lawsuit in 2003. Days before jury selection was to begin, and after seven years of contentious litigation, (see Dkt. Nos. 1-1004), Avaya withdrew with prejudice six substantive claims: (i) misappropriation of trade secrets; (ii) tortious interference with contractual relations; (iii) violations of the Digital Millennium Copyright Act ("DMCA"); (iv) false advertising/violation of the Lanham Act; (v) trade libel/commercial disparagement; and (vi) respondeat superior/breach of duty of loyalty.  Avaya tried its remaining causes of action, breach of contract, fraud, and iterations of unfair competition,[4] in a jury presentation that lasted two months, involved 35 witnesses, and spanned over 6,000 pages of transcript.

---

[3] S. Graham, D. Graham's brother, and Shelby, D. Graham's childhood friend, are officers of the corporate defendants.  TLI was the first telecommunications company founded by D. Graham and began assigning its PBX maintenance contracts to Continuant in 2005.  Team was "set up to specifically sell and market Avaya product to [Avaya's] small [] business customers."  (Tr. 1924)  The individual defendants are domiciliaries of Washington and Oregon.  TLI and Team are Washington corporations with their principle places of business in Washington; Continuant is an Oregon corporation with its principal place of business in Oregon.

[4] Specifically, Avaya tried (i) breach of contract; (ii) tortious interference with prospective economic gain; (iii) fraud; (iv) unfair competition; (v) unjust enrichment; (vi) aiding and abetting; and (vii) civil conspiracy. (Joint Final Pre-Trial Order at 9-10)

Avaya's claims center around TLI/C's use of a series of software commands on its customers' systems, the use of which enables TLI/C to compete with Avaya in the maintenance market. Avaya alleges that such use, and the means TLI/C utilized to access the commands, is unlawful. But Avaya failed to introduce a legally sufficient evidentiary basis for the jury to conclude that this is so. For liability to lie on Avaya's breach of contract claim, the jury would have to interpret the clear terms of two unambiguous contracts in contravention of their plain and ordinary meanings. And in order to find TLI/C accountable in tort and equity, the jury would be forced to deem unlawful harmless misrepresentations and ordinary commercial competition. These are claims the law cannot support. Accordingly, Defendants' motions will be granted.

## I.

Avaya manufactures, sells, and maintains PBX systems for medium and large-sized companies.[5] (Tr. 802)[6] It invests heavily in the development of its PBX, which consists of hardware purchased by the customer and licensed software. To

---

[5] Avaya is a successor in interest of AT&T (Tr. 1535), which spun off its telecommunication equipment business to form Lucent in October of 1996. In September 2000, Lucent spun off a portion of the company to form Avaya. (Tr. 801) Avaya is a Delaware corporation with its principal place of business in Basking Ridge, New Jersey. (4th Am. Compl. ¶ 1)

[6] When referencing the trial transcript, the Court abbreviates its citation and cites only the page number: (Tr. ___).

sell and maintain these systems, Avaya utilizes both full-time sales personnel, referred to as "Avaya badged salesmen" who transact "directly" with customers, and small retail businesses, currently referred to as "authorized Business Partners" ("BPs") that comprise Avaya's "indirect channel" to customers.[7]  To become a BP, a company must sign a form contract drafted by Avaya.  Beginning in 1996, TLI took part in Avaya's indirect channel, focusing on equipment sales in the northwest of the United States.  (See, e.g., Tr. 4679-80)

In 1999, Avaya began relying more heavily on its indirect channel to generate sales and provide maintenance to new customers.  (Tr. 2018)  A downturn in the telecommunications market in 2000 led to substantial layoffs, which further propelled the company's transition.  (Tr. 2018)  Avaya consequently encouraged BPs (then called Dealers) to enter the maintenance market, providing them training and subsidizing the hiring of former Avaya engineers.  (Tr. 2787)  TLI took advantage of Avaya's offerings and entered the maintenance market, officially signing its first customer in 2001.  (Tr.

---

[7] Under two contracts TLI entered into with Avaya's predecessor, Lucent, in 1996 and 1998, TLI was referred to as a "Dealer."  (P-1959 and P-01958)  The 2003 contract between TLI and Avaya introduced the phrase "Business Partner."  (D-01223, § 4.15)

2787)   Soon thereafter, with Avaya's encouragement, TLI began investing "millions" in its maintenance business.[8]  (Tr. 3302)

In order to maintain a PBX, a technician must be able to access the PBX's "on-demand maintenance commands" ("ODMCs"). (Tr. 832, 1057-60)  ODMCs are a software function installed on the PBX that allow a technician to enter key-based instructions and troubleshoot any problem the system is experiencing.[9]  (Tr. 831)

Somewhat counterintuitively, a customer does not gain access to ODMCs upon purchasing the system.  Rather, because of how Avaya programs the machine, a user can only access ODMCs by

---

[8] TLI primarily invested in its Network Operations Center ("NOC"), where it receives maintenance alarms from the PBXs it monitors.  (Tr. 2896-97, 3302) Avaya itself has recognized the investment necessary to provide post-warranty maintenance.  Linda Schumacher testified that for BPs "to become certified" in the provision of maintenance they need to invest "money and effort.  They needed the resources.  They needed to make sure that they had training, so yes, they were investing[.]"  (Tr. 2021)

[9] As depicted in slides Avaya showed to the jury, a technician accesses ODMCs by using a laptop computer to connect to the PBX and then enters the commands on the laptop's keyboard.  A technician connects to a customer's PBX either directly, via a direct wire connection, or remotely, via the internet or a phone line.  (Tr. 897)
  The machine's application software, run in conjunction with the operation system, is comprised of three modules: call processing, which "actually processes the calls" and controls "anything that has to do with managing a phone call itself"; administration, which "is used to actually set up the PBX to work for the customer"; and maintenance, a key component of which is the ODMCs.  (Tr. 821-25)  The most often referenced ODMC is "Busyout and Release," which allows a technician to deactivate a circuit card used in the PBX, remove it to inspect whether it is operating properly, return it to the switch, and release it back into the operation of the machine.  (Tr. 834)

entering (i) a restricted login, or (ii) a customer login when the customer has previously been granted access.[10]

Of the restricted logins, there are four — three reserved for Avaya personnel[11] and one referred to as "DADMIN," or Definity Administration, and used by authorized BPs.[12]   A DADMIN login only allows a user access if the login itself has been enabled on the PBX.   (Tr. 890-91)  Before activating a DADMIN login, Avaya requires the customer and the BP servicing the machine to sign a DADMIN Request Form stating that the customer authorizes Avaya to allow the named BP access.   (E.g., P-00348)  Once received, Avaya issues the BP an enabled login.

Avaya only grants a customer login access to ODMCs if the customer subscribes to Maintenance Assist, a yearly contract in which the customer pays Avaya for access.[13]   Specifically, when a customer subscribes to Maintenance Assist, Avaya enables

---

[10] A login is a combination of a username and password used to access technologically advanced parts of the PBX.

[11]  The logins reserved for Avaya personnel are referred to collectively as Avaya logins and consist of the INIT, INADS, and CRAFT usernames.  These logins can access more software functions than the DADMIN and customer logins.

[12] The DADMIN login was created in 1999 in conjunction with the release of Avaya's then latest PBX model, the Definity.  (Tr. 1774-75)

[13] Even though allowing buyers to access the ODMCs would cost Avaya close to nothing, Avaya charged customers 60 cents per phone per month for a Maintenance Assist subscription.  In March 2005, and for a short period thereafter, Avaya doubled the price to $1.20.  (Tr. 1795-96)  A PBX can operate up to ten thousand phones, and possibly more.  (Tr. 952)

Maintenance Software Permissions ("MSPs") on the customer's PBX, thereby deactivating the lock blocking access.[14]

In 2000-01, Avaya encouraged BPs to perform maintenance on customers' PBXs. However, by 2002, Avaya did an about-face and adopted policies limiting BPs', customers', and independent maintenance providers' ability to perform maintenance.[15] Towards the end of 2002, for example, Avaya began using a new form contract with BPs, termed the Avaya One contract, that contained an expanded noncompete provision in which BPs agreed to refrain from soliciting maintenance business from certain prospective Avaya customers.[16] (Tr. 1650, D-01223, Reseller Product Group Attachment § 3.2) The noncompete provision was one way Avaya tried to protect its share of the maintenance market following

---

[14] Until the mid-1990s, ODMCs were not accessible at all via customer logins. In response to feedback from some of its largest customers who wanted to give access to their internal IT staff, Avaya began selectively offering customer access for a one-time activation fee. Soon thereafter, Avaya began offering access only through Maintenance Assist.

