UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

AVAYA INC.,

   Plaintiff/Counter-Defendant,

      v.

TELECOM LABS, INC.,
TEAMTLI.COM, CONTINUANT INC.,
DOUGLAS GRAHAM, SCOTT GRAHAM,
and BRUCE SHELBY,

   Defendants/Counterclaimants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 06-2490
(JEI/KMW)

**OPINION**

**APPEARANCES:**

ARCHER & GREINER, PC
Robert T. Egan, Esq.
Lloyd Freeman, Esq.
Mark Oberstaedt, Esq.
Christine S. Baxter, Esq.
Trevor J. Cooney, Esq.
Erin R. Carroll, Esq.
Julie A. Robinson, Esq.
One Centennial Square
Haddonfield, NJ 08033
    Counsel for Plaintiff/Counter-Defendant

*Pro Hac Vice*:
BRYAN CAVE LLP
Lawrence Scarborough, Esq.
Kathleen S. Callahan, Esq.
Jacob A. Kramer, Esq.
Daniel T. O'Connor, Esq.
J. Michael Cooper, Esq.
Daniel I. Prywes, Esq.
Desmonne A. Bennett, Esq.
1155 F Street, N.W.
Washington, DC 20004
    Counsel for Plaintiff/Counter-Defendant

K&L GATES LLP
Anthony P. Larocco, Esq.
Charles F. Rysavy, Esq.
Kathy D. Helmer, Esq.
Dana B. Parker, Esq.
Michael E. Waller, Esq.
Robert F. Pawlowski, Esq.
Mark D. Marino, Esq.
Ashley L. Turner, Esq.
Benjamin I. Rubinstein, Esq.
Stacey A. Hyman, Esq.
Scott G. Kobil, Esq.
Matthew S. Sachs, Esq.
One Newark Center
10th Floor
Newark, NJ 07201
        Counsel for Defendants/Counterclaimants

*Pro Hac Vice*:
K&L GATES LLP
Douglas F. Broder, Esq.
Anthony P. Badaracco, Esq.
Daniel A. Pincus, Esq.
599 Lexington Avenue
New York, NY 10022
        Counsel for Defendants/Counterclaimants

**IRENAS**, Senior District Judge:

Currently before the Court in this antitrust matter is the motion for permanent injunction of Counterclaimants Telecom Labs, Inc. and Continuant Inc.[1]

Following a seven-month trial, the jury found Counterclaim-Defendant Avaya Inc. ("Avaya") liable on two of the eight causes of action presented: (1) attempted monopolization of the post-warranty maintenance market for Avaya-brand private branch exchange telephony systems ("PBXs"); and (2) unlawful tying of software patches for Avaya-brand predictive dialer systems ("PDSs") to (i) the purchase of Avaya-brand post-warranty maintenance or (ii) an agreement not to use TLI/C for such maintenance.

In light of the verdict, TLI/C moves the Court to issue an extensive injunction canceling the vast majority of the licensing agreements Avaya has with its customers and voiding all contracts the company has with its Business Partners.  TLI/C also seeks the implementation of internal and external compliance monitors to prevent future anticompetitive conduct.

Avaya, conversely, argues TLI/C has failed to demonstrate it is entitled to injunctive relief.

---

[1] Telecom Labs, Inc. and Continuant Inc. are referred to singularly as "TLI/C."

In light of the strict demands that must be met before equitable relief can be granted, the Court holds that only a narrow injunction is appropriate.  Specifically, the Court grants Avaya PBX customers who purchased their machines between 1990 and 2008 the right to access on-demand maintenance commands ("ODMCs") on their own systems, free of charge, for maintenance and administrative tasks.  This right extends to those purchasers' agents, such as independent service providers, who access the ODMCs for the customers' benefit.[2]

TLI/C has failed, however, to demonstrate its entitlement to the additional relief requested.

After detailing the jury's verdict and TLI/C's proposed injunction, the Court sets forth the equitable analysis it must utilize and the conflicting case law evaluating the propriety of injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. The Court then applies these traditional equitable principles to TLI/C's motion.