[15] BPs, pursuant to the Avaya One agreement, are authorized Avaya service providers. Although Avaya does not prohibit entities other than BPs to provide maintenance, (Tr. 1745), it calls such providers "unauthorized service providers." (Tr. 1933) TLI/C, on the other hand, refers to such providers as "independent service providers" ("ISPs"). (Tr. 3296) The difference is of no legal import, and only "a handful" of ISPs exist. (Tr. 2826)

[16] The provision prohibited BPs from contacting large PBX customers listed in Avaya's "valued customer program," as well as any current Avaya maintenance customer. (D-01223, Product Group Attachment §3.2.) Avaya continually expressed to its BPs the importance of attracting new Avaya PBX customers, and consequently sought to prohibit what it called "unhooking": "proactively marketing [maintenance] to" a PBX customer who has "a contractual relationship" with Avaya. (Tr. 1789)

the company's downsizing and the resulting increase in competition from BPs.

TLI began negotiating its Avaya One contract in late 2002, (Tr. 5051), and signed the agreement on March 21, 2003. (D-01223) However, TLI's agreement was amended by hand, modifying the noncompete to allow TLI to solicit maintenance business from many Avaya customers.[17] (Id.) Of the approximately 300 Avaya One agreements signed, TLI's was the only one to be modified. (Tr. 1895)

When Linda Schumacher, then Head of Global Sales Operations for Avaya, learned of the modification, she was "shocked and extremely concerned." (Tr. 1893) She informed Avaya's management immediately, and on July 31, 2003, only four months after it executed the agreement, Avaya notified TLI that it was terminating the contract. (D-4643)

The contract provided for 60-days notification for a termination without cause. (D-01223, § 17.1) Consequently, between July 31 and September 30, Avaya contacted TLI's maintenance customers to inform them of TLI's soon-to-be de-authorized status, (Tr. 2125), and TLI, with its future access to restricted logins in doubt, began looking for ways to ensure

---

[17] The amendment was initialed by D. Graham and Teri Caraffa, an Avaya Contracts Manager. TLI's contract also modified TLI's billing practices, (see D-01223, § 5.1), but this modification is not relevant to the instant dispute.

access to its customers' ODMCs.  On September 30, 2003, TLI's
contract with Avaya terminated, and TLI became an unauthorized
maintenance provider.

Two weeks later, TLI sued Avaya in federal court, alleging
antitrust violations and seeking a preliminary injunction
compelling Avaya to allow TLI access to the ODMCs on its
customers' machines.  (P-01981, ¶ 19)  TLI's application was
denied, (3:03-cv-04961 (SRC), Dkt. No. 20), and several months
later, on July 7, 2004, TLI voluntarily withdrew its case.
(3:03-cv-04961 (SRC), Dkt. No. 31)

Without any relief from the court, Defendants began
obtaining access to their customers' ODMCs in a variety of ways.

TLI/C accessed some of its customers' PBXs from the
passwords and logins it received while a BP, and some passwords
were available on the internet.  (Tr. 2915)  Additionally, some
customers had purchased MSPs for the life of their machines
during Avaya's initial offering of MSPs, enabling TLI/C to
access those customers' ODMCs through their customer logins.
(Tr. 3216)

Approximately 70 times, Defendants had a customer sign a
blank DADMIN Request Form and then asked an authorized BP to
fill-out, sign, and submit the form on TLI/C's behalf.  (Tr.
2768-2927; 2976-2978; 2978-2979; 3051; 4659-4660; P-01147; P-
01961; P-00757; P-01220; P-01042)  The compliant BP became the

BP of record, although Defendants provided the maintenance and kept the revenue. (Id.) These BPs participated either for a fee or without charge, hoping to profit from any subsequent parts or equipment sales to the customer. (Tr. 3051, 3403)

Defendants also used two former Avaya employees to obtain access to their customers' ODMCs. One, David Creswick, helped "hack" and "crack" into customers' phones to obtain maintenance passwords, activate MSPs, enable DADMIN logins, and change passwords.[18] (Tr. 2669-70; 2690-97; 2700, 2708-10; 2767; 2768; 3065-71; 3103; 3217-18; 3340; 4660-61; 6533; P-01197; P-02212; P-00657; P-02233) Creswick retrieved the passwords by accessing data the PBX automatically stores, referred to as "translations," (Tr. 3067), and was paid between $200 and $300 each time he helped. (Tr. 2718)

TLI/C also worked with former Avaya employee Harold Hall, who kept, without Avaya's permission, Avaya-developed software that allowed a technician to generate a password to login to systems to enable DADMIN passwords. (Tr. 6577; 6579; 6581; 6580; 6581; 6582; 6584). Hall used this software to generate between 40 and 60 passwords. (Id.; Avaya Br. [1121] at 28-29)

---

[18] At first, Creswick, who goes by the "codename" Mustang because he used to own part of a Mustang aircraft, chose not to provide passwords to Defendants because he "didn't know what [Defendants were] going to use them for." (Tr. 2682) He agreed to help only after he was told the passwords would be used "strictly for maintenance." (Id.)

TLI/C, aware of Avaya's continuing attempt to block its access to ODMCs, an attempt that, if successful, would effectively terminate TLI/C's maintenance business, kept the means by which it accessed ODMCs a secret from its clients and, more importantly, Avaya. (Tr. 2771; 2884-85; 3230-31; 6433-34; 3071; 2976-78; 3233-37)

Avaya brought the instant suit on June 2, 2006. TLI/C never moved to dismiss, and only sought summary judgment on Avaya's DMCA claim, a motion that was granted in part.[19] The remains of Avaya's DMCA claim, along with five other claims, were withdrawn with prejudice September 3, 2013. (Dkt. No. 1005) Opening arguments at trial began September 17, 2013, and Avaya rested November 12, 2013. (Tr. 6598) Defendants did not put on a defense but proceeded directly to their counterclaims.

## II.

Federal Rule of Civil Procedure 50(a) states:

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to

---

[19] Specifically, Judge Brown granted summary judgment in favor of TLI/C on Avaya's §§ 1201(a)(1) and (a)(2) claims, and denied summary judgment on Avaya's § 1201(b)(1) claim. (Dkt. No. 416)
    Defendants did make several motions in limine seeking to limit or preclude several of Avaya's claims. (See Dkt. No. 1007 (motion in limine to preclude or limit Avaya's breach of contract claim); Dkt. No. 1010 (motion in limine to dismiss Avaya's tortious interference with prospective economic advantage claim) However, given that such substantive motions were made for the first time on the eve of trial, the Court denied them without prejudice. (Transcript of Sept. 3, 2013 Status Conference at 20)

> find for the party on that issue, the court may: (A)
> resolve the issue against the party; and (B) grant a
> motion for judgment as a matter of law against the party
> on a claim or defense that, under the controlling law,
> can be maintained or defeated only with a favorable
> finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for a "Rule 50 directed

verdict . . . may be granted only if, as a matter of law,

viewing all the evidence which has been tendered and should have

been admitted in the light most favorable to the party opposing

the motion, no jury could decide in that party's favor."

L.P.P.R., Inc. v. Keller Crescent Corp., --- Fed.Appx. ---, 2013

WL 3814969, at *5 (3d Cir. July 24, 2013) (quoting Tigg Corp. v.

Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987)). "Although

judgment as a matter of law should be granted sparingly, a

scintilla of evidence will not enable the non-movant to survive

a Rule 50 motion." Goodman v. Pennsylvania Turnpike Com'n, 293

F.3d 655, 665 (3d Cir. 2002).


### III.

Defendants submitted seven motions for judgment as a matter

of law, six seeking to strike each of Avaya's substantive claims

and one seeking a finding regarding the licensing agreements

Defendants' customers entered into upon purchasing their PBXs.

In light of Avaya's failure to prove both unlawful conduct and

injury-in-fact, all motions attacking Avaya's claims will be

granted.  Additionally, because the granting of the motions precludes a finding of liability on any primary cause of action, the Court will dismiss Avaya's derivative civil conspiracy claim.  The Court first resolves Defendants' motion regarding the customers' licensing agreements, and then turns to those motions addressing Avaya's substantive claims.

### A.

TLI/C moves for a ruling that Avaya failed to prove the software licensing agreements entered into by TLI/C's 470 customers upon purchasing their PBXs prohibited them from allowing TLI/C to access the ODMCs on their systems.  (Defs.' Mot. [1101] at 2)  The motion will be granted.