---

[2] See Avaya Inc. v. Telecom Labs, Inc., Civ. No. 06-24940-JEI, 2014 WL 97335, at *2 (D.N.J. Jan. 7, 2014): "In order to maintain a PBX, a technician must be able to access the PBX's 'on-demand maintenance commands' ('ODMCs'). (Tr. 832, 1057-60) ODMCs are a software function installed on the PBX that allow a technician to enter key-based instructions and troubleshoot any problem the system is experiencing. (Tr. 831)"

**I.**

Because this suit has been the subject of numerous opinions, knowledge of the facts, which went largely uncontested during trial, is presumed.[3]

**A.**

The jury found that there was a relevant antitrust aftermarket for post-warranty maintenance of Avaya PBXs, and that Avaya attempted, unsuccessfully, to monopolize this aftermarket.  (Dkt. No. 1322 (Jury Verdict) Questions 1 - 3)

Further, the jury found that there was no relevant antitrust aftermarket for patches for Avaya PBXs, (Question 4), and that Avaya did not conspire with its Business Partners to unreasonably restrain trade with respect to post-warranty maintenance of Avaya PBXs, (Question 6).

With regards to PDSs, also referred to as "dialers," the jury found a relevant antitrust aftermarket for post-warranty maintenance of Avaya-brand PDSs, but Avaya neither attempted to

---

[3] See, e.g., Avaya Inc., 2014 WL 97335; Avaya Inc. v. Telecom Labs, Inc., Civ. No. 06-2490-JEI, 2012 WL 1495371 (D.N.J. Apr. 26, 2012); Avaya Inc. v. Telecom Labs, Inc., Civ. No. 06-2490-GEB, 2009 WL 2928927 (D.N.J. Sept. 9, 2009); Avaya, Inc. v Telecom Labs, Inc., Civ. No. 06-2490-GEB, 2009 WL 2928929 (D.N.J. Sept. 9, 2009); Avaya, Inc. v. Telecom Labs, Inc., Civ. No. 06-2490-GEB, 2008 WL 4117957 (D.N.J. Aug. 29, 2008).

monopolize, nor successfully monopolized, such a market. (Questions 7-9)

The jury did find that there was a relevant antitrust aftermarket for patches for Avaya-brand PDSs, and that Avaya "tied the availability of patches for Avaya-brand dialers to (i) the purchase of Avaya-brand post-warranty maintenance or (ii) an agreement not to use an ISP for such maintenance." (Question 11)

Lastly, the jury found that TLI/C was in fact injured by Avaya's conduct, that Avaya's violation of the antitrust laws was a material cause of TLI/C's injury, and that TLI/C suffered an injury of the type the antitrust laws were intended to prevent. (Question 14)

In light of Avaya's liability and the injury incurred, the jury awarded $20 million in compensatory damages. (Question 15)

### B.

Following the verdict and pursuant to Fed. R. Civ. P. 65 and § 16 of the Clayton Act, TLI/C makes the instant motion. The injunction it seeks is extensive.

Specifically, TLI/C asks the Court to order Avaya to:

- refrain from enforcing "any past or present Contract" that "imposes any restrictions on an Owner's ability to access and execute ODMCs on its PBX or PDS for purposes of performing maintenance or administrative tasks," or allowing TLI/C to do the same. (Dkt. No. 1328-3 ("Proposed Injunction"), § III.A.)

- cease disseminating all written or oral communications indicating that a customer's accessing ODMCs for maintenance or administrative tasks is prohibited. (<u>Id.</u>, § III.B)

- void all "provision[s] of an existing agreement with a Business Partner." (<u>Id.</u>, § III.F)

- cease disabling, removing, or deactivating MSPs on the PBX system(s) of any Owner that is a present or Prospective Customer of TLI/C." (<u>Id.</u>,§ III.I)

- stop issuing FUD letters and using the word "unauthorized" to describe TLI/C. (<u>Id.</u>, § III.J., K.)