TLI/C so moves because Avaya, in its case-in-chief, put forward its interpretation of the agreements to cast Defendants' conduct in an unlawful and violative light.  (Tr. 615 (telling the jury that the licensing agreements "do not allow unauthorized service providers like TLI to use the software that Avaya developed."))[20]  In so doing, however, Avaya introduced only two incomplete sets of the unknown number of licensing

---

[20] Because service providers such as TLI are not parties to the licensing agreements, the agreements could not possibly allow or restrict their conduct directly; however, Avaya conveyed to the jury the proposition that the licensing agreements did not allow the purchasers to grant Defendants access to the ODMCs on their machines.  Avaya made this argument notwithstanding that on the eve of trial it dismissed with prejudice its claim that TLI/C unlawfully interfered with the contracts between Avaya and the purchasers of its PBXs.

agreements, (P-01485; P-01765), and supplemented this showing with unsigned contracts and executed agreements signed by third parties unrelated to Avaya's claims.  (P-00177; P-01323)

Avaya argues that the requested ruling is unnecessary, because a finding as to the contracts is not required for liability to be imposed on any of its claims, (Avaya Br. [1112] at 4), and in fact inappropriate, because Avaya will not be asking the jury to determine whether Defendants' customers violated the licensing agreements by allowing Defendants access. (Tr. 6671-72; Avaya Br. [1112] at 4-12)

Failing to rule on the legal implications of the agreements, however, presents two problems.  First, it allows Avaya, which introduced the agreements as evidence of Defendants' unlawful conduct, to present a tortious interference with contractual relations claim under the guise of tortious interference with economic gain, and thereby evade the burden of proving actual breach.[21]  See Nostrame v. Santiago, 213 N.J. 109, 122 (2013) (holding that a tortious interference with contractual relations claimant must prove that defendant "induc[ed] or otherwise caus[ed] the third person not to perform

---

[21] As noted infra, Avaya now argues that the contracts evidence Avaya's reasonable expectation of economic gain.  (Section III.D.)  But it is indisputable that Avaya first presented the agreements as evidence of unlawfulness, and still argues that "there is sufficient evidence in this trial record" for the jury to "find that a customer violates its license agreement with Avaya by hiring Defendants for maintenance and allowing Defendants to access the ODMCs on the customer's PBX system."  (Avaya Br. [1132] at 13)

the contract"). Second, refraining from deciding the meaning of the licensing agreements, which utilize unambiguous terms ripe for judicial construction,[22] allows the lay opinions of Avaya employees and Defendants, individuals who are not themselves parties to the agreements, to replace the Court as expositor of the contracting parties' legal obligations.[23] The importance of both of these issues is heightened because the customers' licensing agreements are the only grounds on which Avaya could argue that Defendants' use of the ODMCs is itself violative of a legal obligation, in light of the fact Avaya dropped its claims for misappropriation of trade secrets, violations of the DMCA, and violation of the Lanham Act. (See Tr. 6602)

---

[22] The agreements specify that they should be governed by New Jersey law, (see, e.g., P-00177, § 10.1), and thereunder unambiguous terms are enforced by the Court. Watson v. City of E. Orange, 175 N.J. 442, 447 (2003).

[23] For example, Avaya relies on TLI's Verified Complaint from the 2003 lawsuit to prove the legal implications of the customers' agreements. (Avaya Br. [1132] at 14 ("Defendants have admitted the scope and extent of the customer contracts relating to access to ODMCs in their Verified Complaint in the 2003 litigation. This is sufficient to establish the content of these documents for this case.")) Avaya's reliance, however, is misplaced. Although Fed. R. Evid. 1007 allows the introduction of such evidence, the interpretation of Defendants, non-parties to the agreements who testified that they do not review the agreements, (Avaya Br. [1110] at 14), is of minimal probative value of the agreements' actual meaning. 5 Federal Evidence § 10:37 (3d ed.) ("[P]ersonal knowledge on the part of the declarant should be required [under Fed. R. Evid. 1007] whenever such an admission is offered as proof of the content of a writing. The interest in accurate ascertainment of content that underlies the Best Evidence doctrine would be disserved by admitting [] admissions where the declarant lacked such knowledge.") Furthermore, as previously noted, it is the role of the Court to give effect to a contract's unambiguous terms. Watson, 175 N.J. at 447. Consequently, Avaya's attempt to use a narrow exception to the Best Evidence rule to supplant the Court must fail.

Consequently, based on the limited evidence Avaya introduced, addressed herein, the Court holds that Avaya failed to prove Defendants' customers violated their licensing agreements by allowing Defendants access to the ODMCs on their PBXs. Furthermore, based on the agreements' unambiguous language, Defendants' customers were allowed to both access ODMCs on their own PBXs and allow Defendants access where such access was for the benefit of the customers. Accordingly, Defendants' motion will be granted.

With periodic updates, Avaya and its predecessors used three main versions of licensing agreements to direct customers' use of the PBX software: one from 1990 to 2003; another from 2003 to 2007; and a third starting in 2007. (Avaya Br. [1132] at 17-23; Defs.' Br. [1101] at 5-16)

Licensing agreements used from 1990 to 2003 granted the purchaser "a personal, non-transferable and non-exclusive right to use, in object code form, all software and related documentation furnished under this agreement." (E.g., P-01499) The agreement obligated the customer to "use [its] best efforts to ensure that [] employees and users of all software licensed under this Agreement comply with these terms and conditions." (Id.) This grant, contained in a section titled "SOFTWARE LICENSE," made no mention of restricted software, and did not address ODMCs or maintenance software at all. In 1996, while

still using the same version of the licensing agreement, Avaya added the following clause, sanctioning the use of third-party maintenance providers: "The decision to acquire hardware, software (in any form), supplies or services from parties other than Lucent ("Third Party Products") is yours even if Lucent helps you identify, evaluate or select them." (E.g., P-00581-1)[24]

Licensing agreements regularly used by Avaya between 2003 and 2007 again contained a broad right to use the PBX's software,[25] and featured a new clause that again permitted use by third-party users: "Customer will make the Software available only to employees, contractors, or consultants with a need to know, who are obligated to comply with all license restrictions contained in the Agreement."[26] (P-0177, § 6.2.3)

---

[24] In 1999, Avaya added the following clause: "You will not enable or attempt to permit any third party to enable software features or capacity (e.g. additional storage hours, ports, or mailboxes) which Avaya licenses as separate products without Avaya's prior written consent." (P-00291) This addition does not preclude a third party from providing maintenance because, as detailed during the Court's construction of the Avaya One contract, (Section III.B., infra), MSPs, the software function Defendants at times enabled to access ODMCs, are not "features or capacit[ies]" and are clearly incongruous to storage hours, ports (the avenue by which a telephone connects to the PBX), and voice mailboxes.

[25] "Subject to Customer's payment of all applicable fees and compliance with the terms of this Section, and any other license terms and restrictions in the applicable Attachment, Avaya grants Customer a non-sublicensable, non-exclusive, non-transferable license to use Software and Documentation provided under the Agreement for Customer's internal business purposes at the indicated capacity levels and locations in the United States." (P-0177, § 6.1.1)

[26] Avaya's explicit allowance of use by "contractors, or consultants" is consistent with the prevailing construction of licensing agreements that allow third-party use for the licensee's benefit. See Estate of Hevia v.

In 2007, Avaya began using a new version of the licensing agreement that obligated the purchaser to refrain from using a third-party maintenance provider: the customer agreed to "not [] allow any service provider or other third party with the exception of Avaya's authorized channel resellers and their designated employees . . . to use or execute any software commands that cause the software to perform functions that facilitate the maintenance repair of any Product."  (D-05584 at AVT00395873)  A PBX purchaser may very well breach this contract if it agrees to it and then hires Defendants to provide maintenance.  However, Avaya did not introduce any evidence indicating that TLI/C's customers signed such a licensing agreement, and consequently this iteration of the agreement cannot be used to prove that TLI/C's customers were prohibited from granting TLI/C access to the ODMCs on their PBXs.[27]

---

Portrio Corp., 602 F.3d 34, 45-46 (1st Cir. 2010) ("When [] there is no indication that a license-granting copyright owner has restricted the licensee's ability to use third parties in implementing the license, the license is generally construed to allow such delegation."); Automation by Design, Inc. v. Raybestos Products Co., 463 F.3d 749, 758 (7th Cir. 2006) (granting summary judgment in favor of defendant on copyright infringement claim because defendant's hiring of third-party to build equipment pursuant to licensed designs did not constitute impermissible transfer); Nimmer and Dodd, Modern Licensing Law 6:19 (2013) ("[T]he rule in patent licenses is that, absent express contrary agreement, a license to use technology encompasses an 'implied license' to have the technology used by a third party on the licensee's behalf.  A similar rule is appropriate in copyright licensing.").

[27] During oral argument on Defendants' Rule 50 motions, Defendants' counsel stated that eight out of Defendants' 470 customers purchased their PBXs in 2007 or after.  (Tr. 6662)  However, no evidence was introduced into the record that this is in fact the case, nor was any evidence introduced as to what these eight customers signed.  Furthermore, the Court notes that the

In addition to the licensing agreements, Avaya introduced two contract supplements the company allegedly issued to purchasers beginning in 1996: the Service Offerings and Support Plan ("SOSP"), which was issued between 1996 and 2003, and the Service Agreement Supplement ("SAS"), issued in 2003 and thereafter. (Tr. 4340, 4361-62) The supplements, which are specifically referenced by the agreements but not signed by the parties, state [28]:

> The following changes to the DEFINITY System proprietary software cannot be made without such authorization:
>
> - Accessing Avaya DEFINITY logins (INIT, INADS, and Craft). These logins are reserved exclusively for access by Avaya personnel;
> - Making changes to the permissions of logins intended for exclusive use by Avaya (INIT, INADS and Craft);
> - Establishing Maintenance Software Permissions (MPSs) [sic] for customer-level logins, without executing an Avaya software permissions addendum[.]