- affirmatively notify prospective customers of TLI/C of the restrictions, both through First Class mail as well as publication in 16 newspapers and websites. (<u>Id.</u>, § IV, A., B.)

- retract all disparaging remarks made by Avaya about TLI/C. (<u>Id.</u>, § IV.F.)

- re-enable, re-install, or reactivate any MPSs that Avaya previously disabled, removed, or deactivated. (<u>Id.</u>, § IV.E.)

The proposed injunction further requires Avaya to hire both internal and external compliance monitors to ensure both that the requirements of the injunction are followed and that no future anticompetitive conduct is perpetrated. (<u>Id.</u>, §§ V.-VI.)

## II.

Federal Rule of Civil Procedure 65(d) states that "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms

specifically; and (C) describe in reasonable detail — and not by

referring to the complaint or other document — the act or acts

restrained or required."

Section 16 of the Clayton Act, 15 U.S.C. § 26, states:

Any person, firm, corporation, or association shall be
entitled to sue for and have injunctive relief, in any
court of the United States having jurisdiction over the
parties, against threatened loss or damage by a
violation of the antitrust laws, including sections 13,
14, 18, and 19 of this title, when and under the same
conditions and principles as injunctive relief against
threatened conduct that will cause loss or damage is
granted by courts of equity, under the rules governing
such proceedings, and upon the execution of proper bond
against damages for an injunction improvidently granted
and a showing that the danger of irreparable loss or
damage is immediate, a preliminary injunction may issue:
Provided, That nothing herein contained shall be
construed to entitle any person, firm, corporation, or
association, except the United States, to bring suit for
injunctive relief against any common carrier subject to
the jurisdiction of the Surface Transportation Board
under subtitle IV of title 49. In any action under this
section in which the plaintiff substantially prevails,
the court shall award the cost of suit, including a
reasonable attorney's fee, to such plaintiff.

### III.

The parties do not dispute the availability of a permanent

injunction for a prevailing, private antitrust claimant.  They

do, however, disagree over what must be proven before such

relief may be granted.  Consequently, the Court addresses the

proper analysis in detail.

Avaya argues that § 16 expressly invokes the "traditional principles of equity" and that such principles require that an injunction movant demonstrate

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

(Opp'n Br. at 4)

TLI/C disagrees. TLI/C, selectively quoting § 16, argues that an antitrust plaintiff "need only show 'a significant threat of injury' from an impending violation of the antitrust laws or from contemporary violation likely to continue or recur." (Reply at 1-4)

TLI/C further argues that the four-factor test Avaya propounds regulates "requests for preliminary injunctions" and "does not apply to a post-verdict motion for a permanent injunction." (Reply at 4)

The Court agrees with Avaya. Three observations make clear that the more restrictive four-factor test is necessary.

First, the Supreme Court has stated that the traditional principles of equity direct a court's issuance of an injunction under § 16, and that such principles require utilizing the four-factor analysis.

In <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 395 U.S. 100, 131 (1969), the Court specifically held that "§ 16 of the Clayton Act, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity[.]"  <u>See also</u> <u>Duplex Printing Press Co. v. Deering</u>, 254 U.S. 443, 464 (1921) ("[The Clayton Act] gives to private parties a right to relief by injunction in any court of the United States against threatened loss or damage by a violation of the anti-trust laws, under the principles regulating the granting of such relief by courts of equity."); <u>see also</u> 15 U.S.C. § 26 (authorizing "[a]ny person . . . to . . . have injunctive relief . . . against threatened loss or damage . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity").  It is thus unquestioned that § 16 invokes traditional principles of equity.

And in <u>eBay Inc., v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006), the Court reaffirmed that the "well-established principles of equity" require that the four-factor test be satisfied before a permanent injunction can issue:  "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  <u>See also</u> <u>SEC v. Citigroup Global Markets, Inc.</u>, ---F.3d ----, 2014 WL 2486793, at *9 (2d Cir.

June 4, 2014) ("eBay strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context").