(P-00296 at 5-6)

The Court holds that Avaya failed to prove that the SOSP and SAS prohibited TLI/C's customers from granting TLI/C access to the ODMCs on their PBXs.

First, there is no direct evidence that any of TLI/C's customers in fact received either of the supplements. Although Avaya introduced the purchase agreements of TLI/C's customers

---

contract came into existence well after Avaya initiated the instant suit in June of 2006. (Dkt. No. 1)

[28] The two supplements contain nearly identical language in this regard. (<u>Compare</u> P-00296 at TLI00112188-89 <u>with</u> P-00278 at MMH0000063)

SmartShop (P-01485) and HealthSouth (P-01765), wherein the SOSP is specifically identified in the agreement's integration clause (id. § 22.E), Avaya did not introduce the supplements the customers allegedly received.

Second, although Avaya introduced evidence that it was the company's practice to have the Account Contract Manager include the SOSP or SAS with the contract paperwork, (Tr. 4344), Avaya did not introduce any evidence demonstrating that Defendants' customers in fact received such supplements.

Third, Avaya failed to introduce any evidence indicating that it was the BPs' practice to include the supplements in contracts for sale, and Avaya did not indicate from whom TLI/C's customers purchased their PBXs.

Lastly, the supplements themselves do not clearly prohibit the purchaser from using ODMCs. Rather, the supplements introduce the concept of "establishing" MSPs; do not reference nor prohibit use of the DADMIN login; and are devoid of prohibitions on using ODMCs. (P-00296 at 5-6)

Even if one were to assume that the supplements prohibited using ODMCs, and the supplements were provided to TLI/C's customers, and TLI/C's customers consented to the obligations contained therein, Avaya has provided no evidence from which the jury could determine how many customers were so obligated, and

how many of those customers received maintenance from TLI/C that violated their contractual obligations.[29]

Accordingly, the Court holds that Avaya failed to prove that the licensing agreements prohibited either TLI/C's customers from accessing ODMCs or TLI/C's access, and, therefore, the licensing agreements cannot be used to prove TLI/C's conduct was unlawful.

**B.**

TLI/C moves to dismiss Avaya' eighth cause of action, breach of contract.  (Defs.' Mot. [1100] at 2)  Avaya alleges that TLI breached both the 1998 Dealer agreement with Lucent and the 2003 Avaya One contract.[30]  To succeed on its claim, Avaya must prove: (1) the existence of a contract; (2) adequate performance of the contract by Avaya; (3) a breach of the

---

[29] Avaya presented its case in terms of TLI/C's general practices for providing maintenance, (e.g., Tr. 2761-2935), and did not introduce evidence of the specific means of access utilized for each customer.  Consequently, even if the Court held that the licensing agreements obligated certain customers to refrain from receiving maintenance from TLI/C in a certain way, such as enabling MSPs, the jury would have no ability to determine if such obligations were violated.  TLI/C could have accessed that customer's ODMCs through the DADMIN login, which is not prohibited by the licensing agreements' supplements.

[30] Avaya also claims that Team breached the 2003 Avaya One agreement it entered into July 24, 2003.  (Joint Final Pre-Trial Order at 9; D-01163)  However, because Avaya's claim as to this contract is dismissed for the same reasons its claim against TLI is dismissed, the Court addresses in detail only Avaya's claim as it pertains to TLI's Avaya One contract.  The Court notes that the Team Avaya One contract was canceled September 24, 2003, with its termination effective November 24, 2003.  (D-04646; Tr. 1926)

contract by defendants; and (4) damages.[31] <u>United Resource Recovery Corp. v. Ramko Venture Mgmt.</u>, 584 F.Supp.2d 645, 652 (S.D.N.Y. 2008); <u>Universal Enterprise Group, L.P. v. Duncan Petroleum Corp.</u>, 2013 WL 3353743 (Del. Ch. July 1, 2003). Because Avaya has failed to introduce evidence from which a reasonable jury could find that TLI breached either of the contracts, TLI/C's motion is granted.[32]

### 1. 1998 Agreement

The parties chose Delaware to govern the "construction, interpretation and performance" of the 1998 contract, (P-01959 ¶ 22.0), and "New Jersey gives effect to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy." <u>General Motors Corp. v. New A.C. Chevrolet, Inc.</u>, 263 F.3d 296, 331 n.21 (3d Cir. 2001); <u>North Bergen Rex. Transp. v. Trailer Leasing Co.</u>, 158 N.J. 561, 568 (1999) (same).  Under Delaware law, "when the contract is clear

---

[31] In a diversity action, which describes Avaya's affirmative claims, federal courts determine the substantive law to be applied by looking to the choice of law rules of the forum state, here New Jersey. <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 645-46 (1964).  As indicated <u>infra</u>, each contract has a choice of law provision that New Jersey effectuates.

[32] During oral argument, Avaya stated that Defendants breached three contractual provisions, § 2.8 of the 1998 agreement and §§ 4.1 and 7.3 of the 2003 contracts.  (Tr. 6633, 6636-37)  Avaya then added that "evidence may arise throughout the course of this trial that implicates other provisions." (Tr. 6637)  Avaya's attempt to leave open the contours of its claim, however, is in vain.  Not only has Avaya rested, thereby foreclosing the opportunity for further "evidence" to "arise," but the cited provisions are the very ones, and only ones, outlined in Avaya's trial brief, (Dkt. No. 1001), and proposed jury instructions, (Dkt. No. 1000).  The time for amending claims has passed.

and unambiguous, [courts] give effect to the plain-meaning of the contract's terms and provisions." <u>Osborn ex rel. Osborn v. Kemp</u>, 991 A.2d 1153, 1159-60 (Del. 2010).  The Court finds that the 1998 contract is clear and unambiguous, and accordingly gives effect to its plain meaning.

Avaya claims that TLI violated § 2.8, (Tr. 6633), which states:

> Dealer may not market or sell Lucent Products to any Lucent BCS Global Account, or . . . the United States Government, and will use its best efforts to ensure that Dealer does not market to present direct customers of Lucent who are under warranty or with existing maintenance contracts for Lucent products or to any entity that is considering a proposal from Lucent for products or maintenance services, except that Dealer may respond to a request for competitive bids, proposals, or quotations even if Lucent is also responding.

(P-01959)

"Lucent Products" is a defined term that "means a Lucent equipment model identified" in the "Product Appendix" to the agreement.[33]  And attached to the parties' agreement is a "Product Appendix" that lists those Avaya products TLI is

---

[33] Section 1.4 defines "Lucent Products" and states in its entirety:
> "Lucent Product" means a Lucent equipment model identified in a Product Appendix to this Agreement that Dealer has purchased from Distributor and that Distributor has purchased directly from Lucent through its BCS Distribution Development and Management group or an order source within Lucent designated by the BCS Distribution Development and Management group (collectively, "DDM") and that carries the standard Lucent warranty when resold to an End User. Lucent Products may be new or Classic.  A Classic Lucent Product has been remanufactured only by or for Lucent.  Each Lucent Product consists of one or more Product Components.  The set of Product Components that may be used to equip a Lucent Product is determined solely by Lucent.

(P-01959)

authorized to sell.  (See, e.g., "Product Appendix: Key Systems" at 22 (listing "Merlin Legend Communications System," "Partner® Communications Systems," and many more telecommunications systems))  Accordingly, the obligations of § 2.8 are twofold: (i) TLI must refrain from marketing or selling specified Lucent equipment to Lucent BCS Global Accounts or the United States government; and (ii) TLI must use its best efforts to ensure it does not market that same Lucent equipment to customers who are either transacting with Lucent directly or considering transacting with Lucent directly.

Avaya alleges that TLI breached this provision by marketing and selling maintenance to customers to whom it was unauthorized to make such offers.  (Tr. 6634-35; see also Tr. 4701 (reading § 2.8 into the record and asking D. Graham when "TLI started selling its own maintenance"))  Such conduct, however, does not constitute a breach: the provision only prohibits the marketing and selling of "Lucent Products," and TLI-provided maintenance is not a "Lucent Product." [34]  Section 2.8 only forbids the sale of "Lucent Products" to customers with "existing maintenance contracts" or who are considering entering such maintenance contracts.

---

[34] TLI appears to believe that the inclusion of the phrase "existing maintenance contracts" prohibits TLI from offering TLI-provided maintenance. But the phrase only helps describe those to whom TLI cannot offer "Lucent Products"—it does not alter the definition of "Lucent Products."