Furthermore, the eBay court, which held the four-factor test must be applied to motions for permanent injunctions made under the Patent Act, reaffirmed that "departing" from these well-established principles "should not be lightly implied." Id. at 391; see also Brown v. Swann, 35 U.S. 497, 503 (1836) ("The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.")  And TLI/C has provided the Court, as detailed below, with minimal evidence indicating that a departure is called for.

Consequently, the traditional principles of equity require using the four-factor test when issuing a permanent injunction under § 16.

Second, the Third Circuit recently expressed approval of the use of the four-factor test to determine whether a permanent injunction should be granted to a private antitrust claimant, albeit approval expressed in dicta.  See ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 300-03 (3d Cir. 2012).

In ZF Meritor LLC v. Eaton Corp., 800 F. Supp. 2d 633 (D. Del. 2011), plaintiffs won a jury verdict on claims arising under the Sherman Act.  The district court then issued a

permanent injunction, specifically relying upon a similar variation of the four-factor test Avaya proposes.[4]  <u>Id.</u> at 638.

Although the Court of Appeals subsequently vacated the injunction on other grounds, namely plaintiffs' failure to prove Article III standing for injunctive relief, the Circuit specifically "agree[d] with the District Court that there are strong public policy reasons for issuing an injunction."  <u>ZF Meritor, LLC</u>, 696 F.3d at 300, 303.  A court only analyzes such public policy reasons, however, under the four-factor test Avaya proposes.  TLI/C's proposal of looking only towards the existence of a threatened injury avoids this analysis completely.

Furthermore, the <u>ZF Meritor, LLC</u> court reaffirmed that "the equitable remedy of an injunction is unavailable absent a

---

[4] The district court held: "In determining whether to grant a request for a permanent injunction, the court must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest."  <u>ZF Meritor LLC</u>, 800 F. Supp. 2d at 637-38.  In support thereof, the court cited opinions analyzing permanent injunctions issued under the Lanham Act, <u>Gucci America, Inc. v. Daffy's Inc.</u>, 354 F.3d 228 (3d Cir. 2003), and the Anticybersquatting Consumer Protection Act, <u>Shields v. Zuccarini</u>, 254 F.3d 476 (3d Cir. 2001).

Because the Court only grants the injunction with regards to a claim on which TLI/C had actual success on the merits, attempted monopolization of the Avaya-brand PBX post-warranty maintenance market, choosing between <u>ZF Meritor</u>'s formulation and that proposed by Avaya is immaterial.

showing of irreparable injury." Id. at 301 (quotations omitted).  Again, only Avaya's proposed analysis takes into consideration whether the threatened injury is irreparable.

Consequently, ZF Meritor, LLC provides further evidence that the more demanding four-factor test is appropriate to determine whether an injunction shall issue.

Case law analyzing permanent injunctions under the antitrust laws, however, is not uniform.  TLI/C attempts to utilize those cases which require a less demanding standard and argue that the test for § 16 standing constitutes the proper test for the issuance of an injunction.  This argument, however, is unconvincing.

In Zenith Radio Corp., 395 U.S. 100 (1969), the district court below found the antitrust defendants liable under the Sherman Act for, inter alia, creation and perpetration of unlawful patent pools.  The court awarded treble damages and injunctive relief.  The Seventh Circuit reversed, finding that Zenith, the antitrust plaintiff, failed to prove injury in fact, and thus was undeserving of either type of relief.

The Supreme Court reversed the circuit court.  Id. at 131. The Zenith Court reinstated the district court's injunction and held that § 16, unlike § 15, which authorizes the pursuit of treble damages upon showing an extant injury, "authorizes injunctive relief upon the demonstration of 'threatened' injury"

only.  Id.  Finding that Zenith sufficiently proved a threatened injury, the Court reinstated the injunction.

TLI/C is correct to point out that the Zenith Court does not affirmatively use the four-factor test in affirming the injunction.  And the district court's opinion below, Hazeltine Research, Inc. v. Zenith Radio Corp., 239 F. Supp. 51 (N.D. Ill. 1965), does not evidence that it was utilized.  Id. at 78 (writing, without more, that Zenith "is entitled to the injunctive relief sought").  Instead, the Supreme Court references only "the proper standard," though leaves that standard unstated.  Zenith Radio Corp., 395 U.S. at 132.