Consequently, no reasonable jury could find that TLI breached § 2.8 of the 1998 agreement by offering TLI-provided maintenance.[35]

## 2. 2003 Agreement

Avaya alleges TLI breached two sections of the parties' 2003 agreement, §§ 4.1 and 7.3.  Pursuant to § 18.1, Avaya's claim is governed by New York law.  (D-01223, § 18.1; D-01163, § 18.1)  Like Delaware, New York states that "[t]he construction of contracts requires that the court give the language and terms their plain and ordinary meaning."  White v. Continental Cas. Co., 9 N.Y.3d 264, 267 (2007).

### a. Section 4.1

---

[35] Although not briefed by the parties, the 1998 contract does not manifest an agreement by the parties concerning TLI-provided maintenance.

Section 1.2 defines Dealer Service as "one or more of those services Dealer may choose to perform itself for Lucent Products in the Area.  Dealer Services include system configuration to the End User, installation, warranty, and provision of post-warranty on-site maintenance."  (§ 1.2)  "Lucent Service," on the other hand, "means one or more of those services provided by Lucent that Dealer may choose to resell as a Lucent Service Sales Agent."  (§ 1.5)  Importantly, the contract states that "Lucent Service also includes post-warranty remote maintenance service separate from post-warranty on-site maintenance service, which Dealer may offer in conjunction with Dealer service. . . [T]he price at which Lucent will provide remote maintenance service as a subcontractor for Dealer Services are described and identified in an Appendix."  (Id.)

The contract's explicit inclusion of "remote maintenance" as a "Lucent Service" but not a "Dealer Service" indicates that the term "Dealer Service" does not encompass remote maintenance.  Furthermore, because Dealer-provided remote maintenance is not addressed in the contract, and the contract contains a strongly worded integration clause limiting the agreement to the contract itself, (§ 24.0), the 1998 contract does not create legal obligations for TLI regarding the provision of post-warranty remote maintenance.  This recognition is an additional reason why Avaya's claim that TLI's provision of maintenance violated the 1998 agreement must fail.

Because the Court finds that no breach occurred, it does not rule on whether the limitations provision of the agreement precludes Avaya's claim. (§ 12.0; see Defs.' Br. [976] at 10)

The obligations of § 4.1, which do not survive the termination of the contract, (see § 17.6), require TLI to "avoid deception, misleading or unethical practices[,] and use best efforts to promote, market, and further the interest of Avaya, its name and Products." [36]  (D-01223)  Avaya alleges TLI breached the provision by (i) attempting to enlist Creswick and compliant BPs to obtain access to their customers' ODMCs; and (ii) soliciting maintenance customers of Avaya.  (Avaya Br. [1111] at 13-15)  The Court finds neither pattern of conduct violative of the provision.

With regards to Defendants' efforts to obtain access to their customers' ODMCs, Avaya points to emails and testimony indicating that Defendants began looking for ways to ensure access to the ODMCs prior to the expiration of the Avaya One agreement.  (Tr. 2893-94; 2976; P-00759)  Importantly, however, Avaya admits that TLI only "found a way to improperly obtain [] access" to ODMCs "[a]fter [it] was terminated" as a BP and the

---

[36] The section, in its entirety, states:
   Reseller shall: (a) conduct its business in a manner that reflects favorably on the Products and on the good name, goodwill and reputation of Avaya; (b) avoid deception, misleading or unethical practices; and (c) use best efforts to promote, market, and further the interest of Avaya, its name and Products.  Reseller represents and warrants to Avaya that at no time will Reseller substitute competitive products where Avaya is specified by an End-User.
(D-01223)  There is no evidence that during the life of the Avaya One agreement TLI conducted its business in such a way that reflected poorly on Avaya or its products, or that TLI substituted its competitive products for those of Avaya when Avaya was requested.

obligations of § 4.1 ceased to apply.  (Avaya Br. [1121] at 25;
see also Tr. 2765 (TLI, following the cancellation of the Avaya
One agreement and the withdrawal of its lawsuit, "then made a
choice to do whatever it took, pay whomever it had to pay, to
get the logins and passwords" it wanted.))  This admission is
fatal to Avaya's claim, for a mere attempt to engage in conduct
that, if successful, would allegedly breach the agreement, does
not itself constitute an actionable breach.

Furthermore, even if Defendants had succeeded in accessing
the ODMCs prior to the provision's expiration, such conduct
would not have breached the agreement because the agreement
specifically granted TLI the right to access ODMCs.  Section 7.2
grants TLI a "personal, non-exclusive and non-transferable
license to use the Licensed Materials only in connection with
Products [] furnished to End-Users" and "only on the hardware on
which it has been loaded by Avaya[.]"[37]  (D-01223)  "'Licensed
Materials' means the object code computer programs furnished
[by] Avaya and intended for use in or provided for use with"
those Avaya products TLI is authorized to sell.  (Id., § 1.7)

---

[37] Section 7.2 states in full:
    Avaya grants Reseller a personal, non-exclusive and non-
    transferable license to use the Licensed Materials only in
    connection with Products demonstrated or furnished to End-Users.
    Reseller is authorized to use the software only on the hardware on
    which it has been loaded b Avaya or on which Avaya has authorized
    it to be loaded.  No title or other ownership rights in intellectual
    property or otherwise in the Licensed Materials shall pass to
    Reseller or any sub licensee under the Agreement.  Reseller agree
    not to export the Licensed Materials out of the Territory.

Accordingly, § 7.2 grants TLI the right to use all PBX software loaded by Avaya onto hardware furnished to end users—a grant that encompasses ODMCs.

Moreover, as discussed _supra_, (_see_ Section III.A.), Avaya granted TLI's customers, through the licensing agreements they signed upon purchasing their PBXs, the right to allow third-party maintenance providers access to the maintenance software on their PBXs.  Consequently, TLI's effectuating of these rights while an authorized BP would not have breached § 4.1.

With regards to TLI/C's solicitation of Avaya's maintenance customers,[38] the Court holds that such conduct could not constitute a breach of the contract's "best efforts" provision.[39] It is black letter law that "if there [i]s an inconsistency between a specific provision and a general provision of a contract[], the specific provision controls." _Muzak Corp. v. Hotel Taft Corp._, 1 N.Y. 42, 46 (1956); _Sumitomo Bank of New_

---

[38] At some point after 2003, Defendants assigned their PBX maintenance contracts to Continuant.  Continuant subsequently focused on soliciting maintenance customers and providing maintenance, while TLI focused on selling PBX systems.

[39] As evidence of breaching conduct, Defendants proffer an email Bruce Shelby wrote in August 15, 2003 that states:
> I want to have all the maintenance, service, AMC and upgrade business.  I just don't want to have expensive salespeople and technicians focused on low-profit/no-profit new system business. . . I can't think of a reason to spend time, energy and money going after low (no?) margin new phone system business.  It's complicated, competitive, requires expensive sales and technical staff, et cetera.  And there's no money in it.

(Avaya Br. [1111] at 13-14 (quoting P-00793); _see also_ Tr. 4721 (reading into evidence P-01622))

<u>York Trust Co. v. Town of North Hempstead</u>, 278 A.D.2d 402, 404
(N.Y.App.Div. 2000). Defendants' contractual obligations as to
soliciting maintenance customers is set forth in § 3.2 of the
Reseller Product Group Attachment, wherein TLI agrees to refrain
from "replacing, interfering with or substituting any . . .
customers listed on Avaya's VCP named account." (D-01223,
Reseller Product Group Attachment §3.2) Avaya has not alleged
that TLI breached this provision, despite the fact the provision
specifically controls the legality of the conduct Avaya now
complains of. Furthermore, there is no evidence in the record
that such a breach occurred. Consequently, even if the Court
held that Avaya's solicitation ran afoul of the more general
"best efforts" clause of § 4.1, Avaya must prove that TLI's
solicitation violated § 3.2 of the Reseller Product Group
Attachment—an allegation Avaya does not even make.

Accordingly, because the conduct Avaya's evidence proves
does not, as a matter of law, constitute a breach of the
agreement, Avaya's claim as to § 4.1 must be dismissed.

### b. Section 7.3

Avaya alleges that TLI breached § 7.3 by enabling MSPs and
DADMIN logins. (Avaya Br. [1111] at 11) Section 7.3 states:

> Reseller agrees not to reverse engineer, decompile or
> disassemble software furnished to it in object code form
> or permit any third party to do so. For any software
> included as part of the Licensed Materials which
> inherently includes the capability of being remotely

> enabled, Reseller expressly agrees that it shall not
> enable, or permit or assist any third party to enable,
> such features or capabilities without Avaya's express
> written permission.