Fourteen years later, a divided panel of the Third Circuit references this ambiguity in dicta.  And TLI/C now argues this represents a rejection of the traditional principles of equity. The Court disagrees.

In Mid-West Paper Prods. Co. v. Cont'l Grp., Inc., 596 F.2d 573, 591-94 (3d Cir. 1979), the Third Circuit held that although Illinois Brick Co. v. State of Illinois, 431 U.S. 720 (1977) bars indirect purchasers from suing price-fixers for treble damages in certain circumstances, such indirect purchasers can bring suit under § 16 if they establish a "threatened injury." The court consequently reversed the district court's grant of summary judgment for defendants, and remanded the case to allow

14

plaintiffs, indirect purchasers of unlawfully price-fixed consumer bags, to pursue injunctive relief.

In the opinion's concluding footnote, the divided panel held: "We disagree with the defendants' argument that a remand is unnecessary because, they claim, it is evident that the plaintiffs are not entitled to injunctive relief.  [] [C]ontrary to defendants' assertions that plaintiffs must prove irreparable injury, the proper standard is that articulated in Zenith Radio Corp."  Id. at 594, n. 85.

The footnote is confounding for two reasons.  First, the panel holds in the sentences preceding the footnote that although indirect purchasers may "have standing to sue under § 16, they still must establish, as the statute requires, that equity principles entitle them to injunctive relief."  Id. at 594; see also id. at 591 ("§ 16 by its terms entitles a party to injunctive relief when and under the same conditions and principles as injunctive relief . . . is granted by courts of equity.")  And the Supreme Court has repeatedly made clear that the "equity principles" require application of the four-factor analysis.  eBay Inc., 547 U.S. at 391.

Second, the Mid-West court also cites "the Zenith test" to determine plaintiffs' standing to pursue injunctive relief.  The court held:

> [C]ourts have held that for purposes of § 16 the
> complainant need only demonstrate a significant threat
> of injury from an impending violation of the antitrust
> laws or from a contemporary violation likely to continue
> or recur, and that a person may have standing to obtain
> injunctive relief even when he is denied standing to sue
> for treble damages.

Mid-West, 596 F.2d at 591.

The "threatened injury" test, however, cannot dictate both a claimant's standing to pursue injunctive relief and the propriety of the injunction sought.[5]

First, not every claimant who has standing to pursue injunctive relief is entitled to the extraordinary remedy. Weinberger v. Romero-Barcelo, 456 U.S. 305, 311 (1982) ("An injunction 'is not a remedy which issues of course[.]'") (quoting Harrisonville v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334, 337-38 (1933)); cf. Buetow v. ALS Enterprises, Inc., 650 F.3d 1178 (8th Cir. 2011) (under the Lanham Act, although damages are assumed if a competitor's ad is proven to be false, the plaintiff must show that it will suffer irreparable harm absent an injunction before the court issues the same); eBay Inc., 547 U.S. at 392 ("[T]his Court has consistently rejected invitations to replace traditional equitable considerations with

---

[5] It is thus not surprising that in his dissent, Judge Higginbotham, Jr. wrote that "[i]t is generally conceded that the decisions on antitrust standing are, in the words of one commentator, discordant, with inconsistent rationales and no common premise." Mid-West, 596 F.2d at 595.

a rule that an injunction automatically follows a determination that a copyright has been infringed.").

Second, appellate courts review a district court's ruling with regards to standing de novo and the issuance of a permanent injunction for abuse of discretion.  Compare National Collegiate Athletic Ass'n v. Governor of New Jersey, 730 F.3d 208, 218 (3d Cir. 2013) ("We review de novo the legal conclusion that the [plaintiffs] have standing[.]") with eBay Inc., 547 U.S. at 391 ("The decision to grant or deny permanent injunctive relief is . . . reviewable on appeal for abuse of discretion.").