(D-01223, § 7.3)  Under New York law, "[w]hether a contract is

ambiguous is a question of law and extrinsic evidence may not be

considered unless the document itself is ambiguous."  South Road

Associates, LLC v. Intern. Business Machines Corp., 4 N.Y.3d

272, 278 (2005); see also W.W.W. Assoc. v. Giancontieri, 77

N.Y.2d 157, 162 (1990) ("Evidence outside the four corners of

the document as to what was really intended but unstated or

misstated is generally inadmissible to add to or vary the

writing.")  Although less than perfectly clear, § 7.3

unambiguously states that TLI cannot "remotely enable[]"

"features or capabilities" on a customer's PBX "without Avaya's

express written permission."  Consequently, the question

dispositive of Avaya's claim is whether MSPs and DADMIN logins

are "features or capabilities" of the customer's PBX.  The Court

holds that they are not.

A feature is defined as "something that is especially

prominent . . . something offered to the public or to a

clientele that is exhibited or advertised as particularly

attractive."  Webster's Third New International Dictionary

Unabridged 832 (1986).  A capability is "a feature or faculty

capable of development or likely to improve."  Id. at 330.

32

Two additional sections of the Avaya One agreement use the words "features" and "capabilities" and reinforce their plain meanings.  Section 4.2 requires TLI's employees "engaged in marketing [Avaya] Products" to be "knowledgeable of the specifications, features and advantages of the Products" and be "capable of demonstrating the use and capabilities of the Products and their application to End-Users[.]"  Section 7.9 states that Avaya "may, at its discretion," audit every system TLI sells "including (among other things) the terms of the software license as it relates to the enablement of any separately licensed features or incremental units of capacity."

The plain and ordinary meanings of these words, see White, 9 N.Y.3d at 267, allow for only one interpretation: neither MSPs, the vehicle by which Avaya blocks access to ODMCs, nor DADMIN logins, the technological means by which BPs provide technical support to their customers, are features or capabilities of the customer's PBX.  Consequently, their enablement by TLI did not breach the 2003 agreement.

In opposition, Avaya argues that its "maintenance commands are part of the 'object code computer programs' that are 'furnished by Avaya' for 'use' with its PBXs, and the logins and MSPs used to access these commands 'inherently include[] the

33

capability of being remotely enabled."[40]  (Avaya Br. [1111] at

12)  But Avaya's assertion does not support the conclusion that

logins and MSPs are themselves "features or capabilities"; and

it is only "features or capabilities" that Defendants are

prohibited from enabling.

Avaya's proposed construction is also belied by the

evidence, which indicates that MSPs, and the subscription

service through which ODMCs were made available, Maintenance

Assist, were not featured parts of a PBX's functionality.  Ms.

Schumacher testified that Avaya's "sales positioning strategy

and tactics were always to sell a full-service maintenance

agreement," and that the company would only inform the

prospective customer of Maintenance Assist after Avaya "tried to

sell the full-service maintenance" package.  (Tr. 1972)

An Avaya corporate memorandum distributed to BPs further

emphasized the discreet nature in which MSPs were to be handled.

The memorandum cautioned that "it is critical to understand that

indiscriminate selling/activation of MSPs has the potential of

allowing 3rd party service providers access to a level of

service that would closely parallel the capabilities of our on-

---

[40] In making the instant argument, Avaya implicitly concedes that ODMCs are
part of the Licensed Materials to which Avaya grants TLI access under § 7.2.
And because the parties' obligations under § 7 "continue beyond termination"
and "survive such termination," (§ 17.6), the concession appears to preclude
any argument that TLI lacked the ability to access ODMCs after September 30,
2013.

site technician." (P-02194 at 5)  The number of subscribers to Maintenance Assist reflected the company's limited offering.  As of 2005, just over one percent of Avaya maintenance customers were subscribers.  (Tr. 1796)

The correctness of holding that MSPs and DADMIN logins are not features or capabilities of the PBX is further supported by the long-standing rule of construction that "any ambiguity in contract language must be construed against the party that drafted the contract."  <u>Matter of Cowen & Co. v. Anderson</u>, 76, N.Y.2d 318, 323 (1990).  The 2003 agreement was drafted by Avaya.  Had Avaya wanted to add MSPs or DADMIN logins to the universe of features TLI was forbidden from turning on, it could have easily done so; instead, it chose not to, and now seeks a tortured interpretation of the contract to preclude conduct allowed under its clear terms.  This it cannot do.

Accordingly, because Avaya has not introduced evidence which sets forth a legally cognizable breach of either contract, no reasonable jury could find that a breach occurred, and Defendants' motion against Avaya's breach of contract claim will be granted.

## c.

Defendants move for judgment as a matter of law dismissing Avaya's common law fraud claim.[41]  (Defs.' Mot. [1105])  New Jersey requires a claimant alleging fraud to prove five elements: (i) a material misrepresentation by the defendant of a presently existing fact or past fact; (ii) knowledge or belief by the defendant of its falsity; (iii) an intent that the plaintiff rely on the statement; (iv) reasonable reliance by the plaintiff; and (v) resulting damages to the plaintiff.  <u>Liberty Mut. Ins. Co. v. Land</u>, 186 N.J. 163, 174 (2006); <u>see also</u> NJ Model Civil Jury Charge 3.30E.  The existence of damages depends on whether the plaintiff detrimentally relied on the misrepresentation.  <u>McClellan v. Feit</u>, 376 N.J.Super. 305, 318 (App.Div. 2005); <u>Jewish Ctr. of Sussex County v. Whale</u>, 86 N.J. 619, 624 (1981).  A claimant must prove these elements by clear and convincing evidence, a standard that "produces" in the trier-of-fact's mind "a firm belief or conviction that the allegations sought to be proved by the evidence" is in fact true.  NJ Model Civil Jury Charge 1.19.  It is evidence "so clear, direct, weighty in terms of quality, and convincing" as

---

[41] Sitting in diversity, the Court must apply New Jersey's choice of law, which dictates that the law of the state with the greatest interest in the dispute applies.  <u>Maniscalco v. Borther Int'l (USA) Corp.</u>, 706 F.3d 202, 206 (3d Cir. 2013).  Here, Defendants are spread out throughout Washington and Oregon and their allegedly tortious conduct occurred throughout the United States; Avaya, on the other hand, was injured, if at all, in New Jersey.  Consequently, New Jersey has the greatest interest in the dispute and its substantive law applies to all of Avaya's tort claims.

to lead one "to a clear conviction of the truth of the precise facts in issue." Id.; see also Land, 186 N.J. at 169 ("[C]lear and convincing evidence is a higher standard of proof than proof by a preponderance of the evidence but a lower standard than proof beyond a reasonable doubt.").

Avaya claims TLI/C's submission of misleading DADMIN Request Forms constitutes actionable fraud. The Court holds that Avaya's claim fails for two interrelated reasons.

First, there is simply no harm underlying Avaya's claim. By providing the DADMIN logins, Avaya allowed TLI/C to actualize a right Avaya granted its customers in their licensing agreements: to enlist the help of a third party to use their PBXs' software for their own, personal benefit. TLI/C did nothing more than that which Avaya allowed. Such conduct does not constitute fraud, and consequently, Avaya's claim must be dismissed.

Stated in slightly more technical terms, Avaya did not rely on TLI/C's misrepresentation to its own economic detriment. Avaya asserts that TLI/C injured Avaya by "diverting maintenance revenue from Avaya." (Dkt. No. 1118 at 21-22) Yet Avaya failed to introduce sufficient evidence whereby a reasonable jury could conclude, with the certainty required, that but for its enabling of the ill-gotten DADMIN logins, it would have received any of

the revenue Defendants allegedly diverted.[42]  Because, as Avaya

itself argues, Defendants "did whatever it took" to gain access

to their customers' ODMCs, (Avaya Br. [1106] at 25), it is

probable that without the DADMIN logins Defendants would have

found other ways to provide maintenance, and thereby retain the

disputed revenue.[43]

Although a jury needs only a "reasonable degree of

certainty" to determine the amount of damages, <u>Tessmar v.</u>

<u>Grosner</u>, 23 N.J. 193, 203 (1957), it must be certain that the

claimant was in fact damaged.  <u>Id.</u>  ("The rule relating to the

uncertainty of damages applies to the uncertainty as to the fact

of damage and not as to its amount, and where it is certain that

damage has resulted, mere uncertainty as to the amount will not

preclude the right of recovery."); <u>Sunkavally v. Kommineni</u>, 2013

---

[42] Avaya is correct that it "is not required to prove that each of the 70 customers for which Defendants obtained a DADMIN login by fraud would have otherwise retained Avaya to provide maintenance using ODMCs." (Avaya Br. [1118] at 20)  However, Avaya must prove by clear and convincing evidence that it was in fact injured. <u>Land</u>, 186 N.J. at 169.  Because Avaya alleges that it was injured by Defendants' diversion of revenue, it must prove that it would have received some portion of this revenue but for the misrepresentations.  Only after such a finding would "Avaya [be] permitted to recover damages measured by the amount of Defendants' profits." (Avaya Br. [1118] at 20-21)

[43] Even if Avaya could prove that without the allegedly ill-gotten DADMIN logins TLI/C would have been unable to provide maintenance, it would then have to prove with near certainty that some of TLI/C's customers would have chosen Avaya for maintenance or subscribed to Maintenance Assist.  The fact that the customers, all of whom had previously decided they did not want Avaya maintenance, could have chosen to contract with a Business Partner or independent service provider, or purchase a new, non-Avaya PBX.  Such possibilities, in light of the customers' decision not to transact with Avaya for maintenance, simply casts too much doubt for the jury to conclude with the level of certainty required that Avaya was in fact injured.