Rather, a more coherent interpretation of § 16 and federal courts' equitable powers is that the "threatened injury" requirement sets forth the preliminary showing necessary to authorize injunctive relief, while the four-factor test directs a court's issuance of the injunction sought.  Accordingly, the Court now turns to the propriety of TLI/C's proposed injunction.

## IV.

At the heart of this case is TLI/C's inability to freely compete with Avaya for the post-warranty maintenance business of Avaya-brand PBX customers who purchased their systems between

1990 and 2008.[6]  Throughout trial, TLI/C propounded evidence that

Avaya continually blocked these customers' access to ODMCs,

thereby dictating who could provide them maintenance and under

what terms.

Closely following the dictates of Eastman Kodak Co. v.

Image Technical Services, Inc., 504 U.S. 451 (1992), TLI/C

argued that this conduct violated the Sherman Act.  It argued

_____

[6] TLI/C focused on this time period for two reasons: to
adequately respond to Avaya's affirmative claims and because of
the changing language of Avaya's licensing agreements.

During the first three months of trial, Avaya prosecuted
its unfair competition and tortious interference claims, arguing
that TLI/C violated common standards of business decency while
servicing 470 Avaya-brand PBX customers.  In its defense, TLI/C
focused on the language of 462 of those customers' licensing
agreements, arguing that the contracts allowed for TLI/C's
services.  The Court agreed.  See Avaya Inc., 2014 WL 97335, at
*7.  Laying the groundwork for its antitrust claims, TLI/C
further argued that Avaya interfered with TLI/C's servicing of
those 470 customers, and that such interference was
anticompetitive.  In light of its verdict, the jury agreed as
well.  (Jury Verdict, Questions 1, 3)

The second reason TLI/C focused on this time period is
because towards the end of 2007, "Avaya began using a new
version of [the PBX] licensing agreement that obligated
[purchasers] to refrain from using a third-party maintenance
provider."  Avaya Inc., 2014 WL 97335, at *6.  The new contract
iteration was widely used beginning May 2008, when Avaya
released a new PBX system, Communications Manager 5.0.  The
contract language was sufficiently clear such that Doug Graham,
TLI/C President and CEO, stated that Avaya was "making it clear
that part of buying 5.0 [was] giving up the ability to allow
access to an independent service provider.  I believe that's
clear."  (Graham Dep. (10/15/08) at 943:18-944:16) (introduced
into evidence by Avaya)

In light of TLI/C's focus, the Court limits the universe of
purchasers to whom the injunction applies to those who purchased
an Avaya-brand PBX system prior to May 2008.

that locked-in purchasers, some of whom spent millions of dollars on machines that last upwards of twenty years, were victimized by Avaya's unilateral policy changes, leaving them with higher maintenance costs and less responsive service.  More importantly for TLI/C, it argued that Avaya's conduct purposely, and powerfully, limited competition.  And the jury, by finding that Avaya engaged in anticompetitive conduct in furtherance of monopoly power, agreed.  (See Jury Verdict Questions 1, 3)

This injury is the type an antitrust injunction most appropriately corrects.  See California v. American Stores Co., 495 U.S. 271, 284 (1990) ("We have recognized when construing § 16 that it was enacted not merely to provide private relief, but . . . to serve as well the high purpose of enforcing the antitrust laws."); Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 338 (1990) ("The antitrust laws were enacted for the protection of competition, not competitors.") (emphasis in original).[7]  And as detailed herein, a narrow injunction is appropriate in light of the four-factor test called for.