WL 3448283 (N.J.Super.App.Div. July 10, 2013) (same).  Avaya has
failed to introduce evidence allowing a reasonable jury to reach
such a conclusion.  Consequently, TLI/C's motion in regards to
Avaya's fraud claim will be granted.

### D.

TLI/C moves for judgment as a matter of law on Avaya's
third count, tortious interference with prospective economic
advantage.  Under New Jersey law, the five elements of the claim
are: (1) a plaintiff's reasonable expectation of economic
benefit or advantage; (2) the defendant's knowledge of that
expectancy; (3) the defendant's wrongful, intentional
interference with that expectancy; (4) the reasonable
probability that the plaintiff would have received the
anticipated economic benefit in the absence of interference; and
(5) damages resulting from the defendant's interference.
Fineman v. Armstrong World Indust., 980 F.2d 171, 186 (3d Cir.
1992) (citing Printing Mart-Morristown v. Sharp Electronics
Corp., 116 N.J. 739, 751-52 (1989)).  When determining whether a
defendant's interference was sufficiently wrongful, New Jersey
courts look to both the subjective intent of the alleged
tortfeasor and the means utilized.  Lamorte Burns & Co., Inc. v.
Walters, 167 N.J. 285, 306-07 (2001).  The conduct, taken as a
whole, must be both "injurious and transgressive of generally

accepted standards of common morality or of law." Harper-Lawrence Inc., v. United Merchants and Mfrs., Inc., 261 N.J.Super. 554, 568 (App. Div. 1993).

The Court holds that Avaya has failed to introduce evidence whereby a reasonable jury could conclude that Defendants have so wrongfully transgressed. See McLaughlin v. Weichert Co. Realtors, 218 N.J.Super. 63, 67 (App.Div. 1987) (reversing jury award on plaintiff's tortious interference claim because uncontested facts did not constitute unlawful conduct).

Avaya first argued that "accessing the on demand maintenance commands was itself wrongful," (Tr. 6602); however, Avaya has failed to prove that this is so. Avaya allows Defendants to provide maintenance, (Tr. 2125); the Avaya One agreement allows Defendants to use all computer programs installed on the customers' PBXs, (D-01223, §§ 1.7, 7.2; Section III.B., supra); the customers' licensing agreements specifically allow for third-party service providers, (Section III.A., supra); and the licensing agreements introduced by Avaya do not prohibit access to the ODMCs, (id.). Consequently, Defendants' mere use of ODMCs cannot constitute sufficiently wrongful conduct that can underlie a tortious interference claim.

In the alternative, Avaya argues that the licensing agreements entered into prove that Avaya reasonably expected to benefit from customers' use of ODMCs, and Defendants' means of

access, if not the use itself, constitutes improper interference

with that expectation.  (Tr. 6667)

     But Avaya's showing in this regard fails as well.  The New

Jersey Supreme Court adopted, with slight alteration, the

Restatement (Second) of Torts' analysis of tortious

interference.[44]  <u>Printing Mart-Morristown</u>, 116 N.J. at 755;

<u>Nostrame</u>, 213 N.J. at 122.  Therein, § 767 lists seven factors a

court should consider "[i]n determining whether an actor's

conduct in intentionally interfering with a . . . prospective

contractual relation of another is improper or not":

        (a)  The nature of the actor's conduct;
        (b)  The actor's motive;
        (c)  The interests of the other with which the actor's
             conduct interferes;
        (d)  The interests sought to be advanced by the actor;
        (e)  The social interests in protecting the freedom of
             action of the actor and the contractual interests of
             the other;
        (f)  The proximity or remoteness of the actor's conduct to
             the interference, and
        (g)  The relations between the parties.

Restatement (Second) Torts § 767.  Every single factor strongly

indicates that TLI/C's conduct does not rise to the level of

competition the law proscribes.

     First, Defendants acted with an accepted motive and

protected interests: to compete with Avaya and protect their

_____

[44] The court's only alteration was replacing the Restatement's use of
"improper" with "malice."  <u>Printing Mart-Morristown</u>, 116 N.J. at 752.  The
the court noted that "the Restatement test is substantially similar to the
'malice' standard currently applied by New Jersey courts."  <u>Id.</u>

maintenance business—a business Avaya itself initially
encouraged developing.  Ideal Dairy Farms, Inc. v. Farmland
Dairy Farms, Inc., 282 N.J.Super. 140, 199 (App.Div. 1995)
(reversing entry of judgment for plaintiff on tortious
interference claim because defendants' conduct, although
"demonstrating fierce rivalry and rank animosity," was borne out
of a decline in sales and desire to compete).

Second, the law does not protect as forcefully a firm's
economic interest in possible, future customers as it does
interests in contracting parties.  See, e.g., Friedman v.
Wahrsager, 848 F. Supp. 2d 278, 299 (E.D.N.Y. 2012)
("[A]llegations of more culpable conduct on the part of the
defendant is required for the tort of interference with business
relations than for the tort of interference with contract.")

Third, society's interests are furthered by protecting the
conduct of Defendants, which brought greater competition to the
market and challenged widespread and vexatious threats of
litigation.[45]  C.R. Bard, Inc. v. Wordtronics Corp., 235

---

[45] Avaya often sent customers who were cancelling their Avaya maintenance
subscriptions a letter seeking to elicit fear, uncertainty and doubt about
the legality of alternative maintenance options.  (Tr. 1967)  One such letter
stated:
> Any unauthorized use of, or access to MSPs or any Avaya Login
> including DADMIN, CRAFT or INIT is a violation of federal and state
> laws and could result in civil and criminal liability and penalties.
> Avaya will take all necessary legal action against violators in
> order to protect Avaya proprietary intellectual property.
(D-05740)  Avaya, however, has never sued any customer for violating the
licensing agreements, and, in the instant suit, voluntarily dismissed all

N.J.Super. 168, 173 (Law.Div. 1989) ("Everyone has a right to enjoy the fruits and advantages of his own enterprise, industry, skill and credit.  He has no right to be protected against competition.")

Fourth, Defendants' interference was far removed from their allegedly improper conduct, as it was not until after the customer left Avaya and hired Defendants that Defendants took steps to access the ODMCs.  See McLaughlin, 218 N.J.Super. at 67-68 ("Thus while the record justifies the conclusion that [defendant's] purpose was to advance its own interest and to earn the commission itself, it does not show that [defendant] used any subterfuge or other improper means" in transacting with the client.); Cf. Zippertubing Co. v. Telflex Inc., 757 F.2d 1401 (3d Cir. 1985) (finding tortious interference where defendants misappropriated information of a nearly completed transaction for their own benefit and to the exclusion of plaintiffs).

Lastly, the relations of the parties further counsels for a finding of lawful conduct, as a mere four months after it signed the modified Avaya One agreement, and not long after originally encouraging TLI to invest in its maintenance business, Avaya

---

claims under federal law and several important substantive claims under state law.

cancelled the contract, thereby jeopardizing Defendants'
monetary investment and business model.[46]

Because every criterion on which New Jersey relies
indicates Defendants' conduct was not tortious, Avaya's claim
must fail.  Consequently, Defendants' motion for a judgment as a
matter of law as to Avaya's tortious interference claim will be
granted.

### E.

Avaya's ninth count, unfair competition, also fails.  (4th
Am. Compl. ¶¶ 153-56)  Avaya posits that "[t]o succeed on its
unfair competition claim, Avaya must establish that (1)
Defendants' conduct violated generally accepted standards of
morality in the business world; and (2) Defendants' conduct was
the actual and proximate cause of Avaya's losses."  (Avaya Br.
[1110] at 12)  Avaya, however, cannot succeed on such a claim,
because, similar to the deficiency of its tortious interference
claim, it failed to prove Defendants violated any standards of
morality.

---

[46] The Court further notes the protection New Jersey affords firms with little
bargaining power, such as TLI, in the New Jersey Franchise Practices Act,
N.J.S.A. 56:10-1 to -15.  See also Instructional Systems, Inc. v. Computer
Curriculum Corp., 130 N.J. 324, 328 (1992).  Although the Act is not
applicable in the instant suit, it does evidence New Jersey's desire "to
prevent arbitrary or capricious actions by the franchisor who generally has
vastly greater economic power than the franchisee."  Id. at 340-41.