---

[7] See also Sandeep Vahessan, The Great A&P and the Struggle for the Soul of Antitrust, 98 Iowa L. Rev. 55, 56 (2013):

> [The Supreme Court has held] in recent decades [] that the antitrust laws exist principally to protect consumer welfare.  The goals of antitrust in the United States have evolved since the passage of the Sherman Act in 1890.  While the Supreme Court once held that the antitrust laws should, among other objectives, protect small firms from larger, more efficient rivals, it has over the past forty years ruled that consumers, and not

## A.

Avaya ceased much of the anticompetitive conduct TLI/C complains of years ago.[8]  (See, e.g., Opp'n Br. at 11 (indicating that the "FUD" letters TLI/C seeks to prevent Avaya from issuing were between four and nine years old))  Avaya indicated during oral argument, however, that it does not believe its conduct with regards to blocking access to ODMCs for pre-2008 systems is wrongful, and intimated that it will continue to block access

_____

producers, are the ultimate beneficiaries of this legal regime.

[8] TLI/C did not move for discovery as to Avaya's current policies.  Avaya did request discovery in opposition, (See Dkt. No. 1330), but the Court denied the request.  The Court informed the parties that it would only issue an injunction based on evidence introduced at trial, wherein Avaya had an opportunity to respond to all evidence submitted.  See generally United States v. Microsoft Corp., 253 F.3d 34, 101 (D.C. Cir. 2001).
    With regards to Avaya's current practice of referring to TLI/C as "unauthorized," a practice to which Avaya readily admits, the Court finds the practice lawful.  Differentiating between Avaya Business Partners and independent service providers conveys to consumers that a contractual relationship exists between the former and Avaya, while no such relationship exists with the latter.  This truthful conveyance benefits consumers, and does not run afoul of the antitrust laws.  See Nat'l Ass'n of Pharm. Mfrs., Inc. v. Averst Labs., 850 F.2d 904, 916 (2d Cir. 1988) ("Advertising that emphasizes a product's strengths and minimizes its weakness does not, at least unless it amounts to deception, constitute anticompetitive conduct violative of § 2.")
    Only if Avaya were to combine the term "unauthorized" with a threat of criminal and civil liability would the communication rise to the level of anticompetitive.  Yet Avaya has represented to the Court that it ceased publishing such misleading communications long ago, and consequently TLI/C is not threatened by such conduct.

for those pre-2008 purchasers who do not pay an additional fee. (See also Mot. for Permanent Injunction, Ex. 5)

The Court finds this position to be in error. Avaya's interference with customers' ODMC access constituted the bulwark of TLI/C's argument that Avaya tried to monopolize the post-warranty maintenance aftermarket for Avaya-brand PBXs. And the jury's findings that both an aftermarket exists for post-warranty PBX maintenance, and that Avaya sought to monopolize it, constitutes an affirmation of TLI/C's argument.

Furthermore, refraining from prohibiting Avaya's conduct would lead to an irreparable injury. If left unrestricted, Avaya's policy of interference would force TLI/C to bring an additional claim, most likely in a long-winded and hard fought litigation over lost profits that would be difficult to calculate. See Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010) ("Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to . . . measure, or that it is a loss that one should not be expected to suffer."); In re Vitamin C Antitrust Litig., No. 06-MD-1738 (BMC)(JO), 2013 WL 6191945, at *6 (E.D.N.Y. Nov. 26, 2013) (granting permanent injunction based, in part, on fact "antitrust claims are difficult, costly, and time-consuming").

Of additional importance, purchasers of pre-2008 systems represent a particularly important market for TLI/C, as its

Avaya-brand PBX maintenance business depends upon servicing legacy systems.  Failure to allow TLI/C to compete for these customers' business may very well severely limit its ability to compete in the Avaya-brand maintenance market. See Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1999) ("Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will.").

Consequently, the Court finds TLI/C is threatened with irreparable injury if a narrow injunction is not issued.

### B.

For many of the same reasons set forth in III.A., TLI/C does not have an adequate remedy at law.  See In re Vitamin C Antitrust Litig., 2013 WL 6191945 at *6 (noting the similarity of the first two eBay factors and finding them both met for "many of the same reasons"); cf. N.L.R.B. v. 710 Long Ridge Road Operating Co. II, LLC, Civ. No. 14-cv-1542(CCC), 2014 WL 1155539, at *3 (D.N.J. Mar. 21, 2014) ("To meet the threshold of establishing irreparable harm sufficient to warrant a stay, a moving party must show that the harm cannot be adequately compensated by money damages.").