Avaya attempts to differentiate its unfair competition claim by focusing on the support Avaya provided Defendants in entering the post-warranty maintenance market, including Avaya's subsidizing of the salaries of laid-off Avaya engineers. (Avaya Br. [1110] at 14-15)  Avaya argues that in light of such support, and the fierce manner in which Defendants subsequently competed with Avaya, "[a] reasonable jury could conclude . . . that the only thing that TLI/C truly cared about was making money."  (Avaya Br. [1110] at 14)

Fatal to Avaya's claim, however, is that such prioritization is the norm.  Even Linda Schumacher, former Head of Global Sales Operations for Avaya, stated that Avaya's decision to rely more heavily on its Business Partners to provide maintenance, and consequently give that seemingly selfless support, was itself a "business decision" made in furtherance of Avaya's own bottom line.  (Tr. 2019)

Moreover, the New Jersey Superior Court, Law Division has specifically held such motivation within the bounds of lawful competition:

> We live, after all, in a society consumed by the desire to acquire wealth, enamored by entrepreneurship and enthralled by success.  Competition is always the premise, winning always the goal.  In such an environment, can one conclude that the means used by defendant in this case to compete with plaintiff were wrongful? I think not.

45

C.R. Bard, Inc. v. Wordtronics, Corp., 235 N.J.Super. 168, 175-
76 (Law.Div. 1989).

### F.

Avaya's claim for unjust enrichment must also be dismissed,
although for reasons not set forth by TLI/C.  Unjust enrichment,
a quasi-contract cause of action, cannot exist when there is an
enforceable agreement between parties.  Callano v. Oakwood Park
Homes Corp., 91 N.J.Super. 105, 108-10 (App.Div. 1965); Statler
v. Dell, Inc., 775 F.Supp.2d 474, 485 (E.D.N.Y. 2011) ("Where a
valid contract governs the subject matter in a lawsuit, a
plaintiff may not recover in quasi-contract, and it is
appropriate to dismiss a claim for unjust enrichment.").  The
parties agree that the Avaya One contract was enforceable at the
time it was entered into, and TLI/C does not challenge the
survival provision therein, § 17.6, that extends many of the
parties' contractual obligations to this day.

Furthermore, the subject matter of the alleged benefit
TLI/C received, "accessing and using Avaya's 'on demand
maintenance commands' ('ODMCs') without a license or other
permission to do so from Avaya," (Av. Br. [1120] at 4-5), is
covered by one of the sections of the contract that survives,
"Licensed materials."  Also, as discussed above in other parts
of this opinion, nothing done by TLI/C was, in fact, unjust.

Consequently, Avaya's claim for unjust enrichment will be dismissed.

### G.

Avaya argues that the evidence proves that Defendants aided and abetted Harold Hall to breach the duty of loyalty he owed Avaya, his former employer.  (Avaya Br. [1119] at 2) Specifically, Avaya argues that Hall, after working for Avaya for 32 years, took with him Avaya Software Guard software and used it while working with TLI/C to gain access to approximately 40-60 different PBX systems.  (Id. at 6)

In its moving brief, TLI/C argues that Avaya has failed to introduce evidence proving Hall engaged in wrongful conduct, thereby precluding liability.[47]  (Defs.' Br. [1103] at 6)  The Court agrees.  Hall's use of the ASG key allowed TLI/C to access software on its customers' PBXs that those customers had a right to access.  TLI/C's use of that software, for its customers' benefit, does not constitute wrongful conduct.

Furthermore, Hall's use of Avaya proprietary software, to overcome software blocks that lack any legal support in

---

[47] A party asserting a claim for aiding and abetting must prove (1) the existence of a wrong by another person; (2) knowledge of that wrong by the defendants; (3) substantial assistance or encouragement on the part of the defendant to the person to effectuate that wrong; and (4) harm resulting to a third person from the wrong.  Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 414, 415 n.3 (3d Cir. 2003).

copyright or licensing law, does not constitute a breach of the duty of loyalty.

Lastly, as discussed <u>supra</u>, (Section III.C.), Avaya has not submitted sufficient evidence to prove that it was injured by TLI/C's access to the ODMCs.  (Avaya Br. [1119] at 4) Consequently, Avaya's claim for aiding and abetting will be dismissed.

### H.

With no substantive cause of action remaining, the Court will dismiss Avaya's claim of civil conspiracy.  <u>Sandone v. Diana</u>, 2012 WL 5869580, *3 (N.J.Super.A.D. Nov. 21, 2012) (affirming the Law Division's dismissal of civil conspiracy because "there [wa]s no independent cause of action against" defendants).

### IV.

Although judgment as a matter of law should be granted "sparingly," <u>Pitts v. Delaware</u>, 646 F.3d 151, 155 (3d Cir. 2011), it is proper in the instant case.  First, the underlying facts are not in dispute, rendering the existence of liability not on a question of fact but rather legal merit.[48]

---

[48] The vast majority of Avaya's own case came from Defendants' admissions.  In fact, Defendants' admissions were the only evidence introduced cataloging the

48

Second, except as to Avaya's DMCA claim, Defendants never challenged the sufficiency of the instant claims, making this the first opportunity for the Court to engage in the commonplace task of evaluating the legal sufficiency of a party's claims.

Third, there exists a real danger that the jury may base its decision on evidence that is not probative of unlawful conduct: the fact someone "hacked" or "cracked" a password does not necessarily bespeak of illegality, and a third party's interpretation of a contract does not reveal its actual legal implications.

For seven years Avaya asserted that TLI/C's accessing the ODMCs embedded in the PBX software was illegal because such access (i) violated the Digital Millennium Copyright Act, (ii) violated the Lanham Act, (iii) was enabled by a theft of Avaya's trade secrets, and (iv) interfered with Avaya's contracts with PBX purchasers.  And these were not claims dropped early in this massive litigation, but were pursued with vigor by Avaya until they were voluntarily dismissed with prejudice on the eve of trial.[49]

Avaya has tried to resurrect these dismissed claims which, presumably, they could not prove, with recourse to the somewhat

---

full extent of their use of ODMCs, including both the number of clients served and means of access utilized.

[49] Avaya also withdrew two other claims.  See p. 4, supra.

amorphous torts of (i) unfair competition, (ii) fraud, (iii) unjust enrichment, (iv) aiding and abetting, (v) civil conspiracy, and primarily (vi) interference with prospective economic advantage.  Avaya tries to create a miasma of illegality around conduct, the illegality of which it could not prove directly.

Hinting that an end-user might have contractually agreed to bar an ISP from access to the embedded maintenance software is not the same as proving it, particularly in light of the wide variety of contracts used by Avaya over many years to sell PBXs to TLI/C's customers.  However, Avaya dropped the claim (interference with contractual relationships) which would require real proof.

Avaya appears determined to put TLI/C out of the market for post-warranty maintenance of Avaya PBXs, even though TLI/C occupies only a tiny sliver of that market.  Yet, Avaya has not met its burden of proving that anything TLI/C did was illegal, nor has it proven that TLI/C aided its customers in breaking their contracts with Avaya.  Trying to shoehorn abandoned tort claims into the interference with economic advantage tort bucket, in the particular circumstances of this case, should not and will not be allowed.

Avaya argues that the various techniques used by TLI/C to gain access to the ODMCs were, if not illegal, unethical.

Starting with Avaya's cancellation of TLI's Avaya One contract without cause on July 31, 2003, only months after it was executed, cf. N.J.S.A. 56:10-5, and continuing through Avaya's various tactics to eliminate TLI/C's ability to compete for the maintenance of Avaya PBXs, ample evidence exists suggesting that both sides in this litigation may have acted in ways some would call unethical. However, in the context of this case, TLI/C's conduct could hardly be called tortious.

Avaya has also argued that TLI/C's actions violated its "policies" which were evolving and changing over a long period of time. However, the Court knows of no legal reason that TLI/C was obliged to adhere to these policies since at their root was an effort to eliminate TLI/C as a competitor in the post-warranty Avaya PBX maintenance market.

Finally, Avaya asserts that it spent millions of dollars on software development in connection with its PBX products and that its actions vis-a-vis TLI/C were justified as insuring a reasonable return on that investment. The problem with that argument is that there is not a shred of evidence that programming blocks to customer and ISP access to the maintenance software was itself costly or that such blocks did anything to enhance the functionality of a PBX.

Accordingly, because a reasonable jury would not have a legally sufficient evidentiary basis to find for Avaya on any of

51

its claims, TLI/C's motions will be granted.   An appropriate

Order accompanies this Opinion.


Date: 1/7/14

_____
Hon.  Joseph E. Irenas, S.U.S.D.J.