## c.

The balance of hardships between the parties favors granting TLI/C only a narrow injunction.

The Court agrees with Avaya that the Proposed Injunction would impose a "considerable burden" on Avaya and TLI/C has failed to demonstrate that such a burden outweighs the prospective harm it would prevent.  (Opp'n Br. at 8)[9]

Throughout the course of the trial, however, TLI/C established that the hardship for Avaya of ceasing to interfere with ODMC access for 1990-2008 purchasers would not be considerable.  Furthermore, it is evident that any hardship would be outweighed by the gains to TLI/C and consumers.

The evidence introduced at trial indicated the following: that up until 2008, Avaya failed to explicitly set forth a PBX purchaser's rights with regards to accessing ODMCs in the customers' licensing agreements; that the company relied on extra-contractual documents, often drafted after the licensing agreement was signed, to establish its ownership rights to the

---

[9] TLI/C barely even tries.  It argues, in two sentences, that "ceas[ing] business activities that constitute Sherman Act violations" cannot be a recognizable hardship.  (Reply at 6) But TLI/C's argument fails to recognize that its Proposed Injunction seeks to prohibit conduct the jury found did not violate the Sherman Act.  Compare Proposed Injunction § III. F. (voiding all Business Partner contracts) with Jury Verdict, Question 6 (finding Avaya did not conspire with its Business Partners to violate the antitrust laws).

maintenance software; that it previously deactivated a customer's access to ODMCs despite that customer's undeniable lawful right to such access; that the company advanced an unreasonable interpretation of the contractual term "personal" to justify its refusal to allow independent service providers the opportunity to assist Avaya customers with their maintenance; and after this litigation was initiated, it changed its licensing agreements to make more explicit the company's policy.

Furthermore, the Court's injunction will not cancel any maintenance agreement Avaya and its Business Partners currently have with customers. Rather, the injunction merely increases competition for those customers seeking new maintenance agreements.

Consequently, the Court finds that with regards to making available ODMC access for pre-2008 purchasers, the balance of hardships weighs in TLI/C's favor.

### D.

Lastly, the public will be better served with the Court's injunction. Consumers will benefit from greater competition, the goal of the antitrust laws, and private parties' ability to contract will not be impaired.

The public would not be better served, however, by the additional relief TLI/C seeks.

Imposing internal and external compliance monitors would add little additional security at great costs.  See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 653 (1985) (recognizing that mandatory treble damages provide "an especially powerful deterrent to [antitrust] violators.")  These increased costs would undoubtedly trickle down to consumers, most likely increasing the maintenance costs TLI/C vehemently complained of.

Furthermore, the Court fails to see how the public would benefit by rendering all contracts between Avaya and its Business Partners invalid.  First, the jury specifically found Avaya and its Business Partners did not conspire to violate the antitrust laws, see Jury Verdict, Question 6, and a permanent injunction should not violate a jury's verdict.  Metro-Goldwin-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (holding that in light of eBay, "a district court should only include injunctive terms that have a common sense relationship to . . . the conduct for which a defendant has been held liable.").

Second, TLI/C again fails to convince the Court that such disruption would benefit the consumer.  Although TLI/C depicted Avaya's policy of "coopetition" as nothing more than a veiled

attempt to disguise monopolist intent, the term has been in use since at least 1913, see Paul Terry Cherington, Advertising as a Business (1913), and may very well bring about a more efficient, and thus cost-effective, marketplace.  TLI/C, however, makes no concerted effort to demonstrate that eradicating this business model would benefit the customer.

Overall, TLI/C succeeds in arguing that the public would be better served by granting ODMC access to those PBX purchasers who acquired their systems between 1990 and 2008.  For all other relief, however, TLI/C's motion falls short.

## V.

For the reasons set forth above, TLI/C's motion for permanent injunction will be granted in part and denied in part. The Court's Injunction will be contained in a separate order.

Date: 6/30/14

_____
Joseph E. Irenas, S.U.S.D.J.